# EXHIBIT Q

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Cheri Marie Hanson, as trustee for the next of kin of Andrew Derek Layton,

                Plaintiff,

vs.

Daniel Best, Audrey Burgess, Craig Frericks, Kyley Groby, Matthew Huettl and Kenneth Baker, individually and acting in their official capacities as City of Mankato Department of Public Safety Police Officers; The City of Mankato; Gold Cross Ambulance, Michael Jason Burt, and Thomas John Drews,

                Defendants.

Civil File No.: 15-CV- 4578(MJD/SER)

**FIRST AMENDED COMPLAINT**

**Jury Trial Demanded
Under Fed. R. Civ. 38(b)**

---

For her first amended complaint, plaintiff Cheri Marie Hanson, as trustee for the heirs and next of kin of Andrew Derek Layton, states and alleges as follows:

**PRELIMINARY STATEMENT**

1.     This is a civil action for money damages arising out of the death of Andrew Derek Layton on January 5, 2013.

2.     Plaintiff Cheri Marie Hanson ("Plaintiff" or "Hanson") is the natural mother of Andrew Derek Layton ("Layton" or "Andrew Layton") and was duly appointed trustee by Order of the District Court of Nicollet County, State of Minnesota, to prosecute a civil action for the benefit of the next of kin of her deceased son, Andrew

1

Layton, pursuant to the provisions of the Minnesota Wrongful Death Statute, Minn. Stat. § 573.02 (3).

3.     This wrongful death action stems from a violation of Andrew Layton's constitutional rights by six, on-duty City of Mankato Department of Public Safety police officers Daniel Best #3116 ("Best"), Audrey Burgess #3104 ("Burgess"), Craig Frericks #3102 ("Frericks"), Kyley Groby #3134 ("Groby"), Matthew Huettl #3142 (Huettl"), Kenneth Baker #3144 ("Baker"). Defendants Best, Burgess, Frericks, Groby, Huettl and Baker violated Layton's well-settled federal civil rights while acting under color of state law.

4.     Plaintiff also asserts wrongful death claims against the City of Mankato under *Monell v. Dep't of Social Servs.,* 436 U.S. 658 (1978) and *Canton v. Harris,* 489 U.S. 378 (1989).

5.     Plaintiff further alleges wrongful death - negligence / medical malpractice – claims against Gold Cross Ambulance ("Gold Cross") and two of its employees, nationally registered paramedics Michael Jason Burt ("Burt") and Thomas John Drews ("Drews").

6.     Plaintiff, on behalf of Layton's next of kin, demands this action be tried to a jury.

## THE PARTIES

7.     Plaintiff is a resident of the City of North Mankato located in Nicollet County, State of Minnesota.

8.     Defendant Best, at all times relevant and material hereto, was a police officer for the City of Mankato Department of Public Safety and was acting within the course and scope of his employment with the City of Mankato.

9.     Defendant Burgess, at all times relevant and material hereto, was a police officer for the City of Mankato Department of Public Safety and was acting within the course and scope of her employment with the City of Mankato.

10.     Defendant Frericks, at all times relevant and material hereto, was a police officer for the City of Mankato Department of Public Safety and was acting within the course and scope of his employment with the City of Mankato.

11.     Defendant Groby, at all times relevant and material hereto, was a police officer for the City of Mankato Department of Public Safety and was acting within the course and scope of her employment with the City of Mankato.

12.     Defendant Huettl, at all times relevant and material hereto, was a police officer for the City of Mankato Department of Public Safety and was acting within the course and scope of his employment with the City of Mankato.

13.     Defendant Baker, at all times relevant and material hereto, was a police officer for the City of Mankato Department of Public Safety and was acting within the course and scope of his employment with the City of Mankato.

14.     Defendant City of Mankato (the "City") is a municipality, a political subdivision organized under the laws of the State of Minnesota, which includes a police department operated as the Department of Public Safety, 710 South Front Street, Mankato, MN 56001.  At all relevant and material times hereto, the City employed

defendants Best, Burgess, Frericks, Groby, Huettl, and Baker (sometimes referred to together or collectively herein as the "defendant officers") and was responsible for defendant officers' supervision, training and discipline.

15. At all times relevant and material hereto, the defendant officers acted under color of state law and pursuant to their authority as police officers employed by the City's Department of Public Safety.

16. Defendant Gold Cross is an ambulance service operating in, among other places, the City of Mankato and is owned by Mayo Foundation for Medical Education and Research *doing business as* Mayo Medical Transport *also known as* Gold Cross Ambulance with its registered office at 200 First Street SW, Rochester, MN 55905. Gold Cross Ambulance owns and operates the ground ambulance service in Mankato, Minnesota *known as* Gold Cross – Mankato, which is located at 1755 Bassett Drive, Mankato, MN 56001. Defendant is identified herein as Gold Cross.

17. Defendants Burt and Drews are paramedics, who, at all times relevant and material hereto, were employed by defendant Gold Cross, and on January 1, 2013, they were on duty, staffing a Gold Cross ground ambulance (sometimes Gold Cross, Burt and Drews are referred to herein as the "Gold Cross defendants"). At all times material to these proceedings, Burt and Drews were nationally registered paramedics through the National Registry of Emergency Medical Technicians, a U.S. certification agency covering pre-hospital medical providers ("NREMT"). Nationally Registered Paramedic is the highest-level certification through NREMT and represents the pinnacle of the Emergency Medical Services ("EMS") ladder.  NREMT registered paramedics, like Burt

4

and Drews, are considered Advanced Life Support. To become nationally registered paramedics, defendants Burt and Drews were required to successfully complete and master a National Standard Curriculum as defined by the U.S. Department of Transportation – National Highway Traffic Safety Administration ("NHTSA")

18.    At all times relevant and material hereto, paramedics Burt and Drews staffed a Gold Cross "Advanced Life Support" ("ALS") ground ambulance.

19.    At all times relevant and material hereto, an intended purpose and function of a Gold Cross ALS ground ambulance operating in Mankato, MN was to provide high-quality emergency medical care at the scene of traumatic or medical emergencies and during transport to and between medical facilities.

20.    At all times relevant and material hereto, it was a purpose, function, responsibility and duty of the Gold Cross defendants – nationally registered paramedics Burt and Drews - to work at emergency scenes side by side with first responder agencies, including law enforcement agencies, i.e. Mankato Department of Public Safety police officers, to provide high quality emergency medical care.

## JURISDICTION

21.    This civil action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 and the Fourth and Fourteenth Amendments to the United States Constitution and Minn. Stat. § 573.02.

