## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

─────────────────────────────────────────────────

Cheri Marie Hanson, as trustee for the next of kin of Andrew Derek Layton,

        Plaintiff,

vs.

Daniel Best, Audrey Burgess, Craig Frericks, Kyley Groby, Matthew Huettl and Kenneth Baker, individually and acting in their official capacities as City of Mankato Department of Public Safety Police Officers; The City of Mankato; Gold Cross Ambulance, Michael Jason Burt, and Thomas John Drews,

        Defendants.

**Case No.: 15-CV-04578 (MJD/SER)**

**DEFENDANT OFFICERS'
MEMORANDUM OF LAW IN
SUPPORT OF THEIR SUMMARY
JUDGMENT MOTION**

─────────────────────────────────────────────────

## INTRODUCTION

In the early hours of New Year's Day, Mankato officers were called to the Hy-Vee to check on a male, later identified as Andrew Layton, who was sleeping in the unheated foyer. Officer Daniel Best woke Layton, who was immediately combative, shoving Best into nearby carts and ignoring his commands. Best requested back-up and attempted to subdue Layton while officers responded. However, Layton was uncontrollable, kicking, thrashing around, and swinging his arms while yelling in an "animalistic" manner. In response to Layton's violent resistance, Best—and the officers who came to his aid— used several techniques in an effort to overcome Layton's super-human strength and ceaseless resistance. Ultimately, Layton was restrained with handcuffs and leg restraints

1

and Gold Cross was called.  Following the paramedics' medical assessment, Layton was transported to jail, where he experienced a cardiac arrest.  He was resuscitated and transferred to the hospital, but died five days later.  The Mankato Defendants seek dismissal of Plaintiff's claims as the officers' actions were objectively reasonable, the force used was not excessive, the officers were not deliberately indifferent to Layton's medical needs, and they are entitled to qualified immunity.

## UNDISPUTED FACTS[1]

On January 1, 2013, Officer Best was dispatched to the Hy-Vee for a welfare check on a suspicious male sleeping in the unheated foyer.  (Ex. 1, *Best Dep.*, p. 23 (hereinafter "*Best*"); Ex. 2, *Baker Dep.*, p. 43 (hereinafter "*Baker*"); Ex. 3, *Groby Dep.*, p. 18-20 (hereinafter "*Groby*")).  The foyer is a small, enclosed space, where shopping carts are stored, leaving a narrow walkway between the exterior wall and the carts.  (Ex. 4, *Huettl Dep.*, p. 40-41 (hereinafter "*Huettl*"); Ex. 5, *Ahl Dep.*, p. 27 (hereinafter "*Ahl*"); Ex. 6, *Klompenhower Dep.*, p. 64 (walkway was wide "enough to be able to get a cart through")(hereinafter "*Klompenhower*")).

At 4:45 a.m.,[2] Best entered the foyer and saw a male, later identified as Andrew Layton, sleeping on the floor.  (*Best*, p. 23; Ex. 7, *Best Squad Video*).  Based on Layton's location in the early hours of New Year's Day and Best's experience as a patrol officer, Best's initially suspected Layton was alcohol-intoxicated and passed out.  (*Best*, p. 33-

---

[1] For purposes of summary judgment, Defendants will accept all testimony as true. Defendants reserve the right to challenge the veracity and accuracy of testimony.

[2] Portions of the incident were captured on video/surveillance.  Each recording device calculated times differently.  The times, as referenced herein, were captured in Best's squad video, Exhibit 7, unless otherwise indicated.

34).  Best, who was in full police uniform, attempted to wake Layton, tapping him on the shoulder and said, "Wake up.  Police Department,"  (*Id.*; Ex. 8, *Banguara Video* at 0:11-1:03; *Ahl*, p. 39-40; *Klompenhower*, p. 28-29).  A short-time later, Layton stood.  (*Best*, p. 35; *Ahl*, p. 41-42; Ex. 9, *Johnston Dep.*, p. 29 (hereinafter "*Johnston*"); *Ex. 8*, at 1:03).

Once on his feet, Layton tensed his arms/upper body.  (*Best*, p. 36).  Best thought Layton was "balanc[ing] himself" until he unexpectedly threw his weight back into Best, shoving Best into nearby shopping carts and suddenly pulled away from his grasp.  (*Id.*; *Ahl*, p. 51-52; *Johnston*, p. 29-30; *Ex. 8*, at 1:03-1:11).  Best ordered Layton to "knock it off, don't pull away!" as he reached for Layton's arm.  (*Id.*; *Best*, p. 36-38).  Layton again pulled away from Best.  (*Ex. 8*, at 1:03-1:11).  Best—the only officer on the scene and in pain from being pushed into the carts—took Layton to the ground with a leg sweep in an effort to gain immediate control over him.  (*Best*, p. 37-38).

Best and Layton crashed to the ground.  Layton began "growling" in an "animalistic" manner as he fought Best's efforts to control him.  (*Klompenhower*, p. 29-31; Ex. 10, *Devens Dep.*, p. 39 (hereinafter "*Devens*")).  Best requested immediate assistance, airing "16. Fighting," as he climbed onto Layton's lower back/buttocks.  (*Best*, p. 39-42; *Klompenhower*, p. 35, 46; *Ex. 7*, at 4:45:54).  Best repeatedly ordered Layton to "put your hands behind your back!" as he pulled on Layton's left arm, attempting to handcuff him.  (*Best*, p. 39-40, 57; *Klompenhower*, p. 32, 67-68; *Ahl*, p. 89; *Ex. 8*, at 1:22-1:52).  Layton did not respond to this command; rather, he growled, thrashed around, swung his arms, and twisted away from Best.  (*Id.*; *Best*, p. 43, 48-49, 60-61; *Ahl*, p. 89; *Devens*, p. 24).  Best ordered him to "stop resisting!" and "quit

3

fighting!"  (*Ex. 7*, at 4:46:11-4:47:20; *Ex. 8*, at 1:34).  Layton did not comply; instead, he wrestled Best.  (*Best*, p. 43-44; *Ahl*, p. 52, 62, 74).

Due to Layton's strength and violent resistance, Best began fatiguing.  (*Best*, p. 43).  Bystanders saw Layton's uncontrollable resistance, failure to comply with Best's commands, and heard his animalistic yelling.  (*Ahl*, p. 52, 62, 75-76; *Klompenhower*, p. 32-36; *Johnston*, p. 60-62; *Devens*, p. 24-25).  Fearing for Best's safety, Hy-Vee Manager, Eric Klompenhower,[3] rushed to Best's aid.  (*Klompenhower*, p. 35-36, 65-66; *Best*, p. 42, 51-52; *Ahl*, p. 64-66; *Johnston*, p. 76; *Devens*, p. 26).  While Best tried to keep Layton on the ground, Klompenhower knelt next to Layton and grabbed his right arm with both hands, attempting to pull it out from under his body.  (*Ex. 8*, at 1:35-2:25; *Best*, p. 42-44, 52-55; *Klompenhower*, p. 36-37).

Best and Klompenhower were unable to control Layton, who fought the men, violently thrashing, kicking, and twisting, with such force Best thought he was going to be flipped off of Layton's back.  (*Best*, p. 52, 57; *Ahl*, p. 70 (Best was "grabbing onto an arm and holding on for dear life."); *Klompenhower*, p. 58, 62-63, 68-69; Ex. 31, *Best Report*, p. 3).  Layton's kicks struck Best and Klompenhower.  (*Id.* at 39-41).  Due to Layton's continuous kicking, Best asked bystander, Christopher Ahl, to sit on Layton's legs.  (*Ex. 7*, at 4:46:42; *Best*, p. 52-53, 59-61; *Klompenhower*, p. 39-42; *Ahl*, p. 66-69).  At that time, Layton's hands were not handcuffed.  (*Id.* at 93-94, 101).  According to Hy-Vee employee, Jeff Kirby, despite Klompenhower and Ahl's assistance, Layton's

---

[3] At the time, Klompenhower was a North Mankato Reserve Officer.  (*Klompenhower*, p. 15, 60-61).

thrashing was so forceful, he was "throwin' them around like rag dolls." (Ex. 11, *Kirby Statement*, p. 2).

