UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Cheri Marie Hanson, as trustee for the next of kin of Andrew Layton,<br><br>                    Plaintiff,<br><br>vs.<br><br>Daniel Best, Audrey Burgess, Craig Frericks, Kyley Groby, Matthew Huettl and Kenneth Baker, individually and in their official capacities as a police officers for the City of Mankato; and Gold Cross Ambulance Service, Michael Jason Burt and Thomas John Drews.<br><br>                   Defendants. | Civil File No.: 15-CV-4578 (MJD/SER)<br><br><br>**PLAINTIFF'S MEMORADUM IN OPPOSITION TO DEFENDANT OFFICERS' MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

The medical and law enforcement communities have long-recognized use of prolonged or extended prone restraint of a person can result in asphyxiation. Due to this serious risk of death, it is clearly established under the Fourth Amendment exerting downward force or pressure onto the back of a controlled arrestee for a prolonged time constitutes excessive force. Consistent with this standard, police throughout the United States, including the Mankato Department of Public Safety ("MDPS"), have long trained their officers once a person is under control he should be put in a "recovery position" (e.g., on his side or seated).

Nevertheless, Officers Daniel Best ("Best"), Audrey Burgess (Burgess"), Kyle Groby ("Groby"), Matthew Huettl ("Huettl"), Kenneth Baker ("Baker") and Craig

Frericks ("Frericks"), (collectively as "defendant officers") working as a team restrained Andrew Layton in maximum prone restraint, applying downward force or pressure with their hands, knees and/or other body parts to Layton's head area, neck, shoulders, back, hips and upper leg areas for approximately 30 minutes after Layton's wrists were handcuffed behind his back, his legs were hobble-tied together, and he was under their control.

When Best entered the Hy-Vee, he found Layton passed out. Within nine minutes, defendant officers had Layton hogtied on the floor. There was no reason Layton could not be moved to a recovery position. However, for over 12 minutes, defendant officers intentionally left Layton "hogtied" on his stomach to punish him, because defendant officers erroneously assumed Layton was "on meth." They deliberately kept Layton hogtied to get "the energy out of him."

When defendant officers finally released Layton from the hogtie restraint, they immediately placed him in maximum prone restraint tied down on his stomach to an ambulance stretcher for transport to jail. Layton's wrists were handcuffed behind his back, his ankles were tied together, three stretcher belts were lashed across Layton's upper legs, lower and upper torso, and he had a spit hood over his mouth and nose.

Over 30 minutes after putting Layton in a prone restrain, when defendants officers finally released him from prone restraint at the jail, it was too late - Layton flatlined and was brain dead.

Because of well-established dangers associated with prolonged prone restraint related positional asphyxiation, defendant officers were trained to avoid restraining

arrestees in the prone position except for a short period of time to place handcuffs and/or leg restraints on an agitated or combative arrestee. Courts in multiple jurisdictions have also recognized the dangers.

The medical and law enforcement communities have long-recognized certain people are more at risk for prone restraint related positional asphyxiation than others. Complicating or predisposing factors that increase the risk for prone restraint related asphyxiation include alcohol intoxication, drug overdose, extreme physical exertion or extended struggling before prone restraint, mental illness, or an extremely agitated mental state of psychiatric distress referred to by police as "excited delirium." All of these complicating factors were either present or suspected in this case, but none of the officers made any reasonable effort to intercede on Layton's behalf, seriously monitor Layton's medical condition, or ensure Layton received medical care and treatment.

Dr. Michael Baden, M.D., Diplomate, National Board of Medical Examiners, Diplomate, American Board of Pathology, Forensic Pathologist, determined to a reasonable degree of medical certainty that Layton died as a direct result of defendant officers deliberate use of prolonged prone restraint with pressure on the back, neck compression with fracture of the hyoid bone, and the placing of a spit hood over his mouth and nose, which all interfered with Layton's ability to properly breathe and resulted in respiratory failure that caused a hypoxic brain injury and cardiac arrest. Layton died because he could not properly breathe, and his death was due to positional asphyxiation brought about while being restrained on his stomach by defendant officers. The manner of death was homicide. Layton would not have died had he been placed in a

recovery position and taken to the hospital. (*See* Ex. A[1] to Declaration of Bryce M. Miller, Report of Dr. Michael Baden, M.D., August 19, 2016, p. 5-6; *see also* Ex. B (photographs show neck trauma and bruising, contusions and compression facial and shoulder abrasions to Andrew Layton); Ex. C (photo of person with spit hood); Ex. D (photo of person in recovery position).)

Dr. Robert Myerburg, MD, Diplomate, Board of Cardio Vascular Diseases; Diplomate, American Board of Internal Medicine; Professor, Department of Medicine, Division of Cardiology, University of Miami School of Medicine determined to a reasonable degree of medical certainty that Layton died as a direct consequence of defendant officers' application of forceful, prolonged, maximum, prone restraint, which brought about cardiac arrest. (*See* Ex. D, Report of Dr. Robert Myerburg, M.D., August 5, 2016, p. 12.)

## FACTS

**I.    The Medical And Law Enforcement Communities Have Long Recognized The Risk Of Death Associated With Prolonged Prone Restraint.**

The term "prone restraint" means to restrain a person face down on his chest or stomach. Police often use a technique referred to as "foot sweep" or "leg sweep," which consists of an officer placing a person face down on the ground, and the officer then physically applying downward pressure with his/her hands, knees, or other body parts to the individual's shoulders, back, hips, and/or upper legs to control the person for applying

---

[1] Throughout this memorandum, alphabetical exhibits are attached to the Declaration of Bryce M. Miller and numerical exhibits are attached to the Affidavit of Vicki A. Hruby, Dkt. 73.)

handcuffs.

The United States Department of Justice has warned police about dangers associated with prone restraint since at least June 1995. The risk of positional asphyxia is compounded when a person with predisposing factors becomes involved in a violent struggle with police, particularly when physical restraint includes behind-the-back handcuffing combined with placing the person in a stomach down position. (*See* Ex. E, National Law Enforcement Technology Center, *Positional Asphyxia – Sudden Death*, p.2 (June 1995); *See* Ex. F, *Memorandum Re: Positional Asphyxia, Bogazis, Jeffrey, et. al. v. Bristol Hospital, Inc. et. al.,* Docket No.: CV-03-0519859 S, Superior Court, J.D. of New Britain, June 26, 2006.) Consequently, police are trained "[a]s soon as the suspect is handcuffed, get him off his stomach." (Ex. E, p.2.)

Because of these well-established medical principles, police nationwide have long-been trained on the severe risks associated with the application of prolonged prone restraint. (Ex. G, Expert Report of John Ryan ¶¶115–116.) The danger to a person hogtied or hobble-tied has been well known and trained to police for more than two decades. (Ryan Report, ¶115-116.) This danger is exacerbated if the person is left on his stomach.  The danger of maximal restraints, such as hog-tying or hobble-tying is that breathing can be impaired particularly where the person is left in a prone position. (Ryan Report, ¶115-116.) Police are also trained that persons who are in an agitated state or are exhibiting symptoms of excited delirium syndrome, mental health crisis, or substance or alcohol intoxication are at an even greater risk of sudden-in-custody death if not moved off of their stomach and if left in the maximal restraint for a prolonged period of time.

5

(Ryan Report, ¶115-116.) Police have trained for years that once restraint is accomplished officers shall immediately take pressure off the person's back by getting the person turned onto their side or in an upright position to facilitate breathing. (Ryan Report, ¶115-116.) Police train this response due to their familiarity with the number of deaths which have resulted during the restraint process.[2] (Ryan Report, ¶115-116.)