22.    This Court has subject matter jurisdiction over the parties and the causes of action alleged by plaintiff pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §1343.

23.     This Court has supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. § 1367

24.     Venue in this Court is proper in that defendants are located in and conduct business in the State of Minnesota.

## PRONE RESTRAINT MANEUVER

25.     The term "prone restraint" refers to a person lying face down on his stomach (prone) on the floor or ground. It is often defined as the prone positioning of an individual during physical restraint by police officers.

26.     Some police officers utilize specific takedown maneuvers, i.e. a foot or leg sweep, to initiate prone restraint, and this is oftentimes referred to as "prone restraint maneuver."

27.     Generally, a prone restraint maneuver consists of one or more police officers forcing a person face down \ on his stomach on the ground or floor, and the officer(s) then physically applying pressure (downward force) with their hands, knees and/or other body parts to the individual's head area, neck area, shoulders, posterior torso (i.e. back), hips and/or upper legs. The pressure applied by the officer(s) is intended to force down the person – to prevent the individual from moving out of the prone position, so the officer(s) can, e.g., handcuff the individual's hands behind his back.

## PROLONGED PRONE RESTRAINT

28.     Prolonged or extended use of the prone restraint maneuver poses well-established dangers for the individual.

29.     When a person's chest is forcefully compressed down while the individual is held in the prone position, the individual's ability to inhale oxygen is compromised, because the compression of the ribs limits the individual's ability to expand his chest cavity and breathe.

30.     When a person is forcefully pushed down and maintained in a prone position on the ground or on a floor for a prolonged or extended time, the person's diaphragm (the largest muscle of respiration) can be prevented from working properly. If the person's diaphragm is not allowed room to move down into the abdomen, breathing is seriously restricted.

## MECHANICAL ASPHYXIA - POSITIONAL ASPHYXIA

31.     A prolonged use of the prone restraint maneuver therefore creates the serious risk of subjecting an arrestee to mechanical asphyxiation. Mechanical asphyxia is often referred to as positional asphyxia or traumatic asphyxia.

32.     Asphyxia is generally a condition resulting from deficient or absent supply of oxygen to the body.

33.     Mechanical asphyxia / positional asphyxia describes a condition where asphyxiation is caused by pressure applied on the outside of the restrained person's body resulting in insufficient intake of oxygen as a direct result of the prolonged or extended prone body position that interferes with one's ability to breathe – often referred to as ventilation compromise.

34.     As a direct result of a prolonged application of the prone restraint maneuver, respiration can be seriously compromised directly causing insufficient oxygen

in the blood (the failure of sufficient oxygen to reach the person's blood), in order to meet the body's needs or demands (hypoxia), which then results in respiratory compromise and/or a disturbed heart rhythm (cardiac arrhythmia).

35.     The heart, like all of the body's muscles, needs sufficient oxygen to function.

36.     If a person's asphyxiated state persists and the heart does not receive oxygen, a person will likely experience sudden and often-fatal "cardiac arrhythmia" and respiratory arrest due to the combination of factors causing decreased oxygen delivery to the person's blood, tissue and organs at a time of increased oxygen demand or need.

37.     Cardiac arrhythmia generally refers to a group of conditions where there is abnormal electrical activity in the heart (i.e., an uncoordinated pattern of heartbeats).

38.     The persistence of cardiac arrhythmia can lead "asystolic arrest," which is a state where there is no cardiac electrical activity (i.e., the heart does *not* beat), and is often referred to as "flat line."

39.     When a person suffers from asystolic arrest, there is no blood flow to the brain.

40.     The absence of blood flow to the brain creates a condition called "anoxic encephalopathy," which is generally damage to the brain due to a lack of oxygen.

8

## SOME PEOPLE ARE MORE AT RISK FROM PROLONGED OR EXTENDED APPLICATION OF THE PRONE RESTRAINT MANEUVER

41.    Scholarly research suggests certain people are more at risk for prolonged or extended prone restraint related mechanical asphyxia than others. Complicating factors that increase the risk for *prolonged prone restraint related asphyxia* include, among other things, (A) extreme physical exertion or struggling prior to, or during the prone restraint maneuver; (B) mental illness, e.g. agitated or excited delirium syndrome (where a individual may experience, e.g. extreme psychological / psychiatric distress); (C) pre-existing heart disease; (D) drug (e.g. methamphetamine) or alcohol intoxication; and (E) neuromuscular disruption stemming from TASER usage.

42.    Because of well-established dangers associated with prolonged or extended application of  prone restraint maneuvers and resultant mechanical or positional asphyxia, law enforcement officers are taught to avoid restraining individuals in the prone position, *except* for a very short period of time to place handcuffs on the person.

43.    Federal courts that have specifically addressed the issue have found that officers are *not* entitled to qualified immunity for improper use of prone restraint maneuvers, finding that both prongs of the *Saucier v. Katz* test are easily met.  *See, e.g., Weigel v. Broad, 544 F.3d 1143* (10th Cir. 2008); *Champion v. Outlook Nashville, Inc. et. al.,* 380 F.3d  893 (6th Cir. 2004).

44.    Because of well-established dangers associated with the use of prolonged or extended prone restraint maneuvers, law enforcement agencies throughout the country

have promulgated policies addressing this issue of prolonged or extended prone restraint, e.g. the individual *shall not* be left in a restrained prone position and *shall* be placed on their side or back (supine) as soon as they are handcuffed.

45.    Indeed, because risks associated with the use of the prone restraint maneuver for a prolonged or extended period are so great and so well-understood, in 2009, the Governor of the State of Ohio issued an Executive Order barring the use of prone restraint for anything longer than a brief, transitional period of time (i.e., long enough to handcuff a suspect).

## PRONE RESTRAINT WITH POLICE HOBBLE STRAP

46.    Once a suspect is subdued and handcuffed, some law enforcement officers have used a "Hobble Strap," also referred to as "Hobble Restraint" or "Police Hobble."

47.    A hobble strap is a police restraint device. Typically, a hobble restraint is constructed of polymer thermoplastic, 42 to 52 inches long and about 1 inch wide with a loop and self-locking clip and is intended for use on the ankles of a combative, aggressive and/or resisting arrestee.

48.    An individual may be combative, aggressive and resistive for a variety of reasons, including drug or alcohol intoxication, or because the individual is experiencing a psychotic episode – a psychiatric break or state of severe emotional stress or psychological breakdown and mental crisis. Such individuals instinctively resist restraints from officers, paramedics and the actual restraint device.