Officers Kenneth Baker, Matthew Huettl, Kyley Groby, and Audrey Burgess all responded to Best's request for assistance. They began arriving at 4:47 a.m. and saw Layton, actively resisting arrest. (*Baker*, p. 45-46; *Huettl*, p. 39; Ex. 12, *Burgess Dep.*, p. 25 (hereinafter "*Burgess*"); *Groby*, p. 28-34). Baker rushed to Layton's right side, relieving Klompenhower,[4] while Groby took over Ahl's position on Layton's legs. (*Baker*, p. 49; *Groby*, p. 32, 88; *Huettl*, p. 44). Meanwhile, Huettl knelt to Layton's left and tried to pull Layton's left hand from underneath his body as Best continued to hold Layton's hips down with his body to prevent Layton from standing. (*Id.* at 42-46; *Groby*, p. 29, 36). Because Best was unable to control Layton's attempts to stand, Groby also used her hands to push down on Layton's mid-to-lower back. (*Id.* at 36-37; *Devens*, p. 27-29). Despite repeated orders to put his hands behind his back, get on the ground, and stop resisting, Layton did not comply; instead, he continued fighting the officers with "super-human strength." (*Baker*, p. 54-55; *Huettl*, p. 47-48, 75; *Groby*, p. 31, 34; *Johnston*, p. 60-62, 74-76, 78; *Ex. 7*, at 4:45:45-4:47:55). Due to his ceaseless resistance, Baker, Huettl, Best, and Groby, working together, could not handcuff Layton. (*Baker*, p. 51-53, 62-63; *Huettl*, p. 45-48).

---

[4] Klompenhower testified he continued to help the officers, including Best and Baker, until Layton's right wrist was handcuffed. (*Klompenhower*, p. 42-44). For example, Klompenhower testified he was still assisting officers when an officer (Baker) used knee strikes to the right shoulder in an effort to gain control over Layton's right arm. (*Id.* at 82). While the officers do not recall Klompenhower's continued involvement, his testimony is consistent with the officers' description of the force used to overcome Layton's resistance in an effort to handcuff him. *See supra* page 6.

Despite Best's position on Layton's low-back/buttocks, Layton attempted to stand, elevating in a push-up position. (*Baker*, p. 49-50, 53-54, 56; *Huettl*, p. 45-46; *Groby*, p. 31; *Johnston*, p. 42; *Devens*, p. 48). Observing his actions, the officers believed Layton's movements were a calculated attempt to "push his body up" and "try[] to get back up to be able to fight better" with the officers. (*Baker*, p. 54; *Huettl*, p. 46; *Groby*, p. 31). In Baker's judgment, if allowed to stand, Layton would be a "big problem" and a threat to officers and bystanders. (*Baker*, p. 56, 177; *Ahl*, p. 105). To prevent Layton rising from his elevated, push-up-like position, Baker delivered 3-4 knee strikes to his right shoulder/side. (*Baker*, p. 56; *Huettl*, p. 50; *Frericks*, p. 21-22; *Johnston*, p. 46; *Ex. 11*, p. 3). Following the knee strikes, Huettl was able to pull Layton's left arm out from under him, bringing Layton to the ground. (*Huettl*, p. 46, 49-50; *Baker*, p. 56-57). As soon as he was brought back to the ground, Layton again used his right arm to push-up to an elevated position. (*Id.*) In response, Baker placed his knee outside of Layton's right shoulder joint to hold him down for a few seconds so the officers could pull attach a handcuff to Layton's right wrist. (*Id.* at 57-58, 60-61, 72).

Although Best got a handcuff on Layton's right wrist, he was not able to cuff his hands together. With a handcuff on his right wrist only, Baker was concerned Layton would swing his arm and strike an officer with the metal handcuff. *Id.* at 69-70. To control Layton's right arm while officers attempted to connect the handcuffs, Baker delivered 5-6 close fist strikes to Layton's arm. (*Id.*; *Huettl*, p. 50).

Meanwhile, Groby moved toward Layton's head and applied a pressure-point behind Layton's left ear in an effort to distract him and allow Best, Baker, and Huettl to

6

handcuff him.  (*Groby*, p. 37-40, 115, 120-121).  Due to Layton's erratic movement, to apply the pressure-point, Groby used her right hand to stabilize Layton's head against the floor while applying the pressure-point.  (*Id.* at 38-40, 115; *Johnston*, p. 56-57, 90). Though the pressure-point did not appear effective, Huettl gained control over Layton's left arm and officers placed a second set of handcuffs on Layton's left wrist.  (*Huettl*, p. 50-51, 58-59; *Groby*, p. 40).  However, due to Layton's resistance, the officers were unable to link the two sets of handcuffs together.  (*Huettl*, p. 50-51).

Unable to link the two sets of handcuffs together, Officer Burgess, who recently arrived, deployed her Taser, in drive-stun, to Layton's right hamstring.  (*Burgess*, p. 27, 31-33, 40-42; *Best*, p. 63-66; *Huettl*, p. 51).  The first 2-second drive-stun appeared to have no effect so 13 seconds later, Burgess delivered a second 2-second drive-stun to Layton's right thigh.  (Ex. 14, *Taser Download*, p. 4; *Burgess*, p. 33, 38-40).  The Taser had a minimal, temporary, impact on Layton's combative resistance.  (*Johnston*, p. 49; *see Huettl*, p. 51; *Burgess*, p. 33, 40, 43).  However, he continued to thrash around, kick his legs, and growl at the officers.  (*Id.*; *Huettl*, p. 51; *Johnston*, p. 81; *Ex. 7*, at 4:47:38-4:47:55).  Accordingly, Burgess held on to his lower legs, trying to control them. (*Burgess*, p. 35-36).  A short time later, at 4:48:29 a.m., the five officers, working together, were able to link the sets of handcuffs together.  (*Ex. 7*, at 4:48:29 ("I'm hooked up."); *Best*, p. 68-69; *Baker*, p. 70; *Huettl*, p. 51; *Burgess*, p. 33-35).  Because two sets of handcuffs were used, Layton had a greater range of motion than typically occurs with a handcuffed subject.  (*Id.* at 44; *Huettl*, p. 51).

7

Despite being handcuffed, Layton continued violently resisting, thrashing around, kicking, and grabbing the officers.  (*Baker*, p. 70-71; *Burgess*, p. 44; *Groby*, p. 41, 44; *Best*, p. 69-70).  In an attempt to prevent Layton from kicking the officers, Best pushed Layton's feet toward his buttocks.  (*Id.* at 74-75, 77; Ex. 13, *Frericks Dep.*, p. 26 (hereinafter "*Frericks*").  During this process, Best was kicked 2-3 times in the chest.  (*Best*, p. 74).  Meanwhile, because Layton was rearing up with enough force to lift his entire torso off of the ground, Baker and Huettl were attempting to control Layton's upper body by using their hands to hold Layton steady as he was straining against the handcuffs.  (*Id.* at 76-78; *Baker*, p. 71-73; *Huettl*, p. 60-61; *Groby*, p. 47-51).  Due to Layton's strength and ceaseless, violent resistance, the officers viewed Layton as a threat and decided to use leg restraints to prevent further injury to Layton, themselves, or bystanders.  (*Best*, p. 76-78; *Groby*, p. 52; Ex. 15, *Burgess Report*, p. 2; Ex. 16, *Baker Report*, p. 2; Ex. 17, *Huettl Report*, p. 1; Ex. 18, *Groby Report*; Ex. 19, *Frericks Report*).

Best and Burgess attempted to loop the leg restraint strap around Layton's ankles.  (*Burgess*, p. 45, 56-58; *Groby*, p. 49; *see* Ex. 20, *Leg Restraints*).  During this process, Layton kicked Burgess' hand, smashing it between his foot and a shopping cart.  (*Burgess*, p. 37, 56).  As a result, Burgess sustained an injury to her finger.  (*Id.*; *Ex. 15*).  Nonetheless, Burgess and Best were able bind Layton's ankles together with the leg restraint.  (*Id.* at 58; *Frericks*, p. 26).  The leg restraint was then attached to Layton's handcuffs, allowing his body to rest on the ground with his legs bent at approximately a right angle.  (*Id.* at 25-27; *Baker*, p. 27, 72-73; *Best*, p. 130-131; *Burgess*, p. 58-60; *Groby*, p. 58-59; Ex. 23, *Drews Dep.*, p. 65-66 (hereinafter "*Drews*")).