## II.   MDPS Has Trained Its Officers Concerning The Risks of Prolonged Prone Restraint

According to Todd Miller, Director, MDPS, ("Miller") his officers are trained to know if they restrain a person with their wrists handcuffed behind their back and their legs hobble strapped together, the officer must ensure enough slack is left to allow the person to sit in an upright position, and once the person is secured the person should be placed in a seated or upright position and shall not be placed on his stomach for an extended period as this may reduce the person's ability to breathe. (Ex. H, Deposition of Todd Miller, 125:18–128:5; Ex. I, Leg Restraint Device Policy #306, §306.5 (b)-(d).) The officer must ensure the person does not roll onto and remain on his stomach. (Policy #306, §306.5(e); Miller, 126:10-18.) The RIPP Hobble is the only hobble restraint approved by the MDPS. (Miller, 124:11-16; Policy #306, §306.3.) Miller explained, while policy 306 is dated "2013-02-20," policies take more than 40 - 50 days to have officers sign off, so he believes these policies were implemented in 2012. (Miller, 125:13-17.) Miller further testified MDPS officers are trained to understand a hobble restraint must never be used as punishment. (Miller, 118:17-25.) All defendant officers

---

[2] *See El-Ghazzawy v Berthiaume*, 636 F.3d 452, 460 (8th Cir. 2011) (relying on Ryan expert opinion concerning police practices).

used RIPP Hobbles and were trained through supervisor guidance and demonstration in the proper use of RIPP Hobble. (Ex. J, Rule 30(b)(6) Deposition of City of Mankato through MDPS Officer Jeremy Clifton, 102:4-9.)[3] Each RIPP Hobble is accompanied by written, safety material. (Ex. K.) RIPP Hobble safety inserts trained defendant officers "**NEVER HOGTIE ANYONE!**" - "**NEVER Hogtie A Prisoner**." (Ex. K (*Emphasis in original*).)

## III.   MDPS Trained Defendant Officers Concerning Complicating Or Predisposing Factors That Increase The Risk Of Prone Restraint Related Asphyxiation.

Defendant officers were trained to know persons displaying signs of "excited delirium" syndrome, a recognized complicating factor for prone restraint related asphyxiation and is a serious medical concern. Defendant officers were trained that the signs/symptoms typically associated with excited delirium syndrome are:

- Bizarre and violent behavior, . . .
- Removal of clothing . . .
- Aggression
- Hyperactivitiy
- Paranoia
- Hallucination
- Incoherent speech or shouting
- Grunting or animal-like sounds
- Incredible strength or endurance (typically noticed during attempts to restrain the victim)
- Imperviousness to pain (observed during violent acts or restraint)
- Hyperthermia (overheating)/profuse sweating (even in cold weather)

(Ex. L, Prisoner Transport and Handcuffing Policy 3-100.017.)

---

[3] For depositions excerpted by both Plaintiff and Defendant Officers, deposition citations will be to the record provided by the Defendant Officers unless an alphabetical exhibit citation is offered.

Defendant officers were trained that persons who exhibit extreme agitation, violent irrational behavior accompanied by profuse sweating, extraordinary strength beyond physical characteristics, unusually high tolerance to pain or who require a protracted physical encounter with multiple officers to be brought under control, may be at an increased risk of sudden death. (Ex. M, Use of Force, Policy #300, 300.4.2, p.9; Ex. N, Taser Policy, Policy #309, 309.6, p.7; Policy #306, 306.7; *See also,* Ex. P.) Immediately following the paragraph describing the risk of sudden death, the use of force police explicitly states that "any individual exhibiting signs of distress shall be medically cleared prior to being brought to the jail."  (Policy #300, 300.4.2, p. 9)

## IV.    The Officers Wrestle Layton to the Ground and Hogtie Him.

At 04:40 a.m., Best and Baker were dispatched by MDPS to Hy-Vee to respond to a report of a person passed out in the atrium.  (Ex. 31, Best Supp. Report, p.1; Ex. 1, Best, 22:15-23.) Best said the call was "not untypical for downtown Hy-Vee because of our homeless population." (Best, 28:16-23.) At 04:45, Best arrived and walked into the store. (Ex. Q, Chronological Index of Events Occurring on Video Exhibits; Ex. 7 (Best squad video); Ex. O, Deposition of Daniel Best, 27:18-21.)

Before Best arrived, there were no reports of "commotion," "disturbance" or "rowdy behavior." No one suggested Layton had verbally threatened or had been abusive to anyone. Layton had not disturbed the peace. (Ex. O, Best, 30:9-31:14.) When Best saw Layton, he was curled up in the fetal position and unresponsive. Best assumed Layton was intoxicated and asleep. (Best, 34:1-7.)

Layton was wearing a winter coat, a hoodie pulled over his head, and white

sneakers. (Ex. O, Best, 32:18-33:9; Ex. 31, Best Report, p.1.; Ex. 8 (cell video shows Layton had one sneaker on, one off).) Best tapped Layton with his left hand. (Best, 34:11-13.) Layton began to move and to slowly stand up. (Best, 35:2-8.) "He (Layton) was starting to flex up … and—my impression … was … he was trying to balance himself a little bit ... Because he was just laying on the floor." (Best, 36:6-13 (emphasis added).)

In his report, Best said Layton leaned into him and thereby attempted to push him toward the carts. Layton did not have open eyes. (Best Report, p.2.) At his deposition, Best changed his description and said, Layton "shoved" him into some shopping carts. (Best, 36:17-18.) Although he claimed to experience brief pain from the shove, Best conceded that he did not need medical attention and he was not injured as a result of the contact. (Best, 37:3-10.)

Nonetheless, Best's immediate response was to use physical force to put Layton down on his stomach using a foot-sweep technique. (Best, 38:7-39:13; Best Report, p.2.) Best quickly mounted Layton's lower back, with his chest to Layton's back, using his weight and strength to push down. (Best, 39:9-40:20, 44:4-5; Best Report, p. 2.) Layton moaned, groaned, or made loud growling like sounds and never responded to any verbal commands. (Best Report, p. 1.)

As Best fought Layton, he enlisted the assistance of Eric Klumpenhower, the Hy-Vee manager. (Best p.51:7-12.) Klumpenhower held down Layton's right arm, while Best remained on Layton's back. (Best Report, p.2.) Best also directed cab driver Christopher Ahl to sit on Layton's legs, which Ahl did. (Best, p.52:18-53:2.)

9

Klumpenhower and Ahl got off Layton as other defendant officers arrived. (Best Report, p.3; Ex. Q.)

Baker testified that when he arrived at the Hy-Vee, Layton was prone on the floor lying face-down struggling with Best. (Ex. 2, Baker, 46:17-20; Ex. 16, Baker Report, ¶4.) Baker immediately grabbed Layton's right upper arm and delivered 3-4 knee strikes to Layton's right shoulder area. (Baker Report, ¶10.) Baker next knelt on the back of Layton's right shoulder area. (Baker Report, ¶12.) Layton continued to "squirm" under the pressure. (Baker Report, ¶12.)

Huettl testified that he arrived at the same time as Baker and "observed … Best on the ground with another male, … Layton, and, then, there was two-two other males that were in civilian clothes assisting …." (Ex. 4, Huettl, 39:1-12.) Huettl's first response was to grab "[Layton's left] arm and attempt to gain control of … his arm." (Huettl, 42:24-25.) Huettl testified Layton was "actively resisting [by] trying to pull his arms in underneath of him, and he was in the process of kind of pushing himself up." (Huettl, 45:24-46:1.). Huettl said, "[a]t that point, to prevent him from pushing himself up, and to us it's a threat, I basically grabbed ahold of his arm and pulled it out, which caused him to fall back down to the ground." (Huettl, 46:11-15.)

Baker then punched Layton with his fist 5-6 times in Layton's right arm. (Baker Report, ¶13.)  Autopsy photos show there were no marks or bruising on the upper right arm. (Ex. B.) However, Layton's face was bruised and marked with several contusions. (Ex. B.) The right side of Layton's forehead sustained a significant pressure abrasion. (Ex. B.) The front area of Layton's right shoulder sustained a significant pressure

abrasion, and Layton suffered significant neck trauma with a fracture to the Hyoid Bone. (Dr. Baden Report, p.5.)

When Groby arrived at the Hy-Vee, Layton was lying on his stomach, and Best was on top of Layton. (Ex. 3, Deposition of Kyley Lindholm ("Groby"), 28:22-29:10.) Although Groby attempted to describe Layton as trying to get off the ground, she agreed Layton never got up and had no recollection of him not in the prone position. (Groby 31:7-32:12.) Groby testified when she arrived there was a citizen sitting on Layton's legs. (Groby 32:18-19.) She asked the citizen to get off Layton's legs and: "I, at some point, shortly thereafter, applied some pressure to … [Layton's] lower back as officers tried to get his arms out from underneath him." (Groby, 36:10-13.) Groby used her hands to apply pressure above Layton's waist. (Groby, 36:14-20.). Groby admitted pressure was applied to the middle of Layton's back. (Groby, 36:21-37:15.)

When Burgess arrived at the store, she saw four officers on the floor with Layton, so she took out her taser and got down with them. (Ex. 12, Deposition of Audrey Kranz ("Burgess"), 27:22-28:1.) Burgess decided to deploy her taser on her own in the drive-stun mode to the back of Layton's thigh. (Burgess, 33:6-19; Best, 64:11-15; Best Dash cam at 04:47:43 (officer heard saying "Drive Stun Him").) The drive-stun did not appear to change Layton's demeanor. (Burgess, 33:20-23.)