## **MISUSE** **OF THE POLICE HOBBLE RESTRAINT DEVICE TO HOG-TIE AN AGITATED, COMBATIVE, RESISTIVE PERSON**

49.     Some law enforcement officers misuse the hobble restraint device to "hog-tie" the individual. To hog-tie a person, the officers (1) force the person into a prone position, with his hands secured in handcuffs behind his back, and his ankles / feet held together with restraints; and (2) connect the person's hands (handcuffs) and ankle / feet restraints together using the hobble strap restraint device, which in turn results in a slight elevation to the individual's upper and lower body. That is what is commonly referred to as "hog-tying" the person.

50.     It is well known the risk of mechanical asphyxia or positional asphyxia associated with prolonged use of the prone restraint maneuver is significant. It is equally well known hog-tying an arrestee, and then leaving the person in the face down prone position, can seriously limit the person's ability to breathe in oxygen and thereby substantially increases the risk of mechanical asphyxia or prone restraint asphyxia.

51.     Because of well-established dangers associated with the *misuse* of hobble restraints to hog-tie suspects in the prone position, law enforcement agencies throughout the country have promulgated policies addressing the issue by forbidding the use of a hobble restraint to hog-tie a person, and under no circumstances may an individual restrained by a hobble restraint be transported in the prone position. And, if it is necessary to use a hobble restraint device, the person restrained by a hobble, who is in the prone position, must be placed in the side recovery position or on his back – as soon

11

as reasonable – but *never* left in a prone position on the floor and never transported in a prone restrained position.

52.     Recent scholarly studies show in-custody, mechanical asphyxia - restraint asphyxia related deaths are often improperly attributed to substance toxicity or psychiatric phenomena sometimes referred to as agitated or excited delirium.

53.     The National Association of Medical Examiners ("NAME") has recognized deaths resulting from the execution of prolonged or extended prone restraint should properly be characterized as homicides:

> **Deaths due to positional restraint induced by law enforcement personnel or to choke holds  or other  measures to subdue may be classified as Homicide.** In such cases, there may not be intent to kill, but the death results from one or more intentional, volitional, potentially harmful acts directed at the decedent (without consent, of course).  Further, there is some value to the homicide classification toward reducing the public perception that a "cover up" is being perpetrated by the death investigation agency.

National Association of Medical Examiners, *A Guide for Manner of Death Classification* (1st ed. 2002) (emphasis in original).

## FACTUAL BACKGROUND

54.     At times relevant and material herein, Layton was a 27-year-old man.

55.     The underlying incident was initiated during the early morning hours on January 1, 2013, at the Hy-Vee store located at 410 South Riverfront Drive, Mankato, MN 56001 ("Hy-Vee").

### Hy-Vee Surveillance Video

56.     Hy-Vee surveillance videos show (times are taken from the Hy-Vee video)

a.      03:45:33 \ Layton walked into Hy-Vee entry area (hood up, jacket zipped);

b.      03:46:24 \ Layton observed pacing back and forth in Hy-Vee entry area;

c.      03:49:48 \ Layton pacing back and forth in the entry area;

d.      03:50:40 \ Layton still pacing in entry area of the store;

e.      03:54:21 \ Layton still pacing back and forth;

f.      03:58:16 \ Layton walked out of the store into parking lot and stood in the middle of the lot;

g.      03:58:42 \ Layton walked back to the Hy-Vee entry area;

h.      04:01:45 \ Layton observed pacing back and forth;

i.      Around 04:38:35 \ A "Blue Earth" cab driver, Christopher Ahl ("Ahl" or "cab driver"), entered the Hy-Vee entry and saw a young person "passed out" lying on the floor of the entry area of the Hy-Vee. Ahl "immediately" called 911. Before Ahl called 911, Layton had *not* entered the main area of the store - only the entry area – Layton had *not* made a commotion, disturbance nor exhibited any rowdy type behavior at the Hy-Vee;

j.      04:44:29 \ defendant Best, responding to Ahl's 911 call, drove his squad into the Hy-Vee parking lot;

**Defendant's Best's Squad Video and Audio**

57.     Defendant Best's Mankato P.D. squad video and audio show (times taken from Best's squad camera) –

a.      04:44:41 \ Best observed getting out of squad;

b.      04:44:50 \ Best entered the Hy-Vee entry, people were laughing (on information and belief, Hy-Vee employees), and Best responded "we are finding them all over the place," (referencing drunk people passed out); when Best walked up to Layton, he (Layton) was curled up lying on the floor in the fetal position, sound asleep, and snoring – Layton had his coat hood pulled up covering his head - Best assumed Layton was passed out or asleep due to alcohol intoxication;

c.      04:45:10 \ Best poked or prodded Layton saying "wake-up" "police department" "wake up";

d.      04:45:20 \ Best said, "come on" "wake up" "wake up guy;"

e.      04:45:37 \ Best said, "Hey, come on wake up police department;"

f.      04:45:39 \ Best said, "there ya go" … "there ya go;"

g.      04:45:43 \ Layton slowly stood up, tried to collect himself, and started to slowly walk away from Best toward the exit – Best responded, "stay where you are at;"

h.      04:45:45 \ Layton tried to walk away – Best responded, "hey, knock it off" and Best grabbed Layton;

i.      04:45:47 \ Best said, "don't pull away;"

j.      0**4:45:49** \ Best immediately took Layton down to the floor - Best used a foot / leg sweep to **initiate prone restraint maneuver**;

k.      04:45:55 \ Muffled sounds heard coming from Layton - Best had Layton prone and was struggling with Layton on the floor of the Hy-Vee shopping cart \ entry area;

l.      4:46:00 \ Best said, "put your hands behind your back;"

m.      04:46:06 \ Eric Klumpenheimer, the Hy-Vee store manager, jumped in with Best to push and hold Layton down, prone on floor - both men, using all of their strength, intentionally forced downward pressure on Layton's head, neck area, shoulders, back (torso) arms and legs to restrain him in prone position to place handcuffs on behind his back -– **Layton was incoherent** – he was unable to talk or express himself in a clear way that could be understood. After Best initiated the prone restraint maneuver, Layton could only express incomprehensible sounds – he groaned, he moaned and he made guttural sounds – Layton's sounds were without any logical or meaningful connection – Layton's verbal sounds were completely disconnected and unintelligible;

n.      04:46:51 \ A man in a brown jacket (on information and belief Ahl, the cab driver) jumped in, as well – all three men were on top of Layton forcing Layton's prone body down on the concrete floor;

o.      04:47:00 \ 2nd police squad (Burgess) entered the Hy-Vee parking lot (*See* Hy-Vee store for the time) – on information and belief, defendant