8

Even after the leg restraints were applied, Layton resisted, straining against the restraints, moving side-to-side and elevating his chest off of the ground.  (*Baker*, p. 67, 76-79; *Burgess*, p. 60; *Frericks*, p. 26-28, 35, 41-42; *Best*, p. 85, 89-91, 131-132; *Huettl*, p. 68; *Groby*, p. 57, 63-64).  Layton's unrelenting, combative resistance prevented the officers from placing him on his side as they believed, if placed on his side, he would sustain an injury from striking his head on the wall or carts in the narrow walkway. (*Best*, p. 93; *Groby*, p. 46, 65, 69-70; *Frericks*, p. 28-29, 33).

Despite officer continuing orders to calm down and stop resisting, Layton continued to resist, spitting at the officers.  (*Id.* at 84-85; *Huettl*, p. 67, 89; *Baker*, p. 175; *Groby*, p. 71-72).  As a result, Huettl put a spit mask on Layton's head.  (*Huettl*, p. 63-64; *Baker*, p. 127; *Groby*, p. 71).  The spit mask was placed over Layton's head and allowed him to see through mesh material and breathe through surgical mask-like material, but prevented him from spitting.  (Ex. 21, *Spit Mask*).

Due to Layton's extreme agitation, violent, persistent resistance, and unintelligible growling, the officers believed he was on methamphetamine.  (*Best*, p. 80-84, 94, 161; *Baker*, p. 99-101; *Huettl*, p. 86-87; *Groby*, p. 80, 101-102; *Frericks*, p. 51, 69; *Ex. 7*, at 5:00:18).  Although the officers did not believe Layton required immediate medical attention, Commander Frericks (who arrived during the attempt to handcuff Layton) requested Gold Cross ambulance transport Layton to jail, for Layton's safety.  (*Frericks*, p. 38, 49, 69).  The request was made because Frericks was concerned the officers would not be able to safely transport Layton in the back of squad, without releasing his restraints, which he did not view as a viable option as he believed releasing Layton's

9

restraints would escalate the incident and likely result in injury to an officer or bystander. (*Id.*; *Best*, p. 84, 93-94, 106; *Baker*, p. 89-90, 93; *Burgess*, p. 109-110; *Groby*, p. 105-107; Ex. 22, *Burt Dep.*, p. 158 (releasing restraints "would have been a hazard to the police officers and EMS personnel.")(hereinafter "*Burt*"); *Drews*, p. 93; *Ex. 19*).

While awaiting Gold Cross, Baker monitored Layton "to make sure that he was in a position that wouldn't hurt himself" and observed he continued to fight the restraints and yell in an unintelligible manner. (*Baker*, p. 75, 88, 184; *Frericks*, p. 76; *Best*, p. 117; *Huettl*, p. 70-71; *Devens*, p. 50-51; *Johnston*, p. 77). Though Layton would stop fighting against the restraints for a few seconds, he never ceased actively resisting the officers' efforts to control him. (*Baker*, p. 75, 94; *Frericks*, p. 41-44). Given Layton's continued resistance and unpredictable behavior, the officers determined it was safest to keep Layton on his stomach and Baker used his hands to press on Layton's shoulders and guide Layton back to the ground intermittently while awaiting Gold Cross. (*Id.* at 28, 33, 36; *Baker*, p. 80, 84-86, 184; *Groby*, p. 69-70). In addition, Groby held Layton's thighs to the ground with her hands as, despite his leg restraints, Layton was attempting to rise to a kneeling position. (*Id.* at 72-76; *Devens*, p. 29, 38-39). However, after Layton was restrained, none of the officers used their bodyweight to pin Layton's chest, head or neck to the ground. (*Huettl*, p. 69; *Groby*, p. 83-84). Based on his ongoing violent resistance and growling, the officers did not believe Layton was having difficulty breathing. (*Baker*, p. 157-159, 185; *Groby*, p. 48-49; *Frericks*, p. 43; *Best,* p. 117).

Gold Cross arrived at 5:05 a.m. (Ex. 24, *Run Report 69*). Paramedics Michael Burt and Thomas Drews saw Layton in the foyer, handcuffed and in leg restraints, clearly

agitated, fighting against his restraints, growling and yelling incoherently.  (*Burt*, p. 60-64, 149, 153; *Drews*, p. 47-48).  Baker advised paramedics Layton may be experiencing "meth delirium."  (*Drews*, p. 52, 73, 103; *Best*, p. 94; *Baker*, p. 105-107; *Frericks*, p. 72; <u>Ex. 25</u>, *Groby Squad Video* at 5:08:30-5:08:35).  The paramedics treated Layton as a patient, assessing his medical condition, and concluded his behavior "did not [present] a medical emergency," he did not require immediate medical treatment, and he could be safely transported to jail.  (*Burt*, p. 90, 95-96, 106-112, 128-149, 154-156; *Drews*, p. 50-53, 81, 107-116, 125-136, 145-159, 168-169; *Ex.* 24).  According to the officers, if paramedics had advised Layton required medical attention, he would have been transported to the hospital.  (*Best*, p. 110-112; *Frericks*, p. 57, 83; *Burgess*, p. 98; <u>Ex. 26</u>, *Clifton Dep.*, p. 126-127 (hereinafter "*Clifton*").

Officers Baker, Huettl, Groby, and Frericks lifted Layton onto a cot.  (*Baker*, p. 81; *Huettl*, p. 83, 95; *Groby*, p. 91-92; *Frericks*, p. 46; *Ex. 25*, at 5:09:36-5:09:56).  Once placed on the cot, the leg restraints were unhooked from the handcuffs and paramedics took over, attempting to position Layton on his side for transport.  (*Burt*, p. 109, 112, 126, 160; *Drews*, p. 77-78, 163; *Best*, p. 107, 114, 122-123; *Baker*, p. 83, 154, 162; *Burgess*, p. 82; *Groby*, p. 92; *Frericks*, p. 55).  Layton resisted being placed on his side.  (*Burt*, p. 113-116, 160; *Drews*, p. 163; *Baker*, p. 154-155).  Paramedics attempted to apply soft restraints.  (*Burt*, p. 118; *Drews*, p. 83-84; *Best*, p. 106, 124; *Baker*, p. 83; *Burgess*, p. 82).  Layton violently resisted the paramedics' attempts to apply soft restraints to his right ankle and wrist, fighting and twisting away from the paramedics.  (*Baker*, p. 84, 116-117; *Burt*, p. 158; *Drews*, p. 82-83; <u>Ex. 27</u>, *Burt Statement*, p. 3-5).  To

prevent Layton from rolling off of the cot and to hold him steady so Burt could place a soft wrist restraint and cots straps, Baker knelt on the cot and put his knee on Layton's left shoulder for a few seconds.  (*Baker*, p. 117-119).  Layton resisted, bucking up off of the cot with such force that Baker was lifted off of the cot while kneeling on his shoulder.  (*Id.*; *see Ex. 24*).  Once the Velcro wrist restraint was placed, Baker got off of the cot and paramedics positioned the cot straps over Layton's body.  (*Id.*; *Baker*, p. 119; *Burt*, p. 118-119; *Drews*, p. 86-87).

Due to Layton's continued resistance, Best and Baker rode in the ambulance.  (*Burt*, p. 127; *Best*, p. 118-119; *Baker*, p. 113; Ex. 28, *Drews Statement*, p. 8).  During transport, Layton fought against the restraints, using his hands to pull at the restraints, and was able to rear up his body, lifting his chest off of the cot.  (*Id.* at 121-125; *Best*, p. 122; *Burt*, p. 158, 166; *Ex. 28*, p. 5-6; *Ex. 27*, p. 6; *Ex. 24*).  When Layton lifted his chest off of the cot, Baker guided his shoulder back to the cot, with his hands, to prevent Layton from injuring himself by rolling off the cot or getting wrapped up in the loose cot straps and to protect Burt, who was monitoring Layton's condition en-route.  (*Baker*, p. 122-127).  Shortly before the ambulance pulled into the jail, Layton became calm.  (*Id.* at 132; *Ex. 24*).  The officers asked Burt if Layton was okay and Burt reached for his arm and reported Layton had a radial pulse.  (*Id.*; *Baker*, p. 133-137).  Based on this report, the officers understood Layton's heart was beating and he had a good pulse.  (*Id.* at 136).