After successive drive-stuns, the team of officers handcuffed Layton's wrists behind his back. (Best, 68:25-69:3; Best Report, p.3.) The officers used two sets of cuffs linked together to restrain Layton's hands behind his back. (Burgess, 44:4-23.)

Once handcuffed, defendant officers decided to further restrain Layton using a

RIPP Hobble. (Best, 70:22-71:7.) Burgess testified, as soon as the handcuffing was accomplished, she "[brought the RIPP Hobble] inside, and we all assisted in applying them." (Burgess, 45:1-9, 55:16-19.) When asked if Layton was "hogtied," Best responded: "That's a slang term for hobbling somebody." (Best, 72:23-73:1.)

Groby testified that Huettl and Baker were down by Layton when the hobble strap was applied. Specifically she said. "Not by his legs. So from the waist up, yes," one being on each side of Layton. (Groby, 50:12-23.) Huettl testified he was still holding down Layton's left side when the hobble strap was applied to Layton. (Huettl, 60:22-62:2.) Layton remained prone on his stomach.

By 04:54, the team had Layton hogtied. (*See* Ex. Q; *see also* Ex. 7 (Best dash cam audio).)  Best admitted it is his voice on the audio indicating: "We got him hogtied." (Best, 80:18-82:1.) Then Best admits to saying to someone that "[w]e're getting the energy out of him first. Then we're taking him to jail." (Best, 82:3-7.)

Best acknowledged (1) Layton's wrists were handcuffed behind his back; (2) he was placed on his stomach; (3) the RIPP Hobble was around Layton's ankles; and (4) Layton's feet were brought toward his buttocks. (Best, 73:6-75:24.) Best pulled Layton's legs up such that his lower legs and feet formed a 90-degree angle with the floor. (Best 79:19-22; Burgess, 60:4-6.) Baker testified an officer should want more than a 90-degree angle between the upper and lower legs "so enough so their body was—would be flat for free breathing." (w, Deposition of Kenneth Baker, 29:4-18.)  It was Baker's belief that Layton's legs were at more than a 90 degree angle, because one of the officers said: "Hold on. That's too far" and the strap was loosened. (Baker, 74:1-11.) Huettl did not

recall the angle of Layton's legs after he was hogtied. (Huettl, 62:7-8.)

Contrary to Best and Baker's testimony, when Gold Cross paramedic Drews arrived at 05:06, he saw Layton's legs were connected to his wrists with a strap. Drews testified, "They were at a greater than a 90 back, folded up... They were past 90, towards his ... butt, yes." (Ex. 23, Drews, 66:4-17.)  In his statement to the BCA, Burt confirmed Layton was "hogtied." (Ex. 27, Burt Statement, p.3.)

## V.   Layton Is Left Hogtied in a Prone Restraint with Officers Pushing Down on Him.

After getting Layton hogtied, Huettl put a "spit hood" on Layton, because Layton was spitting close to him. (Huettl, 63:24-64:1, 67:6-12.) Burgess did not know who remained with Layton but she was sure that Huettl and Baker were with him: "Because I recall specifically that Baker and Huettl were on either side of Layton throughout the whole—on the floor until we were able to load him on the cot." (Burgess, 46:5-8.)

In his deposition, Huettl denied that he was holding Layton down, but he acknowledged he wrote in his report within 24 hours of the event: "Baker and I ... positioned ourselves on either side of Layton, holding him down to prevent further injury to himself." (Huettl, 67:16-23, 72:13-16; Ex. 17, Huettl Report, p.2.) Significantly, Huettl admitted the team never placed Layton on his back or his side. (Huettl, 68:7-17.)

In his deposition, Best refused to acknowledge Layton was left prone on his stomach. (Best, 85:3-86:14.) Drews indicated that when the paramedics arrived Layton was positioned on his stomach. (Ex. T, Deposition of Paramedic Thomas Drews, 64:17-18.) Notwithstanding Best's recorded statements that the officers had Layton hogtied, and Best's testimony this was a slang term for the restraint technique they used, Best denied

in his deposition that the restraint used by the team was a hogtie. (Best, 85:7-86:22.) Best's testimony shows he either took no steps to place Layton in a proper position, or he was avoiding the question. Best knew that Layton should have been moved to the recovery position. (Best, 88:21-89:22.)

Frericks said Layton was never placed on his back and it was "too dangerous" to place him on his side. (Ex. 13, Frericks, 33:14-19.) Frericks explained: "Well, it would have been dangerous for him, dangerous for us, and we're not trained in putting someone on their side and to hold them there." (Frericks, 36:5-7.) Frericks's assertion that MDPS officers are not trained to place and hold someone on their side after they have been restrained is in direct contradiction of the training, instruction, and department policies described by MDPS Director Miller at his deposition. (*See* supra, Facts, Section II.)

During his deposition, Best was asked to detail how Layton was being combative and resistant after being hobble-tied. Best acknowledged that Layton, with his hands cuffed and his feet hobbled in the air, was unable to kick or punch and finally indicated that the only resistance was Layton would lean left or he would lean right. (Best, 90:16-91:15.) When Layton would try to lean to a side, the officers' response was "[t]o move him opposite of the direction that he was trying to go against us." (Best, 91:14-15.)

At his deposition, Baker acknowledged Layton was never able to get into a standing, seated, or even a kneeling position; Baker thought Layton was trying to get in a better position. (Baker, 66:10-23.) Baker testified that by using force the officers were able to limit what Layton was able to do and to keep him on his stomach. (Baker, 67:1-7.) Baker testified that while the team waited for the ambulance to arrive, he remained in

14

contact with Layton as Layton would try to roll over and Baker put weight on his shoulder to kept him positioned on his stomach while in maximum restraint, so that he would not roll over and injure his handcuffed wrists. (Baker, 84:4-86:23.) Baker testified, if Layton would move, he would use his hand on Layton's upper right shoulder to keep Layton in place. (Baker, 85:24-86:2.) Baker believes Huettl remained at Layton's left side. (Baker, 86:24-87:5.)

## VI.   The Officers Recognize Layton Experiencing Symptoms of Excited Delerium Syndrome, But Fail to Treat It As A Medical Emergency.

In his report, Huettl said, "While waiting for Gold Cross to arrive, Layton displayed a fluctuation in moods by being calm at times but then immediately would display 'raging behavior' by tensing his muscle, yelling and groaning, pushing his body to the point of exhaustion, violently flexing and shaking. Layton had pushed his body to the point he was causing himself to sweat profusely; due to the cold temperature outside, I could see steam coming from Layton's head and shoulder area." (Ex. 17, Huettl Report, p.1.)

Layton was continually yelling or growling and his words were not intelligible. (Huettl Report, p.1; Best, 48:21:49:1.) He seemed to have "superhuman" strength. (Huettl, 49:12-24.) Huettl thought Layton did not seem to respond to pain, and throughout the ordeal Layton's eyes were closed. (Huettl, 52:20-21, 62:19-20.) Best said he did not know if Layton's moans were in response to pain. (Best, 49:4-6.) Burgess acknowledged, Layton made "bizarre and animalistic sounds" throughout the whole incident. (Ex. W, Deposition of Audrey Kranz ("Burgess"), 61:19-62:3; Ex. 15, Burgess Report, p.2.) Burgess had "no clue" what was going on with Layton. (Burgess, 62:13-14.)

Burgess understood a person who was aggressive, had incoherent speech, was grunting and making animalistic sounds, exhibited incredible strength, was impervious to pain and was profusely sweating, exhibited symptoms associated with excited delirium syndrome. (Burgess, 70:23-71:21.)

Huettl also stated he was trained on "excited delirium" as of January 1, 2013. (Huettl 76:17-20.) Layton exhibited behaviors consistent with signs of excited delirium and Huettl was familiar with them. (Huettl, 73:7-76:24 (Layton sweating profusely, violent, aggressive, screaming, shouting, grunting, super human strength, imperious to pain).) Huettl acknowledged the signs or symptoms described in the MDPS policy on Use of Force were what he observed in Layton. (Ex. U, Deposition of Matthew Huettl, 78:5-79:3.) The MDPS policy provision Huettl had been trained on states a person exhibiting the symptoms may be at an increased risk for death and should be seen by medical personnel as soon as practicable. (Policy #300, 300.4.2, p.9)

Commander Frericks testified he made assumptions about Layton shortly after dealing with him, because "he was incredibly strong and that, with all of us there, it was hard to control him...And—well, as far as meth use goes, at times, they are incoherent" (Frericks, 32:22-33:1.)