15

Burgess jumped in and used her strength and weight to push down on Layton and execute prone restraint maneuver;

p.      04:47:04 \ 3rd police squad (Groby) entered the Hy-Vee parking lot (*See* Hy-Vee store video for the time) – on information and belief, defendant Groby directly assisted the other defendant officers to execute prone restraint maneuver;

q.      04:47:09 \ 4th police squad (Huettl) entered the Hy-Vee parking lot (*See* Hy-Vee store video for the time)– on information and belief, defendant Huettl became directly involved in the forced prone restraint maneuver using all of his strength and weight to push down on Layton;

r.      04:47:16 \ 5th police squad (Baker) entered the Hy-Vee parking lot (*See* Hy-Vee store video for the time) – on information and belief, defendant Baker directly assisted and participated in the prone restraint maneuver on Layton and delivered "knee strikes" to Layton's head, neck, rib and back areas;

s.      04:47:43 \ defendant Burgess placed her Taser into armed status - Burgess then hit Layton two (2) times with the drive stun as Layton was restrained prone on the floor - several adult men were pressing down on Layton's shoulders, back and legs (defendant's Taser activity record times are slightly different from the Hy-Vee store video times and defendant Best's dash cam – the Taser records suggested that (i) at 04:46:12 defendant Burgess placed her Taser in armed status, (ii) at 04:46:18 she

used her Taser on Layton for the first time, (iii) at 04:46:31, she used her Taser on Layton a second time, and (iv) at 04:46:53 Burgess placed her Taser into safe mode);

t.  04:47:43 \ on information and belief, defendant officers, Best, Huettl and Baker, asked Burgess to "drive stun him" (*See* Best squad audio / video);

u.  **04:48:00** \ on information and belief, defendant officers, Best, Burgess, Groby, Huettl and Baker had Layton handcuffed behind his back and kept him prone on the floor;

v.  **04:53:00** \ on information and belief, the defendant officers, Best, Burgess, Groby, Huettl, Baker and Frericks hog-tied Layton misusing a police hobble strap, leaving Layton in prone restrain hog-tied on the floor;

w.  04:54: 04 \ on information and belief, Best told the other defendant officers it was his **belief that Layton was "methed out" -** drug intoxicated;

x.  04:54:46 – 04:55:16 \ on information and belief, defendant Best said **"we got him hog-tied"** – defendant officers – Best, Burgess, Groby, Huettl, Baker and Frericks kept Layton hog-tied in prone restraint on the floor of the Hy-Vee store, intentionally, according to defendant Best - **"getting the energy out of him first, then we're taking him to jail";**

y.  04:55:17 \ Best told Ahl that he (referring to Layton) **"he's all fucking methed out";**

z.      04:58:56 to 04:59:05 \ defendant Frericks spoke to "Dispatch" and requested an ambulance to transport Layton to jail, specifically, telling Dispatch he and the other defendant officers did *not* want Layton to go to hospital – "we're going to jail".

58.     At the time of the prone restraint maneuver, the Taser usage, the handcuffing, and the hog-tying of Layton, defendant officers, Best, Burgess, Frericks, Groby, Heuttl, Baker, all had knowledge Layton was subject to complicating factors listed above in paragraph 41 above, i.e. extreme physical assertion, symptoms of mental illness (extremely, mentally agitated or delirious). The defendant officers also believed Layton was suffering the effects of drug intoxication and alcohol intoxication.

59.     On information and belief, as the handcuffing was completed, the defendant officers, Best, Burgess, Groby, Huettle and Baker, used the weight of their bodies and the full strength of their arms, to force down on Layton's head, neck area, shoulders, upper back or torso, and legs, to drive down onto Layton, thus compressing Layton's torso in such a manner that Layton could not obtain oxygen as needed: to wit; a prone restraint maneuver.

60.     After Layton was handcuffed, the defendant officers, Best, Burgess, Frericks, Groby, Huettl and Baker, left Layton in the prone position for a prolonged or extended period and defendant officers Best, Burgess, Groby, Huettl, Baker continued at various times to push down on Layton's upper body – his head, neck area, upper and lower back (torso) and his legs.

61.    After Layton had been Tased twice, handcuffed behind his back and subjected to prone restraint for a prolonged period of time, the defendant officers, Best, Huettl, Burgess, Groby and Baker *misused* a police hobble strap (a restraint device) and hog-tied Layton with the hobble and then these same defendant officers, including Frericks as well, left Layton in that hog-tied - maximal restraint prone position.

62.    At all times material herein, on information and belief, defendant officers Best, Burgess, Groby, Huettl, Baker and Frericks knew and understood there were significant dangers for Layton directly related to their prolonged use of maximal prone restraint, from mechanical asphyxia or positional asphyxia, including misuse of the police hobble to hog-tie Layton in the prone position.

63.    The defendant officers, Best, Burgess, Frericks, Groby, Huettl and Baker were all present and on the scene during all phases of the prolonged or extended application of maximal prone restraint and each defendant officer had a realistic opportunity to intervene and prevent unnecessary harm, injury and death from occurring to Layton. None of the individual defendant officers, Best, Burgess, Frericks, Groby, Huettl and Baker, took reasonable steps to intervene on Layton's behalf, in order to protect Layton from the other defendant officers' intentional, reckless, culpable conduct leading directly to mechanical asphyxia / positional asphyxia, respiratory arrest, cardiac arrest, severe anoxic brain injury and death.

64.    At 05:05:54, a Gold Cross ground ambulance pulled into the Hy-Vee parking lot, and at **05:06:09** the ambulance rolled up to and stopped at the Hy-Vee entrance (*See* Hy-Vee store video for times).

65.    The Gold Cross Patient Care Report shows the Gold Cross defendants went to the Hy-Vee store in response to a 911 call related to an "**overdose / poisoning ingestion**)" – that is the reported reason for the ambulance run or call.

66.    When the Gold Cross defendants arrived at the Hy-Vee, defendant paramedics Burt and Drews observed that defendant officers had Layton hog-tied in the prone position on the floor, and that defendant officers had placed a "spit hood" over Layton's mouth and nose, which could make breathing more difficult, as well.

67.    The Patient Care Report indicates the defendant officers (Best, Frericks) told Gold Cross defendants Burt and Drews that Layton had resisted and struggled for about 30 minutes and was still struggling against the maximal prone restraints.

68.    Defendant officers (on information and belief, Best, Baker and Frericks) asked the Gold Cross defendants to use their ambulance cot with restraints, in order to tie Layton down on his stomach (prone) on the ambulance cot for transport.