Moments later, the ambulance entered the Sally Port and Layton was rolled into the booking area, where it was discovered he was unresponsive.  (*Drews*, p. 121-123; *Baker*, p. 137; *Groby*, p. 96-97; *Frericks*, p. 61-62).  Officers removed the handcuffs.

12

(*Best*, p. 127; Ex. 32, *Jail Surveillance*).   CPR was initiated and, following two applications of the AED, a cardiac rhythm was restored.  (*Ex. 32*; Ex. 29, *Run Report 70*). Layton was transported to the hospital.  *Id.*  Mayo physicians determined he sustained a sudden cardiac arrest.  (Ex. 30, *Autopsy*).  He did not regain consciousness and died on January 5, 2013.  (*Id.*)

On the basis of these undisputed facts, there is simply no factual or legal basis for Plaintiff's excessive force and deliberate indifference claims.

## SUMMARY JUDGMENT STANDARD

Rule 56(c) requires a motion for summary judgment be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. Trial courts should look favorably upon motions for summary judgment to accomplish the just, speedy and inexpensive resolution of civil litigation.  *Celotex v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

## ARGUMENT

## I.     PLAINTIFF'S FOURTH AMENDMENT CLAIMS MUST BE DISMISSED.[5]

### A.     Plaintiff's §1983 claims must be dismissed because the officers did not violate Layton's constitutional rights.

It is well-established, pursuant to the community caretaking function, police officers are permitted, and even expected, to ensure the safety of the public and individuals, regardless of suspected criminal activity.  *Winters v. Adams*, 254 F.3d 758, 763 (8th Cir. 2001); *Meehan v. Thompson*, 763 F.3d 936, 941 (8th Cir. 2014)(detaining intoxicated

---

[5] Plaintiff dismissed her *Monell* claims, Counts IV-V.  *ECF* 65.  As a result, the City of Mankato was dismissed.

passenger). In exercising this function, an officer may seize a person when there is reason to believe the person is impaired, presenting a danger to themselves or others. *Id.*

Here, Best was called to the Hy-Vee on the report of a suspicious male, sleeping in an unheated foyer, on the early hours of New Year's Day. Based on the location and time, it was reasonable for Best to suspect Layton was intoxicated and/or impaired. *Compare Best Dep.*, p. 36 *with Winters*, 254 F.3d at 763; *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1021 (9th Cir. 2009)(lawful basis to detain man for questioning when found sleeping in his car outside of a store). Thus, Best had a lawful basis to detain Layton for questioning to determine if he was impaired and/or presented a threat to himself or others.

However, before Best could question Layton, he unexpectedly shoved Best into adjacent shopping carts, then pulled away. Layton's erratic conduct further supported detaining him under Best's community caretaking function. In addition, Layton's physical resistance presented Best with a second, lawful basis to arrest Layton—obstruction of process. Minn. Stat. §609.50. Courts recognize there is no lawful basis to resist a peace office engaged in the performance of his official duties. *Foster v. Metropolitan Airports Comm.*, 914 F.2d 1076, 1081 (8th Cir. 1990)(detention reasonable when individual "intentionally interfered with duties of peace officer."); *Jacobson v. Mott*, 623 F.3d 537, 542 (8th Cir. 2010)(probable cause to detain individual for obstruction defeats unreasonable search and seizure claim). Because Best was exercising his community caretaking duties when waking and attempting to question Layton, who responded with physical aggression, there was a lawful basis to detain and arrest Layton. Accordingly, Layton's detention did not violate the Fourth Amendment.

14

Under *Graham v. Connor*, 490 U.S. 386 (1989), the use of force is not constitutionally excessive if the "officers' actions are objectively reasonable in light of the facts and circumstances confronting them."   *Id.* at 397.   In applying this objective reasonableness standard, a court must pay close attention to the particular facts.   *Nelson v. County of Wright*, 162 F.3d 986, 990 (8th Cir. 1998).   It should consider factors, such as the severity of a suspected crime, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting or evading arrest.   *Graham*, 490 U.S. at 396.

The issue of reasonableness must be examined from the perspective of the facts known to the officer at the time of the incident.   *Schulz v. Long*, 44 F.3d 643, 648 (8th Cir. 1995).   The Supreme Court "caution[s] against the '20/20 vision of hindsight' in favor of deference to the judgment of reasonable officers on the scene."   *Graham*, 490 U.S. at 393, 396; *Saucier v. Katz*, 533 U.S. 194, 205 (2001).   "If an officer reasonably, but mistakenly, believes that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed."   *Id.*

It is well-established the right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."   *Graham*, 490 U.S. at 396; *Crumley v. City of St. Paul*, 324 F.3d 1003, 1007 (8th Cir. 2003).   Here, based on the totality of the circumstances, the officers' use of force was constitutional due to Layton's unexpected, violent, and ceaseless resistance beginning immediately after he encountered Best.

15

As noted above, Best had a lawful basis to detain Layton under the community caretaking function.  *See supra* page 13-14.  In response to Best's questioning, Layton became combative, shoving Best into shopping carts and pulled away.  Due to Layton's resistance, Best—the only officer on scene—used a leg sweep to take Layton to the ground.  In light of Layton's physical resistance, the use of a leg sweep to ground Layton was reasonable.  *Wertish v. Krueger*, 433 F.3d 1062, 1067 (8th Cir. 2006)(no constitutional right violated when passively resistant suspect pulled out of car and thrown on roadway); *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017).

In *Ehlers*, an officer took a non-violent suspect to the ground when he attempted to walk away from the officer.  The Court found the takedown was constitutional because a reasonable officer would interpret the suspect's continued movement away from the officer as resistance.  *Id.*  Layton's conduct was more extreme than the resistance in *Ehlers*—he shoved an officer and forcibly pulled away.  Given his resistance, Best's use of the leg sweep to gain control over him was reasonable.  *Id.*; *Womack v. Bradshaw*, 610 Fed.Appx. 582, 583 (8th Cir. 2015)(takedown, prompted by suspect's forcible resistance to arrest, was constitutional).

Once on the ground, Layton continued to resist and refused to put his hands behind his back, as ordered.  Layton wrestled Best, who climbed onto Layton's low-back/buttocks, trying to gain control.  Due to Layton's strength and violent resistance, two civilians intervened to assist Best while back-up was en-route.  Nonetheless, Layton continued to fight, throwing all three men around like "rag dolls."  (*Ex. 11*, p. 2).  Under these circumstances, Best's use of his weight in an effort to control Layton was

16

reasonable. *Ryan v. Armstrong*, 850 F.3d 419, 427-28 (8th Cir. 2017)(using bodyweight to restrain violently resisting inmate was reasonable); *Blazek v. City of Iowa City*, 761 F.3d 920, 923 (8th Cir. 2014)(placing weight on passively resisting suspect's back after takedown was reasonable).

Even after back-up arrived, Layton continued battling the officers, attempting to stand, thrashing around, pulling his arms from the officers, and kicking.  As a result, Groby pushed down on Layton's low back to prevent him from rising, while Huettl and Baker attempted to gain control over his hands.  Like Best's use of weight to control Layton, Groby's efforts to hold Layton down for a brief period, were reasonable given the officers' difficulty overcoming Layton's ongoing, violent resistance.  *Ryan*, 850 F.3d at 427-28; *Blazek*, 761 F.3d at 923.

Due to Layton's extreme strength and continuous resistance, Baker used of knee and fist strikes when he reasonably perceived Layton's movements as an attempt to "try[] to get back up to be able to fight better" with the officers.  (*Baker*, p. 54).  Courts deem knee and fist strikes objectively reasonable when necessary to overcome a suspect's active resistance to arrest.  *Winters*, 254 F.3d at 764 (finding use of closed fist strikes during a community-caretaking stop reasonable to overcome individual's resistance and control his erratic behavior); *Smith v. City of Minneapolis*, 754 F.3d 541, 548 (8th Cir. 2014)(six knee strikes reasonable to subdue resistant subject); *Christine v. Davis*, 600 Fed.Appx. 47 (3d Cir. 2015)(officers did not engage in excessive force when taking arrestee to ground and using knee strikes to control suspect's hands for cuffing).