## VII.   The Officers Call Gold Cross to Transport Layton to Jail

Best acknowledged around 04:58/04:59 Commander Frericks contacted dispatch requesting an ambulance to transport Layton to jail. (Best, 84:15-19.) Frericks testified he called for Gold Cross because: "I was worried that … [Layton] would not be transported safely, for him and for ourselves." (Frericks, 38:8-9.) In calling Gold Cross, Frericks was

16

concerned about positional asphyxia. (Ex. 19, Frericks Report, p.1.) Best testified he and other defendant officers did *not c*onsider taking Layton to the hospital emergency room. (Best, 92:22-93:1.) It was their intent to use the ambulance to transport Layton to jail. (Best p.93:3-94:6.)

Frericks wanted Gold Cross to assist with transport to jail, but when the ambulance arrived, Frericks claims he told Best to check with paramedics to see if Layton should go to the hospital. (Frericks, 38:24-39:3.) Frericks said, "Well, I figure with the medical personnel there, once it –they're in his—their hands, they could determine whether he should be checked out at the ER or if they should just bring him up to jail." (Frericks, 39:15-19.) Even though this was Frericks' alleged purpose, Gold Cross did not perform, or even appear to perform, an appropriate assessment of Layton. (*See* Pl. Mem., Dkt. 48 at 21-26.)

In fact, contrary to Frericks' claim that he believed Layton received medical assessment, Frericks testified Best yelled to him across the parking lot, "to the effect that they won't evaluate him in this state or something like that." (Frericks, 57:3-5; Frericks Report, p.1.) Frericks was present for the deposition of paramedic Burt, who testified the conversation with Best didn't happen. (Frericks, 57:14-16; Burt, 157:10-20.) Frericks admitted he didn't hear a conversation between Best and a paramedic. (Frericks, 57:21-25.) Paramedic Drews testified he had absolutely no recollection of any such conversation. (Drews, 167:17-168:3.)

Paramedic Drews testified: "when we first arrived, it was requested that we assist them in transporting the patient to the jail." (Ex. T, Drews 69:25-70:2.) Drews had never

done that before in his career. (Ex. T, Drews, 70:3-6.)  Burt similarly testified Layton is the only patient he has ever transported to jail. (Ex. X, Deposition of Michael Burt, 79:21-25.) Burt stated they went to the Hy-Vee to assist police in safely transporting "somebody to their facility." (Burt, 132:10-11.) Drews said that after hearing the story from the police, the decision was immediately made to take Layton to jail because that is what the police wanted. (Drews, 75:10-76:6)

Drews described his interaction with defendant officers as - "Well, in that whole conversation, that I recall, it was said that they had dealt with this person many times, and this is how he reacted on every occasion, they have to fight with him. So, it was assumed by both—well, by myself, they knew exactly what they were doing." (Ex. T, Drews, 72:13-14.)

Burt testified Layton did not need to go to the hospital because an officer, who he was unable to identify, said, based on "engagements that they've had with him before, this was a typical reaction with police enforcement." (Burt, 136:1-3.) Burt said he understood that to mean Layton "had been aggressive with police prior to this." (Burt, 136:10-11.) Drews said he was also told by defendant officers - "… [Layton] was a known meth abuser and an alcoholic... and … one of them had said they thought he was either drunk or high on meth." (Drews, 52:6-9, 73:6-14.)

Baker recalled during a period of calm, Best located Layton's wallet and took out Layton's military identification. (Baker, 94:10-17.) Baker said he then recognized Layton from a prior contact involving narcotics. (Baker, 94:21-95:15.) Baker said he believed Layton was on methamphetamines and was not experiencing any medical emergency,

just having "meth delirium." (Baker, 105:16-17.) Baker said, he did not believe the situation was a medical emergency; he viewed Layton simply as a combative suspect. (Baker, 93:11-13.) Baker did not recall any conversations among the officers that this might be a medical emergency. (Baker, 93:17-22.)

**VIII.   Layton Is Transported to Jail Restrained In A Prone Position.**

Burt and Drews were dispatched to the call at 04:58 and arrived the scene at 05:05. (Ex. X, Burt, 75:12-18.) Seven minutes later at 05:12, they were transporting Layton to jail. (Ex. X, Burt, p.76:5-14.)  Burt acknowledged in his statement to MN BCA that when they placed Layton on the stretcher - " … they released the strap they had him hog tied." (Burt, 125:2-7.)

Huettl testified he was one of the four that picked Layton up and put him on the ambulance stretcher. The officers put Layton on the stretcher in the same position he was in when he was on the floor. (Huettl, 83:17-19.) Huettl said in his report - "Gold Cross arrived on the scene, and Layton was placed on the stretcher on his stomach" by Baker, Frericks, Groby, and Huettl. (Huettl, 83:20-84:1; Huettl Report, p.2.) Kranz acknowledged Layton was "strapped facedown." (Ex. W, Burgess, 64:9-11; Burgess Report, ¶15; *See* Exhibit S (photo of Layton on stretcher at jail).) While placing the stretcher belts over Layton's prone and restrained body, Baker got up on the stretcher and put his knee to Layton's left shoulder area, pressing down with his weight and strength. (Baker, 117:21-119:7.) A witness, Joan Devens, testified that Layton had become less active and started to settle down when he was placed on the gurney.  (Ex. Y, Deposition of Joan Devens, 55:20-57:9.)

19

Burt confirmed in addition to other restraints (handcuffs and hobble strap), defendants used three transport belts, one lashed across the lower legs, one across the midsection, and one across the upper body (back of chest area). (Burt,118:19-119:10.) In Burt's statement to MN BCA he said during transport Layton's legs were cuffed, so that one strap was enough to hold his legs; Layton was in a prone position on the stretcher; and his hands were still cuffed behind him but he was not in a totally prone position due to his head facing one side. (Ex. 27, Burt Statement, p. 3-4.)

During the drive to the jail, Baker and Best rode in the ambulance with Burt and Drews. (Baker Report, ¶20.) Nine minutes after leaving the Hy-Vee, at 05:21, they arrived at the jail and Layton was brain dead. (Ex. X, Burt, 77:5-15.).

## IX.   Police Practices Expert John Ryan's Conclusions.

Based upon his specialized background, education, experience, and training, as well as his continued research authoring, auditing, consulting and training on law enforcement practices nationwide, including his review of discovery in this case, Ryan concluded the manner of prolonged restraint of Layton was contrary to all generally accepted policies, practices, training and legal mandates. (Ryan Report, ¶ 113.)

Regardless of how the defendant officers attempt to characterize how precisely the restraint was applied to Layton, it cannot be disputed Layton was placed in maximum (four point) restraint (on his stomach) for a prolonged period of time. (Ryan Report, ¶114.) Two basic principles adopted by all police when a person is restrained include first, take pressure off the persons back and move the person off their stomach and two, monitor their physical stress, especially when the subject is demonstrating signs of

20

distress. (Ryan Report ¶¶114, 116.) Any reasonable officer would have recognized continued pressure, even if intermittent was inconsistent with generally accepted policies, practices, training, and legal mandates. (Ryan Report, ¶117.) Ryan further concluded the manner in which defendant officers kept pressure on Layton subsequent to the completion of maximal restraint was contrary to all generally accepted police policies and practices. (Ryan Report, ¶117.)

Police throughout the United States are familiar with the concept of compression asphyxia sometimes referred to in police training as mechanical asphyxiation (positional asphyxiation). (Ryan Report, ¶123) Officers are taught pressure applied to the back of a prone subject can impair breathing and therefore once the subject is restrained all pressure should be removed from the subject's back. (Ryan Report, ¶123.)

Ryan further concluded any reasonable officer would have recognized Layton, who had just been the subject of a use of force, was in a medical emergency and would have recognized the need for Layton to receive immediate medical care. (Ryan Report, ¶124.) The testimony of the defendant officers, including and especially the supervisory officer, shows Layton was to be taken to jail rather than a hospital, notwithstanding defendant officers' beliefs Layton was "methed out;" in an altered state, suffering "meth delirium," was super strong, was speaking unintelligibly, and was sweating profusely, was contrary to all generally accepted policies, practices, training, and legal mandates. (Ryan Report, ¶124.)