69.    Gold Cross defendants – paramedics Burt and Drews readily complied with the defendant officers' request for maximal prone restraint for transport.

70.    Four of the defendant officers together with the Gold Cross defendants lifted Layton off the floor onto the ambulance cot and strapped / tied him down – prone – on the ambulance cot for transport. Two defendant officers and Gold Cross defendants Burt and Drews watched the other four defendants put Layton face down \ prone on the ambulance cot and strap him down on the cot in a prone position for transport.

71.    Defendant officers (Frericks, Best and Baker) told the Gold Cross defendant's they (defendant officers) wanted to transport Layton to jail and *not* the

hospital; although, defendant officer Best told defendant Frericks the Gold Cross defendants, Burt and Drews, would not take Layton to the hospital emergency room. According to defendants Best and Frericks, the Gold Cross defendants instructed Best that the hospital "ER could not evaluate Layton in the state he is in."

72.    Gold Cross defendants deny that they told Best or any other defendant officer that Layton could not be evaluated or treated at the hospital ER, and, on information and belief, the Gold Cross defendants contend that defendant officers Best and Frericks insisted that Layton go to jail, *not* the hospital for emergency medical care.

73.    Gold Cross defendants did *not* object to transporting Layton to jail and agreed to transport Layton to jail with Layton strapped down – tied down – in maximal prone restraint - on their Gold Cross ambulance cot.

74.    Defendant Gold Cross paramedics, defendants Burt and Drews, noted in the Patient Care Report that upon their arrival at the Hy-Vee, Layton was experiencing **"Tachypnea."**

75.    "Tachypnea" is a medical term used to describe breathing that is rapid and shallow. Abnormally fast breathing is a symptom that is often caused by a buildup of carbon dioxide in the person's lungs.

76.    Whenever the ability to expire carbon dioxide decreases, it causes a buildup of carbon dioxide in the person's blood. The result is respiratory acidosis, which stimulates the respiratory centers in the person's brain. In turn, causing a respiratory rate increase in an attempt to normalize blood pH.

21

77.     Tachypnea's rapid shallow breathing can be caused by many health related reasons, some of which include: pain, exercise, exertion, heart disease, stress, anxiety, panic attack, metabolic acidosis, neuromuscular disorders and trauma.

78.     Gold Cross defendants Drews and Burt also observed Layton had sustained an abrasion to his head, and Layton was experiencing an ***altered level of consciousness*** ("altered LOC").

79.     An altered LOC can result from a variety of factors, including alterations in the chemical environment of the brain (e.g. exposure to intoxicants), insufficient oxygen or blood flow in the brain.

80.     In the Patient Care Report, Gold Cross defendants' paramedics reported Layton's "Primary symptoms" were "Mental/Psych" and "Secondary Impressions" were set down as "Behavioral Psychosis."

81.     At 05:12:53, the Gold Cross ambulance started to drive away from the Hy-Vee parking lot (*see* Hy-Vee store video for time) with Layton strapped – maximal prone restraint - on the ambulance cot.

82.     Two defendant officers, Best and Baker, rode in the Gold Cross ambulance with Burt and Drews to transport Layton to the Blue Earth County jail instead of the emergency department of the hospital.

83.     When the Gold Cross paramedics transported Layton to the jail, in addition to maximal prone restraint, they had Layton's head turned to his (Layton's) left, meaning Layton's face was turned away from the defendant paramedic and two defendant police officers (Best and Baker), who were seated in the back of the ambulance.

22

84.     Further, defendant Gold Cross paramedics and defendant officers (Best and Baker) had Layton's mouth and nose covered with a spit hood, which most probably made it even more difficult for Layton to have effective breathing.

### Blue Earth County Jail Sally Port Video

85.     Blue Earth County sally port surveillance videos show (*See* Blue Earth County sally port video for times) –

    a.     At **05:21:48** \ The Gold Cross ground ambulance pulled into the Blue Earth County jail sally port;

    b.     05:22:06 \ the back doors of the Gold Cross ambulance opened;

    c.     05:22:25 \ Layton was taken out of the Gold Cross ambulance in maximal prone restraint – tied down on the ambulance cot, and he looked unresponsive;

    d.     05:22:42 \ Gold Cross defendants began to roll Layton toward the pre-booking area of the jail – Layton appeared still – unresponsive - on arrival at the Blue Earth County jail, Gold Cross defendants determined (i) Layton was in cardiac arrest (a cessation of the heart's function): (ii) Layton had no pulse; and (iii) Layton was not breathing – he was in respiratory arrest (the cessation of normal breathing due to failure of the lungs to function effectively - respiratory arrest is different from, but may be caused by, a cardiac arrest (where the heart muscles fail to contract and breathing stops);

23

e.   05:22:51 \ Gold Cross defendants stop rolling their cot – appear to be looking at paper work (?) – Layton looked unresponsive;

f.   05:23:04 \ Gold Cross defendants, paramedics Burt and Drews, again started to roll Layton toward pre-booking area.

**Blue Earth County Jail Pre-Booking Area Surveillance Video**

86.   Blue Earth County jail pre-booking area video shows (*See* Blue Earth County pre-booking area video for times)  –

a.   05:23:20 \ Defendants Burt and Drews stopped rolling their cot in the jail's pre-booking area – Layton was still and looked unresponsive;

b.   05:23:54 \ Gold Cross defendant may have been checking Layton's hand for any pulse;

c.   05:24:05 – 05:25:07 \ Gold Cross defendants removed restraints;

d.   **05:25:07** \ Defendants released Layton from the ambulance cot and placed him on the floor in the supine position – lying face up on his back;

e.   05:25:18 – 05:44:24 \ Gold Cross defendants and defendant officers, switched off and on, performed chest compressions / CPR on Layton;

f.   05:44:37 \ Stopped chest compressions, Layton placed onto Gold Cross stretcher;

g.   05:45:00 \ Defendants restarted chest compressions;

h.   05:46:17 \ Chest compressions / CPR stopped, defendants lifted stretcher with Layton onto a Gold Cross ambulance rolling cot, positioning

Layton on his back for transport to hospital ER – when Layton placed onto cot, chest compressions were then restarted;

i.      05:46:26 \ chest compressions stopped;

j.      **05:48:26** \ Gold Cross ambulance with Layton's body departed the Blue Earth County jail sally port with lights and siren (*See* Blue Earth County video for time).

87.      While at the Blue Earth County jail, the Gold Cross defendants used chest compressions / CPR and intravenous fluids - Epinephrine. Layton was also placed on an electrocardiogram ("ECG") monitor, which showed a rhythm of "asystole."