Baker used 3-4 knee strikes to Layton's right shoulder to prevent Layton from standing. Layton did not respond to the knee strikes as expected; instead, he continued to forcibly resist arrest and again pushed himself to an elevated position. In response, Baker placed his knee on Layton's right shoulder and held him to the ground for a few seconds until officers were able to place a handcuff on Layton's right wrist. After the right handcuff was placed Baker removed his knee, Layton pulled his right arm free, causing Baker to reasonably fear Layton could use the handcuff, affixed to his right wrist, as a weapon to strike officers. To control Layton's right arm, Baker delivered 5-6 close fist strikes to Layton's right arm. Collectively, each of these uses of force was reasonable and in direct response to Layton's ongoing resistance.

In *Bennett v. Britton*, 609 Fed.Appx. 11 (2d Cir. 2015), the Second Circuit considered the use of strikes to overcome a subject's resistance when he swung his belt at officers. The Court found the strikes were reasonable due to the threat presented by the subject. *Id.* at 14. Layton's conduct is analogous to the arrestee in *Bennett*. Like *Bennett*, Layton presented a threat when his right wrist was handcuffed, but, due to his resistance, the handcuff could not be linked to his other wrist. Given Layton's location in the narrow entryway, it was reasonable for Baker to conclude allowing Layton to swing his right arm may cause an officer to be struck with the handcuff, resulting in injury. *Id.* Under these circumstances, the use of strikes to control his right arm in an effort to handcuff Layton was reasonable. *Id.*; *Winters*, 254 F.3d at 764.

Despite the officers' combined efforts to gain control over Layton, he continued actively fighting with "super-human" strength. Thus, the officers' use of force gradually

18

increased, in proportion to the degree of resistance presented by Layton.  Because the knee and fist strikes did not allow the officers to handcuff Layton, Groby next attempted a pressure-point behind Layton's left ear.  To do so, she briefly held his head to the floor.  Under these circumstances, the use of a pressure-point, and momentarily holding Layton's head to the floor to complete this technique, were reasonable.  *Bussey-Morice v. Kennedy*, 657 Fed.Appx. 909, 913 (11th Cir. 2016)(restraining arrestee's head with hand while applying pressure-point did not violate arrestee's constitutional rights)(*Bussey-Morice II*); *Forrester v. City of San Diego*, 25 F.3d 804, 807-08 (9th Cir. 1994)(use of pressure-point techniques to overcome protesters' resistance was constitutional).

As the pressure-point and knee/fist strikes were ineffective and Layton was not handcuffed, the officers again were required to recalibrate the force necessary to control Layton.  At this time, Layton had been fighting, non-stop, with the officers for over two minutes.  (*Ex. 7*, at 4:45:30-4:47:38).  Due to his strength and combativeness, the officers were fatiguing.  Accordingly, Burgess decided to drive-stun Layton with her Taser.  She delivered a 2-second drive stun to Layton's right hamstring.  When the first 2-second drive-stun was ineffective, Burgess deployed her Taser for a second 2-second activation 13 seconds later.  (*Ex. 14*).  Given Layton's uncontrollable resistance, the use of the Taser was reasonable.  *DeBoise v. Taser Intern., Inc.*, 760 F.3d 892 (8th Cir. 2014); *Carpenter v. Gage*, 686 F.3d 644, 649-50 (8th Cir. 2012).

In *DeBoise*, officers were attempting to take a schizophrenic into custody. *DeBoise*, 760 F.3d at 895.  He refused to comply with commands to lie on the ground and put his hands behind his back.  Rather, he screamed at the officers.  *Id.*  The Court found,

19

based on his violent and aggressive behavior, including kicking at officers and failing to comply with officer orders, the officers reasonably concluded he presented a threat to them or others, justifying tasing him eight times in probe-mode and twice in drive-stun. *Id.* at 895-98.  The Eighth Circuit found the use of force was reasonable, stating:

> no reasonable officer, observing DeBoise's behavior, would have understood the actions to be so disproportionate and unnecessary to amount to a violation of DeBoise's rights.

*Id.* at 897.  Here, like *DeBoise*, Layton's active and aggressive resistance, including kicking and swinging his arms as the officers were attempting to handcuff him, supported Burgress' Taser user.  *Id.*; *Carpenter,* 686 F.3d at 649-50.  Moreover, the Taser use in this case—two drive-stuns lasting two seconds each—was far fewer than the eight 5-second deployments in probe mode and two drive-stuns the Eighth Circuit found reasonable, under similar circumstances, in *DeBoise.*

Immediately following the Taser activations, Burgess, who believed the Taser was ineffective due to Layton's continued resistance, attempted to hold down his legs so the officers could handcuff him.  Only at that time, more than three minutes into the struggle, were the officers able to handcuff him, using two sets of handcuffs to minimize Layton's risk of injury.  (*Ex. 7*, at 4:48:29; *Huettl*, p. 51; *Burgess*, p. 44).

Despite the handcuffs, Layton continued to resist, raising his chest off of the ground while kicking the officers.  In an attempt to control his legs, Best pushed Layton's feet into his buttocks.  This was unsuccessful as Layton kicked Best in the chest 2-3 times.  (*Best*, p. 74).  Due to his unrelenting resistance, the officers attempted to control

Layton's legs with a leg restraint, which was linked to his handcuffs.  The leg restraint was applied at 4:53:42.  (*Ex. 7 & 25*, at 4:49:07-4:53:42).

This Court refused to find a constitutional violation where officers used prone restraint when confronted with a violently resisting inmate, placing the inmate prone and using bodyweight and leg restraints to control him.  *Ryan v. Armstrong*, 154 F.Supp.3d 798, 810-11 (D.Minn. 2016), *aff'd in part, rev'd in part*, 850 F.3d 419 (affirming dismissal of excessive force claim); *Smith v. City of Minneapolis*, 2012 WL 12848434 (D.Minn. 2012)(dismissing use of force claim based, in part, on allegations of prone restraint, where suspect violently resisted), *aff'd* 754 F.3d 541; *Brandt v. Davis*, 191 F.3d 887, 891-92 (8th Cir. 1999); *Wagner v. Bay City, Tex.,* 227 F.3d 316, 324 (5th Cir. 2000)(dismissing force claim when officers pepper sprayed man, placed him face-down, and placed knee on man's neck/back while handcuffing him); *Gregory v. County of Maui,* 523 F.3d 1103, 1107-09 (9th Cir. 2008)(struggle with arrestee did not amount to unreasonable force, as it was proportionate to the threat posed to the officers).

In *Ryan v. Armstrong*, this Court considered the use of prone restraint, including shackling the inmate's ankles with his legs crossed and bent back at the knees, and applying bodyweight to an individual's back, coupled with two Taser drive-stuns.  *Ryan*, 154 F.Supp.3d at 810-11.  The Court found the officers' actions were objectively reasonable given the inmate's physical resistance and aggressive behavior that caused minor injuries to several officers.  Moreover, the Court found the officers' use of "a considerable amount" of bodyweight on the inmate's back was insufficient to create a fact issue for trial as the inmate was exhibiting extreme strength and resistance, which

posed a threat to the officers.  *Id.*  The Eighth Circuit affirmed, holding, in light of Plaintiff's violent resistance, "none of the defendants' actions, either singly or in combination, amounted to an objectively unreasonable application of force."  *Ryan*, 850 F.3d at 428.  Based on the inmate's continued and violent physical resistance, the use of prone restraint techniques were deemed reasonable.

Here, Layton's resistance was unrelenting and violent, resulting in minor injuries to two officers and a bystander.  His combative and aggressive behavior presented a serious threat to officer and bystander safety.  In light of his violence, which is supported by <u>all</u> witnesses who observed his arrest, placing Layton in a prone position with leg restraints and using the officers' weight and/or hands, intermittently, to hold him to the ground was reasonable.  *Ryan*, 850 F.3d at 427-28; *Brandt*, 191 F.3d at 891-92.

Even after Layton was in restraints, he continued to fight, spitting at the officers, moving side-to-side, and elevating his chest of the ground.  When Layton began spitting, Huettl put a spit mask on Layton.  Courts consistently find it reasonable for officers to use spit masks to avoid being spat at during arrests.  *Boyd v. Pollard*, 621 Fed.Appx. 352, 354-55 (7th Cir. 2015)(use of spit mask to prevent inmate from spitting on nurse was constitutional); *Bussey-Morice II*, 657 Fed.Appx. at 914 (use of pillowcase to cover arrestee's head, preventing arrestee from spitting, was constitutional).  Given Layton's behavior, Huettl's use of a spit mask to prevent Layton from spitting on the officers was not unconstitutionally excessive.