It is well known in police training one of the causes of such delirium is drug use. Defendant officers erroneously diagnosed or concluded Layton was in a state of "Meth

Delirium," and Best incorrectly concluded Layton was "methed out." Any reasonable officer would have recognized if someone is "methed-out" or in "meth delirium" they should be transported to hospital for evaluation, particularly when exhibiting super-strength, incoherent language, and agitated behavior. These are the very signs or symptoms trained to defendant officers with respect to persons experiencing excited delirium syndrome. (Ryan Report, ¶128.) Best indicated that he was supposed to follow the policy if he thought it was excited delirium syndrome but indicated he thought it was methamphetamine at the time. (Ryan Report, ¶129.)

Ryan further concluded Commander Frericks actions in standing by while Layton was kept in a prone position while hobble-tied or hogtied and who determined initially, notwithstanding Layton's behavioral clues, Layton should go to jail, as well as allowing Layton to be transported to the jail rather than hospital, fell far below the generally accepted policies, practices, and training for the supervisory function in law enforcement. (Ryan Report, ¶132.)

## ARGUMENT

### I.    Defendant Officers Motion to Dismiss the Federal Claims Must Be Denied.

#### A.    Summary Judgment Is Rarely Appropriate In Excessive Force Cases.

For this motion, Court must view the facts and inferences in the light most favorable to the Plaintiff. *Boerner v. Brown & Williamson Tobacco Corp.*, 260 F.3d 837, 841 (8th Cir. 2001). The "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Afremov v. Sulloway & Hollis, P.L.L.C.,* 922 F. Supp 2d 800, 805 (D. Minn. 2013) (*quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 255 (1986)). The Court must disregard any evidence favoring defendant that the jury is not required to believe. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Where a reasonable inference can be drawn from the evidence, that inference creates a genuine issue of material fact, and summary judgment is inappropriate and should be left for the fact finder to decide what inferences to believe. *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999). Summary judgment is rarely appropriate in excessive force cases because the question of whether force is excessive is typically "a question of fact." *Haggins v. City of St. Paul*, 2010 WL 1380134, at *7 (D. Minn. 2010) (quoting *Duncan v. Storie,* 869 F.2d 1100,1103 (8th Cir. 1989), *cert. denied*, 493 U.S. 852, (1989)).

    **B.**    **Defendant Officers Violated The Fourth Amendment by Restraining Layton In A Prone Position On His Stomach For Over 30 Minutes and Applying Downward Force Or Pressure On Layton's Back After He Was Subdued, Secured, and Controlled Without Monitoring His Medical Condition.**

To prove excessive force, Plaintiff must show Layton was subjected to a seizure within the meaning of the Fourth Amendment through application of force. A seizure occurs when a police officer by means of physical force restrains the liberty of a citizen. *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) citing *Terry v. Ohio,* 392 U.S. 1 (1968). It is indisputable defendant officers were seizing Layton when they forcefully kept him in a maximum prone restraint position for over 30 minutes. Plaintiff is not challenging the force defendant officers used on Layton prior to handcuffing and the decision to use the RIPP Hobble. Therefor the critical inquiry is whether defendant officers' conduct after Layton was subdued and controlled was objectively reasonable.

The question is whether the defendant officers' actions are objectively reasonable

in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Graham,* 490 U.S. at 397 (citations omitted). To determine whether an officer's use of force is reasonable, courts consider such things as (1) severity of offense at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest, or attempting to evade arrest by flight. A court may also consider the result of the force, the extent of the person's injuries, as well as standard police procedures. *Shannon v. Koehler,* 673 F.Supp. 2d 759, 783 (N.D. Iowa 2009) (*citing, Mann v Yarnell*, 497 F.3d 822, 826 (8th Cir. 2007).

Before Layton was subdued, controlled, wrists handcuffed behind his back, ankles hobble-tied, and with a spit hood placed over mouth and nose, arguably it would be reasonable for defendant officers to assert Layton committed assault on an officer; specifically, assault in the 4th degree in violation of Minn. Statute § 609.2231. While a couple of defendant officers complained of pain, they acknowledged it was short lived and none of the defendant officers needed any medical attention. Defendant officers had no evidence Layton committed any crime before the initial contact with Layton. Before they hogtied Layton and kept him on his stomach, defendant officers recognized Layton might be experiencing drug overdose or suffering from mental illness because of the behaviors associated with excited delirium syndrome. Therefore, a reasonable inference can be made that defendant officers understood they were dealing with a person suffering from drug overdose and psychiatric medical emergency, rather than some guy intent upon engaging in criminal conduct. However, once Layton was handcuffed and hobble-tied, he

was subdued and controlled under the law, posing no threat to defendant officers or anyone else.

When a person has been restrained an officer's constitutional authority to use force is significantly more circumscribed. *Morrison v. Bd. Of Trustees Of Green T.P.*, 583 F.3d 394, 405 (6th Cir. 2009). The record is clear: Layton was subdued and controlled. Layton's squirming or attempts to lean to his left or lean to his right while pressed down on his stomach should be viewed as attempts to breathe and not resist. Moreover, defendant officers cannot articulate actual resistance that occurred after Layton was hogtied and then moved into maximum prone, four-point restraint and lashed to the stretcher for transport to jail.

The Eight Circuit has recognized once a person is handcuffed and placed in prone position, they pose minimal threat. *See Henderson v. Munn*, 439 F.3d 497, 503 (8th Cir. 2006) ("… Henderson was under control lying face down on the ground with both arms handcuffed behind his back. In this compromising position, Henderson posed little or no threat to the safety of the officers or others."); *see also, Drummond v. City of Anaheim*, 343 F.3d 1052, 1057-58 ("while Drummond may have represented a threat before he was handcuffed – an action that he does not claim was in itself an excessive use of force – after he was knocked to the ground where officers cuffed his arms behind his back as he lay on his stomach, a jury could reasonably find he posed only a minimal threat to anyone's safety").

An exhausted, subdued, or controlled Layton posed minimal threat after he was handcuffed and hobble tied. It was therefore objectively unreasonable for defendant

officers to keep him 1) hogtied on his stomach and in maximum four-point prone restraint, 2) tied down to the stretcher with force or weight on his back every time he tried to lean left or lean right 3) for over 30 minutes, instead of moving him into a recovery position or on his back and transporting him to hospital.

The defendant officers rely to *Ryan v. Armstrong*, 154 F.Supp.3d 798 (D. Minn. 2016)(appealed as *Ryan, v. Armstrong*, 850 F.3d 419, 428 (8th Cir. 2017)), for support that it is not a constitutional violation to use a prone restraint with a violently resisting inmate. (*See* Def. Mem., Dkt. 68 at 21.) The case at hand is distinguishable from *Ryan* due to the relatively short period of time that Ryan was maintained in a prone position. In *Ryan*, the entire encounter lasted under five minutes with only three minutes of officers applying body weight. In fact, the defendants in *Ryan* took the action that the present defendants should have taken by rolling Ryan onto his side after getting him in a four-point restraint. *Ryan*, 154 F.Supp.3d 798, 805 (D. Minn. 2016).

Similarly, the defendant officers cite to *Smith v. City of Minneapolis*, which involved the arrestee being rolled into the recovery position immediately following being restrained. 2012 WL 12848434, *3 (D. Minn. Dec. 18, 2012) (*affirmed* 754 F.3d 541 (8th Cir. 2014)). Like the *Ryan* case, and unlike the case before this Court, after being put in restraints by officers, the officers "rolled Smith over on his side", 754 F.3d at 544, "rolled onto his side in the 'recovery position'." 2012 WL 12848434 at *3. Layton was not treated the same way because he was kept in the prone position for over 30 minutes, and continued to receive pressure and force to his back and shoulders when he struggled to breathe.

26

### C.  Defendant Officers Are Not Entitled To Qualified Immunity.

The plaintiff must show the following to overcome the shield of qualified immunity from suit: "(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional right; and (2) the right was clearly established at the time of the deprivation." *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009) (*citing, Henderson v. Munn*, 439 F.3d 497, 501-02 (8th Cir. 2006); *see, Ryan v. Armstrong*, 850 F.3d 419, 424 (8th Cir. 2017) (*citing, Pearson v. Callahan*, 555 U.S. 223 (2009).