88.      Asystole is defined as cardiac arrest rhythm in which there is no discernible – no observable or recognizable – electrical activity. Asystole is colloquially known as *flat-line*, a state of no cardiac electrical activity; hence, no cardiac output or blood flow. Asystole is one of the conditions that may be used for a medical practitioner to certify clinical or legal death. It is well known and generally recognized that very few patients have a positive outcome and successful treatment of cardiac arrest with asystole.

89.      When Layton was brought into the pre-booking area of the jail he was brain dead.

90.      Before Layton's body was taken from the jail to the hospital, paramedics were able to regain a pulse after Layton was "shocked" twice (a rhythm being sinus tachycardia with a pulse and a blood pressure); although, he had been PEA – pulseless electrical activity - for quite sometime.

91.     At 04:45:00, defendant officer Best initiated the prone restraint maneuver (*See* Best squad video for time).

92.     At 04:48:00, on information and belief, defendant officers, Best, Burgess, Groby, Huettl and Baker had Layton handcuffed behind his back at 04:48:00 and left him on the floor in a restrained prone position, with defendant officers pushing down on his upper torso and legs. (*See* Best squad video for time).

93.     At 04:53:00, defendant officers, Best, Burgess, Groby, Huettl and Baker *misused* the police hobble restraint strap to hog-tie Layton, and then after Layton he was hog-tied these defendant officers, including Frericks, intentionally left Layton hogtied in the prone position. (*See* Best squad video for time).

94.     At 05:25:07, Gold Cross defendants released Layton from maximum prone restrain. (Blue Earth County jail pre-booking area video).

95.     The defendant officers, Best, Burgess, Frericks, Groby, Huettl and Baker, and Gold Cross defendants, paramedic Burt and paramedic Drews, working together, intentionally and recklessly kept Layton under maximum prone restraint for almost 40 minutes (approximately 39 minutes and 18 seconds) after defendant officer Best initiated the prone restraint maneuver, despite their knowledge of the serious dangers associated with the application or use of prolonged prone restraint.

96.     Despite their knowledge of the dangers associated with prolonged or extended application of prone restraint, the defendant officers and the Gold Cross defendants denied Layton medical care until after he suffered cardiac arrest and respiratory arrest, flat lined and suffered a severe anoxic brain injury – brain death.

**MCHS – Mankato Hospital**

97.     At about 05:55 a.m. on January 1, 2013, Layton was received at MCHS – Mankato emergency room.

98.     Upon Layton's arrival to the emergency department, doctors immediately started Layton on "mechanical ventilation" – Layton was only able to take in oxygen (breathe), because the mechanical ventilator machine pushed oxygen into his lungs and controlled exhalation of carbon dioxide.

99.     At 06:25:00, Layton was admitted to the MCHS- Mankato Intensive Care Unit ("ICU") in critical condition - cardiac arrest.

100.    It was also noted that Layton had multiple bruises and contusions on his forehead, nose, face, neck, back, rib cage area, nose and right leg / shin. Further, it was discovered, Layton had sustained a right nasal bone fracture.

101.    When Layton was finally brought to the hospital, his pupils were "3 mm, fixed;" and he was *not* conscious – Layton was unresponsive and his "*Glosgow Coma Scale total score was 3*". Layton could *not* breathe on his own and required intubation, in order to breathe.

102.    It is generally known and accepted in the medical community, patients with a Glasgow Coma Scale score of 3 and bilateral fixed and dilated pupils have a dismal prognosis.

103.    As a direct result of the defendant officers' (Best, Burgess, Frericks, Groby, Huettl, Bakers) intentional and Gold Cross defendants' (Burt and Drews) reckless, negligent prolonged or extensive application of maximum prone restraint, including hog-

tying Layton and leaving him prone, and transporting Layton to jail under maximal restraint - face down on his stomach - prone – tied down to the ambulance cot, Layton suffered the effects of mechanical asphyxia or positional asphyxia, which in turn directly lead to cardiac arrest and respiratory failure.

104.   As a direct result of the defendant officers' culpable conduct and the Gold Cross defendants' culpable conduct, Layton also suffered a severe anoxic brain injury.

105.   From his admission to ICU on January 1, 2013, Layton was basically managed as a critically ill patient on life support. Layton never regained consciousness.

106.   On January 5, 2013, Layton was taken off life support and transferred from the ICU to the general medical floor for palliative care. Layton died about two (2) hours after he was taken off life support and transferred to palliative care.

107.   Layton succumbed from the effects of the defendants' use of prolonged maximal prone restraint - mechanical asphyxia / positional asphyxia, which directly lead to cardiac arrest, respiratory arrest and severe anoxic brain injury and death.

108.   As a direct result of the defendants' culpable conduct, Layton's next of kin have suffered pecuniary loss, including but not limited to medical and funeral expenses, and loss of relationship, aid, counsel, guidance, advice, assistance, protection and support.

109.   Layton's mother, plaintiff Cheri Marie Hanson, has lost her loving son.

110.   Layton's daughter, PJD (age 6), has lost her loving Dad.

111.   Brandon Layton has lost his big brother and friend.

112.   Corey Layton has lost his big brother and friend.

113.   Despite the evidence in the record of the defendant officers' improper use of and prolonged use of the maximal prone restraint maneuver, including misuse of the police hobble to hog-tie Layton in a maximal prone restraint position, the defendant City Police Chief, on information and belief, appears to have taken the position that the defendant officers, each defendant individually and acting together, followed proper department protocol and policies.

114.   On information and belief, the City was content not to make any legitimate inquiry into the unlawful and deadly technique executed by the defendant officers.

115.   Any legitimate inquiry by the City would have necessarily included basic questions, such as:

a.   What was the length of the maximal prone restraint maneuver;

b.   What was the length of application of external pressure to Layton's back (torso);

c.   What was the amount of pressure applied by the defendant officers to Layton's head, neck, torso (back) and legs;

d.   What was the length of time the defendant officers had Layton hog-tied in the prone position;

e.   What was the total length of time of the prone restraint of Layton on the floor of the Hy-Vee and on the Gold Cross ambulance cot;

f.   Were there "complicating factors" present, which would make prolonged use of the prone restraint maneuver more dangerous;

g.      Why wasn't Layton restrained laying on his his back (supine) with his head up - when he was restrained on the floor of the Hy-Vee store, as well as when he was transported to the Blue Earth County jail in the Gold Cross ambulance;

h.      Why did the defendant officers - Best, Burgess, Frericks, Groby, Huettl,, Baker - all  fail to inform the Gold Cross defendant paramedics Layton had been Tazed two times during the prone restraint maneuver;

i.      Why die the defendant officers insist on taking Layton to jail and not to the hospital?