Finally, in response to Layton's continued resistance, the officers, in their judgment, determined they could not safely place Layton on his side as it was likely he

would strike his head against the adjacent wall or carts when he struggled against the restraints. Accordingly, while awaiting Gold Cross, Baker, who was monitoring Layton's condition, used his hands intermittently to guide Layton back to the ground. Due to Layton's unrelenting resistance and the tight space in the entryway, Baker's actions were not unconstitutionally excessive. *Giannetti v. City of Stillwater,* 216 Fed.Appx. 756, 765-66 (10th Cir. 2007)(finding no unreasonable force used when officers placed hands and knees on decedent, who continued to actively resist after being placed in a prone position); *Bornstad v. Honey Brook Twp.*, 211 Fed.Appx. 118, 123-25 (3d Cir. 2007)(finding placing a knee on decedent's chest and turning him over on his stomach did not constitute excessive force when he was actively resisting arrest).

Once Gold Cross arrived, paramedics took over monitoring Layton and directed his positioning on the cot and Layton's leg restraints were unhooked from his handcuffs. At that time, he reared up from the cot so Baker got onto the cot and held Layton's left shoulder down for a few seconds to allow paramedics to apply soft restraints and cot straps necessary to ensure Layton, as well as the paramedics' and officers', safety during transport. Given the circumstances, Baker's use of force to facilitate securing Layton to the cot was reasonable. *Bussey-Morice II*, 657 Fed.Appx. at 914-15 (using knee to press down on suspect's head, while on hospital bed, was reasonable to overcome his resistance); *Estate of Phillips v. Milwaukee*, 123 F.3d 586 (7th Cir. 1997)(no claim for excessive force when, due to his resistance, suspect was held in prone position with knee in his back and monitored by officers awaiting transport).

In sum, the *Graham* factors are met because: (1) Layton was suspected of a serious crime—assaulting an officer; and (2) he violently resisted arrest, despite officer commands to stop resisting, presenting an ongoing threat to the safety of the officers and others. *Graham*, 490 U.S. at 396. Each officers' use of force was reasonable, in direct response to Layton's increased agitation and proportionate to his degree of resistance. Therefore, Plaintiff cannot establish Layton's Fourth Amendment rights were violated.[6]

### B. The officers are entitled to qualified immunity on Plaintiff's excessive force claims.

Even assuming the officers violated Plaintiff's constitutional rights, which is denied, the officers are nonetheless entitled to qualified immunity against any §1983 claim. "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct did not violate purely established statutory or constitutional rights which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Malley v. Briggs*, 475 U.S. 335 (1986), the U.S. Supreme Court explained, "if officers of reasonable competence could disagree on the issue, immunity should be recognized." *Id.* at 341. As such, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id.*

Qualified immunity involves a legal question—whether the officers' conduct was objectively reasonable given their individual knowledge and the clearly established law. *Waddell v. Forney*, 108 F.3d 889 (8th Cir. 1997). Earlier this year, the U.S. Supreme Court

---

[6] Plaintiff also asserts the officers should have intervened to protect Layton. *ECF 1*, ¶63. However, this allegation is not mentioned as a specific violation of Layton's Fourth Amendment rights. *Id.* at ¶¶119-126. Here, because no constitutional violations occurred, there is no basis for a failure to intervene claim.

mandated that clearly established law must be particularized to the facts of the case. *White v. Pauly*, 137 S.Ct. 548, 552 (2017). The Court noted, when the plaintiff failed to identify a case where an officer, acting under similar circumstances, was held to have violated the Fourth Amendment, qualified immunity bars plaintiff's claims. *Id.*; *De La Rosa v. White*, 2017 WL 1130225, *5 (8th Cir. 2017) Similarly, here, there are no cases that demonstrate, under similar circumstances, that the officers would have violated Layton's Fourth Amendment rights. To the contrary, as cited above, there is significant case-law supporting, where a subject forcibly resists arrest and fails to comply with officer orders, reasonable force—including the use of prone restraint—can lawfully be used to effect the arrest.

When evaluating the availability of qualified immunity, courts consider a Plaintiff's conduct during the arrest. *Ryan*, 850 F.3d at 427-28; *Foster*, 914 F.2d at 1079. Here, every witness to Layton's arrest supports the officers' assertion that Layton violently resisted. In fact, due to his resistance, Burgess, Best, and Klompenhower sustained minor injuries when they were kicked. It was not clearly established that, in light of Layton's violent, unrelenting resistance, the officers could not use force to gain control over him and prevent injuries to Layton, the officers, or bystanders. *See Ryan*, 850 F.3d at 427-28; *Giannetti*, 216 Fed.Appx. at 759-60; *Bornstad*, 211 Fed.Appx. at 123-24; *Wagner*, 227 F.3d at 324.

In *Bussey-Morice*, the Eleventh Circuit considered various uses of force to overcome a suspect's "unbelievable strength" and unrelenting resistance. *Bussey-Morice v. Gomez*, 587 Fed.Appx. 621 (11th Cir. 2014)(*Bussey-Morice I*). Officers were called to a hospital to assist in subduing a belligerent male. *Id.* at 623. The male did not comply with officer commands; rather, he pulled away and assumed a threatening stance. *Id.* at

624.  Due to his physical resistance and failure to comply with officer orders, two officers each tased the male three times in probe-mode.  The Taser appeared to be ineffective so the officers went "hands on" and attempted to pin the male to the ground.  He kicked and fought the officers, refusing to put his hands behind his back.  *Id.*  As a result, additional officers were summoned to the scene and six officers, working together, attempted to subdue and handcuff the suspect.  *Id.* at 625.  While the officers were able to get the male handcuffed, he continued to resist.  *Bussey-Morice II*, 657 Fed.Appx. at 911.  An officer pushed the male's feet toward his buttocks in an effort to prevent him from kicking the officers.  *Id.*  This was ineffective and the male began spitting.  In response, an officer used pressure-points an effort to obtain compliance and later put a pillowcase over the man's head to prevent him from spitting.  *Id.*  Further, due to his continued resistance, an officer kneeled on the suspect's head to maintain control.  *Id.*  The suspect was then placed in a four-point restraint.  *Bussey-Morice I*, 587 Fed.Appx. at 625.  Later, it was discovered he was not breathing.  *Id.*

The Eleventh Circuit considered the officers' use of force and found the officers were entitled to qualified immunity because:

> [the officer's] force increased gradually and in proportion to the degree of resistance exercised by Bussey…In light of the fact that so many of [the officer's] actions were both measured to the degree of resistance exhibited…we cannot find, that as a matter of obvious clarity, [the officer] violated Bussey's Fourth Amendment rights.

*Bussey-Morice II*, 657 Fed.Appx. at 914-15; *Bussey-Morice I*, 587 Fed.Appx. at 627 (qualified immunity for Taser use).  Further, the fact the man's erratic, violent behavior could be attributed to a medical condition did not somehow convert the officers'

otherwise reasonable use of force in response to his resistance to an unconstitutional use of force.  *See id*. at 625 (man's symptoms caused by cocaine-induce excited-delirium).

In March 2017, the Eighth Circuit also considered officers' gradual increase of the use of force necessary to control a combative inmate.  *Ryan*, 850 F.3d at 424.  In response to the inmate's resistance, he was taken to the ground, held down by several officers while attempting to handcuff and shackle him, and tased twice in drive-stun.  *Id*.  The Court found the officers use of force was reasonable and in response to the inmate's violent resistance.

Here, the officers were confronted with the type of resistance discussed in *Bussey-Morice* and *Ryan*.  Like the officers in *Bussey-Morice* and *Ryan*, the officers attempted to gain control over Layton using several use of force techniques.  Despite their best efforts, Layton, who exhibited "super-human strength," continued to resist.  As a result of his persistent, violent resistance, the officers gradually increased the force used in proportion to the degree of Layton's resistance.  Under these circumstances, it was not clearly established the officers use of force was constitutionally excessive.  *Id.*; *Bussey-Morice II*, 657 Fed.Appx. at 914-15; *Bussey-Morice I*, 587 Fed.Appx. at 627; *Bornstad*, 211 Fed.Appx. at 124.  Thus, the officers are entitled to qualified immunity.