When the use of excessive force is the claimed constitutional violation, as it is here, the case is analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 288 (1989). "The reasonableness of a use of force turns on whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him, without regard to his subjective intent or motivation." *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012) (*citing Graham*, 490 U.S. at 397). Officers must consider the "totality of the circumstances" when deciding whether the use of deadly force is justified. *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985). Evaluating the totality of the circumstances is an inherently factual inquiry and, to do so, the Court must consider the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers and others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

The second step of the qualified immunity inquiry is also "fact-intensive...and 'must be undertaken in light of the specific context of the case, not as a broad general

proposition.'" *Samuelson v. City of New Ulm*, 455 F.3d 871, 875 (8th Cir. 2006) (citations omitted). "A right is clearly established if, at the time of the challenged conduct, 'every reasonable official would have understood that what he [was] doing violate[d] that right.'" *Wallace v. City of Alexander*, 843 F.3d 763, 769 (8th Cir. 2016) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

The United States Supreme Court recently reiterated, "the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 137 S.Ct. 548, 552 (2017) (*quoting Ashcroft*, 563 U.S. at 742). Instead, "the clearly established law must be 'particularized' to the facts of the case." *Id*. "Of course, 'general statements of the law are not inherently incapable of giving fair and clear warning' to officers, but 'in light of pre-existing law the unlawfulness must be apparent.'" *White*, 137 S.Ct. at 552 (internal citations omitted).

Whether a right is clearly established is a question of law. *Atkinson v. City of Mountain View*, 709 3d 1202, 1211 (8th Cir. 2013). A court's analysis is objective; for a right to be deemed clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the law. *Id.* The court must conduct an inquiry into the specific facts of the case, while viewing the evidence in a light most favorable to the plaintiff. *Id.*

There is no doubt that on January 1, 2013, Layton's right to be free from excessive force in the context of a seizure/arrest was clearly established under the Fourth Amendment. *See Small v. McCrystal,* 708 F.3d 997, 1005 (8th Cir. 2013) (*citing Henderson v. Munn,* 439 F.3d 497, 503 (2006)).

The <u>question presented to this Court</u> regarding qualified immunity is this: Is it clearly established that it was objectively unreasonable for defendant officers, working as a team, to keep Layton in maximum four-point restraint on his stomach for 30 minutes and misuse those restraints by applying downward force or pressure with their hands, knees, or other body parts to Layton's head area, neck, shoulders, back, hips and upper leg areas, <u>after</u> Layton's wrists were handcuffed behind his back, his ankles were hobble-tied together, and he was subdued and under control. The answer is: Yes.

### 1.    Defendant Officers Had Fair Warning Their Conduct Was Objectively Unreasonable.

The Supreme Court has made it clear that there need not be a case with materially or fundamentally similar facts, in order for a reasonable person to know her/his conduct would violate the Constitution. *Young v. Selk*, 508 F.3d 868, 875 (8th Cir. 2007) (*quoting, Hope v. Pelzer*, 536 U.S. 730, 741 (8th Cir. 2002)). Officials can be on notice their conduct violates established law even in novel factual circumstances. *Hope,* 536 U.S. at 741.

The Eighth Circuit subscribes to a broad view of the concept of clearly established law. Courts are instructed to look to all available decisional law, including decisions from other courts, federal and state, when there is no binding precedent in this circuit. *Vaughn v. Ruoff,* 253 F.3d 1124, 1129 (8th Cir. 2001); s*ee Atkinson v. City of Mountain View*, 709 3d 1202, 1211 (8th Cir. 2013); *Irving v. Dormire*, 519 F.3d 441, 451 (8th Cir. 2008); *Sexton v. Martin*, 210 F.3d 905, 911 (8th Cir. 2000). "There is no requirement that 'the very action in question [be] previously ... held unlawful.'" *Vaughn*, 253 F.3d at 1129. It is enough that "earlier cases must give officials 'fair warning that their alleged treatment of

29

[the plaintiff] was unconstitutional.'" *Meloy v. Bachmeier*, 302 F.3d 845, 848 (8th Cir. 2002).

This case does not present a novel circumstance. There are numerous published opinions from other jurisdictions that gave defendant officers fair warning. Namely, subjecting Layton to prolonged maximum prone restraint, applying downward force or pressure with their hands, knees, and other body parts to Layton's head, neck, shoulders, back, hips and upper leg areas for over 30 minutes after Layton's wrists were handcuffed behind his back, his ankles were hobble-tied together, and he was subdued and under defendant officers' control, constitutes excessive force under the Fourth Amendment.

In *McCue v. City of Bangor*, 838 F. 3d 55 (1st Cir. 2016), the Circuit Court of Appeals held even without particular Supreme Court and First Circuit cases directly on point, it was clearly established that exerting force on a person's back while the person is kept in a face-down position after being subdued or incapacitated constitutes excessive force. *Id.* at 64. The Court stated that such precedent was established before the incident prompting that case, dated September 12, 2012. *Id.*

The *McCue* court relied on published decisions from at least four other circuits that had announced this constitutional rule before the incident in question. *Id.* at 57. The incident arose from a police encounter with McCue, who was acting very erratic. It was thought McCue ingested drugs called "bath salts." To restrain McCue, officers placed him in a prone position for a disputed period of minutes while two officers exerted weight on his back and shoulders. After the police intervention, McCue was declared dead. An expert for plaintiff attributed the likely cause of death due to prolonged prone

restraint in the face of a hyper-metabolic state of excited delirium. *Id.* at 56.

In the *Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008) decision, which stems from an incident in 2002, the Tenth Circuit held "the law was clearly established that applying pressure to Weigel's upper back, once he was handcuffed and his legs restrained, was unconstitutionally unreasonable due to the significant risk of positional asphyxiation associated with such action." *Id.* at 1155. The *Weigel* court relied upon lessons from *Cruz v. City of Laramie*, 239 F.3d 1183 (10th Cir. 2001).

In *Cruz,* police responded to a complaint of a naked man, Cruz, running on the exterior landing of an apartment building. *Id.* at 1186. When officers arrived, Cruz was jumping up and down and kicking his legs in the air. Officers wrestled Cruz to the ground and handcuffed him. They applied a nylon restraint to his ankles to abate his resistance. Then a metal clip was used to fasten the wrist and ankle restraints together, a restraint technique known as hog tying, leaving him on his stomach. *Id.* A short time later, Cruz's face blanched. He was rushed to the hospital and was dead on arrival. Plaintiff's expert reported Cruz's died from positional asphyxiation. *Id.*

The *Cruz* case arose out of an incident in 1996. *Id.* at 1186. The court held in 1996 when officers encountered Cruz, there was not clearly established law prohibiting the defendant officers' use of hogtie restraints. *Id.* at 1189. However, the court made clear such similar future conduct was strictly prohibited stating "officers may not apply [the hogtie] technique when an individual's diminished capacity is apparent." *Id.* at 1188. To reach their decision, the court not only evaluated hog-tying cases and the risks of the restraint technique, the court also discussed the dangers of "sudden custody death

syndrome." *Id.* at 1189.  The court addressed in detail the known "relationship between improper restraints and positional asphyxiation." *Id.* In particular, the *Cruz* court highlighted the "breathing problems created by pressure on the back and placement in a prone restraint position, especially when an individual is in a state of 'excited delirium.' These breathing problems lead to asphyxiation." *Id.*

In *Gutierrez v. City of San Antonio*, 139 F.3d 441 (5th Cir. 1998), officers approached Gutierrez, whom they initially believed was intoxicated. Soon after the encounter, officers called EMS, because they believed Gutierrez might be experiencing a toxic overdose of drugs. *Id.* at 443. Gutierrez displayed many of the signs associated with excited delirium syndrome. Officers hogtied Gutierrez and kept him on his stomach in the backseat of the squad to wait for EMS. When paramedics arrived, Gutierrez had no pulse and was pronounced dead at the ER. *Id.* at 443-44. The circuit court dismissed the officers' interlocutory appeal of the district court's denial of qualified immunity, reasoning that the definition of deadly force was clearly established before the time of the incident in 1994, and there was significant evidence that using the hogtie restraint technique could present a substantial risk of death when accompanied by leaving the person on his stomach, particularly when the person was drug intoxicated or showing signs of excited delirium syndrome. *Id.* at 449; s*ee also*, *Champion v. Outlook Nashville*, *Inc.*, 380 F. 893, 903 (6th Cir. 2004) (holding at the time of the incident in 2000, it was "clearly established that putting substantial or significant pressure on a person's back while the person is kept in a prone position after being subdued or incapacitated constitutes excessive force."); *Drummond v. City of Anaheim*, 343 F.3d 1052, 1061 (9th