116.    The defendant officers' conduct was done willfully, callously and with either with reckless indifference or actual malice to the life, rights and safety of Layton and has no place in civilized society.

117.    Layton's death was the direct result of the defendant officers' and Gold Cross defendant's prolonged use of a maximal prone restraint maneuver.

118.    Plaintiff demands a jury trial to all issues of fact herein.

## COUNT I.

### 42 U.S.C. § 1983- Fourth Amendment Violations

119.    Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

120.    By the actions described above, defendant officers, Best, Burgess, Groby, Huettl, Baker and Frericks, under color of state law, violated and deprived Layton of his clearly established and well-settled civil rights to be free from unreasonable searches and

seizures and the use of excessive, unreasonable, unnecessary and deadly force in violation of the Fourth Amendment.

121.   Layton died as a direct and proximate result of defendant officers' acts and omissions, and the defendant officers are therefore liable in an amount to be determined.

122.   Plaintiff is entitled to recover Layton's compensatory damages, including medical and burial expenses, pain and suffering before death, loss of earnings, and hedonic damages, such as loss of enjoyment of life.

123.   Plaintiff's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of relationship, aid, counsel, guidance, advice, assistance, protection and support.

124.   The defendant officers subjected Layton to these deprivations of his rights in such a manner so as to render them liable for punitive damages.

125.   Punitive damages are available against the defendant officers and are hereby claimed as a matter of federal common law under *Smith v. Wade,* 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. Ann. § 549.20.

126.   Plaintiff is entitled to punitive damages in an amount exceeding Ten Million ($10,000,000) Dollars.

## COUNT II

### Deliberate Indifference to Serious Medical
### Needs Violation of Section 1983 – Fourteenth
### Amendment Substantive Due Process

**Against individual Defendant Officers**

127.   Plaintiff realleges the allegations contained in all prior paragraphs and includes them in this count as though fully restated herein.

128.   Defendant officers, Best, Burgess, Groby, Huettl, Baker and Frericks, acting under color of law, deprived Layton of the rights, privilege and immunities secured by the Constitution of the United States by acting with deliberate indifference to the serious medical needs of Layton, whom they had placed in their custody, in violation of 42 U.S.C. §1983 and the due process clause of the Fourteenth Amendment to the United States Constitution.

129.   Defendant officers treated Layton purely as a combative criminal suspect, instead of treating him as a person requiring immediate medical care.  Disregarding the obvious state of Layton's psychiatric and emotional state, which made it impossible for Layton to follow directions or verbal commands and which should have been treated with calming behavior, defendant officers physically forced - smashed Layton down with a foot / leg sweep and held him, face-down onto the floor, handcuffed him and shocked him twice with a Tazer (in drive stun mode which is only intended to cause pain (to punish) NOT to incapacitate, so police officers can handcuff a suspect), and then the defendant officers hog-tied Layton, leaving him hog-tied in the prone position, misusing the police hobble, in order to further punish Layton. Under these circumstances, the prolonged and extended use of maximal prone physical restraint combined with Taser usage coupled with hog-tying Layton and keeping him prone constituted deliberate indifference to a serious medical need.

130.    The deliberate indifference of defendant officers, Best, Burgess, Frericks, Groby, Huettl and Baker, to Layton's serious medical needs shocks the conscience.

131.    The deliberate indifference of the defendant officers to Layton's serious medical needs shows knowledge of the risk of harm and intent to cause harm.

132.    As a direct and proximate result of the defendant officers' deliberate indifference to Layton's serious medical needs, Layton suffered serious injuries and death.

## COUNT III

### Punitive Damages Under Federal Law

133.    Plaintiff realleges the above allegations as if hereinafter set forth in full and further states and alleges as follows:

134.    All of the aforementioned acts, errors and omissions of the defendant officers were committed in bad faith and with reckless disregard for the rights and safety of Layton, as well as other citizens, so as to subject defendant officers to punitive damages, pursuant to the statutes and common law of the United States of America.

## COUNT IV

### Failure To Train Under Canton v Harris

135.    Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

136.    Before January 1, 2013, defendant City with deliberate indifference to the rights of citizens failed to property train City of Mankato Department of Public Safety police officers or in the alternative, failed to require adherence to appropriate policies to

avoid the improper prolonged use or application of maximal, prone restraint maneuvers when arresting citizens.

137. Through the City's ratification and approval of the defendant officers' culpable actions, and by failing to discipline the defendant officers, there has been an approval of a deficient policy, custom, or practice of using the prolonged, maximal, prone restraint maneuver without sanction or consequence.

138. Layton's death and the violation of his civil rights were directly and proximately caused by the aforementioned acts and omissions and by the City's failure to train, and the City is thereby liable in an amount as yet to be determined.

139. Plaintiff is entitled to recover Layton's compensatory damages, including medical and burial expenses, pain and suffering before death, loss of earnings, and hedonic damages, such as loss of enjoyment of life.

140. Layton's next of kin have suffered pecuniary loss, including but not limited to medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection and support.

141. Plaintiff is entitled to recovery of her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## <u>COUNT V</u>

**Civil Rights Violations – Monell v. Department of Social Services**

142. Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

143.   Before January 1, 2013, the City, with deliberate indifference to the rights of citizens, initiated, tolerated, permitted, failed to correct, promoted, and/or ratified a custom, pattern or practice on the part of its police officers, including the defendant officers herein, of improperly using prolonged maximal prone restraint maneuvers.

144.   Through the City's ratification and approval of the defendant officers' actions and by failing to discipline the defendant officers, there has been an approval of a deficient policy, custom, or practice of using the prone restraint maneuver without sanction or consequence.

145.   Layton's wrongful death and the violation of his civil rights was directly and proximately caused by the aforementioned acts and omissions and by the City's customs, patterns, and/or practices, and the City is thereby liable in an amount as yet to be determined.

146.   Plaintiff is entitled to recover Layton's compensatory damages, including medical and burial expenses, pain and suffering before death, loss of earnings, and hedonic damages, such as loss of enjoyment of life.

147.   Layton's next of kin have also suffered pecuniary loss, including but not limited to medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection and support.

148.   Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT VI

**Negligence/Medical Malpractice Against The Gold Cross Defendants**

149.   Plaintiff realleges the allegations contained in all prior paragraphs and includes them in this count as though fully restated herein.