In an effort to avoid this conclusion, Plaintiff will likely encourage this Court to mischaracterize the officers' use of leg restraints as a "hog-tie".  Few Courts have attempted to differentiate between "hog-ties" and leg restraints/hobbles.  A "hog-tie" occurs when an arrestees wrists and ankles are separated by 12 inches or less.  *See Cruz v. City of Laramie*, 239 F.3d 1183, 1186 (10th Cir. 2001), *Norris v. Engles*, 494 F.3d 634,

639 n.5 (8th Cir. 2007)(citing *Cruz* for definition of "hog-tie").   Here, there is no evidence Layton was "hog-tied" as his thighs could rest on the ground with his knees at approximately 90 degree angle.  (*Frericks*, p. 26-27; *Baker*, p. 73-74; *Burgess*, p. 51-52; *Best*, p. 130-131; *Groby*, p. 58; *Drews*, p. 65-66).

Even assuming he was "hog-tied" (which is denied), the Eighth Circuit has considered use of a "hog-tie" and has found a "hog-tie" restraint is constitutional to control a violent subject.   *Brandt,* 191 F.3d at 891-92; *Mayard v. Hopwood,* 105 F.3d 1226, 1228 (8th Cir. 1997); *Ryan,* 850 F.3d at 427-28.   In *Brandt*, a juvenile became agitated during transportation and began kicking the squad door.  Brandt was removed from the squad and kicked the officer during the process, resulting in the officer restraining Brandt by first placing pressure on his back and using leg restraints, placing Brandt in a "hog-tied" position.  The Eighth Circuit found the use of force reasonable because Brandt was an "unruly and violent arrestee" and the officers' actions were "necessary to prevent Brandt from harming himself and fleeing through a window or door in the patrol car."  *Id.* at 892.

Layton's conduct was more extreme and violent than the plaintiff in *Brandt*.  The officers struggled with Layton for nearly ten minutes before he was placed in leg restraints.  During that time, they attempted to get Layton to calm down with verbal commands.  When he failed to respond to their commands, they tried to control him with less restrictive restraints, like handcuffs.  However, these less restrictive methods were ineffective and Layton continued to kick the officers.  As he did not respond to lesser control techniques and verbal commands, it was reasonable for the officers to use leg

restraints.    In  light  of  the  case-law  cited  above  and  Layton's  violent,  continuous

resistance,  Plaintiff  cannot  establish  the  officers  use  of  leg  restraints  violated  clearly

established  law.    Accordingly,  the  officers  are  entitled  to  qualified  immunity.

## II.    PLAINTIFF'S  FOURTEENTH  AMENDMENT  CLAIMS  MUST  BE DISMISSED.

Plaintiff  alleges  Layton  was  denied  medical  care  in  violation  of  the  Fourteenth

Amendment.    As  a  practical  matter,  allegations  an  arrestee  has  been  denied  medical  care

are  properly  construed  as  Eighth  Amendment  claims.    *DeShaney v. Winnebago County

Dept. of Social Services,*  489  U.S.  189,  199-200,  (1989);  *Walton v. Dawson,*  752  F.3d

1109,  1117  (8th  Cir.  2014).    Because  Plaintiff  cannot  establish  Layton's  medical  needs

were  deliberately  disregarded,  this  claim  must  be  dismissed.

### A.  The officers were not deliberately indifferent to Layton's medical needs.

To  assert  an  Eighth  Amendment  claim,  Plaintiff  must  establish  the  officers  were

deliberately  indifferent  to  Layton's  serious  medical  condition.    *Dadd v. Anoka County*,  827

F.3d  749  (8th  Cir.  2016);  *Jackson v. Buckman*,  756  F.3d  1060  (8th  Cir.  2014).    The

deliberate  indifference  standard  requires  "both  an  objective  and  subjective  analysis."  *Id.*  at

1065.    "To  be  objectively  serious,  a  medical  need  must  have  been  'diagnosed  by  a  physician

as  requiring  treatment'  or  must  be  'so  obvious  that  even  a  layperson  would  easily  recognize

the  necessity  for  a  doctor's  attention.'"  *Id.*    In  addition,  Plaintiff  must  also  establish  the

officers  actually  knew  Layton  needed  medical  care  and  disregarded  "a  known  risk  to  the

[arrestee's]  health."  *Gordon ex rel. Gordon v. Frank*,  454  F.3d  858,  862  (8th  Cir.  2006).

This  requires  "more  than  negligence,  more  even  than  gross  negligence."  *Id.*

Plaintiff cannot establish either element.  It is undisputed Gold Cross examined Layton and determined he was not experiencing a medical emergency and did not need immediate medical attention.  Given the paramedics' assessment, Plaintiff cannot establish Layton's condition was obvious to a layperson or that the officers disregarded a known risk to Layton's health.  *Gordon*, 454 F.3d at 862; *Carpenter*, 686 F.3d at 351.

It is well-established officers can rely upon a paramedics' medical assessment. *Carpenter*, 686 F.3d at 351; *Christian v. Wagner*, 623 F.3d 608, 614 (8th Cir. 2010); *Patrick v. Lewis*, 397 F.Supp.2d 1134 (D.Minn. 2005); *Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002).  In *Carpenter*, officers struggled to restrain an actively resistant suspect, who they tased multiple times.  686 F.3d at 644.  After gaining control over the suspect, the officers called paramedics.  The paramedics did not tell the officers the suspect needed to be treated or object to transporting him to jail.  *Id.* at 651.  It was later determined Carpenter was having a stroke.  The Eighth Circuit held the plaintiff could not state a deliberate indifference claim because "medical professionals…never even suggested that treatment was warranted" and, thus, "there is insufficient evidence that a need for medical treatment was so obvious that the sheriff's deputies exhibited deliberate indifference by taking Carpenter to jail." *Id.*

Like the officers in *Carpenter*, it was reasonable for the officers to rely upon the paramedics' medical assessment.  Drews and Burt evaluated Layton and concluded his behavior "did not [present] a medical emergency" and did not warrant immediate medical treatment.  (*Burt*, p. 133-136).  In light of the paramedics' assessment and opinion Layton could be safely transported jail, Plaintiff cannot establish the officers actually knew Layton

was experiencing a life threatening medical condition and were deliberately indifferent to it. *Id.*; *Wagner*, 227 F.3d at 325 (taking a combative arrestee to jail, who continued to groan during transport, but was found unresponsive upon arrival at jail did not support an Eighth Amendment claim because the officers' "actions are a far cry from the deliberate difference required to establish liability.").

While it is anticipated Plaintiff will argue Gold Cross was requested for transport only, the officers' reason to summon paramedics to the scene is irrelevant.  (*Ex. 24*).  In *Wagner v. Bay City*, the Fifth Circuit dismissed a plaintiff's deliberate indifference claim, which was based on an officer's conclusion an arrestee should be transported to jail, rather than the hospital.  *Wagner*, 227 F.3d at 319.  The officer did not contact paramedics; rather, the handcuffed arrestee was placed in the back of the squad car in a prone position and driven to jail.  *Id.*  During transport, the arrestee stopped struggling, but the officer heard "a couple of groans."  *Id.*  When the squad arrived at the jail, the arrestee was unresponsive. *Id.*  The Court found the plaintiff's deliberate indifference claim failed because the officer, who heard the arrestee groaning during transport, had no reason to believe the arrestee's breathing was compromised and, upon discovery the arrestee was not breathing, immediately began CPR.  *Id.*  at 325.  Thus, the plaintiff could not establish the subjective element of a deliberate indifference claim.  *Id.*

Here, more compelling than *Wagner*, the officers called paramedics to the scene to assess Layton and ensure he was safely transported to jail.  En-route to the jail, Burt monitored Layton's condition and assured officers he had a pulse when he became still.

31

(*Ex. 24*).  Under these circumstances, Plaintiff cannot establish the subjective element of a deliberate indifference claim.  *Wagner*, 227 F.3d at 325; *Carpenter*, 686 F.3d at 651.

### B. The officers are entitled to qualified immunity on Plaintiff's Eighth Amendment claim.

Case-law supports that it is reasonable for officers to rely upon trained-professionals' medical assessments.  *Carpenter*, 686 F.3d at 651; *Meloy*, 302 F.3d at 849. In light of this well-established case-law, Plaintiff cannot establish the officers violated clearly established law when they transported Layton to jail, rather than the hospital.