Cir. 2003) (holding in 1999 the "officers allegedly crushed Drummond against the ground by pressing their weight on his neck and torso, and continuing to do so despite his repeated cries for air and despite the fact that his hands were cuffed behind his back… *Any* reasonable officer should have known that such conduct constituted … excessive force.")(emphasis in original); *Abdullahl v. City of Madison*, 423 F.3d 762, 765-771 (7th Cir. 2005)( the court found it would be improper to grant qualified immunity at summary judgment where an officer, for 30 – 45 seconds, had placed his right knee and shin on the back of a person's shoulder area and applied weight to keep the person from squirming or flailing. Abdullahl observed the arrestee had arched his back upwards as if he was trying to escape. However, the court observed such movement might not have constituted resistance but a futile attempt to breathe); see e.g. *Johnson v. City of Cincinnati*, 39 F. Supp. 2d 1013 (S.D. Ohio 199); *Swans v. City of Lansing*, 65 F.Supp. 2d 625 633-65 (W.D. Mich. 1998); *Estate of Bryant v. Buchanan*, 883 F.Supp. 1222, 1224 (S.D. Ind. 1995); *Alexander v. Beale Street Blues Company*, Inc., 106 F.Supp. 2d 934 934, 945 (W.D. Tenn. 199); *Guseman v. Martinez*, 1 F.Supp. 2d 1240, 1257 (D. Kan. 1998).

As demonstrated by all these court opinions, it was well known that the actions taken by defendant officers against Layton were prohibited as excessive force under the Fourth Amendment. They had fair warning that their conduct was objectively unreasonable.

        **2.**     **Defendant Officers Were Also Given Fair Warning That Their Actions Were Unconstitutional Through MDPS Training And Policies**.

Courts also look to an officer's training to define the contours of what is clearly

established, since it is intended to instruct officers on the boundaries of force. *See,* e.g., *Champion*, 380 F.3d at 904; *see also Weigel v. Broad*, 544 F.3d 1143, 1154-55 (10th Cir. 2008); *Drummond,* 343 F.3d at 1061-62. The *Drummond* court found training materials are relevant not only to whether the force used was excessive but also "to whether reasonable officers would have been on *notice* the force was objectively unreasonable. *Id.* at 1061-62." (emphasis in original).

MDPS Director Miller testified that defendant officers were trained to know if they restrain a person with wrists handcuffed behind the back and ankles hobble strapped together, he/she must ensure there is enough slack left to allow arrestee to sit in an upright position, and once the person is secured the person should be placed in a seated or upright position and shall not be placed on his stomach for an extended period as this may reduce the person's ability to breathe. Defendant officers were trained they must ensure the person does not roll onto and remain on his stomach. Director Miller further testified that defendant officers were trained to understand a hobble restraint must never be used as punishment.

The RIPP Hobble is the only hobble restraint approved by MDPS. All defendant officers used RIPP Hobbles and were trained through supervisor guidance and demonstration in the proper use of RIPP Hobble. Each RIPP Hobble is accompanied by written, safety material that specifically trained defendant officers "NEVER HOGTIE ANYONE!" - "NEVER Hogtie A Prisoner." (*See* Ex. K.)

In addition, defendant officers were taught that complicating or predisposing factors increase the risk of prone restraint related asphyxiation. Defendant officers were

34

specifically trained to know that a person displaying signs of "excited delirium" syndrome is a complicating factor for positional asphyxia and is a serious medical concern. Defendant officers were trained to understand excited delirium symptoms include, e.g. grunting or animal-like grunting, incoherent speech, shouting, imperviousness to pain, extraordinary strength or endurance, extreme agitation, profuse sweating, requiring a protracted physical encounter with multiple officers to be brought subdued or controlled, etc. Persons exhibiting these symptoms may be at an increased risk of sudden death.

Not only were these issues raised in MDPS training, but these are issues that law enforcement has been aware of nationwide since at least the mid-1990's. MDPS training and policies gave defendant officers fair warning their conduct here was objectively unreasonable.

**D.     Each Defendant Officer Had A Duty To Intervene To Protect Layton From Defendant Officers' Use Of Excessive Force.**

At the time of the incident, January 1, 2013, it is indisputable that a police officer may be liable for an unreasonable seizure under the Fourth Amendment if she/he fails to intervene to prevent the unconstitutional use of excessive force by another officer. *See Krout v. Goemmer*, 583 F.3d 557, 565-66 (8th Cir. 2009). In *Putman v. Gerloff,* 639 F.2d 415 (8th Cir.1981), the court held a prison guard could be liable under § 1983 if he was present and saw another correctional officer hit an inmate several times with a gun, but did nothing to stop the assault. *Id.*at 423. The court quoted *Byrd v. Brishke,* 466 F.2d 6 (7th Cir.1972), for the proposition "one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who

35

summarily punish a third person in his presence or otherwise within his knowledge." *Id.* at 11.

This duty of a police officer to intervene to prevent the excessive use of force - where the officer is aware of the abuse and the duration of the episode is sufficient to permit an inference of tacit collaboration - was also recognized in numerous appellate decisions as of 2006, without any serious dispute from other quarters. *Krout,* 583 F.3d at 566; *see also Torres–Rivera v. O'Neill–Cancel,* 406 F.3d 43, 51–52 (1st Cir.2005); *Priester v. City of Riviera Beach,* 208 F.3d 919, 924–25 (11th Cir.2000); *Ensley v. Soper,* 142 F.3d 1402, 1407 (11th Cir.1998); *Mick v. Brewer,* 76 F.3d 1127, 1136 (10th Cir.1996); *Gaudreault v. Municipality of Salem,* 923 F.2d 203, 207 n. 3 (1st Cir.1990) (per curiam); *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988); *Bruner v. Dunaway,* 684 F.2d 422, 426 (6th Cir.1982). Other decisions from this circuit have applied the general proposition in various contexts. *See Williams v. Mueller,* 13 F.3d 1214, 1216 (8th Cir.1994); *Buckner v. Hollins,* 983 F.2d 119, 122 (8th Cir.1993); *Arnold v. Jones,* 891 F.2d 1370, 1372–74 (8th Cir.1989); *Webb v. Hiykel,* 713 F.2d 405, 408 (8th Cir.1983).

Taking the facts in the light most favorable to Layton, the evidence supports a finding that defendant officers violated Layton's clearly established rights under the Fourth Amendment by failing to intervene when they had a duty and opportunity to do so. There is a submissible case defendant officers used excessive force against Layton.

It is indisputable that after Layton was subdued and controlled by defendant officers, he was hogtied and kept on his stomach for more than 12 minutes; and after he

was released from the hogtie restraint he was tied to a stretcher on his stomach with his wrists still handcuffed behind his back, his ankles hobble tied together and three stretcher belts were lashed across his upper thigh area, lower back, and upper back areas to further restrain him on his stomach. Furthermore, individual defendant officers forcefully used their hands, knees, strength or weight to force down on Layton every time he squirmed on the floor or stretcher or attempted to lean to his left side or lean to his right side.

Defendant officers kept Layton in maximum prone restraint for over 30 minutes before he flat-lined and died as a direct result of positional restraint asphyxiation. This type of gratuitous force against Layton, who had been subdued and controlled with maximum four-point restraint on his stomach, is objectively unreasonable under the Fourth Amendment.

There is also ample evidence in the record from which a jury could find that individual defendant officers observed this use of excessive force and had an adequate opportunity to intervene and stop it, but unreasonably failed to do so. All defendant officers were on the scene after Layton was subdued, handcuffed behind his back, hogtied, and tied on his stomach to the ambulance stretcher. All defendant officers were present on the scene after Layton was subdued and controlled and individual defendant officers used their hands, knees, strength to push or force down on Layton every time Layton squirmed on the floor or attempted to lean to his left or lean to his right, limited by his restraints, reacting to pain or attempting to breathe.

Given the time defendant officers kept Layton in maximum prone restraint, there was sufficient time for each and every defendant officer to determine exactly what was

going on, and to act appropriately. Based on these facts, a jury reasonably could find that defendant officers violated Layton's clearly established rights by failing to intervene and stop the ongoing violation. Accordingly, they are not entitled to qualified immunity on Layton's Fourth Amendment claim.