150.    The employees of Gold Cross, paramedic defendants Burt and Drews, were negligent and failed to act within the scope of the commonly accepted standards of medical care by failing to appropriately assess Layton – by failing to properly monitor Layton's blood pressure, breathing, and heart rate - by failing to instruct defendant officers that Layton must *not* be transported in a maximal prone restraint position and by failing to instruct or advise the defendant officers of the potential interaction between improper / prolonged use of maximal prone restraint and mechanical asphyxia or positional asphyxia and cardiac arrest and respiratory arrest, given the particular circumstances presented by Layton's medical status.

151.   The Gold Cross paramedic defendants, Burt and Drews, were at all times acting within the scope of their employment.

152.   The failure by the p a r a m e d i c employees of defendant Gold Cross to comply with commonly accepted standards of medical care caused Layton serious injuries and death.

## COUNT VII

### Punitive Damages Under Minn. Stat. §§ 549.191 and 549.20 / Gold Cross Defendants

153.   Plaintiff realleges the allegations contained in all prior paragraphs and includes them in this count as though fully restated herein.

154.   Gold Cross defendants acted with deliberate disregard for the rights and safety of Layton, because defendants had knowledge of facts and intentionally disregarded those facts, which created a high probability of injury to Layton; or, alternatively, defendants deliberately acted in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of Andrew Layton; and/or defendants deliberately acted with indifference to the high probability of injury to the rights or safety of Layton.

155.   The Gold Cross defendant paramedics viewed Layton purely as a combative criminal suspect, instead of assessing him as their patient and treating him as their patient, who needed immediate, pre-hospital assessment / evaluation, medical care and treatment. The Gold Cross defendant paramedics intentionally ignored obvious signs and symptoms of serious medical emergencies, including, but not limited to, possible poisoning / drug overdose, over intoxication from alcohol, an obvious altered mental state, possible mental psychosis and/or behavioral psychosis, tachypnea. The defendant

paramedics intentionally and deliberately failed to perform any type of a meaningful assessment of Layton's physical and mental conditions. The Gold Cross defendants intentionally and deliberately ignored Layton's obvious psychiatric and emotional disturbance, which made it impossible for Layton to communicate in any type of a coherent or effective manner. The Gold Cross defendant paramedics, along with defendant officers physically forced Layton into a prone (on stomach), maximum restraint position for transport, which violated all relevant protocols for safe transport of a restrained patient. The Gold Cross defendant paramedics intentionally and deliberately ignored numerous signs and symptoms that Layton presented a medical emergency and required medical evaluation at an Emergency Department of a hospital. Instead, defendants transported Layton in a dangerous, maximum, prone restraint position – tied face down on his stomach on the ambulance cot / stretcher with his hands cuffed behind his back - to jail instead of to a hospital for evaluation and care or treatment. Defendants intentionally and deliberately denied Layton proper medical evaluation, care and treatment for an extremely serious medical condition. Rather, the defendant paramedics ignored obvious signs of a medical emergency and assumed Andrew Layton was merely a belligerent, criminal, who refused to cooperate, refused to speak in an intelligible coherent manner. Defendants deliberately concluded there was nothing wrong with Andrew Layton, except he had a bad attitude, so he was going to jail – not hospital.

156.   The deliberate indifference of Gold Cross defendants to Layton's medical needs shocks the conscience.

157.    The deliberate indifference of the Gold Cross defendants to Layton's serious medical needs shows knowledge of the risk of harm and intent to cause harm.

158.    As a direct and proximate result of the Gold Cross defendant paramedics intentional and deliberate indifference to Layton's serious medical needs, and their intentional and deliberate decision to transport Andrew Layton in a maximum prone restraint position (on his stomach) Andrew Layton suffered serious personal injuries, including hypoxia, respiratory failure, cardiac arrest, severe anoxic brain injury and death.

## COUNT VIII

### Wrongful Death – Minn. Stat. § 573.02

159.    Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

160.    Defendant officers Best, Burgess, Groby, Huettl, Baker and Frericks, as well as the Gold Cross defendant, Burt and Drews conduct described and set forth in the preceding paragraphs herein above are wrongful acts and omissions for purposes of Minn. Stat. § 573.02, subd. 1.

161.    Those wrongful acts and omissions directly and proximately caused Layton's death.

162.    As a result, Layton's next of kin have suffered, in an amount as yet to be determined, pecuniary loss, including but not limited to medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection and support.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff Cheri Marie Hanson, as trustee for the heirs and next of kin of Andrew Derek Layton, prays for judgment against defendants as follows:

1.      As to Counts I and III, a money judgment against defendant officers, Best, Burgess, Groby, Huettl, Baker and Frericks, for compensatory damages in an amount to be determined and punitive damages in an amount in excess of Ten Million ($10,000,000) Dollars together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

2.      As to Counts II and III, a money judgment against defendant officers, Best, Burgess, Groby, Huettl, Baker and Frericks for compensatory damages in an amount to be determined and punitive damages in an amount in excess of Ten Million ($10,000,000) Dollars together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

3.      As to Counts IV and V, a money judgment against the City of Mankato for compensatory damages in an amount to be determined together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

4.      As to Count VI and VII, a money judgment against the Gold Cross defendants for physical injury, and emotional harm and medical expenses, wrongful death and burial expenses and punitive damages as a result of their failure to act

reasonably and their intentional and deliberate failure to act according to commonly accepted standards of medical assessment, care  and treatment in an amount to be proved at trial;

5.      As to Count VIII, all damages available under Minn. Stat. Ann. § 573.02, subd. 1 in an amount to be determined together with costs and prejudgment interest;

6.      For an Order requiring the imposition of appropriate discipline for defendant officers, Best, Burgess, Groby, Huettl, Baker and Frericks; and

7.      For such other and further relief as this Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims.


Dated:                                    **JAMES R. BEHRENBRINKER**
                                          *Attorney at Law*


                                          _____
                                          James R. Behrenbrinker
                                          (MN Bar No. #0186739)
                                          412 South Fourth Street
                                          Suite 1050
                                          Minneapolis, MN  55415
                                          *Tel.*  (612) 294-2605
                                          *Fax* (612) 294-2640
                                          jbehrenbrinker@comcast.net

                                          **COLLINS BUCKLEY SAUNTRY
                                             & HAUGH, PLLP**


                                          _____
                                          Bryce M. Miller (MN Bar No. 386901)
                                          W-1100 First National Bank Building
                                          332 Minnesota Street

41

St. Paul, MN  55101
*Tel.*  (651) 227-0611
*Fax.* (651) 227-0758
bmiller@cbsh.net

**Attorneys for Plaintiff**