Further, to defeat qualified immunity on a deliberate indifference claim, Plaintiff must meet a high threshold.  In *Jones v. Minn. Dept. of Corrections*, 512 F.3d 478 (8th Cir. 2008), an woman, at booking, did not respond to commands and was "mumbling and exhibiting a blank stare."  *Id.* at 479.  Her breathing was "heavy," "labored," and "fast paced" and she smelled of urine.  *Id.* at 480.  She was assessed by an intake nurse, who noted she was "uncomfortable, grunting, with dried blood on her mouth and lips" and had respirations three times faster than normal.  *Id.*  The inmate was moved a cell, later found unresponsive and pronounced dead.  *Id.*  The Eighth Circuit found the intake nurse was entitled to qualified immunity because her symptoms "did not constitute a sufficiently obvious medical issue."  *Id.* at 482.  If the symptoms present in *Jones* were insufficient to show an obvious medical need and supported a finding of qualified immunity against a trained medical professional, the symptoms exhibited by Layton were clearly insufficient to provide the officers with notice Layton needed immediate medical attention.  As Plaintiff cannot cite to any case-law establishing it was clearly unreasonable for the officers to rely

upon the paramedics medical assessment, the officers are entitled to qualified immunity. *White*, 137 S.Ct. at 552.

## IV.   PLAINTIFF'S STATE-LAW CLAIMS MUST BE DISMISSED.

### A.   Officers are entitled to official immunity.

Plaintiff asserted a state-law claim for wrongful death against the officers.  Applying the arguments above, Plaintiff has not established any wrongdoing, but even if she had, the officers' actions are protected by official immunity.  "Official immunity is an immunity from suit and the question may be appropriately resolved on summary judgment." *Reuter v. City of New Hope*, 449 N.W.2d 745, 751 (Minn.App. 1990).  "Official immunity 'prevents a public official charged by law with duties which call for the exercise of his judgment or discretion' from being held personally liable for damages, unless the official has committed a willful or malicious act." *Elwood v. County of Rice*, 423 N.W.2d 671, 677 (Minn. 1988).

A ministerial duty is one that is "absolute, certain and imperative, involving merely the execution of a specific duty arising from fixed and designated facts." *Anderson v. Anoka-Hennepin Independent Sch. Dist. 11*, 678 N.W.2d 651, 656 (Minn. 2004).  "In contrast, a duty is discretionary if it involves 'more individual professional judgment that necessarily reflects the professional goal and factors of a situation.'" *Mumm v. Mornson*, 708 N.W.2d 475, 490-91 (Minn. 2006).  The Minnesota Supreme Court has explained, "police charged with the duty to prevent crime and enforce the laws are not purely 'ministerial officers' in that many of their duties are of an 'executive character involving the exercise of discretion.'" *Elwood*, 423 N.W.2d at 678.  Malice, in the immunity context, means "the intentional doing of a wrongful act without legal justification or excuse, or,

33

otherwise stated, the willful violation of a known right." *Dokman v. County of Hennepin*, 637 N.W.2d 286, 296 (Minn.App. 2001).

Under this analysis, the officers are entitled to official immunity on Plaintiff's wrongful death claim. The decision to use force to restrain and detain Layton was a discretionary decision. Minnesota law recognizes officers are permitted to use reasonable force to effect a lawful arrest. Minn. Stat. §609.06, subd. 1(1)(a); §629.32; *Paradise v. City of Minneapolis*, 297 N.W.2d 152, 155 (Minn. 1980); *Dokman*, 637 N.W.2d at 294-96 (reasonable use of force during welfare check). The officers had to exercise their judgment in how to handle the risks posed by a violently resistant suspect. As the use of force was objectively reasonable, Plaintiff's wrongful death claims fail as a matter of law. *See Loch v. City of Litchfield*, 689 F.3d 961, 967-68 (8th Cir. 2012); *Johnson v. Morris*, 453 N.W.2d 31, 41 (Minn. 1990).

Moreover, official immunity is available when officers exercise discretion regarding whether a person needs medical care. *See Drake ex rel. Cotton v. Koss*, 393 F.Supp.2d 459, 466 (D.Minn. 2005). As Plaintiff cannot establish the officers were deliberately indifferent to Layton, official immunity bars Plaintiff's wrongful death claim. *Id.*

There is also no indication the officers acted with malice. The officers did not willfully violate a known right, but instead used the amount of force a reasonable officer would use when confronted with a violently resistant suspect. They also reasonably relied upon the paramedics' opinion that there was no medical emergency. Thus, they are entitled to official immunity.

**B.      The statute of limitations bars Plaintiff's wrongful death claims against Officers Best, Baker, Huettl, Burgess, and Frericks.**

Under Minnesota law, a wrongful death claim is subject to a three-year statute of limitations.  Minn. Stat. §573.02.  Thus, Plaintiff's claims needed to be commenced on or before January 1, 2016.  In Minnesota, an action is not commenced until each defendant is personally served.  Minn.R.Civ.P. 3.01; *McKenzie v. Lunds, Inc.*, 63 F.Supp.2d 986, 1001-02 (D.Minn. 1999)(Minn.R.Civ.P. apply to pendant state claims in federal court).  Failure to commence litigation before the statute of limitations runs is grounds for dismissal with prejudice of the pendant state-law claim.  *Burks v. Griffith*, 100 F.R.D. 491, 493 (N.D.N.Y. 1984).

Officers Best, Baker, Huettl, Burgess, and Frericks were not personally served until March 2016.  (*Affidavits of Best, Baker, Huettl, Burgess, & Frericks*).  Accordingly, Plaintiff commenced suit against these officers after the 3-year statute of limitations.  Therefore, Plaintiff's wrongful death claims against Best, Baker, Huettl, Burgess, and Frericks must be dismissed as a matter of law.  *Tiedeken v. Tiedeken*, 363 N.W.2d 909, 909 (Minn.App. 1985)(affirming dismissal of wrongful death action because it was brought outside three-year statute of limitations).

**V.      THERE IS NO BASIS FOR A PUNITIVE DAMAGES CLAIMS.**

Plaintiff makes a claim for punitive damages.  Punitive damages may be awarded against individuals in a §1983 action where "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involved reckless or callous indifference to

the federally protected rights of others."  *Duncan v. Wells*, 23 F.3d 1322, 1324 (8th Cir. 1994); *Smith v. Wade*, 461 U.S. 30, 56 (1983).  According to the Eighth Circuit:

> The focus, in determining propriety of punitive damages in §1983 action, is on intent of defendant, and whether defendant's conduct is of the sort that calls for deterrence and punishment over and above that provided by compensatory awards."

*Coleman v. Rahija*, 114 F.3d 778, 787 (8th Cir. 1997).  In *Coleman*, the court pointed out, even a finding of deliberate indifference, which may establish liability under §1983, does not necessitate a finding of callous indifference warranting punitive damages.

To assert a viable punitive damages claim, there must be evidence the officers' conduct was "outrageous" or "egregious."  *See Hollins v. Powell*, 773 F.2d 191, 198 (8th Cir. 1985); *Cornell v. Woods*, 69 F.3d 1383, 1391 (8th Cir. 1995).  The officers used reasonable force to restrain a violently resistant suspect that physically assaulted two of the officers and a Hy-Vee employee.  Their use of force gradually increased as lesser force tactics proved ineffective.  The officers did not intentionally harm Layton and called Gold Cross to the scene shortly after Layton was restrained.  There simply is no evidence of any outrageous or egregious conduct which would allow Plaintiff to pursue punitive damages.

## CONCLUSION

Mankato Defendants respectfully request the Court grant summary judgment and dismiss Plaintiff's claims.

Dated: April 14, 2017 **JARDINE, LOGAN & O'BRIEN, P.L.L.P.**

By:  *s/Vicki A. Hruby*
Joseph E. Flynn (A.R. #0165712)
Pat J. Skoglund (A.R. #152729)
Vicki A. Hruby (A.R. #0391163)
8519 Eagle Point Boulevard, Suite 100
Lake Elmo, MN 55042-8624
Telephone: (651) 290-6500
Facsimile: (651) 223-5070
E-Mail:     jflynn@jlolaw.com
              pskoglund@jlolaw.com
              vhruby@jlolaw.com

***Attorneys for Defendant Officers Best, Burgess,
Frericks,  Groby, Huettl, Baker***