> **E.**   **It Was Clearly Established Defendant Officers Had A Constitutional Obligation To Monitor Layton's Medical Condition While They Maintained Him In Maximum Four-Point Prone Restraint.**

The Eighth Circuit has not expressly determined which amendment governs issues related to the adequacy of medical care by police officers during seizure. *See Patrick v. Lewis,* 397 F.Supp. 2d 1134, 1139 (D. Minn. 2005). Opinions from other jurisdictions establish that the Fourth Amendment applies. *See Tatum v. City and County of San Francisco,* 441 F.3d 1090, 1098-99 (9th Cir. 2006); *see also Boone v. Spurges*, 385 F. 3d 923, 933 (6th Cir. 2004) (reasoning without holding the Fourth Amendment should apply: "A seizure can be 'unreasonable' for any number of reasons, and the guarantee of reasonableness in the manner of a seizure does not seem to allow for a distinction between a claim that an officer used excessive force and a claim that the same officer denied medical care to the detainee"). Application of the Fourth Amendment is consistent with related Eighth Circuit precedent. *See e.g., Chambers v. Pennycook*, 641 F3d 898, 905 (8th Cir. 2011) (recognizing the Eighth Circuit applies the Fourth Amendment objective reasonableness standard not only to arrest, but at least through booking).

Alternatively, defendant officers' decision to take Layton to jail and deny him medical treatment at a hospital showed deliberate indifference to his need for medical attention by a doctor in violation of his clearly established constitutional rights.

Regardless of whether an "unreasonable" decision to forego treatment would violate the Constitution, the Eighth Circuit deemed it clearly established by 2008 that an arrestee has a right to be free from deliberately indifferent denials of emergency care. *Bailey v Feltman*, 810 F.3d 589, 593 (8th Cir. 2016) (*citing Spencer v. Knapheide Truck Co.,* 183 F.3D 902, 905 n. 3 (8th Cir. 1999); *Thompson v. Kin,* 730 F.3d 742, 750 (8th Cir. 2013)).

In cases like this, the Eighth Circuit has borrowed from the Eighth Amendment's deliberate indifference standard. *Bailey*, 810 F.3d at 593. To show a due process violation based on deliberate indifference, plaintiff must show Layton (1) suffered from an objectively serious medical need, and (2) defendant officers had actual knowledge of that but deliberately disregarded it. *Id.* at 594. A medical need is objectively serious if it is supported by medical evidence, such as a doctor's diagnosis or it is so obvious even a layperson would easily recognize the necessity of a doctor's attention. *Id.* Both are present here.

Butch Huston, M.D., Ramsey County Medical Examiner's Office, performed the autopsy on Layton. Based upon his review of defendant officers' reports, supplemental reports, and reports received from MN BCA concerning its investigation of the incident, Dr. Huston concluded a cause for Layton's death was related to Excited Delirium Syndrome. (Ex. 31, Autopsy Report, p.1.)

Similarly, Dr. Baden concluded that Layton "would not have died when he did if he had been brought promptly to the hospital. Driving to the jail first resulted in a more than 30 minute delay before he arrived at the hospital and took away from Mr. Layton any possibility of recovery from this hypoxic episode…" (Dr. Baden Report, p.6.)

Defendant officers were trained and understood arrestees displaying signs or symptoms of "excited delirium" syndrome have a serious medical problem. Defendant officers were trained and understood symptoms of excited delirium syndrome to include, e.g. grunting or animal-like grunting, incoherent speech, shouting, imperviousness to pain, incredible strength or endurance. Defendant officers acknowledged Layton showed signs associated with excited delirium syndrome. Defendant officers were trained and understood arrestees, who exhibit such signs or symptoms or who require a protracted physical encounter with multiple officers to be brought under control, may be at an increased risk of sudden death. They did nothing to help Layton medically, and they "did nothing" in violation of his constitutional rights.

## II. Defendants Motion to Dismiss State Law Claims Must Be Denied Because Plaintiff Has Not Alleged Stand-Alone State Law Claims.

Plaintiff has not asserted any independent state law claims against the defendant officers as the wrongful acts and omissions alleged in the complaint are violations of Federal law. (*See* Complaint, Dkt. 1, ¶154.) The purpose of §1983 is to compensate victims and deter future deprivations of federal constitutional rights. *See Owen v. City of Independence*, 445 U.S. 622, 651 (1980); *Hankins v. Finnel*, 964 F.2d 853, 861 (8th Cir. 1992). This is a wide-ranging goal and remedies can be wide-ranging as well. Federal courts can specifically draw from remedies under applicable state statutes only to the extent the state law is not inconsistent with federal law. *See Westcott v. Crinklaw*, 133 F.3d 658, 660-61 (8th Cir. 1998); *Hankins*, 964 F.2d at 861. Since there is not a Federal wrongful death statute, Plaintiff referenced the Minnesota Wrongful Death Statute to put the defendant officers on notice of the remedies sought through the federal claims.

With regard to the Federal claims under §1983, defendant officers do not challenge that those claims were commenced under Federal law through filing of the complaint and service within the time prescribed by Rule 4(m). Fed. R. Civ. P. 4(m).[4]

## III.   Plaintiffs Punitive Damage Claim Must Not be Dismissed.

Defendant officers seek a summary dismissal of Plaintiff's claim for punitive damages based on their version of the evidence and misapplication of the law. Defendant officers argue:

> The officers used reasonable force to restrain a violently resistant suspect that physically assaulted two of the officers and a Hy-Vee employee. Their use of force gradually increased as lesser force tactics proved ineffective. The officers did not intentionally harm Layton and called Gold Cross to the scene shortly after Layton was restrained.

(Defs.' Mem. p.36).

Of course, defendant officers' above summary is entirely one-sided and assumes facts in the light most favorable to the moving party, rather than the non-moving party. Defendant officers' use of the words "reasonable force" and "gradually increased", as well as describing Layton as "violently resistant" and "physically assaulted", demonstrate the slanted reasoning that is inappropriate in granting a summary judgment motion against the non-moving party.

Punitive damages may be awarded under 42 U.S.C. § 1983 when the defendant's conduct is shown to be "motivated by evil motive or intent, or when it involves reckless

---

[4] The summons and complaints were served upon Officers Best, Baker, Huettl, Burgess and Frericks on December 30, 2015, when their commanding officer accepted service on their behalf.  (*See* Dkts. 7, 8, 9, 10, 12) After the Defendant Officers raised sufficiency of process defense in their answer, Plaintiff reserved the Defendants within the 90 days to serve federal claims as a prophylactic measure

or callous indifference to the federally protected rights of others." *Schaub v. VonWald*, 638 F.3d 905, 922 (8th Cir. 2011) (affirming punitive damages awarded by Honorable James M. Rosenbaum, District of Minnesota, following a bench trial). Punitive damages punish a defendant for outrageous, intentional, or malicious conduct, and deter similar extreme conduct in the future. *Id*. "It is a question of fact whether a defendant's conduct was motivated by an evil motive or involves reckless indifference to the federally protected rights of others." *Id*. at 923 (*citing Coleman v. Rahija*, 114 F.3d 778, 787 (8th Cir. 1997).

As argued in previous sections, Layton's federally protected rights were seriously violated, and Plaintiff is entitled to seek punitive damages for those injuries. Plaintiff does not need to prove the punitive damages claim during this motion for summary judgment, and defendant officers' proffered facts are not determinative. Whether the Court will permit plaintiff to submit a punitive damage instruction to the jury will depend upon the evidence presented at trial. *Riggs v. City of Owensville*, No. 4:10-CV-793 CAS, 2011 WL 1743691, at *10 (E.D. Mo. May 4, 2011). Accordingly, Defendant officers' motion to dismiss Plaintiff's punitive damages claim should be denied.

## CONCLUSION

For the reasons discussed above, Plaintiff respectfully asks this Court to deny the Defendant Officer's Motion.

Dated: May 5, 2017                  **JAMES R. BEHRENBRINKER**

                                    *Attorney at Law*

                                    *s /James Behrenbrinker*
                                    James R. Behrenbrinker  (MN#186739)
                                    412 South Fourth Street, Suite 1050
                                    Minneapolis, MN 55415
                                    *Tel.* (612) 294-2605
                                    *Cell* (612) 419-8400
                                    *Fax* (612) 284-1791
                                    behrenbrinker.law.office@gmail.com

                                    **COLLINS, BUCKLEY, SAUNTRY
                                    & HAUGH, PLLP**

                                    *s/ Bryce M. Miller*
                                    Bryce Miller, MN#386901
                                    332 Minnesota Street, Suite W1100
                                    Saint Paul, MN 55101
                                    (651) 227-0611
                                    bmiller@cbsh.net

                                    **ATTORNEYS FOR PLAINTIFF**