UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| Cheri Marie Hanson, as trustee<br>for the next of kin of<br>Andrew Derek Layton,<br><br>       Plaintiff,<br><br>vs.<br><br>Daniel Best, Audrey Burgess,<br>Craig Fredericks, Kyley Groby,<br>Matthew Huettl, and Kenneth<br>Baker, individually and acting<br>in their official capacities<br>as City of Mankato Department<br>of Public Safety Police<br>Officers. The City of Mankato;<br>Gold Cross Ambulance: Michael<br>Jason Burt, and Thomas John<br>Drews,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) Court File No. 15-cv-04578 (MJD-SER)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **Expert Report of John J. Ryan**

1.  My name is John Ryan. I have been actively involved in police practices and law enforcement since 1981. I was an active police officer for twenty years. In the final year of my active career and since my retirement in June of 2002 from police services, I have been involved in police and law enforcement practices as a private consultant regarding law enforcement issues.

2.  My education includes a Bachelor of Science Degree in the Administration of Justice from Roger Williams University in Bristol, Rhode Island; a Master of Science Degree in the Administration of Justice from Salve Regina University in

1

EX. G

Newport, Rhode Island and; a Juris Doctor Degree from Suffolk University Law School.

3. From 1993 until 2002 I served as an adjunct faculty member in the graduate Administration of Justice Program at Salve Regina University in Newport, Rhode Island. In that capacity I was responsible for graduate courses on Constitutional Issues in Law Enforcement; Police Misconduct/Civil Liability; Managing Police Organizations; Contemporary Issues in the Justice Field; Juvenile Justice; Mental Health Law; and Business Crime.

4. Since 2000, I have written several manuals for use by police officers. Two of these manuals are extensively used by Rhode Island Law Enforcement agencies. These manuals are: Rhode Island Law Enforcement Officers' Guide to Criminal Procedure, 2000, and Rhode Island Law Enforcement Officers' Bill of Rights, A Guide to Investigations and Hearings, 2000. The other manuals are nationally distributed by the Public Agency Training Council as materials used in conjunction with training programs for public employees. These manuals are: Legal and Liability Issues in the Public Schools, 2001; Policy Development for Public Safety Agencies, 2002, Civil Liability and Risk Management for Law Enforcement Agencies, 2003, Use of Force, 2004, Administrative Investigations In Law Enforcement Agencies, 2004, Legal and Liability Issues for Hostage Negotiators, 2005, Public Safety Media Relations (Manual and Guide) 2005, Arrest Search and Seizure, 2005, and Law and Best Practices for Successful Police Operations, 12 High Risk Critical Tasks That Impact Law Enforcement Operations and Create Exposure to Liability Litigation 2007, 2010 and 2013

EX. G

editions, <u>Legal and Liability Risk Management Manual Guide-The Law and Best Practices of Successful Jail/corrections Operations</u> 2009.

5. I also author an annual publication for law enforcement officers titled, <u>Case Law for Critical Tasks in Law Enforcement.</u> This field guide provides officers with a legal update on critical tasks such as search, seizure, use of force, pursuit, investigations and interrogations. This guide has been adopted by agencies around the United States for use by law enforcement personnel.

6. I am currently the co-director of the Legal and Liability Risk Management Institute along with James Alsup, G. Patrick Gallagher and Lou Reiter. In that capacity I author and edit the institute's legal update service for law enforcement. This update service and an archive of all articles that I have written can be found at www.patc.com.

7. As part of the Legal and Liability Risk Management Institute I also conduct policy, training and operations reviews for law enforcement agencies and jails throughout the United States. These reviews focus on the manner in which agencies treat the critical tasks in law enforcement and jail operations. As part of these reviews I assist agencies in identifying areas in policy, training and operations that may be improved upon to bring the agency within the legal mandates and generally accepted practices in law enforcement and jail operations.

8. Since 1993, I have conducted numerous training sessions for public employees. Participants in this training have included law enforcement officials, school officials, attorneys and judges. I have provided training in the following areas:

EX. G

a. Policy development for public safety agencies.

b. Legal Issues in police use of force.

c. Legal Issues in internal affairs investigations.

d. Police misconduct/civil liability.

e. Legal/Liability Issues in Narcotics Operations.

f. Arrest, Search and Seizure, & Interrogation.

g. Racial profiling.

h. Legal issues in public schools.

i. Media relations for public safety agencies.

j. Constitutional update for law enforcement officers.

k. Basic training for detectives.

l. Law enforcement officers' bill of rights/due process in administrative investigations.

m. Legal/policy and decision making factors in law enforcement pursuits including use of force/intervention tactics.

n. Legal and policy Issues for hostage negotiators.

o. Legal and liability issues for SWAT operations

p. Legal and liability issues for jails

q. High Risk Critical Tasks/Best Practices in Law Enforcement Operations.

9. I am a former police Captain of the Providence Police Department in Providence, Rhode Island where I served for twenty years before retiring in 2002. During my tenure as a police officer I served in the following capacities: patrol officer in both the Patrol Division and the Tactical Unit; a detective in the

4

EX. G

Detective Bureau; a sergeant in the Patrol Division; a lieutenant in the Patrol Division; Director of Training; Director of the Department's Office of Public Affairs and; Director of the Department's Administrative Staff. During most of my career I also took an active role in researching and authoring department policy.

10. Since my retirement in June of 2002 I have taught numerous courses on police policy and procedure, arrest, search and seizure, use of force, police pursuits, dealing with the mentally ill, emotionally disturbed, and suicidal, domestic violence, law enforcement's response to autism, law and best practices in the internal affairs process, civil liability for law enforcement agencies, and specialized courses for narcotics officers, SWAT commanders, and internal affairs officers. Participants in these courses have come from thousands of law enforcement agencies around the United States. Officers in attendance have come from departments with under ten sworn officers and departments with sworn officers numbering in the thousands. These programs are conducted numerous times annually throughout the United States and also include on-line courses on these topics for law enforcement.

11. The course on policy and procedure focuses on critical tasks in law enforcement and includes, inter alia, policy issues relating to use of force; police pursuits; domestic violence; sexual harassment and external sexual misconduct; off-duty conduct; hiring & retention issues; internal affairs; supervisory practices; search and seizure; property and evidence; care, custody and transport of prisoners as well as training issues relating to critical tasks in law enforcement.

5

EX. G

12. The program on High Risk Critical Tasks/Best Practices in Law Enforcement includes instruction on Use of Force including inter alia: dealing with individuals of diminished capacity i.e. emotionally disturbed, mentally impaired; and suicidal, excited delirium, as well as persons with disabilities and use of electronic control devices; Search-Seizure and Arrest; Pursuit and Emergency Vehicle Operation; Care, Custody, Control, and Restraint of Prisoners; Domestic Violence; Off-Duty Conduct; Sexual Harassment, Discrimination, and Misconduct; Selection and Hiring; Internal Affairs; Special Operations; and Property and Evidence.

13. As a co-director of the Legal & Liability Risk Management Institute I regularly research and draft policies for law enforcement agencies and jails relating to high-risk critical tasks including use of force, arrest-search & seizure, pursuit, emergency vehicle operation, special operations, internal affairs, hiring and selection-retention of officers, care-custody-control & restraint of prisoners, sexual harassment-discrimination & sexual misconduct, domestic violence, and dealing with the mentally ill. In addition, I write, record, produce, and distribute on-line training videos for law enforcement nationwide.

14. In 2002, I was a featured speaker at the national conference for the International Association of Law Enforcement Planners, which was held in Long Beach, California.

15. In 2002, I was a featured speaker at the National Internal Affairs Investigators Association conference, which was held in Tampa, Florida.

EX. G

16. In 2004, I was a featured speaker at the Rhode Island Bar Association's Annual Meeting, speaking on Constitutional Issues related to Law Enforcement practices.

17. In 2005, I was a featured speaker at the National Sheriffs' Association Annual Conference, held in Louisville, Kentucky, where I presented training for legal advisors on Internal Affairs and Employee Discipline.

18. In 2005, I was a featured speaker at the annual national conference for Public Risk Managers (PRIMA) in Milwaukee where I conducted training for risk managers and attorneys representing police departments. One of the trainings involved use of force while the second covered the high liability areas in law enforcement operations to include arrest, warrants, and other issues involving search and seizure, as well as police pursuits.

19. I have been a featured speaker annually, to include the 2011 session, of Georgetown Law Center's annual §1983 Civil Rights Litigation program. I have regularly presented materials related to law enforcement policy, training and supervisory practices as well as use of force. In 2009 I presented materials for two sessions one of which was on the use of TASER and one, which was a panel discussion on strip searches. I have been published annually in materials from Georgetown Law Center related to this program. The 2011 session was focused on reviewing current law enforcement practices and civil liability related to TASER.

EX. G

20. In November of 2005, I was a featured speaker at the annual National Conference of the National Leagues of Cities & Towns in Seattle, Washington speaking on Contemporary Liability Risks for Law Enforcement Agencies.

21. In October of 2006, I was a featured speaker at the annual conference of National Internal Affairs Investigators' Association in Gatlinburg, Tennessee.

22. I have also provided lectures for attorneys on civil rights litigations relating to law enforcement operations, including a November of 2006 presentation for the Georgia Bar Association's ICLE program.

23. In 2007 I was a featured speaker at the annual conference for the International Municipal Lawyers Association.

24. In 2007, 2008, 2009, 2012 and 2013, I was a featured speaker at the Practising Law Institute's Annual Section 1983 Civil Rights Litigation program. My 2007 presentation in this program resulted in a law review article in the Touro Law Review (Volume 24, Number 3, pages 569-600) "Recent Developments in the Use of Excessive Force by Law Enforcement" Karen Blum/Jack Ryan. It is noted that my materials have been included in their annual publication related to this program.

25. In 2008 I was a featured speaker at the annual conference for the Association of American Law Schools, Civil Rights section, where I presented material on law enforcement policy, training, and generally accepted practices in pursuits and use of force.

26. In 2009 I was a featured speaker for the national conference for public risk managers.

EX. G

27. In 2009 I conducted executive level training on law enforcement pursuit operations for the Utah Highway Patrol.

28. In 2009 I was certified with TASER by the Muncie Indiana Police Department by a TASER certified instructor.

29. In 2009, I was a featured speaker at the Annual Kentucky Tactical Officers' Association Conference where I lectured on high risk tasks in tactical operations including high risk entries.

30. In 2009 I was the featured speaker at the Alabama Attorney General's annual "Law Enforcement Summit" where I lectured on high risk critical tasks in law enforcement to include use of force, pursuit, arrest, search and care, custody and control of prisoners.

31. In 2010, I was a featured speaker at the annual national conference for PRIMA where I presented a law enforcement risk management program titled: "Promoting Professionalism while Reducing Liability; The Impact of Policy, Training, and Supervision and Auditing Strategies."

32. In 2010, I was a featured speaker at the National Internal Affairs Investigators Association annual conference held in Indianapolis, Indiana where I lectured on Bias Free Law Enforcement/Profiling.

33. In 2010, I was a featured speaker at the annual conference of the National Council of County Association Executives, where I spoke on law enforcement liability and strategies to reduce liability by increasing professionalism.

34. In 2012 I developed a training program for law enforcement and attorneys dealing with use of force; electronic control devices; and sudden custody death.

9

EX. G

This program, which I am presenting throughout the United States, is accompanied by a text manual, which I wrote and is also being distributed nationwide. As part of this program I have trained thousands of officers with respect to the expected and appropriate response in dealing with persons who have been injured or otherwise shown physical distress during the subdual process.

35. In 2012, I was a featured speaker at the National Internal Affairs Investigators Association Annual Conference where I spoke on Use of Force and Sudden In-Custody Death.

36. In 2012 I was a featured speaker at the Texas Commission of Law Enforcement Officers Standards and Education where I presented to law enforcement trainers from throughout the State of Texas on training liability and the need for training in the high risk critical tasks in law enforcement.

37. In 2013, I was a featured speaker and panel member in a program titled "Policing in Trying Times" at Suffolk University Law School in Boston Massachusetts.

38. In 2013, I was a featured speaker at "Police K-9" magazine's national Handler Instructor Training Seminar, an annual conference for K-9 handlers and trainers. This presentation focused on the law and best practices for use of law enforcement K-9s as a tool of apprehension.

39. In 2015, I was a featured speaker at the spring conference as well as the annual conference of the International Municipal Lawyer's Association. The

EX. G

presentation topic was officer involved shootings and qualified immunity post Plumhoff.

40. In 2015, I was a featured speaker for the annual conference of IADLEST, International Association of Directors of Law Enforcement Standards and Training. My topics included "Training Liability" and "Emerging Liability Trends."

41. In 2015, I was a featured speaker at the Georgia Jail Association's Annual Conference in Savannah, Georgia where I presented topics relating to high-risk critical tasks in the jail operation.

42. In 2015, I was a featured speaker at the Arkansas Association of Chiefs of Police annual meeting where I presented materials on the Law and Best Practices for Policing in Trying Times.

43. In 2015, I was a featured speaker at the South Carolina Municipal Association's Annual Meeting for Elected Officials where I presented materials on Law Enforcement in Trying Times as well as covering issues related to law enforcement body cameras.

44. In 2015, I was a featured speaker for the Texas Commission on Law Enforcement where I provided training for 750 law enforcement trainers from throughout the State of Texas covering topics related to law enforcement liability and proper training.

45. In 2015, I was a featured speaker at the National Internal Affairs Investigators' Annual Conference where I presented training on emerging trends in law

EX. G

enforcement liability and the interplay of the Internal Affairs process with agency liability.

46. In 2016, I was a featured speaker at the annual conference of the Defense Research Institute in Austin, Texas.

47. Since 2002, I have been involved in the auditing of law enforcement operations throughout the United States conducting several audits annually based on either a need or as a proactive measure of agency performance in the high liability areas of the road and jail operation. I have been involved in assisting dozens of departments nationally through these audits in developing policy, training, and enhancing operations for law enforcement services.

48. My experience, training and background are more fully described in the attached curriculum vitae, which I incorporate by reference to this report.

49. I have reviewed the following materials to date regarding this case:

**Thumb Drive**
1. Officer Best's Squad Video
2. Hyvee store videos
3. Balgura Cell Phone video
4. Blue Earth Co Jail Booking Area Video

        C50_pre-booking area
        C52_Sallyport SE
        C54_Sallyport NW
5. Audio Recordings of Interviews

        Allison Taylor
        Andrew Taylor
        Eric Klompenhower
        Gerald Wharton
        Int- Chris Ahl
        Jackie Schmidt
        Jeffrey Kirby
        Joan Devens
        Joseph Lowe

EX. G

Michael Burt
Michelle Morris
Misty Scheurs
Peter Johnston
Thomas Drews

6. Photos of Layton Clothing (19 count)
7. BCA Case File

Blue Earth Co Attorney's office letters
ACISS Initial Report 1/5/13
CID Involvement Report 1/6/13
Mankato Dept of Public Safety-Police Division Supplemental Reports
Mankato Dept of Public Safety-Police Division Incident Reports
ACISS Investigative Supplemental Reports 1/2013
Provisional Report ME 2013-0060
Transcript-Christopher Ahl Interview
Property Release/Disposal Receipt
Evidence Sync Device Report
Transcript-Allison Taylor Interview
Transcript-Andrew Taylor Interview
Transcript-Eric Klompenhower Interview
Mayo Clinic Auth to Release Protected Health Information-Andrew Layton
Transcript-Matt Hanzel & Thomas Drews Interview
Transcript-Michael Burt Interview
Mankato Police Call for Service
Transcript-Jacqueline Schmidt Interview
Letter to Pat Hentges from Viril & Mary Layton 1/15/13
Transcript-Misty Schreurs Interview
Laboratory Analysis Requests
Ramsey Co. ME Property Releases
Office of the MED Final Autopsy Protocol
Transcript-Peter Johnston Interview
Transcript-Jeffrey Kirby Interview
Transcript-Gerald Wharton Interview
Transcript-Michelle Morris Interview
Transcript-Joan Devens Interview
Transcript-Joseph Lowe Interview
ACISS Attachment Report 4/12/13
HY-VEE Video Timeline
Officer Best Squad Video Timeline
BEC Justice Center Video Timeline
Andrew Layton Timeline
Anonymous letter & newspaper article submitted to PD
ASCLD/LAB Report o the examination of Physical Evidence
Mankato PD Incident Report 1/13/11

EX. G

Waseca PD Transmittal Slip 10/22/12
Waseca PD Incident Report 10/19/12
Supplemental Report 10/19/12
Waseca PD Investigation Reports & photos 10/19/12
Waseca Co Judicial Determination of Probable Cause to Detain
Wasecao Co Sheriff's Office fax transmittals re: 10/19/12 incident
ASCLD/LAB Reports on the Examination of Physical Evidence
11/28/12, 1/7/11
 Austin PD Incident Detail Report 10/11/10
Minnesota Bureau of Criminal Apprehension letter 3/12/13
Mankato Police Call for Service
Transcript-Jacqueline Schmidt Interview
Letter to Pat Hentges from Viril & Mary Layton 1/15/13
Transcript-Misty Schreurs Interview
Laboratory Analysis Requests
Ramsey Co. ME Property Releases
Office of the MED Final Autopsy Protocol
Transcript-Peter Johnston Interview
Transcript-Jeffrey Kirby Interview
Transcript-Gerald Wharton Interview
Transcript-Michelle Morris Interview
Transcript-Joan Devens Interview
Transcript-Joseph Lowe Interview
ACISS Attachment Report 4/12/13
HY-VEE Video Timeline
Officer Best Squad Video Timeline
BEC Justice Center Video Timeline
Andrew Layton Timeline
Anonymous letter & newspaper article submitted to PD
ASCLD/LAB Report o the examination of Physical Evidence
Mankato PD Incident Report 1/13/11
Waseca PD Transmittal Slip 10/22/12
Waseca PD Incident Report 10/19/12
Supplemental Report 10/19/12
Waseca PD Investigation Reports & photos 10/19/12
Waseca Co Judicial Determination of Probable Cause to Detain
Wasecao Co Sheriff's Office fax transmittals re: 10/19/12 incident
ASCLD/LAB Reports on the Examination of Physical Evidence
11/28/12, 1/7/11
 Austin PD Incident Detail Report 10/11/10
Minnesota Bureau of Criminal Apprehension letter 3/12/13

**7/12/16 DISC**
City of Mankato Dept. Policies
Complaint
Defendant Gold Cross
Final Autopsy Protocol

EX. G

Gold Cross Ambulance Guidelines
Joint Answer of Defendant Police Officers & City of Mankato
Mankato Police Reports
RIPP HOBBLE Manufacturer Materials
Statements taken of Third Parties by MN BCA Investigators

**BURT & DREWS FILES**
City of Mankato Dept. Policies
Complaint
Defendant Gold Cross
Final Autopsy Protocol
Gold Cross Ambulance Guidelines
Joint Answer of Defendant Police Officers & City of Mankato
Mankato Police Reports
RIPP HOBBLE
Statements taken of Third Parties by MN BCA Investigators
Burt Deposition
Drews Deposition
**DEPOS & EXHIBITS**
Baker, Kenneth (Full)
Best, Daniel (Full & EXs 1-5)
Clifton, Jeremy (Full & EXs 1-12)
Frericks, Craig (Full)
Huettl, Matthew (Full & EX 1)
Kranz, Audrey (Burgess) (Full & EX 1)
Lindholm, Kayley (Groby) (Full & EXs 1-9)
**ME AND HUSTON FILES**
16 06 04 Ramsey County ME File #1
16 06 04 Ramsey County ME File #2
16 06 04 Ramsey County ME File #3
16 06 04 Ramsey County ME File #4
Butch's CV
Huston, Butch-Full
**ANDREW LAYTON TIMELINE (pdf)**
**Exhibit 5-City of Mankato policy**
**Hobble Insert 11-12**
**Hobble Insert**
8.

50. This expert report is based upon the materials provided to this date. The
opinions presented in this report are based upon my specialized experience,
training and knowledge of police practices as well as my continued research and

15

EX. G

work with law enforcement nationally. This work includes conducting training for law enforcement around the United States as well as auditing the policies and operations of law enforcement agencies around the United States. My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision. I am familiar with police civil litigation and know the normal phases of discovery. With this in mind I recognize that there may be additional documentation as the case progresses. In the event that additional material is produced I shall be prepared to supplement this report.

51. At the outset it is important to note that this report is based upon the facts as presented by the material and specifically avoids drawing conclusions based upon credibility issues of the parties.

52. The law enforcement event reviewed in this report occurred in the City of Mankato, Minnesota on New Years day 2013 at the Hy-Vee Grocery Store located at 410 South Riverfront Drive. The event involves the interaction between Andrew Layton and officers of the City of Mankato Police Department and Gold Cross medical that ended with the death of Layton following his transport to jail.

53. Officer Best acknowledged his understanding that the involvement of the Mankato Police Department was prompted at about 0438 hours when a taxi-driver, Christopher Ahl entered the Hy-Vee store, observed a subject [Andrew Layton] sleeping on the floor in the entry way, and called 911. (Best 22). As the result of Mr. Ahl's 911 call, Officer Best along with Officer Baker were

EX. G

dispatched to the Hy-Vee store. (Best 23). Officer Best acknowledged that he entered the Hy-Vee store at approximately 0444-0445. (Best 27).

54. Officer Best testified to the nature of the call as follows: "No. I just went with what the information was. It came in as a suspicious person sleeping in the front entry, which is not untypical for downtown Hy-Vee because of our homeless population." (Best 28). Best reported that he had no information that Layton had caused any type of "commotion," "disturbance" or "rowdy behavior" at the store before Best arrived. (Best 29-30). Officer Best had no memory of people laughing as he entered the story but acknowledged that video of the incident depicted people laughing at Andrew Layton as he slept in the cart area. (Best 31-32). Officer Best acknowledged that he said to people that were there that the police were finding people sleeping all over the City of Mankato referring to these sleeping people as like finding "Easter Eggs." (Best 33). Officer Best testified that his "assumption was I thought that he was most likely intoxicated. That was my assumption. (Best 34).

55. Officer Groby (now Lindholm) testified that she "would use the term 'welfare check' to check on that person's well-being, would be similar to a suspicious person." (Groby 19)

56. Officer Best described that Andrew Layton was wearing a hoodie and while not being able to call it a jacket, acknowledged that it was a winter coat. (Best 32). Best agreed that when he observed Layton, Layton had the coat pulled up over his head. (Best 33). Officer Best indicated that Layton was wearing white tennis shoes or sneakers and he thought one of them was off. (Best 44). It is noted that

EX. G

in cell phone video provided it can be seen that during the struggle on the ground Layton has only one sneaker, however, it appears that the sneaker fell off at the start of the interaction as it is clear that he had both on when sleeping. (Cell Video). Best testified as to his initial contact stating: "Yeah. I was bending over and just kind of tapping him (indicating) with my—I think my left hand." (Best 34). Best described that he was trying to wake Layton "gently." (Best 34). Best indicated that Andrew Layton began to move and stand up. (Best 35).

57. Officer Best testified that although Layton got up, he did not open his eyes. (Best 35). Best denied that Layton started to move toward the exit and said: "He was starting to flex up (indicating) and—my impression—my impression—was that he was trying to balance himself a little bit…Because he was just laying on the floor." Best 35). Best acknowledged that he said to Layton "Don't Pull Away" but indicated that occurred after Layton shoved him back into the carts. (Best 36). When asked if the shove was depicted on the video Best responded, "Yeah…He—actually, when I'm hanging onto him, he flexes up his body. If I can explain, he flexes up with muscles and does this (indicating) and uses his body to shove me back into the carts. You can see it and hear the carts rattle. And it was painful." (Best 37). Best indicated that pain was short in duration, he did not seek medical attention and was not injured as a result of the "shove" he described. (Best 37).

58. Officer Best agreed that after telling Layton not to pull away, Best immediately took Layton to the floor using a foot-sweep or leg-sweep to decentralize Layton.

18

EX. G

(Best 38). Best described: "Yes, I'm initiating a takedown at that point in time to attempt to control the subject. Stomach is ideal place for them to be. It's harder for them to punch me." (Best 39). Best said he could not determine if Layton's eyes were still closed when he took him to the ground, because Best was behind Layton on the lower part of Layton's back with Best's chest to Layton's back. (Best 39). Best described that he was down by Layton's buttocks but was using his weight and strength to push Layton down. (Best 40). Best said that he had pressure on Layton's lower back/torso. (Best 44).

59. Officer Best testified that once on the ground he gave a loud, clear command for Andrew Layton to put his hands behind his back. (Best 40). Officer Best said that he asked Eric Klumpenhower to assist him in dealing with Layton. (Best 51-52). Best described the actions of Eric Klumpenhower, the Hy-Vee Manager at that point as follows: "He grabbed onto his right arm with both of his hand in an attempt to control him. I still couldn't see his (indicating). That's where the weapons usually are, the waistband, that type of thing. And I had already called for help, '16th fighting, 16th fighting' on my lapel mic." (Best 42). Officer Best said that he continued to try and control Layton and was not just trying to "bench press him down" "You're not going to control somebody that way. You see what I'm saying? And I could tell that he was trying to flip me off him, the way he was adjusting and maneuvering his body, and I actually thought he was going to. I was out of gas, I think was my words." (Best 43). Officer Best testified that he never had Andrew Layton on his back. (Best 50).

19

EX. G

60. Officer Best testified that Klumpenhower was trying to control Layton's right arm, while he remained on Layton's lower back and Best asked the cab driver, Christopher Ahl, who had initially called 911, to come over and assist he and Klumpenhower. (Best 52). Best said he told Ahl to sit on Layton's legs, which Ahl did. (Best 52-53).

61. Officer Best agreed that both Klumpenhower and Ahl removed themselves from Layton as other officers arrived to take over. (Best 63). Best acknowledged that at some point Officers Burgess, Groby, Huettl, and Baker arrived on the scene as well as Commander Frericks. (Best 62).

62. Officer Best was asked how many officers were on Layton when Officer Burgess used her TASER to which he responded: "What do you mean by 'on'? We were trying to control his arms and legs... Again, I can't say they were on him. We were trying to control him. Give me a second. Three, maybe four. And, then, I can't remember if some came and some went. It was fluid... The situation was changing." (Best 63-64). Best agreed there were maybe four officers touching Layton at the point that Officer Burgess deployed her TASER. (Best 64). It is noted that an officer can be heard on Officer Best's MVR saying "drive-stun him" at approximately 4:47:43 a.m. (Best MVR). Best testified that Burgess deployed her TASER twice to the back of Layton's thigh in the drive-stun mode. (Best 64). Officer Best said that he believed somebody said "Tase him but could not recall who said it." (Best 66-67).

63. Officer Best agreed that he, Burgess, Groby, Huettl, and Baker were able to get Layton handcuffed behind his back. (Best 68-69). Officer Best did not agree that

EX. G

once Layton was handcuffed he was kept prone on his stomach indicating that he was constantly moving and asserting: we couldn't control him." (Best 69). Best testified: "At one point in time, he was on his stomach and then he got to his left and then he got to his right. It was, again—I use the word 'fluid.' It was consistently in motion. Ad that's why we—even with a double set of handcuffs on him, we were still not—we didn't have him restrained enough to control him. (Best 69-70).

64. Officer Best acknowledged that after Layton was handcuffed behind his back, he and the other officer decided to further restrain Layton using a "hobble strap." (Best 70). Best believed that Officer Burgess supplied the strap. (Best 71). When asked if Andrew Layton was hogtied, Officer Best responded: "That's a slang term for hobbling somebody. (Best 71-72). Law enforcement throughout the United States uses both terms, "hog-tie" and "hobble-tie" or "hobbling." These are not slang terms in law enforcement and actually signify two distinct forms of restraint. Both of these restraint tactics involve handcuffing behind the back, restraining the ankles and then connecting the restrained ankles to the restrained wrist. All similarities end there. Hobbling or a hobble time is done with a sufficient length between the wrists and the ankles such that the person can walk under their own power at a near upright position, but not be able to run, merely hobble along. The hog-tie on the other hand is when the wrists and ankles are pulled close enough together in a manner that the individual would not be able to get up on their own and hobble along under their own power. It is

EX. G

noted that manufacturers of hobble-cords generally include in the product warning a strict prohibition on hog-ties.

65. Officer Best acknowledged that Mr. Layton was handcuffed behind his back, was laying on his stomach; the hobble was around his ankle area; and his feet were brought toward his buttocks. (Best 73/75). It is noted, that based on the testimony of officers two sets of handcuffs were used. Best described the restraint of Layton: "Yeah. You bring them up to about a 90-degree angle. You don't want to put the heels to his buttocks. At one point in time, I put the heels to his buttocks when I was physically using myself as the restrain; but when you put the hobble straps on, you don't want his heels to his buttocks... You want that—I don't know—probably from ankle to butt. I mean, I don't have a tape measure, but you probably want it about this far apart (indicating)." (Best 75). Best indicated that he pulled the legs up such that Layton's lower legs and feet formed a 90-degree angle with the floor. (Best 79). It is noted that Paramedic Drews testified that when he observed Layton his legs were connected to his wrist with a strap and to his best recollection stated: "They were at a greater than a 90 back, folded up... They were past 90, towards his--... Towards his butt, yes." (Drews 66).

66. Officer Best acknowledged that it is his voice on the video indicating: "We got him hogtied." (Best 80). Best said that he was making that statement to Eric, and Chris. (Best 80). Best said he was using the slang, so that they would understand the terminology. (Best 81-82).

EX. G

67. Officer Best said that he believed it was him on the video at 0454 indicating that Andrew Layton was "methed out." (Best 80). Best acknowledged that his belief at 0454 was that Layton was methed out. (Best 83). Best testified: "I don't know whether he OD'd or not; but based on past experience of fighting with people that used methamphetamine, his experience were the same." (Best 83).

68. Officer Best would not acknowledge that Layton was left prone on his stomach, instead indicating that he "was consistently moving." (Best 85). Notwithstanding his acknowledged statements which were recorded during the event that officers had Layton hog-tied and his testimony that this was a slang term for the technique, he denied that the restraint tactic used was a hog-tie and instead reported it was a hobble. (Best 85). I note that the restraint tactic, as described by Best would be recognized by any reasonable and well-trained officer as a hog-tie just as he reported it in the heat of the moment just after Andrew Layton was restrained.

69. While this report specifically attempts to avoid credibility determinations it is clear from Best's answers when asked about Layton's body-position after he was hog-tied that he either took no steps to place Layton in a proper position or that he was avoiding the question. The following exchange occurred in sworn testimony: "Q. When he was hogtied, was he kept on his stomach? A. He was never hog-tied. He was hobbled. Q. When he was hobbled, was he on his stomach? A. At one point in time, he would try to move to his left or to his right. And that's why we were having difficulty restraining and controlling him. Q. Okay. Was it you intention to try to keep him on his stomach? A. Ideally, we

23

EX. G

want to control the subject. It was not our intention to just. —I don't know how to say it. Our intention was to control him. Q. Okay. But when you were trying to control him, you were trying to keep him on his stomach, correct? A. No. Q. No? Were you trying to keep him on his side? A. Ideally, that would be the best recovery position for somebody that's hobbled. Q. But you didn't do that? It was—I wasn't there all the time. That was our attempt, but it's…" (Best 85-86). Later in testimony Best was asked whether "After Andrew was hobbled, did any one of the police officers move Andrew onto his side?" Best responded: "I'm trying to figure out how to answer it because I came and went. I mean, I was—I left Andrew, went in the store, came back. But that was—as I said before, our attempt, ideally, is to have the person in the recovery position on the side. But with him constantly being combative and still resisting against the restraints what we had…I don't recall if we were able to hold him to his side." (Best 88-89).

70. Officer Baker testified that in using the hobble-strap, an officer would want more than a 90-degree angle indicating the officer would want enough distance "so enough so their body was—would be flat for free breathing/" (Baker 29).

71. Officer Huettl described what he observed on his arrival at the Hy-Vee Store: "I then entered into the entrance area of the Hy-Vee, where I observed Officer Best on the ground with another male, who I guess later was identified as—as Andrew Layton, and, then, there was two-two other males that were in civilian clothes assisting Officer Best. (Huettl 39). Huettl said that he was not familiar with Layton at that point. (Huettl 39-40).

24

EX. G

72. Officer Huettl said that his first response was grab "Andrew's arm and attempted to gain control of—of his {left} arm." (Huettl 42-43). Huettl testified that Layton was "actively resisting, trying to pull his arms in underneath of him and he was in the process of kind of pushing himself up." (Huettl 45-46). Huettl asserted: "At that point, to prevent him from pushing himself up, and to us it's a threat, I basically grabbed ahold of his arm and pull it out, just underneath of him, which caused him to fall back down to the ground (indicating). (Huettl 46). Officer Huettl acknowledged that Layton seemed to have "superhuman" strength and long endurance. (Huettl 49). Huettl also indicated that Layton did not seem to be responding to pain. (Huettl 52).

73. Officer Huettl testified that he was still on Layton's left side when the hobble strap was applied to Layton. (Huettl 61). Huettl denied holding Layton down testifying "We don't—I mean, it was something—we don't press down on people when they're already on the ground." (Huettl 61). Huettl could not recall the angle of Layton's legs after the hobble was applied but acknowledged that Layton's eyes were shut. (Huettl 62).

74. Office Huettl acknowledged putting a spit hood on Layton. (Huettl 63-64). Huettl indicated that the training he received on the spit hood was during his FTO phase and described the training: "It was, basically, told that you apply it with the mesh portion towards the top of the head and that it—the fabric area would go up over the nose area (indicating). (Huettle 66). Other than this training as an FTO, Huettl said that he also has read the instructions in the spit hood packaging. (Huettl 66). Huettl said that he was the one who asked for a

25

EX. G

spit mask because Layton was spitting close to him. (Huettl 67). Huettl said that when Layton was handcuffed, hobble strapped, and with the spit mask on, he made no attempt to hold Layton down. (Huettl 67). Huettl denied that Layton was ever prone because Layton was always moving. (Huettl 68). Huettl acknowledged that Layton was never on his back or his side. (Huettl 68).

75. Officer Huettl testified that when he assisted putting Layton on the cot from the ambulance, Layton was put on the cot in the same position he was in when he was on the ground. (Huettl 83). Huettl acknowledged his report which indicated: "Gold Cross arrived on scene and Layton was placed on the stretcher on his stomach by Officer Baker, Commander Frericks, Officer Groby, and I." (Huettl 83-84).

76. Huettl testified that while in the shopping cart area with Officer Baker, he was sometimes kneeling and sometimes standing up and he did not maintain physical contact with Layton. (Huettl 70-71). Huettl said that he stood up after the spit hood was put on but before the ambulance arrived. (Huettl 71). Huettl testified that Baker stayed down the entire time. (Huettl 71). Huettl denied that when he was down by Layton that he was holding Layton down but acknowledged that he wrote in his report within 24 hours of the event: "Baker and I…position ourselves on either side of Layton, holding him down to prevent further injury to himself." (Huettl 72). Officer Huettl acknowledged that when he was on the ground he observed that Layton was sweating profusely, further acknowledging that there was steam coming off Layton's head and shoulder area. (Huettl 73). Huettl said that his observations led him to believe that Layton was "warm."

26

EX. G

(Huettl 73). Huettl acknowledged that Layton was violent, Layton was aggressive, Layton was screaming and shouting, Layton's speech, if there was any could not be understood, Layton had superhuman strength, Layton did not seem fazed by pain, and Layton was sweating profusely. (Huettl 74-76).

77. Officer Huettl was asked if he was trained on Excited Delirium" to which he responded: "It was talked about." (Huettl 76). Huettl acknowledged that the behaviors of Layton that he acknowledged were symptoms of excited delirium. (Huettl 76). Huettl was shown the Mankato Policy on Use of Force (Clifton Exhibit 10) and acknowledged that the symptoms in the policy were the symptoms he observed in Layton. (Huettl 78). Huettl acknowledged the Mankato policy provision indicating that a person exhibiting the symptoms may be at an increased risk for death and should be seen by medical personnel as soon as practicable. (Huettl 78). Huettl testified that he had been trained on this policy as of January 1, 2013 (Huettl 78-79). Huettl subsequently testified that he could not recall if he had been trained on the symptoms and the risk of sudden death. (Huettl 80). Huettl testified that other than the words in the Mankato policy (Clifton Exhibit 10), he could not recall any training from the Mankato Police Department on Excited Delirium. (Huettl 81).

78. Officer Best was asked to detail the manner in which Layton was being combative and resistant after being hobble-tied. Best acknowledged that with his hands cuffed and his feet hobbled in the air Layton was unable to kick or punch and finally indicated that the resistance was "even when he was restrained, he would lean left (indicating)' he would lean right (indicating).

27

EX. G

(Best 91). Best said : "Ideally, what we wanted to do was get him on a side, but we couldn't." (Best 91). Best reported that the officers' response when Layton would try to lean to a side was "To move him opposite of the direction that he was trying to go against us." (Best 91). When asked if he pushed Layton the opposite way as he just described the response to be, Best said that he did not and he could not recall if other officers did. (Best 91). Best acknowledged that Officer Huettl also placed a spit-mask on Layton. (Best 104).

79. It is clear from this testimony that Best knew that a person, who has been involved in a struggle with officers, needs to be placed in a recovery/rescue position. This is a term of art in law enforcement, which recognizes that a person who is restrained in any manner should not be left in a prone position on their stomach. All law enforcement training indicates that a person should be placed on their side or in an upright position to facilitate breathing. It is also trained to officers that a person's continued movements following restraint in a prone position may actually be the subject fighting for air due to an inability to breathe. Based on the foregoing testimony of Best, he indicated that numerous officers were not able to move and maintain Layton in a recovery position even though he was hog-tied with his lower leg and feet at a ninety-degree angle from the ground and his body. Additionally, Best being the primary officer indicated that Layton was still being combative and resistant to the point that Best did not know if they were able to hold him to his side, yet he left the officers that responded to assist him and went in to the store. It is noted that in accord with

EX. G

the recording of this event, he went into store following the restraint and told people that they had "hog-tied" Andrew Layton.

80. Officer Best acknowledged that at no time did Andrew Layton speak intelligible words but moaned and growled, though Best did not know if the sounds were in response to pain. (Best 49).

81. Officer Burgess-Kranz indicated that when she arrived she observed 4 officers on the floor with Layton so she took out her TASER X2 and got down with them. (Kranz 27-28). Kranz indicated that she decided to deploy her TASER on her own in the drive stun mode to the back of Layton's thigh. (Kranz 33). Kranz said the drive-stun did not appear to change Layton's demeanor. (Kranz 33). Kranz described that the officers used two sets of cuffs linked together to restrain Layton's hands behind his back due to their inability to get his hands close enough together for a single pair of cuffs. (Kranz 44). Officer Kranz testified that as soon as handcuffing was accomplished she went to get leg restraints. (Kranz 45). Kranz indicated that she did not know who remained with Layton but she was sure that Huettl and Baker were with him: "Because I recall specifically that Baker and Huettl were on either side of Layton throughout the whole—on the floor until we were able to load him on the cot." (Kranz 46). Officer Kranz acknowledged that she has heard other officers refer to hobble strapping as hogtying but she herself does not use that term. (Kranz 48).

82. Officer Kranz testified that once she located the leg restraints, she: "Brought them inside and we all assisted in applying them." (Kranz 55). Officer Kranz indicated that Layton injured her finger as she and Best were getting the loop

EX. G

around Layton's feet (Kranz 56). Kranz agreed that once the ankles are cinched together the legs are brought to a 90-degree angle so the hobble can be attached to the handcuffs. (Kranz 59). It is noted that Kranz indicated that she did not know the angle of Layton's legs. (Kranz 60). Kranz acknowledged that Layton continued making "animalistic sounds" which she described as "bizarre" in her report. (Kranz 61). Kranz said she had "no clue" what was going on with Andrew Layton. (Kranz 62). Kranz said that while she was assisting holding Layton down: "Somebody said something about him sweating a lot." (Kranz 66). Officer Kranz testified as follows as to what occurred after the hobble straps were placed on Layton: "We get the hobble straps. I back off. Baker and Huettl, they remain by Andrew's side until Gold Cross can arrive. Gold Cross is summoned." (Kranz 63).

83. Officer Kranz indicated that she assisted in lifting Layton on the ambulance cot. (Kranz 63). Kranz acknowledged that Layton was strapped down on his stomach face down. (Kranz 64). Kranz said the paramedics were either standing there or assisted in putting Layton on the cot. (Kranz 66). Kranz said she did not remember anything after Layton was strapped to the cot. (Kranz 68). Officer Kranz testified that a person who was aggressive, had incoherent speech, was grunting and making animalistic sounds, exhibited incredible strength, was impervious to pain and was profusely sweating exhibited the symptoms related to excited delirium. (Kranz 70-71). Kranz testified that when Layton was put in the ambulance he was in the care of Gold Cross. (Kranz 73). Kranz indicated that Layton was being transported to the jail. (Kranz 73). Kranz said that her

EX. G

training with respect to excited delirium was to call Gold Cross as soon as practicable so that Gold Cross could evaluate the individual. (Kranz 76).

84. Officer Baker testified that when he walked in to the Hy-Vee, Andrew Layton was prone on the floor, faced-down, struggling with Best. (Baker 46). Baker said that he believed that while he was the first officer in the Hy-Vee, he, Officer Huettl, and Officer Groby all "filtered in about the same time." (Baker 48). Baker described Layton's movements: "His arm was—he was, again, fighting with Officer Best. It looked to me like he was trying to, like, do a push-up. (Baker 49). Baker said that he grabbed Layton's right forearm and then tried "to pull that out into a cuffing position." (Baker 50). Baker said that Layton was trying to pull his arm away from Baker. (Baker 51). Baker indicated that as Layton continued to pull away he was also pushing his body up, "trying to get up." (Baker 54). Baker said: "It looked to me like he was trying to get back up to be able to fight better." (Baker 54). Baker said that Layton was yelling and growling and that he could not understand what he was saying. (Baker 54-55). With respect to Layton pushing himself upward, Baker testified: "It made me afraid that if he's able to do that with us trying to control him, if he was able to get up, that would be a big problem…Once he was able to actually get up into an elevated position, I delivered three or four knee strikes to his shoulder, to the meaty portion of his shoulder…To be able to prevent him from posturing up and creating more of a threat to us." (Baker 56).

85. Officer Baker testified that although his knee strikes were not successful in getting Layton back down he "and Officer Huettl, we were able to get his arms

31

EX. G

out from underneath him again and we were able to get him back down to the ground." (Baker 57). Baker said: "I don't know if I pushed him. I took him down so he didn't have anything to push up on and he went down to the floor. (Baker 57). Baker acknowledged putting pressure on Layton describing: "Yeah. After we were able to get him back down on the ground, he continued to try to get his arm back and continued to try to—what I thought was trying to—push himself up in an elevated position. So, yes, I put my knee on his shoulder to prevent him from being able to do that. (Baker 57). Baker indicated that his knee was on Layton's right shoulder. (Baker 57). Baker indicated that his knee was on Layton's shoulder before Layton was handcuffed. (Baker 58). Baker indicated that Layton's hands were "Still at his sides" but he did not know if they were underneath him. (Baker 59). Baker said he believed that while his knee was holding Layton down, Officer Best had a cuff on Layton's right hand and was trying to pull that back. (Baker 60).

86. Officer Baker described that Layton was fighting before being cuffed stating, "He was doing more than resisting. He was actively fighting. He was kicking. He was flailing his legs. He was grabbing at—like, with the right hand that was cuffed, he was grabbing at anybody that came near that cuff, trying to grab their hand. So he was fighting. (Baker 62-63). It is noted that Commander Frericks indicated that part of Layton's resistance was keeping his hands under his chest as officers tried to handcuff him. (Frericks 17).

87. Officer Baker said that he knew that Layton kicked Officer Best but acknowledged that this kick was when Best was trying to control Layton's legs.

32

EX. G

(Baker 64). Baker acknowledged that at no time while he was on the scene was Layton able to get into a standing, a seated position, or even a kneeling position but indicated that he was thrashing around trying to get in a better position. (Baker 66). Baker indicated that by using force the officers were able to limit what Layton was able to do and to keep him on his stomach. (Baker 67).

88. Officer Baker testified to his use of force after one of the cuffs were applied as follows: "Yes, After one cuff was applied to his right hand, he was still fighting against that and pulling and grabbing and kicking. That creates—I don't know how familiar you are with handcuffs, but that creates and higher degree of risk because you have a swinging metal piece. If he was able to get that arm free, that creates and elevated risk for anybody around there. That basically gets him a weapon. So, at that time, in order to induce getting that arm into the cuffing position, I delivered five or six closed-fist strikes to the arm as a—to try to distract him and try to induce compliance that way." (Baker 70). Baker said these strikes worked "somewhat" as "They were able to get another set of cuffs on the other wrist and double cuff." (Baker 70). Baker testified that Layton continued to fight while handcuffed by kicking and trying to grab with his hands that were cuffed behind his back. (Baker 71).

89. Officer Baker testified that it was his belief that Layton's legs were at more than a 90 degree angle because he remembered a conversation where someone said: "Hold on. That's too far." (Baker 74). Baker said that he did not know who said this, but when it was said the strap was loosened. (Baker 74).

EX. G

90. Officer Baker described that Layton was very strong and that after the fight someone mentioned that Layton was sweating. (Layton 75). Baker said that as they waited for the ambulance to arrive he remained in position by Layton and intermittently had contact with Layton as Layton would try to fight the restraints and Baker kept him positioned on his stomach while in maximum restraint so that he would not roll over and injure his handcuffed wrists. (Baker 84). It is noted that maintaining Layton on his stomach once in maximal restraint is contrary to all law enforcement training due to the well-recognized need to move such an individual to the recovery/rescue position. Baker said that when Layton would move, he would use his hand on Layton's upper right shoulder to keep Layton in place. (Baker 85-86). Baker testified that he believed Officer Huettl remained at Layton;s left side. (Baker 87).

91. Officer Groby testified that she had not personally dealt with Layton before this event but had been given his name earlier that evening in a theft/assault call she was investigating. (Groby 22-23). Groby said that when she went into the Hy-Vee, Layton was lying on his stomach. (Groby 28). Groby acknowledged that Best was on top of Layton but could not recall how he was on top. (Groby 29). Groby indicated that she gave verbal commands for Layton to get on the ground and he continued to try and get up. (Groby 31). Groby agreed that Layton never got up, could not recall if he rolled to his back, but said he was "moving from side to side." (Groby 31-32). Groby further described that when she arrived there was a citizen sitting on Layton's legs. (Groby 32). Officer Groby testified that she asked the citizen to get off Layton's legs and: "I, at some point, shortly

34

EX. G

thereafter, applied some pressure to Andrew's lower back as officers tried to get his arms out from underneath him." (Groby 36). Groby said she used her hands to apply the pressure above Layton's waist. (Groby 36).

92. Groby said that Layton was resisting arrest by not putting his arms behind his back and failing to follow verbal commands. (Groby 34). Groby acknowledged her report that the pressure was applied to the middle of Layton's back. (Groby 37). Groby acknowledged that before Layton was handcuffed she also applied pressure behind Layton's ear and held his head to the ground. (Groby 37). Groby testified that she did not assist in putting the leg restraints on Layton. (Groby 49). Groby believed that Best and Kranz (Burgess) put the leg restraints on Layton. (Groby 49). Groby could not recall if she was still there when the leg restraints were applied but she was in close proximity. (Groby 50). Groby said that Officer Huettl and Baker were still down by Andrew while the leg restraints were being applied. (Groby 50). Groby described the positions of Huettl and Baker as "Not by his legs. So from the waist up, yes," one being on each side of Layton. (Groby 50).

93. Commander Frericks described his observations on arrival as follows: "Well, I was the last to arrive. And I recall that our officers were struggling with a male individual on the ground. Basically, each one of them had, like, a limb they were hanging onto." (Frericks 16). Frericks indicated that Layton was on the ground face down and that his hands or arms were underneath his chest area. (Frericks 17). Frericks testified that he had no prior contacts with Layton and did not know him. (Frericks 21). Commander Frericks acknowledged his report

35

EX. G

indicating that he observed Officer Baker deliver knee strikes to Layton in the upper arm area. (Frericks 21-22).

94. Commander Frericks testified that he was on the scene when Layton was "hobble strapped." (Frericks 24). Frericks said: I'm not sure which officer did what. Alls I remember is that we got the hobble—or we got the leg restrains around the legs and then hooked them around the cuffs. (Frericks 25). Frericks did not agree with Best's estimation that Layton's legs were at a 90-degree angle, but estimated that the legs were at a 110 degrees from Layton's butt. (Frericks 27). Frericks said that Layton continued to fight even after he was "hobbled" and the "officers' response was to try to control him so no one got hurt." (Frericks 28). Frericks indicated that the 6 officers did not have "an opportunity to really hold him on his side with the way he was fighting." (Frericks 28-29). It is noted that at the time Layton was in a hog-tie or to use Frerick's terminology a hobble-tie and it also noted that there was maybe only five officers with Layton since Best testified he went inside and spoke to people. It is noted that Frericks himself indicated that he was in the area while Layton was being restrained but did not know how far away he was because "I went in and out of the entryway." (Frericks 34). It is noted that Commander Frericks indicated that even in the hobble restraint at "110 degrees" with a spit mask on Layton "was still violently fighting." (Frericks 41). Frericks said: "He was kicking, moving, anything he could do." (Frericks 42). It is noted that testimony from the paramedics indicated that they were not even sure an officer was

EX. G

kneeling or touching Layton when they arrived and found him restrained on the floor.

95. Commander Frericks said that he made assumptions about Layton shortly after dealing with him because he was "he was incredibly strong and that, with all of us there, it was hard to control him…And—well, as far as meth use goes, at times, they are incoherent" (Frericks 32-33). Frericks said that Andrew was never placed on his back and it was too dangerous to place him on his side. (Frericks 33). With respect to placing Layton on his side, Frericks testified: "Well, it would have been dangerous for him, dangerous for us, and we're not trained in putting someone on their side and to hold them there. (Frericks 36). It is noted that if Frericks is correct that officers in the Mankato Police Department are not trained to place and hold someone on their side after they have been restrained, then the training of the Mankato Police Department is contrary to the training of virtually every other law enforcement agency in the country, which train officers that persons should be placed in the recovery/rescue position under the circumstances that occurred in this case in order to facilitate breathing. Frericks said he was there when the spit hood was placed on Layton, but he did not know if Layton was spitting on officers. (Frericks 33).

96. Officer Best acknowledged his understanding that somewhere around 0458-0459 Commander Frericks contacted dispatch to request an ambulance to transport Layton to jail. (Best 84). Officer Best testified that and the other officers did not consider having Layton taken to the hospital emergency room at

EX. G

that time. (Best 92). Best said the original intent was to have the ambulance take Layton to the jail. (Best 93). When asked if the ambulance had been called to give Layton pre-hospital care, Best responded that it was called for transport. (Best 94). Best believed that it was partly his suggestion that led to calling the ambulance to transport Layton to jail because he and Commander Frericks believed he might be injured in the backseat of a police car. (Best 106).

97. Commander Frericks testified that he called for Gold Cross because: "I was worried that he would not be transported safely, for him and for ourselves." (Frericks 38). Frericks indicated that initially he simply wanted Gold Cross to assist with the transport but when they arrived, Frericks told Best to check with Gold Cross personnel to see if Layton needed to go to the hospital to be checked out. (Frericks 39). Frericks testified: "Well, I figure with the medical personnel there, once it —they're in his—their hands, they could determine whether he should be checked out at the ER or if they should just bring him up to jail." (Frericks 39). Frericks testified that Officer Best yelled to him across the parking lot, "to the effect that they won't evaluate him in this state or something like that." (Frericks 57). Commander Frericks said that they would have deferred to the expertise of the paramedics if they had indicated that Layton needed to go to the hospital. (Frericks 57). Frericks acknowledged that he was present for the testimony of the paramedic, who testified that this conversation with Officer Best never occurred and that he did not hear the conversation between Best and the paramedic. (Frericks 57).

EX. G

98. Officer Baker testified that he was one of the officers who assisted in putting Layton onto the stretcher. (Baker 81). Baker said that while he was not a part of the conversation relating to calling Gold Cross, he did not think the situation was a medical emergency but looked at it as a combative suspect. Baker testified that he did not remember any conversation that this was a medical emergency. (Baker 93).

99. Officer Baker acknowledged that during a period of calm, Officer Best located Layton's wallet and took out Layton's military identification. (Baker 94). Baker said that he then recognized Layton from prior contacts involving narcotics including arrests made by Baker. (Baker 95). Baker could not recall how many times he had contacts or arrested Layton and did not know the outcome of any charges brought against Layton. (Baker 96-97). Baker said it was his training and experience that led him to believe, based on Layton's behaviors that his actions were consistent with methamphetamine or narcotics use. Notwithstanding this belief Baker said he still did not believe that Layton was facing a medical emergency based on training he received at City of Mankato and Rock County, as well as experience of seeing behaviors in the field. (Baker 101). Officer Baker said that he told the paramedics that Layton had "meth delirium." (Baker 105). Baker testified that while using the word delirium, he was indicating that Layton was on methamphetamine. (Baker 106).

100. Citing to the video Officer Best said that it was Officer (now sergeant) Baker who told paramedics that Layton had "meth delirium." (Best 94). Best described delirium as "basically an altered state of mental actions that can be

EX. G

due to intoxication, due to high fever, overactive excitement." (Best 94). When asked if delirium was a medical emergency, Best responded that you would have to ask a doctor. (Best 97). It is noted that various forms of delirium have been recognized by law enforcement for more than two-decades. It is also noted that any reasonable and well-trained officer who believed that a subject who was found sleeping in a market; had to be awakened; got up with eyes closed never acknowledging the officer, who had to be taken to the ground to be controlled; struggled with multiple officers who were trying to restrain him; placed in maximum restraints in order to be controlled, and who the officer assumed had drug induced delirium, would conclude that a medical emergency was occurring.

101.     Paramedic Burt said that when arrived on scene he had a discussion Officer Best and he believed there was another officer present. (Burt 59). Burt indicated that Layton was on the floor in the entryway. (Burt 60). Paramedic Burt described: "he had handcuffs on and cuffs to the ankle." (Burt 60). Burt acknowledged that Layton had a spit-mask on, was on his stomach, and Burt believed his wrists were connected to his ankles with his legs raised. (Burt 61). Burt said that there were officers around but he was not sure if any officer was touching Layton. (Burt 64). Burt went on to testify: "There was no police— there were police officer around him. I don't remember any one person having any contact when we arrived, So that, at that point, there is no pressure being put on, on the patient." (Burt 156). Burt said that Layton was moaning. (Burt 64).

102.     Paramedic Drews testified: "when we first arrived, it was requested that we assist the in transporting the patient to the jail." (Drews 69). Drews indicated

40

EX. G

that it was the first time in his career to that point that he had done that. (Drews 69). Drews described his interaction with an officer as follows: "Well, in that whole conversation, that I recall, it was said that they had dealt with this person many times, and this is how he reacted on every occasion, they have to fight with him. So, it was assumed by both—well, by myself, they knew exactly what they were doing." (Drews 72). Drews said he was also told: "That he's-that he was a known meth abuser and an alcoholic… and One—one of them had said they thought he was either drunk or high on meth." (Drews 73). Drews was unable to recall which officer(s) provided him with any of this information. (Drews 73). When asked if he did any patient care with Layton at the Hy-Vee, Drews responded: "I believe I took his pulse." (Drews 81).

103. Paramedic Burt acknowledged that he and his partner were dispatched to the call at 0458 and arrived at 0505. (Burt 75). Burt acknowledged that 7 minutes later at 0512, the paramedics were transporting Layton to the Blue Earth County Justice Center. (Burt 76-77). Burt also acknowledged arriving at the Justice Center at 0521. (Burt 77). Paramedic Burt testified that Layton is the only patient he has ever transported to jail. (Burt 79). Burt indicated that the paramedics went to the Hy-Vee to assist law enforcement in safely transporting "somebody to their facility." (Burt 132).

104. It is noted that Paramedic Burt acknowledged that Layton was transported in a prone position but qualified that Layton was not completely facedown because he had a pillow positioned underneath him turning his head to the left and lifting his shoulder. (Burt 114). Burt indicated that in addition to other restraints, the

EX. G

paramedics used three transport straps, one across the lower legs, one across the midsection, and one across the upper body, chest area. (Burt 118). In testimony, Burt acknowledged his prior statements to the BCA where he indicated that during the transport Layton's legs were cuffed so that one strap was enough to hold his legs; Layton was in a prone position on the cot; and his hands were still cuffed behind him but he was not in a totally prone position due to his head facing one side. (Burt 123). Burt also acknowledged his prior statement to BCA that when they placed Layton on the cot: "um at which point they released the strap they had him hog tied." (Burt 125). Burt indicated that they did not put Layton on his back because they would've had to release the handcuffs. (Burt 160).

105. Paramedic Burt testified that one of the reasons that he did not need to go to the hospital was because an officer, who he was unable to identify, that based on "engagements that they've had with him before, this was a typical reaction with police enforcement." (Burt 136). Burt said he understood that to mean that Layton "had been aggressive with police prior to this. " (Burt 136). It is noted that Burt did not know if "excited delirium" was a medical emergency. (Burt 152). Burt then said that when performing his assessment, excited delirium was considered but ruled out because the "patient would have periods of being calm, and the physical findings were conclusive with struggle." (Burt 153). Burt indicated that the physical findings conclusive with struggle were: "Just that he had been struggling against his restraints." (Burt 153).

EX. G

106. Paramedic Drews testified: "When we [w]alked [deposition says talked] in and first saw him he was laying down handcuffed and fighting against resist— restraints. So, that tells me he's a threat to others. (Drews 48). Drews further testified: "He was having a mental or psychological problem, because most sane people don't fight with the police." (Drews 50). Drews indicated that he got information that Layton had a history of drug abuse that he indicated was told to him by an officer at the scene but he could not recall which officer gave him the information. (Drews 52) Paramedic Drews indicated that he took notes at the scene but he shredded them after the call indicting that it is a requirement of HIPAA [Health Insurance Portability and Accountability Act of 1996]. (Drews 44).

107. Paramedic Drews detailed his first observations of Layton as follows: "The patient laying on the floor, handcuffed, with a spit hood on, with some sort of strap holding his feet up to his feet—to his hands, I mean… And six or five or six or seven police officers there." (Drews 62-63). In describing what the officers were doing Drews said: "There was a few of them around—standing around the patient. The one had come out to greet us. Other than that, I don't recall." (Drews 63-64). Drews did not recall if any officer was kneeling or touching Layton. (Drews 64). Drews indicated that Layton was positioned on his stomach. (Drews 64). Drews acknowledged that he documented "tachypnea" in his report, which he said was based on rapid breathing. (Drews 107).

43

EX. G

108.  Officer Best said that he asked Paramedic Burt if Layton "can be medically evaluated?" (Best 109). Best said that Burt's response was "No. He's too violent." (Best 110). Best said that he argued with Commander Frericks: "I wanted him to go to jail, and that's when Frericks said, I think, 'Bull shit.' Ask him if he—they can medically evaluate him first.' It's on the video." (Best 115). Officer Best acknowledged that he was instructed by Commander Frericks to check with the paramedics for a determination if Layton should be brought to the hospital for evaluation. (Best 166). Officer Best was asked if he was trained to instruct the paramedics as to concerns of positional asphyxia when an officer is accompanying the transport, to which he responded: "That's not up to me to tell the paramedics how to treat the patient." (Best 166). It is noted that based on Best's testimony, Layton was not a patient being treated but was instead a prisoner being transported. It is well known that law enforcement is responsible for the safe transport of their prisoners.

109.  It is noted that the video makes clear that while Andrew Layton was no longer hog-tied, he had multiple restraints holding him to the stretcher facedown on his stomach. (MVR). Commander Frericks testified that the reason they put Layton on his stomach on the stretcher was because: "We didn't have any other direction from Gold Cross at the time." (Frericks 48). Frericks went on to testify that placing Layton on his stomach on the stretcher "didn't concern me because it didn't seem to concern Gold Cross." (Frericks 54).

110.  Officer Baker testified to his belief that Commander Frericks ordered him to ride in the ambulance. (Baker 113). Baker described that he was positioned

44

EX. G

towards the front of the rear treatment compartment of the ambulance. (Baker 113). Baker said that Officer Best and the paramedic were off to the side on the bench. (Baker 113). Baker indicated that for the most part he was standing up. (Baker 114). Baker testified that while in the ambulance: "In order to prevent him from fighting and rolling back or doing—and so the medic could actually put those Velcro restraints on, I put my knee on his left shoulder, left shoulder and arm area, to secure him while he as able to apply those restraints. (Baker 117-118). Baker indicated that he actually had to get up on the cot to accomplish this restraint with his knee. (Baker 118). Baker said that because the straps on the stretcher were loose Layton would try to fight and struggle and he would push him back down to the cot. (Baker 122-123). It is noted that in accord with the provided materials, in addition to the Velcro straps, Andrew Layton was in handcuffs (behind his back), face down with legs shackled and strapped down while in the rescue. Additionally, according to Baker, Layton remained in the spit-mask until someone in the jail took it off Layton to perform CPR. (Baker 128).

111. It is noted that Officer Best seemed to indicate in his deposition that when a person is on their stomach but their arms are not out to their side, they are not yet in a prone position. (Best 58). Officer Best's interpretation of "prone" is inconsistent with any law enforcement defensive tactics training that I have ever reviewed, participated in, or am aware of. Officer Best also testified that he was unfamiliar with the term "maximum restraint" which is common terminology used in law enforcement anytime a person is restrained in a manner that makes

EX. G

movement difficult or impossible and is used even by manufactures of hobble restraint due to the fact that hobble cords are a maximum restraint device.

112. I note that I have made a number of observations/opinion within the foregoing facts and I hereby incorporate those opinions to the following section of the report.

113. It is my opinion, based upon my specialized background, education, experience, and training, as well as my continued research authoring, auditing, consulting and training on law enforcement practices nationwide that the manner of prolonged restraint of Mr. Layton was contrary to all generally accepted policies, practices, training and legal mandates.

114. I note that irrespective of whether Mr. Layton's legs were 90 degrees apart from his wrists, 110 degrees apart from his wrists, or were more than 12 inches from his wrists, my opinions in this matter would not change. Irrespective of the terminology used, it cannot be disputed that Mr. Layton was placed in maximum (four point) restraint for a prolonged period of time. Two significant and basic principles adopted by all law enforcement when a person is restrained include first, move the person off their stomach and two monitor their physical stress. These two principles are emphasized in policy and training when dealing with someone who may be intoxicated, under the influence of narcotics, or having a medical or mental health crisis. Additionally, when a person is in maximum restraint, meaning all four limbs are restrained and then the wrists are connected to the ankles the need for movement to a rescue position and monitoring are essential. This is the generally accepted practice throughout the United States

EX. G

and was clearly not followed by any of the officers involved with Mr. Layton. It is noted that Officer Best used both "rescue position" and "recovery position" in his testimony.

115.   The dangers of prolonged restraint of a person in a hog-tie or hobble-tie has been well-known and trained to law enforcement for more than two decades. This danger is exacerbated if the person is left on their stomach. In this case Layton also was donned with a spit-mask. The danger of maximal restraints, such as hog-tying or hobble-tying, that is outlined to officers in generally accepted training and policy is that is that breathing can be impaired particularly where the subject is left in a prone position. Officers are also trained that persons who are in an agitated state or who are exhibiting the symptoms of excited delirium, mental health crisis, or substance and alcohol intoxication are at an even greater risk of sudden-in-custody death if not moved off of their stomach and if left in the maximal restraint for a long period of time. It is noted that after the maximal restraint was accomplished, Officer Huettl and Officer Baker remained with Layton while awaiting the ambulance. It is also clear based on testimony and the various recordings that other officers left the immediate area. Officer Huettl testified that he stood up at points leaving just Baker down by Layton's side. Clearly any arguable danger with respect to moving Mr. Layton to his side, rather than leaving him on his stomach had passed.

116.   Law enforcement has trained for years that once restraint is accomplished Officers shall immediately take pressure off the person's back and get the person

EX. G

turned onto their side or in an upright position in order to facilitate breathing. Law enforcement trains this response due to its familiarity with the number of deaths which have resulted during the restraint process. An agency that has failed to direct its officers through training and policy on this issue is clearly not acting consistently with professional law enforcement and is indifferent to the care, custody, control and restraint of prisoners.

117. While there is testimony that disputes continued pressure on Mr. Layton, there is a testimony and video evidence of pressure on Mr. Layton's back at various points in the interaction between he and the officers. Officer Baker testified to climbing onto the cot in the ambulance to use his knee to hold Mr. Layton down as well as standing and intermittently pushing Layton down on the cot on the transport to the jail, all of which occurred while Layton was strapped down on his stomach with his wrists handcuffed behind his back, his ankles cinched together and a spit mask on. Any reasonable and well-trained officer would have recognized that this continued pressure, even if intermittent was inconsistent with generally accepted policies, practices, training, and legal mandates.

118. It is my opinion based upon the testimony of officers and the recorded comments of Officer Best to whoever he spoke to that Mr. Layton was hog-tied, a well-known term in law enforcement. As noted in the foregoing paragraphs, the difference between the two is a matter of distance and the distance is based on whether a person so restrained would or would not be able to hobble. I note that manufacturers such as RIPP have specific warnings regarding hog-ties. I

EX. G

also note that some agencies have identified specific distances between the wrists and the ankles to distinguish a hog from a hobble tie. I know of no agency policy or training that would dispute the fact that Mr. Layton was in maximal restraint or four point restraint.

119. Any reasonable and well-trained officer would recognize the need to move Mr. Layton to a position that facilitated breathing and to monitor his well being while in maximal restraint. When looking at the time in this event based on the video evidence, Andrew Layton was taken to the floor and positioned on his stomach from 0445:49 (Best MVR) and remained on his stomach until arriving at the jail and being taken off the stretcher at approximately 0525:07. (Jail Video). All officers are trained that persons should not be left in a prone position for a prolonged period of time. In this case Layton was left in a prone position for a prolonged period of time while in maximal restraint. It is noted that based on the audio from Officer Best's MVR, it appears that handcuffing was complete by 0448:37. (Best MVR). At approximately 0449:13, an officer is heard asking to the effect of "you got a hobble." (Best MVR). Based upon Best's MVR it appears that the "hobble-tie" was complete at approximately 0453:30. (Best MVR). Clearly, by 0454:01 officers can be heard having conversations relating to what had occurred as well as their opinions on what caused Layton's behavior. (Best MVR). At 0457:30 to O457:39 "3102" can be heard telling dispatch that the ambulance is needed more for transport than for injuries. (Best MVR). At 0501:20 through 0501:36 Officer Best indicated that he would go in the ambulance. (Best MVR). It is noted that even when Layton

EX. G

was moved onto the cot for transport in the ambulance his four limbs were restrained; wrists behind his back; ankles held together by the hobble strap; spit-mask on; placed on his stomach; Officer Baker climbing on the cot at one point and on top of his shoulder area pressuring him down to the stretcher; and Baker standing up and "intermittently applying pressure to Layton's back which continued through the transport. Additionally straps from the ambulance were put across Layton's body to hold him to the stretcher. Any reasonable and well trained officer would recognize that Layton was in maximal prone restraint and would have recognized the need to change Layton's body position. As noted, all officers receive training that once restraint is achieved all pressure should be removed from the subject's back and the subject should be placed in the rescue or recovery position.

120.  Policy and training on proper restraint and use of a hobble are nothing new in law enforcement. Policies dating back nearly 20 years recognized the need for proper application of the hobble restraint; proper body positioning once the restraint was applied and proper monitoring as well as medical care where necessary for the subject.[1] In 2002 The International Association of Chiefs of

---

[1] See e.g. Garden Grove Police Department (California) General Order 5.27 "Use of the Hobble Restraint" March 5, 1997: "Once a suspect is subdued and handcuffed, and hobble restraints are placed on their legs, they must be rolled onto their side and left in that position until transportation. If any medical problems are observed with the arrestee, paramedics shall be requested and the arrestee provided with the appropriate medical attention. An arrestee who has the hobble attached, should be placed in an upright seated position during transportation. If this cannot reasonably be accomplished, the arrestee should be transported by ambulance. An officer must accompany the arrestee in an ambulance if this mode or transportation is utilized. The arrestee will be monitored at all times while the hobble restraint is attached."

EX. G

Police published Training Key #541 on "Four Point Restraints" which updated a
training key published in 1992, Training Key #429 "Custody Death Syndrome."[2]

121.　It is noted that restraint is a use of force. It is well known in law enforcement that officers have a duty to intervene when they observe another officer committing unconstitutional acts and particularly excessive force. It is equally well known that duty only arises when an officer observes excessive force and the officer has an opportunity to intervene. Thus, irrespective of whether a particular officer used a particular tactic in restraining Mr. Layton, all of the officers were present for a long period of time while Mr. Layton was left prone and in maximal restraint. It is my opinion that all the officers present had the opportunity to intervene and their failure to do so was inconsistent with generally accepted policies, practices, training, and legal mandates.

122.　It is my opinion, based upon my specialized background, education, experience, and training, as well as my continued research authoring, auditing, consulting and training on law enforcement practices nationwide that the manner in which officers kept continued pressure on Mr. Layton subsequent to the completion of maximal restraint was contrary to all generally accepted policies, practices, training and legal mandates.

---

[2] International Association of Chiefs of Police Training Key #541 "Four Point Restraints" Alexandria, VA. 2002. "As recommended by the IACP and as reinforced by the court in Cruz, when four-point restraints are absolutely essential for control of a suspect, they should be used with great care, and the condition of the suspect should be continuously monitored. The suspect should be turned on his or her side rather than placed on his or her stomach. His or her pupil response should also be monitored, as well as respiration and heart rate. This is particularly the case where the suspect presents characteristics that suggest greater susceptibility to positional asphyxia. Should any difficulty in breathing be encountered by the suspect or other potentially dangerous physical responses be encountered, four-point restraints should be removed and other options employed."

EX. G

123. Law enforcement throughout the United States is familiar with the concept of compression asphyxia sometimes referred to in law enforcement training as mechanical asphyxiation. While not being trained for medical purposes officers are taught that pressure applied to the back of a prone subject can impair breathing and therefore once the subject is restrained all pressure should be removed from the subject's back. It is clear that officers kept the pressure, even if in the officer's words, "intermittently" on Layton's back. Officer Baker has testified that he climbed on the cot to put pressure on Layton's back in the ambulance while he was being restrained and put pressure on his back during the transport. Pressure on Layton's back after the initial restraint was accomplished was inconsistent with generally accepted policies, practices, training and legal mandates. It is noted that some level of pressure was continued for a prolonged period of time, even if one accepts the version of events recited by the involved officers that such pressure was "intermittent" it continued from the moment of the takedown by Officer Best, through the ambulance transport when Officer Baker indicated that he continued putting pressure on Layton, even climbing on the cot in the rescue to put his knee on Layton.

124. It is my opinion, based upon my specialized background, education, experience, and training, as well as my continued research authoring, auditing, consulting and training on law enforcement practices nationwide that any reasonable and well-trained officer would have recognized that Andrew Layton, who had just been the subject of a use of force, was in a medical/mental health

EX. G

emergency and would have recognized the need for Layton to receive immediate medical care. The testimony of the involved officers as well as a supervisory officer indicating that Layton was to be taken to the jail rather than a medical facility notwithstanding the officers' varied beliefs that Layton was "methed out;" in an altered state, suffering "meth delirium," was strong, was speaking unintelligibly, and was sweating was contrary to all generally accepted policies, practices, training, and legal mandates.

125. All law enforcement is trained with regard to a duty to recognize medical needs and to respond reasonably to those needs. Officers are taught that this duty is unconditional when the subject is in the custody of law enforcement. In fact, agencies are directed that they have a duty to train officers to recognize medical needs of prisoners where the officer is going to be facing such decisions as to whether a person in police custody gets medical care. Based on the testimony of the Officer Best and Commander Frericks as well as comments in the MVR it is clear that the officers were utilizing the paramedics for transporting Mr. Layton to jail and were not considering medical treatment.

126. "Excited delirium" is broadly defined as a state of agitation, excitability, paranoia, aggression, and apparent immunity to pain, often associated with stimulant use and certain psychiatric disorders. The signs and symptoms typically ascribed to "excited delirium" include bizarre or violent behavior, hyperactivity, hyperthermia, confusion, great strength, sweating and removal of clothing, and imperviousness to pain. Speculation about triggering factors include sudden and intense activation of the sympathetic nervous system, with

EX. G

hyperthermia, and/or acidosis, which could trigger life-threatening arrhythmia in susceptible individuals."[3]

127. Officers are trained that Excited Delirium can be recognized by certain behaviors which include but are not limited to: Irrational Speech/ Speaking in Gibberish, Shouting, Yelling, or screaming, Confusion, Sudden changes in behavior i.e. raging followed by sudden calmness, Paranoia, believe that someone is after them, Frightened/Panicky, Hallucinating/hearing Voices, Violent/Destroying Property, Unexplained Strength/Endurance, High level of Pain Tolerance, Sweating Profusely/High Body Temperature, Foaming at mouth, Drooling, Dilated Pupils, Evidence of Self-inflicted injuries, Removing Clothing, or Completely Naked. Officers are taught that when a person exhibits some of these behaviors officers should be aware that they are facing a medical emergency. It is noted that officer testimony in this case acknowledged that Andrew Layton exhibited many of the listed symptoms. The officers also acknowledged that the Mankato Police Department listed many of the same symptoms as evidence of Excited Delirium.

128. Officer Best acknowledged that Mr. Layton exhibited the symptoms of excited delirium as defined by the Mankato Policy. It is well known and discussed in law enforcement training that one of the causes of such delirium is drug use. Officers at the scene commented that Mr. Layton may be in a state of Meth Delirium while Officer Best indicated that Layton was "methed out." Any reasonable and well-trained officer would have recognized that if someone was

---

[3] Carolyn B. Robinowitz, MD, REPORT OF THE COUNSEL ON SCIENCE AND PUBLIC HEALTH 453 (AMERICAN MEDICAL ASSOCIATION, ANNUAL MEETING 2009)

EX. G

"methed-out" or in "meth delirium" they should be transported to the hospital for examination, particularly when exhibiting super-strength, incoherent language, and agitated behavior. These are the very symptoms and causes trained to officers with respect to persons with excited delirium.

129. Officer Best was asked: Q. And, now, according to your department, the department's policies or the department's position, if I understand it correctly, if I understood you correctly, is that an individual like Andrew who has signs or symptoms that would include bizarre behavior, incoherent speech or shouting, grunting, moaning, animal-like sounds, impervious to pain, incredible strength, these are what you were taught or trained by the department to be signs for excited delirium, correct? A. That's what's in the policy." (Best 160). Best indicated that he was supposed to follow the policy if he thought it was excited delirium but indicated he thought it was methamphetamine at the time. (Best 161).

130. Officer Best was asked if he knew all of his department's policies to which he answered: "Like, all 1,000 of them?" (Best 103). Officer Best acknowledged that agency policy if a person is in a state of excited delirium it is considered a medical emergency and officers should seek medical attention from the subject, however he did not believe Layton was a case of excited delirium. (Best 159). Best then acknowledged that Layton's behaviors exhibited during the encounter would have come within the definition of excited delirium under the Mankato Police Department policy. (Best 159). It is noted that Officer Best testified that he was aware that officers at the scene considered the possibility that Layton

EX. G

was in "meth delirium" while at the scene. Best himself described delirium as an altered state of mind sometimes being caused by intoxication and overactive excitement. Best said that he believed the training was that if a person had the behavioral symptoms of excited delirium they were to be transported to the hospital by ambulance. (Best 160).

131.    In response to Excited Delirium, officers are trained to quickly gain control of the subject, assign an officer to the subject's head to speak to the subject calmly and monitor them, and to turn the subject over to medical as soon as possible. Officers are encouraged in training to seek cooperation from EMS to test the subject's temperature, put on external cooling methods if appropriate, place on a pulse oximeter, and check sugar levels. Contrary to what occurred here, officers are instructed to remove handcuffs when placing the subject on the stretcher on their back and assist EMS with replacing cuffs with soft-restraints attached to the stretcher.

132.    It is my opinion, based upon my specialized background, education, experience, and training, as well as my continued research authoring, auditing, consulting and training on law enforcement practices nationwide that Commander Frericks actions in standing by while Andrew Layton was kept in a prone position while hobble-or hog-tied and who determined initially, notwithstanding Layton's behavioral clues that Layton should go to jail, as well as allowing Layton to be transported to the jail rather than a hospital, fell far below the generally accepted policies, practices, training and legal mandates for the supervisory function in law enforcement.

56

EX. G

133. It is my opinion, based upon my specialized background, education, experience, and training, as well as my continued research authoring, auditing, consulting and training on law enforcement practices nationwide that based on the testimony of the involved officers and that of Officer Clifton, the training of City of Mankato's officers with respect to care, custody, control, and restraint of prisoners as well as dealing with persons with medical/mental health needs is inadequate and inconsistent with generally accepted practices nationwide.

134. Officer Baker said he was not trained to get a person who was hobble tied out of the prone position stating he was trained: "Just monitor and maintain control." (Baker 30). Baker said that he was trained that ideally you would keep a person that was hobbled in a prone position with their body from knees to shoulders touching the ground. (Baker 32-33). As noted this is the opposite of the generally accepted law enforcement training in the United States and has been for nearly two decades.

135. Officer Best was asked if when a person is on methamphetamine does it ever rise to a medical emergency to which he responded: "I'm trying to think. Because we deal with it a lot I don't think I've had-in my over 20 years' experience, I don't think I've had a meth user that was transported to the hospital when we've had contact. If they've become violent, it's to jail. (Best 99).

136. Officer Best indicated that he has heard the term "positional asphyxia" on the news where "they've talked about concerns of people not being able to breathe in certain positions." (Best 138). Best said that he has never heard the terms

EX. G

"compressional asphyxia" or "restraint-related asphyxia." (Best 139). I note that all officers should be able to identify, through training, the concept of positional asphyxia which includes the existing danger of putting someone in maximal restraint as occurred with Layton. The fact that Best indicated that he has only heard this term on the news evidences a training deficiency within the Mankato Police Department.

137. Officer Clifton said that he was not aware of any policy that discussed positional asphyxia. (Clifton 109). Clifton also indicated his belief that there was nothing in agency policy regarding the use of spit hoods. (Clifton 118). Clifton could not recall or provide documentation of training on use of the spit-hood but indicated anecdotally that he recalls being in a room while it was being shown before being placed in the squad cars. (Clifton 119). Clifton acknowledged that the Prisoner Transport and Handcuffing policy that discussed Excited Delirium had been in place since 2008. (Clifton). The fact that the agency has no policy on positional asphyxia and has done no documented training on spit masks is further evidence of training deficiencies that impacted the officers' actions with respect to Andrew Layton.

138. Officer Best acknowledged that he has heard the terms leg restraint and hobble used interchangeably in the Mankato Police Department. (Best 162). Best said that he was not trained that if you put a person in a leg restraint or hobble that they should be immediately seated upright. (Best 162). Best did not recall training that would tell officers that once a person was secured at the wrist and ankles and the hobble strap was attached to the handcuffs, the person should

EX. G

not be left on their stomach for an extended period of time. (Best 164). Similarly, Best testified that he "we're not trained" that a person who is secured with the hobble restraints and handcuffs needs to be monitored so they don't roll on their stomach and needs to be monitored for labored breathing. (Best 165). Best indicated that he did not recall any type of training instructing an officer of any observations with respect to behavior or health that an officer should look for when a subject is in a hog or hobble restraint. (Best 167).

139.   Clifton indicated that leg restraint devices should be in every squad car. (Clifton 92).   Clifton testified that there was nothing in policy regarding hogtying as he defined it, which included placement of the wrists within 12 inches of the ankles. (Cliftom 93).   It is noted that Officer Clifton would not speculate any circumstance under which a subject in maximal restraint should be moved off of their stomach essentially indicting that it was a decision left to the officer. (Clifton 98).   It is noted that irrespective of the distance between Layton's wrists and the ankles, and whether an officer refers to the restraint as a hogtie or a hobble restraint, any reasonable and well-trained officer would recognize that Layton was in four-point restraints since all 4 limbs were restrained and then his wrists were connected to his ankle.  As noted the danger of such restraints and body positioning following such restraint has been recognized in law enforcement for nearly two decades.  Notwithstanding the fact that the Mankato Police Department had hobble restraints in every car and utilized them as four-point restraints, involved officers testified they had no formal training on the use of these restraints.

59

EX. G

140.   Officer Huettl testified to on the job training related to the hobble strap as followed: "it was talked about from my field training officers… Basically, that you would place the strap around the subject's ankles area, tighten that up, and then you'd run it up to, like, a belt or the handcuffs, and secure it, and make sure that their legs don't go past, you know, 90 degree or, you know, that it would go too far (indicating). (Huettl 60). Huettl said he was not taught how to position a person after the hobble strap was applied. (Huettl 60).

141.   As noted, Officer Huettl testified that he could not recall any training on Excited Delirium other than the words written in the Mankato Police Department Use of Force Policy (Cilfton Exhibit 10). (Huettl 81). Additionally, Huettl could not recall any training on positional asphyxiation and was not familiar with the term mechanical or restrain related asphyxiation. (Huettl 81-82). Huettl testified that he had never been trained that someone's body position can impact his or her ability to breathe. (Huettl 82). Huettl indicated that he did have some personal understanding of body positioning testifying: "If you stay in one position with pressure for too long, you know, like the way I think about it is kind of cave in, you know, if your body doesn't have the ability to move that you can potentially run out of air. (Huettl 82). Huettl testified that he did not consider Layton in danger of positional asphyxia notwithstanding the fact that Layton was handcuffed behind his back with his legs hobble strapped and a spit mask on. (Huettl 83).

142.   Clifton acknowledged policy changes that went into effect after Layton's death on 2/20/13 related to training and use of the RIPP strap. (Clifton 100-102).

EX. G

Officer Groby testified that the training on leg restraints "would be on-the-job training on a call for service." (Groby 53-54). Groby testified that while she had been shown the leg restraints she had not used leg restraints at all in her training or in her experience. (Groby 54).

143. Officer Clifton, Mankato's 30 (b) (6) deponent testified that Officer Best had been through training for dealing with persons who were mentally ill. (Clifton 57). Clifton testified that he was not aware of any specific training related to the use of hobble for the involved officers. (Clifton 92).

144. At this stage of my review I do not know if I may be asked to review additional documents. Should I be asked to review any additional documents I will be prepared to render additional opinions or supplement the opinions stated within this report.

145. At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony. Should I decide to use any such tool; I will assure that they are made available for review, if requested, prior to their use.

146. My fees for these professional services are outlined in the attached retainer agreement.


This report is signed under penalty of perjury on this 18th day of August 2016, in Greenville, R.I.


_s/John J. Ryan_
John J. Ryan

61

EX. G

# John "Jack" Ryan

700 N. Carr Rd, #595
Plainfield, Indiana   46168
Office (317) 386-8325
Cellular Phone: (401) 692-1555
FAX (317) 386-8228
Email:   jackryan2@cox.net

## EDUCATION

| | |
|---|---|
| 1990-1994 | Juris Doctorate, Cum Laude, Suffolk University Law School |
| 1986-1990 | Master of Science, Administration of Justice, Salve Regina University |
| 1981-1986 | Bachelor of Science, Administration of Justice, Roger Williams University |

## EMPLOYMENT

2002-   Police Practices Consultant, Trainer, Auditor
2003-   Co-Director, Legal Liability Risk Management Institute
1993-2002   Adjunct Professor, Salve Regina University
Administration of Justice Graduate Program
Courses:
       Constitutional Issues in Law Enforcement
       Police Civil Liability
       Juvenile Justice
       Mental Health Law
       Managing Police Organizations
       Business Crime
       Contemporary Issues in the Administration of Justice

1982-2002   Police Officer, Providence Police Department

| | |
|---|---|
| 1982-1985 | Patrol Officer, Patrol Division |
| 1985-1987 | Patrol Officer, Tactical Division |
| 1987-1988 | Detective, Detective Division |
| 1988-1992 | Sergeant, Patrol Division |
| 1992-1995 | Lieutenant, Patrol Division |
| 1995-2000 | Director of Training |
| 1995-2001 | Department Public Information Officer |
| 1997-2001 | Captain, Administrative Staff Division |
| 1998-2001 | Director of Administration |
| 2001-2002 | Research and Policy |

\* As Director of Administration for the Providence Police Department-Supervisory
Responsibilities included:
- Administrative Staff
- Advisor to Chief of Police and Internal Affairs
- Fleet Operations
- Human Resource Bureau
- MIS
- Property/Evidence
- Prosecution Bureau
- Public Information Office
- Record Bureau
- Training Division

EX. G

## PUBLICATIONS:

| | |
|---|---|
| 2013 | Law and Best Practices for Successful Police Operations, 12 High Risk Critical Tasks 3rd Edition |
| 2010 | Law and Best Practices for Successful Police Operations, 12 High Risk Critical Tasks 2nd Edition |
| 2008 | Recent Developments in the Use of Force, Excessive Force by Law Enforcement Touro Law Review, Vol. 24, Number 3 |
| 2008 | 25th Annual Section 1983 Civil Litigation, by Practicing Law Institute Video/Audio-The Unbiased Witnesses in Law Enforcement Litigation. Vol. 1, Section 8 |
| 2007 | Law and Best Practices for Successful Police Operations, 12 High Risk Critical Tasks That Impact Law Enforcement Operations and Create Exposure to Liability Litigation |
| 2006 | Legal & Liability Issues in SWAT, Emergency Response and Special Operations |
| 2006 | Law Enforcement Administrative Investigations, contributing author, Evidence Use and Control Chapter |
| 2005 | School Legal Update |
| 2005 | Critical Tasks in Law Enforcement, A Legal Guide for Officers and Supervisors (Annual) |
| 2005 | Arrest, Search & Seizure (Annual) |
| 2005 | Legal & Liability for Law Enforcement Negotiators |
| 2005 | Use of Force |
| 2004 | Law Enforcement Legal/Liability Update |
| 2003 | Civil Liability and Risk Management for Law Enforcement Agencies |
| 2003 | Case Law on Critical Tasks in Law Enforcement |
| 2003 | Legal Guide to Administrative Investigations |
| 2002 | Policy Development for Public Safety Agencies |
| 2001 | Legal and Liability Issues in Public Schools |
| 2000 | Rhode Island Law Enforcement Officers' Guide to Criminal Procedure |
| 2000 | Rhode Island Law Enforcement Officers' Bill of Rights, A Guide to Investigations and Hearings. |

## PUBLISHED ARTICLES:

| | |
|---|---|
| 2006 | Public Risk, Published by the Public Risk Management Association, January 2006, Vol. 21 No. 2 "A Continuing Story Taser Policies for Police Departments Continue to Evolve" pp. 14-17 |
| 2006 | Public Risk, Published by the Public Risk Management Association, March 2006, Vol. 21 No. 3 "Freeze" Off-Duty Firearms and Intervention: Avoiding Tragedy and Liability" pp. 16-18. |
| 2004 | Crime and Justice International May/June Vol. 20 No. 80 "High Speed Vehicle Pursuit" pp. 30-34; "Developing Trends in Stop & Frisk" p.35; "Fighting Words Directed at a Police Officer: Viability and Liability" pp.36-37 |
| 2004 | Crime and Justice International July/August Vol. 20 No. 81 "Law Enforcement Liability Issues-Agency or Individual Officer's Response to Misconduct by Others may Create Agency or Individual Liability" pp. 29-30. |
| 2004 | Public Risk, Published by the Public Risk Management Association, July 2004, Vol. 19 No. 6 "Handcuffs: How to Manage the Risk" pp.14-17. |
| 2003 | The Law Enforcement Trainer published by American Society of Law Enforcement Trainers, Volume 19, number 3  May/June "Training Liability In The Use Of Deadly Force" pp 24-28. |

*** Note: Articles published electronically on a weekly basis and archived- available at www.patc.com

## AWARDS:

| | |
|---|---|
| 1999 | Salve Regina University, Alumnus, Distinguished Service Award |

EX. G

| 1994 | American Jurisprudence Award, Trial Practice |
| 1992 | American Jurisprudence Award, Constitutional Law |
| 1991 | Moot Court Outstanding Performance Award |

## LAW ENFORCEMENT ACHIEVEMENT AWARDS:

| 1996 | Chief's Award, Off-Duty Shooting in Progress Arrest |
| 1987 | City Council Award, Off-Duty Breaking and Entering Arrest |
| 1986 | Rhea Archambault (Officer of the Year) Award |
| 1982-2002 | Over 35 Letters of Commendation |

## CONFERENCE PRESENTATIONS/TRAINING SESSIONS:

2012    Sheriff's Association New Sheriff's Conference Legal Update and Best Practices For Sheriffs.

2012    Texas Commission Law Enforcement Officer on Standards and Education annual conference for Texas Trainers/ "Legal Issues for Law Enforcement Trainers"

2012    Practicing Law Institute- "Mass Protest" 29th Annual Conference Section 1983 Civil Rights Litigation

2009    Continued training programs for Public Agency Training Council throughout the United States to include, Policy Development and Implementation, Arrest Search & Seizure, Use of Force, Civil Liability Issues, Liability Issues for Narcotics Officers, Legal Issues for Tactical Operations, Liability Issues in Public Schools and Internal Affairs

2009    Georgetown Law Center/Civil Rights Litigation, Session 1 "Strip Searches in Jails," Session 2 "Tasers"

2008    Texas Commission on Law Enforcement Standards and Education "Liability Management for Law Enforcement Trainers

2008    Association of American Law Schools Annual Conference- "Law Enforcement Policy and Training/Use of Force & Pursuit in the Aftermath of Scott v. Harris"

2007    Continued training programs for Public Agency Training Council throughout the United States to include, Policy Development and Implementation, Arrest Search & Seizure, Use of Force, Civil Liability Issues, Liability Issues for Narcotics Officers, Legal Issues for Tactical Operations, Liability Issues in Public Schools and Internal Affairs

2007    Georgetown Law Center/Civil Rights Litigation: Session 1 "Law Enforcement Policy and Training in Use of Force" ; Session 2: "Law Enforcement- the ADA and Persons of Diminished Capacity."

2007    South Dakota Annual Conference for Chiefs and Sheriffs-"Legal Update on High Liability Issues in Law Enforcement"

2007    Pennsylvania Chiefs of Police-"Legal Update on High Liability Issues in Law Enforcement"

2007    International Municipal Lawyer's Association Annual Conference- "Garrity and the Administrative Interview"

2007    Practicing Law Institute- "Use of Force" 24th Annual Conference Section 1983 Civil Rights Litigation

2007    25th Annual Section 1983 Civil Litigation, by Practicing Law Institute Video/Audio-The Unbiased Witnesses in Law Enforcement Litigation. Vol. 1, Section 8

2006    Continued training programs for Public Agency Training Council throughout the United States to include, Policy Development and Implementation, Arrest Search & Seizure, Use of Force, Civil Liability Issues, Liability Issues for Narcotics Officers, Legal Issues for Tactical Operations, Liability Issues in Public Schools and Internal Affairs

2006    Georgetown Law Center/Civil Rights Litigation "Police Misconduct" §1983

2006    National Internal Affairs Investigators Association Annual Conference, Gatlinburg Tennessee "Use of Force and the Internal Affairs Process"

2006    Georgia Bar Association "ICLE", Atlanta Georgia "Evaluating Police Liability Claims"

2005    Legal and Policy Issues in the Use of Force- throughout United States

2005    Georgetown Law Center/ Civil Rights Litigation "Less-Lethal Force"

3

EX. G

| 2005 | Arrest, Search & Seizure, and Questioning-throughout United States |
| 2005 | Civil Liability and Risk Management in Law Enforcement-throughout United States |
| 2005 | Internal Affairs/Administrative Investigations- throughout United States |
| 2005 | PRIMA National Conference-Milwaukee "Use of Force" and "Critical Tasks in Law Enforcement" |
| 2005 | National Sheriff's Association Annual Conference-Louisville "Legal Issues in Administrative Investigations" |
| 2005 | National Leagues of Cities and Towns (Risk Consortium)-Seattle "Identifying Contemporary Risks in Law Enforcement Liability" |
| 2004 | Legal and Liability Issues in Public Schools, throughout United States |
| 2004 | Policy Development for Law Enforcement Agencies, throughout United States |
| 2004 | Civil Liability and Risk Management for Law Enforcement Agencies, throughout United States |
| 2004 | Legal Issues in Narcotics Operations, throughout United States |
| 2004 | Critical Legal Tasks for Patrol Officers, Illinois Mobile Training Unit |
| 2004 | Georgetown Law Center/Civil Rights Litigation-§ 1983 |
| 2004 | Rhode Island Bar Association Annual Conference- "Stop in the Name of the Law" |
| 2004 | Oklahoma Attorney General's Annual Conference "Policy Summit" Policy session for Police Executives |
| 2004 | Texas Commission Law Enforcement Officer on Standards and Education annual conference for Texas Trainers/ "Legal Issues for Law Enforcement Trainers" |
| 2003 | Legal and Liability Issues in Public Schools, throughout United States |
| 2003 | Policy Development for Law Enforcement Agencies, throughout United States |
| 2003 | Civil Liability and Risk Management for Law Enforcement Agencies, throughout United States |
| 2003 | Advanced Internal Affairs, Myrtle Beach, SC, Las Vegas, NV. |
| 2003 | Georgetown Law Center/Civil Rights Litigation-§1983 |
| 2003 | Georgia Internal Affairs Investigators Annual Conference |
| 2003 | Tennessee Chiefs' Association Conference Training |
| 2003 | Alaska Chiefs' Association/FBINAA Executive Development Conference |
| 2003 | Office of Corporation Counsel/Metropolitan Police, Washington D.C. |
| 2003 | International Law Enforcement Educators and Trainers Association Annual Conference/Chicago "Trainers and Use of Force Liability" |
| 2002 | Legal and Liability Issues in Public Schools, throughout the United States |
| 2002 | Policy Development for Public Safety Agencies, throughout the United States |
| 2002 | International Association of Law Enforcement Planners National Conference |
| 2002 | National Internal Affairs Investigators Association National Conference |
| 2001 | Legal Issues in Use of Force Seminar, Salve Regina University |
| 2001 | Advanced Internal Affairs Seminar, Las Vegas |
| 2000 | Police Misconduct/Racial Profiling, Georgetown University Law Center |
| 2000 | International Crime Prevention, University of Warwick, UK. |
| 2000 | Criminal Procedure Update Seminar, Salve Regina University |
| 1999 | Law Enforcement Officers' Bill of Rights Seminar, Salve Regina University |
| 1998 | Police Media Relations Seminar, Salve Regina University |
| 1997 | Police Civil Liability Seminar, Salve Regina University |
| 1995 | Basic Training for Detectives, Rhode Island State Police |
| 1993 | Search and Seizure in Schools, Rhode Island Legal/Educational Partnership |

## CURRICULUM DEVELOPMENT:

| 2005 | Jail Liability Issues |
| 2005 | Arrest, Search & Seizure, and Questioning |
| 2004 | Legal Issues/ Case Law Update for Narcotics Investigators |
| 2004 | Legal and Liability Issues for Tactical Commanders |
| 2004 | Investigation of Officer Involved Shootings |
| 2003 | Legal Issues in Administrative Investigations |
| 2003 | Civil Liability and Risk Management for Law Enforcement Agencies |

EX. G

| 2002 | Policy and Procedure for Law Enforcement Agencies |
| 2002 | Legal and Liability Issues in Public Schools |
| 1993 | Graduate Course, Police Civil Liability |
| 1993 | Providence Police Academy Entry-Level, 22 Week Program Revamp |

## SPECIALIZED LAW ENFORCEMENT TRAINING

Law Enforcement Instructor Development, Federal Bureau of Investigation
Advanced Tactical Management, Prince William County Criminal Justice Academy
Emergency Services Media Relations, Old Dominion University
Rights of Police Officers, Labor Relations Information System
High Performance Police Management, Police Management Association
Crime Prevention for Administrators, National Crime Prevention Institute
Effective Speaking and Human Relations, Dale Carnegie Inc.

## PROFESSIONAL AFFILIATIONS:

Rhode Island Bar Association
Fraternal Order of Police
Providence Police Association
International Municipal Lawyers Association

## ADMITTED TO PRACTICE OF LAW:

State of Rhode Island, November 1994
District of Rhode Island Federal Court, June 1995

## VOLUNTEER ORGANIZATIONS:

Northern Rhode Island Vikings Junior Hockey Association, President 2002-2004
Northern Rhode Island Vikings Junior Hockey Association, Board Member 1998-2003

## CASE CONSULTATIONS:

June 2002: Estate of Weibel, New Hampshire, Retained (Plaintiff)
December 2002: McGowan v. Siomos, CA NO. 00-40113-NMG (Mass. Fed. Dist. Ct.)
(Testimony) (Plaintiff)
June 2003: Parker v. Swansea et al., CA NO. 01-10063NG,( Mass. Fed. Dist. Ct.)
(Testimony) (Plaintiff)
July 2003: Gilbert v. Atkinson et al., CA NO. 1:03-CV-108-3 (GA. Fed Dist. Ct. Middle
Dist.) (Retained) (Defendant)
October 2003: Neal v. Pinellas County et al., CA NO. 8:03-CV-247-T-17MAP (Fla. Fed
Dist. Ct. Tampa Div.) (Retained) (Defendant)
December 2003: Hickey v. NYPD et al., (N.Y. Fed. Dist. Southern) (Deposed) (Plaintiff)
December 2003: Mills v. Merrimack et al., Index # 01CV6506 (N.H. Fed. Dist. Ct.)
(Retained) (Plaintiff)
March 2004: Richman v. City of Anacortes, NO. C03-2559 (Washington Fed. Dist. Ct.
Western Dist. At Seattle) (Retained) (Defendant)
July 2004: Brown v. City of McDonough GA. Et al., NO. 1 03 CV 2699 (GA. Fed. Dist.
Ct. Northern District, Atlanta Division) (Deposed) (Defendant)
May 2005: Graham v. Bennett et. al. No. 04-2136, (Ill. Fed Dist. Central Dist. Urbana).
(Retained) (Defendant)
June 2005: Taylor v. Ohio State Patrol, No. 2004-07891 (Court of Claims Ohio)
(Testimony) (Defendant)
July 2005: Reis v. Delaware Port Authority, No. CAM-L-4988-03 (Superior Court of
New Jersey) (Retained) (Defendant)
July 2005: Schneider v. Franklin County Ohio (Deposed) (Plaintiff)
August 2005: White v. Nault, CIVIL ACTION NO.3:02CV1589 (WWE) (Retained)
(Plaintiff)

EX. G

September 2005: Kesser v. City of Miami, Case No. 04-22608 CIV Jordan/Brown (U.S. Dist. Ct. Southern District of Florida) (Retained) (Defendant)

November 2005: Aroneo v. Ferraioli, Morris County Police, Docket No. MRS-L-1946-03 (Superior Court of New Jersey Law Division: Morris County (Retained) (Defendant)

January 2006: Atwood v. Nieliwocki et al., Civil Action No.3:05CV-0248 (JBA) (Connecticut Federal District Court) (Testimony) (Plaintiff)

January 2006: O'Brien v. City of Pembroke Pines, et al., (Deposed) (Defendant)

February 2006: In the Matter of Detective Cooke, Disciplinary Hearing, Sheridan Wyoming. (Testimony) (City).

April 2006: Martin v. Kent, (Case No. : 24-C-05-005960) Circuit Court for Baltimore City (Retained) (Defendant).

April 2006: Matter of Reyes, Georgia (Defendant)

May 2006: Ripley v. City of Lake City, Florida, (Deposed) (Defendant), Civil Action NO: 3:04-cv-1328-J-16MCR

May 2006: Torres v. Love, (Deposed) (Plaintiff) U.S. District Court, District of New Jersey, Civil Action NO. 04-cv-2233 (FLW)

May 2006: Olson v. Pelkey, (Retained) (Plaintiff) U.S. District Court, District of Minnesota, Case No. 05-1189 MJD/FLN

June 2006: Williams v. City of Champaign, (Retained) (Defendant) U.S. District Court, Central District of Illinois Case No. 04-2150

July 2006: Conn v. City of Reno, (Retained) (Defendant) U.S. District Court, District of Nevada Case No. CV-N-05-0595-HDM-VPC

September 2006: Parker v. City of South Portland, (Testimony) (Plaintiff), U.S. District Court, Maine, Case No. CV-06-129-GZS

October 2006: MP & Patel et al., v. City of Spartanburg (Deposed) (Testimony)

October 2006: Estate of Brutsche et al. v. King County et al., (Retained) (Plaintiff) United States District Court, Western District of Washington/Seattle, Case No. CV05-15382

October 2006: Sharp v. Fischer et al., (Deposed) (Defendants), U.S. District Court, Southern District of Georgia/Savannah, Case No. CV406-020

October 2006: Meir v. McCormick, (Testimony) (Plaintiff), U.S. District Court, Minnesota, Case No. 06-190 (ADM/JSM)

October 2006: Montiel v. Liepold, (Testimony) (Plaintiff), U.S. District Court, Minnesota, Case.No. 06-331 (JNE/JJG)

December 2006: Banks v. City of Hampton, (Retained) (Defendant), Clayton County Superior Court, GA.

December 2006: Ecxford v. City of Zion, et al., (Deposed), (Defendant), Circuit Court of Illinois, Lake County, No. 05 L 855

January 2007: State of New Jersey v. Gillespie, (Testimony), (Defendant), Superior Court Gloucester County, Indictment 06-0300268

January 2007: Estate of Joseph Kovack v. City of Philadelphia, U.S. District Court for the Eastern District of Pennsylvania (Retained) (Defense)

March 2007: Rauen/Hartman v. City of Miami, (Retained) (Defendant), U.S. District Court, Southern Dist. Florida, CA No. 06-21182-CIV-JORDAN

March 2007: Bryan v. Las Vegas Metropolitan Police Department, (Deposed) (Defendant), U.S. District Court, District of Nevada, Case No. 2:06-cv-1103-KJD-PAL

March 2007: Estate of Cruz v. City of Camden, et al, CA No. 06-cv-1809; Agosto v. City of Camden et al, CAM-L-5454-06; Roman-Santiago v. City of Camden, CAM-L-5458-06 (Retained) (Defense) (New Jersey State Court) [Same Event-three filings]

March 2007: Wilson v. City of College Park, CA No. 2007EV001667B (Deposed) (Defense) (Georgia State Court)

April 2007: Johnson v. Tousignant, U.S. Dist. Of Vermont, CA 1:06- cv-128 (Retained) (Defense)

March 2007: Lee v. City of Franklin, U.S. Dist., Northern Dist. GA., CA 3:06-CV-127-JTC (Retained) (Defense)

6

EX. G

May 2007: Rider et al v. City of Oakland et al., U.S. Dist. Northern Dist. CA., CA. No. C-05-03204-MHP (Retained) (Plaintiff)

May 2007: Carangelo v. Sliders et al., Superior Court of Connecticut, No. 04-183054 S (Testimony) (Plaintiff)

June 2007: Andrews v. City of Douglasville, Superior Court of Douglas County, GA., CA. No. 07CV00558 (Retained) (Defense)

June 2007: Navratil v. Johnson, U.S. Dist. Minnesota, CA. No. 06-2613-ADM-AJB (Retained) (Plaintiff)

June 2007: Baker v. Harper, et al., U.S. Dist. GA., CA. No. 1:06-CV-1421 (Deposed) (Defense)

July 2007: Krout v. City of Russellville, U.S. Dist. (Eastern Dist./Western Division) Arkansas, CA. No. 4-06-CV-01294 JLH (Deposed) (Defense)

July 2007: Town v. Thelen, U.S. Dist. Minnesota, CA. No. 06-3113 PAM/RLE (Retained) (Plaintiff)

July 2007: Wade v. Colaner, U.S. Dist., New Jersey, CA. No. 06-3715 (Testimony) (Defense)

July 2007: Marshall v. Reno Police Department et al., U.S. Dist. Nevada, CA. No. 3:07-cv-00222-ECR-RAM (Retained) (Defense)

August 2007: Myers v. City of Orangeville (Testimony) (Defense)

November 2007: Stockton v.Auren et al., U.S. Dist. Minnesota, CA. No. 07-556 (JRT/FLN) (Retained) (Plaintiff)

December 2007: Cundiff v. Postel, U.S. Dist. E.D. Tennessee, C.A. No. 3:06-CV-437 (Retained) (Defense)

December 2007: Scott v. Town of Brattleboro, U. S. District Court District of Vermont, C.A. No. 1:07-cv-233-jgm (Retained) (Defense)

January 2008: England v. LVMPD, et al, U. S. District Court District of Nevada, CA No. 2:07-cv-01238-PMP-GWF (Testimony) (Defense)

January 2008: Estate of Peyton Strickland v. New Hanover County Sheriff's Dept (Retained) (Defense)

January 2008: Taylor, et al v Deputy Scott Wood, et al (Retained) (Defense)

January 2008: Costales v White, et al, U. S. District Court District of New Mexico, CA No.07-CV-00827(Retained) (Defense)

February 2008: Saiz v Bernalillo County, et al, U. S. District Court District of New Mexico, CIV 07 790 JAP/LFG (Testimony) (Defense)

February 2008: Mahoney v Miller, U. S. District Court District of Minnesota, Case No. 07-CV-1851 (JNE/SRN), (Retained) (Plaintiff)

February 2008: Hoke v Municipal City of Tempe, AZ, Superior Court of the State of Arizona in and for the County of Maricopa, CV2007-052506 (Retained) (Defense)

February 2008: Smith v LVMPD, U. S. District Court District of Nevada, 2:07-cv-1194-JCM (GWF) (Retained) (Defense)

March 2008: Williamson v Grant, et al, U. S. District Court, District of Maryland, Baltimore, CA No.: CCB-07-CV1147, (Retained) (Defense)

April 2008: Crowell & Kilmurray v Kirkpatrick, U.S. District Court District of Vermont, 2:2008cv00055, (Retained) (Defense)

April 2008: Liddy, et al. v. City of Los Angeles, California District Court, 2:2005cv05697, (Retained) (Defense)

April 2008: Michael Ross v. The City of Las Cruces, et al., District Court Dona Ana, New Mexico, No.CV-2007-1688, (Testimony) (Defense)

April 2008:Ahmed Ahqeirat, et al. U.S. Airways Group, Inc., et al. U.S. Court District of Minnesota, No. 07-CV01513 (ADM/AJB) (Retained) (Defense)

April 2008: Paul Wayne, et al. v. Bernalillo County, et al. US District Court for the District Court of New Mexico, No. CIV-07-1255 BB/RLP, (Retained) (Defense)

April 2008: Boria v. Bowers, et al, U.S. District Court for the Eastern District of Pennsylvania, No.06-4384, (Retained) (Defense)

April 2008: Walker v. Las Vegas Metro Police Department, U.S. District Court District of Nevada, No.2:07-cv-00740-PMP-LRL, (Retained) (Defense)

7

EX. G

June 2008: Kasilyan v. Las Vegas Metro Police Department, U.S. District Court For the District of Nevada, Case No. 2:08-CV216-PMP-RJJ, (Retained) (Defense)

July 2008: Jeffery Keating, et al. v. City of Fort Lauderdale, et al. U.S. District Court for the Southern District Of Florida Miami Division, Case No.07-CV-23005-MARTINEZ/Brown, (Retained) (Defense)

July 2008: Jeffery Keating, et al. v. City of Miami, et al. U.S. District Court for the Southern District Of Florida Miami Division, Case No.07-CV-23005-MARTINEZ/Brown, (Retained) (Defense)

July 2008: Kiri Walker, et al., v. Marshallville, Georgia, et al., U.S. District Court Middle District of Georgia Macon Division, No.5:07-CV-476-CAR (Retained) (Defense)

September 2008: State Of New Jersey v. David Romeo, Superior Court of New Jersey Cape May County Law Division, Indictment No. 08-08-00654-1(Testimony) (Defense)

September 2008: Ronald T. Whitaker v. Springettsbury Township, US District Court For The Middle District OF Pennsylvania, No. 08-627(Retained) (Defense)

October 2008: Keating v. Broward Sheriff Al Lamberti and John Brooks, et al. U.S. District Court Southern District of Florida Case No. 07-23005-CIV-MARTINEZ/BROWN (Retained) (Defense)

October 2008: Unseld Nance, Sr., et al., v. Erik Sammis, et al., U.S. District Court Eastern District of Arkansas, Case No. 3:07CV00119 BSM (Testimony) (Defense)

October 2008: George Spicka v. Corporal Stewart, et al., Circuit Court for Baltimore City, Case No. 24-C-07-009474 OT (Retained) (Defense)

October 2008: Nicholas Goblirsch v. Jay Castonguay, et al. U.S. District Court For The District of Minnesota, Case No. 08-CV-764 RHK/JJK (Retained) (Plaintiff)

October 2008: AFL-CIO, et al. v. City of Miami, et al., U.S. District Court Case No. 07-22966-Civ-Ungaro (Retained) (Defense)

October 2008: Cara Jennings, et al. v. City of Miami, et al. U.S. District Court, Case No. 07-23008-Civ-Martinez (Retained) (Defense)

October 2008: George Griffin, Jr., v. City of Rutland, and Edward Dumas, U.S. District Court, Rutland Superior Court, Docket No. 658-8-08 Rdcv (Retained) (Defense)

October 2008: Kevin Farnan v. Eric Howley, Brian E. Turner, Scott E. Gaboury, Jason Noblet and Unnamed Law Enforcement Officers, Bennington Superior Court, Vermont No. 287-8-08Bncv (Retained) (Defense)

November 2008: Kevin Cobbs and Marlana Fichtner v. David Clements and Ethan Thibault, Vermont District Court No. 5941-11-05 Cncr (Retained) (Defense)

November 2008: Linda Davis v. Christopher Lora, U.S. District Court For The District of Vermont, Civil Case No.2:07-cv-00248-wks (Retained) (Defense)

November 2008: William Enos v. Richard King, U.S District Court For The District of Vermont, Civil Case No.2.08-cv-208 (Retained) (Defense)

December 2008: Natividad Hernandez v. City of North Miami Beach, FL, U.S. District Court For The Southern District Of Florida Miami Division (Retained) (Defense)

December 2008: Sandria Lewis v. Brandon Thomason and City of Rockport, AR, U.S. District Western District of Arkansas Hot Springs Division (Testimony) (Defense)

February 2009: Lois Alvarado v. Rene Rivera, et al., U.S. District of New Mexico, Case No. CV 08-1116 RLP/ACT (Retained) (Defense)

February 2009: Darwin Gerdes v. Ron Myers, et al., U.S. District Court District of Minnesota, Case 0:08-cv-00557-MJD-RLE (Retained) (Plaintiff)

February 2009: Betty D. Golden v. City of Centerville, et al., U.S. Superior Court of Bibb County, Georgia, Civil Action No. 07-CV-46648 (Retained) (Defense)

March 2009: Jennifer Setters v. City of Wasilla, Wasilla Police Department, et al. U.S. District Court for the District of Alaska, Case No.:3AN-0808743CI (Retained) (Defense)

April 2009: Eldridge Chatman v. Craig Taylor, U.S. District Court District of Minnesota, Case No. 08CV 6097 RHKIFLN (Retained) (Plaintiff)

April 2009: Anthony Bevis v. City of Sandy Springs, et al., State Court of Fulton County State of Georgia Civil Action No. 2008EVoo6230C (Deposed) (Defense)

May 2009: James Needham v. Tony Petrie and Beltrami County, U.S. District Court For The District of Minnesota, Case No. 08-CV-5389 (MJD-RLE) (Retained) (Plaintiff)

8

EX. G

June 2009: Gary King, Jr. v. City of Oakland, U.S. District Court Northern District Of California, No. C-082394 SBA (Retained) (Plaintiffs)
June 2009: Richard Allen Perez, Jr., v. City of Henderson, et al., U.S. District Court District of Nevada, Case No. 2:09-cv-00453-JCM-LRL (Retained) (Defense)
June 2009: Juanita L. Estrada v. The City of Las Cruces, U.S. District Court For The District Of New Mexico, No. CIV 09-10/RBCG (Retained) (Defense)
July 2009: The Estate of Leeroy Hickman, Jr. v. Blount County, Tennessee et al, In The Circuit Court For Blount County, Tennessee, No. L-16557 (Deposed) (Defense)
July 2009: Claude Zain McCollum v. Rodney Bahl et al. U.S. District Court For The Western District Of Michigan, Southern Division, Case No. 08-cv-00096 (Retained) (Defense)
July 2009: Margaret Geier v. Butler County, Ohio, et al., Court of Common Pleas Hamilton County Ohio, Case No. A0807995 (Deposed) (Defense)
July 2009: Georgina Colmenero v. County of Bernalillo, U.S. District Court for The District Of New Mexico, 2008-CV-1112LH/LFG (Retained) (Defense)
July 2009: Dennis Sisneros v. County of Bernalillo, U.S. District Court For The District Of New Mexico, No. 1:09 CV-00213-JB-ACT (Testimony) (Defense)
September 2009: Carol Ann George v. The County of Santa Barbara, et al, U.S. District Court, Central District of California, Case No. CV09-2258CBM (AGRx) (Deposed) (Defense)
September 2009: Tracy Grant Administratrix of the Estate of Randall Pagano v. Township of Bristol, et al., U.S. District Court for The Eastern District Of Pennsylvania, Case No. 09 1580 (Retained) (Defense)
October 2009: Jamie Mercer Handy v. Charter Township of Raisin, et al, U.S. District Court, Case No. 2:09-cv-10118 (Retained) (Defense)
November 2009: Rene Mader-Font, et al. v. M. Rael, U.S. District Court for the District of New Mexico, CV-2009-517 (Retained) (Defense)
November 2009: Timothy M. Andozola v. Chris Romero, The County of Bernalillo, et al. U.S. District Court For The District of New Mexico, CIV-09471 ACT/RHS (Retained) (Defense)
November 2009: Jeff Gillman v. Douglas Schlagetter, et al. U.S. District Court Southern District of Ohio Western Division at Dayton, Case No. 3:08-cv-0454 (Retained) (Defense)
November 2009: Toni Hayes, as Conservator of Tony Tillman, et al. v. City of Taylor, et al. Circuit Court of the County of Wayne, Michigan, Civil Action No. 08-015958-NI (Deposed) (Defense)
November 2009: Karim El-Ghazzawy v. Kay Berthiaume, et al. U.S. District Court District of Minnesota Civil Case No. 09-CV-372 (RHK/AJB) (Plaintiff)
December 2009: Joshua Bailey, et al. v. DeKalb County, et al. DeKalb County State Court, Civil Action File No. 08A94489-3 (Deposed) (Defense)
January 2010: Samuel Mullet, et al. v. Jefferson County Sheriff's Department, et al. U.S. District Court, S.D of Ohio, Eastern Division, Case No. 2:08-cv-857(Retained) (Defense)
February 2010: Estate of Anthony "Tony" Forgione, et al. v. Fort Walton Medical Center, Inc., et al. Circuit Court Of The First Judicial Circuit In And For Okaloosa County, Florida, Case No. 09-CA-2700-S-TR (Deposed) (Defense)
March 2010: Eugenia Elliott v. City of Jeffersontown, et al., Jefferson Circuit Court, Case No. 09-CI-06610 (Retained) (Defense)
March 2010: Angelicka Serna v. Bernalillo County, et al., U.S. District Court For The District Of New Mexico, No.: CIV 09-1061 WPL/WDS (Retained) (Defense)
March 2010: Candice N. Dempsey, et al., v. City of, et al., U.S. District Court Eastern District of Kentucky Central Division at Frankfort, Civil Action No. 3:09-CV-00033-DCR (Deposed) (Defense)
March 2010: James Gray v. Village of Middleport, et al., U.S. District Court Southern District Of Ohio Eastern Division, Case No. 2:09-cv-00868 (Retained) (Defense)

EX. G

March 2010: Myron Williams (Est. Of Brenda Williams) v. City of Scranton, et al., U.S. District Court For The Middle District Of Pennsylvania, No. 3:10-CV-388 (Retained) (Defense)

April 2010: Cosetta R. Morris v. Adam Bailey, acting in his individual capacity as a St. Paul Police Officer, U.S. District Court District of Minnesota, Case No. 09-1060 (ADM/AJB) (Retained) (Plaintiff)

April 2010: Noel Armstrong III v. Det. Sgt. Victor J. Sherman, et al., U.S. District Court for the District of New Jersey Camden Vicinage, Civil Action No.:09cv716(AET) (Testimony) (Defense)

May 2010: Sarah Harris, et al., v. King County, Pierce County Superior Court, Washington, No: 10-2-05484-2 (Deposed) (Defense)

May 2010: Hui Qin Deng/Daechull Chung v. LVMPD et al., US District Court District Of Nevada, Case 2:10-cv-00277-PMP-RJJ (Testimony) (Defense)

May 2010: Susan Zeller v. NJ State Police, et al., Superior Court Of New Jersey, Docket no. MON-L-5972-09 (Retained) (Defense)

June 2010: Jill Ann Kelly v. Jon Napper, et al., U.S. District Court District Of Minnesota, Case No. 0:09-CV-2791 (JRT/FLN) (Deposed) (Plaintiff)

June 2010: Rosemarie Maines v. City of McDonough, Georgia, et al., U.S. District Court Northern District Of Georgia Atlanta Division, Civil Action No. 1:09-CV-3559-WSD (Retained) (Defense)

August 2010: Ronald Romero v. Las Vegas Metropolitan Police Department, et al., U.S. District Court District of Nevada, Case No. 2:10-cv-00537 (Retained) (Defense)

August 2010: Erika Hall as Guardian of the person and property of Charles E. Hall v. City of Aventura, et al., In The Circuit Court Of The Eleventh Judicial Circuit In and For Miami-Dade County, Florida, Case No. F09-25476A (Retained) (Defense)

August 2010: John Sorensen v. David McLaughlin, U.S. District Court for the District of Minnesota, Case No. 09-cv-02842 JRT/JJK (Retained) (Plaintiff)

September 2010: Jeffery Steven Scheib v. Gregory Boderck, Individually; James Berrong, Individually; and Blount County, Tennessee, U.S. District Court For The Eastern District Of Tennessee At Knoxville, No. 3:07-cv-446 (Retained) (Defense)

October 2010: Patrick Reid v. Felix Valdez, et al., U.S. District Court for the District of New Mexico, No. CV-10-335 BB/ACT (Retained) (Defense)

October 2010: David Twedt v. Adam Dupic and the City of Canton, U.S. District Court District of South Dakota Southern Division, CIV. 10-4028 (Testimony) (Defense)

November 2010: Raymond Castillo v. City of Oakland and Officer Bryant Ocampo, U.S. District Court Northern District of California, Case No. C09-04679 PJH (Deposed) (Plaintiff)

November 2010: Estate of John R. Baptie, et al., v. Jonathan Bruno, et al., State of Vermont Rutland County, Superior Court, Docket No. 235-3-09 Rdcv (Retained) (Defense)

December 2010:Charlene DeFreese and Emil Mann, Jr., et al. v. Chad Walder, et al., Superior Court of New Jersey Law Division Bergen County, Case No. BER-L-283-07 (Testimony) (Defense)

January 2011: Rosie Chatt and Dewayne Chatt, Jr, Individually and as Co-Administrators in the Estate of Dewayne Chatt, Sr., deceased, v. City of West Memphis, Arkansas, et al., U.S. District Court Eastern District of Arkansas, Jonesboro Division, Case No. 3:10-cv-0119 SWW (Retained) (Defense)

January 2011: Wanda Johnson, Oscar J. Grant III, et al. v. Bay Area Rapid Transit District, et al., U. S. District Court Northern District of California, Case No. C09-00901 MHP (Testimony) Plaintiff)

February 2011: Richard Greenberg v. New Jersey State Police, et al., Superior Court of New Jersey Law Division, Burlington County, Docket No. BUR-L-552-09 (Retained) (Defense)

March 2011: LaShonda Fentress, et al., v. Brandon Lee Jessie, City of Radcliff Samuel Taylor, et al., Hardin Circuit Court, Civil Action Number 10-CI-02747 (Deposed) (Defense)

EX. G

March 2011: Delia Hernandez et al., v. Manuel (Manny) Frais, Isaiah Baker, John and Jane Does I-IV, City of Las Cruces, et al., U.S. District Court for the District of New Mexico, No. CIV 2010-351 JB/GBW (Retained) (Defense)

April 2011: Lennie J. Bushey v. City of Burlington Police Department, et al., U.S. District Court for the District of Vermont, Civil Case No. 2:09-cv-232 (Retained) (Defense)

April 2011: Kristina Wildeveld-Coneh v. Las Vegas Metropolitan Police Department, et al., U.S. District Court District of Nevada, Case No.2:10cv983-RLH-PAL (Retained) (Defense)

April 2011: Kelley S. O'Brien v. Robert Barrows, et al., U.S. District Court for the District of Vermont, Civil Case No. 1:10-cv-173 (Retained) (Defense)

May 2011: Denise Brown v. Sate of New Jersey, et al., Superior Court of New Jersey Cumberland County Law Division, Docket No: CUM-L674-09 (Testimony) (Defense)

May 2011: Efrain Velasquez, et al., v. City of El Paso, et al., In the US District Court for the Western District, Cause No: EP 10 CV 0457(Retained) (Defense)

June 2011: Fletcher DeWolf II, v. Sgt. Michael F. Lewis, individually and officially, and Town of Bristol., U.S. District Court for the District of New Hampshire, Civil Action No. CV:2009 (Retained) (Defense)

June 2011: Garressa Smith, et al., v. City of Camden, et al., US District court for the District of New Jersey Camden Vicinage, Case No.1:08-cv-04417-JEI-KMW (Retained) (Defense)

June 2011: Lucia Guerrero, et al., v. City of El Paso, et al., In the US District Court for the Western District, Cause No. EP-11CV-0101(Retained) (Defense)

July 2011: Elizabeth Ivy v. John "Jack" O'Connor, Trevor Whipple, South Burlington Police Department & City of South Burlington, U.S District Court in Burlington, Vermont., Civil Case No. 5:11-cv-00162 (Retained) (Defense)

July 2011: Daniel White v. Castle, Ruffner, Robinson, Town of Quantico, U.S. District Court, Eastern District of Virginia, Alexandria Division, Case No. 1:11-cv-00316-AJT-IDD (Retained) (Defense)

August 2011: Roque Dominguez v. City of Harvey, et al., In the Circuit Court of Cook County, Illinois County Department, Law Division, Case No. 2008 L 000931 (Deposed) (Defense)

August 2011: Perry Tucker, et al. v. Salt Lake City Corp., U.S. District Court for the District of Utah, Central Division, Case No. 2:11-cv-00252-SA (Retained) (Defense)

August 2011: Curtis Shafer v. City of Boulder City, et al,. U.S. District Court for the District of Nevada, Case No. 2:10-cv-02228-KJD-GWF (Retained) (Defense)

August 2011: Jeffrey Moldowan v. City of Warren, et al., U.S. District Court Eastern District of Michigan, Case No. 1:08-cv-289 JL (Retained) (Defense)

August 2011: Christopher Van Vorst v. New Jersey State Police et al., U.S. District Court for the District of New Jersey, Civil Action No. 3:10-CV-03926-AET-DEA (Retained) (Defense)

August 2011: State of New Jersey v. Kevin Still, et al., Indictment No. 09-07-00616-IA (Testimony) (Defense)

August 2011: Kevin Garcia v. State of New Jersey, et al., Superior Court of New Jersey Law Division, Morris County, Doc. No. MRS-L-003676-10 (Retained) (Defense)

September 2011: Amber Becker v. City of Henderson, et al., U.S. District Court District of Nevada, Case No. 2:10-cv-00274 (Retained) (Defense)

September 2011: Amelia Eberle v. Bernalillo County, et al. U.S. District Court for the District of New Mexico, Case No. 11-cv141 KMB/WDS (Deposed) (Defense)

October 2011: Micke Craft v. City of East Peoria, et al., U.S. District Court For The Central District of Illinois Peoria Division, Case No. 10 c 1404 (Retained) (Defense)

October 2011: Antoinette Bennett-Jones v. Scott R Graham and Town of Williston, U.S. District Court District of Vermont, Case Number: 5:11-CV-00151 (Retained) (Defense)

October 2011: Lena Williams v. Jeffrey Deal, et al. U.S. District Court Southern District of Georgia Dublin Division, Civil Action No.: 3:11-cv-00061-DHB-WLB (Retained) (Defense)

EX. G

November 2011: Ralph Eldridge v. City of Warren, et al., U.S. District Court Eastern District of Michigan Southern Division, Case No.: 2:10-cv12893-JAC-PJK (Retained) (Defense)

November 2011: Gerry Hummell, et al., v. The City of Las Cruces, et al., U.S. District Court for the District of New Mexico, Case 1:11-cv-00765 (Testimony) (Defense)

November 2011: Deidre L. Crabtree, et al., v. Timothy Cotril., et al., U.S. District Court for the Southern District of Ohio Eastern Division, Case No.: 2:11CV0028 (Retained) (Defense)

November 2011: Katherine Marie Liend v. Bradley Allen, U.S. District Court District of Minnesota, Case No. 11-cv-256(JNE/JSM) (Retained) (Plaintiff)

November 2011: Lucia Esmeralda Oporto, et al., v. The City of El Paso, Texas, et al., U.S. District Court for the Western District of Texas El Paso Division, Case No. EP-10-CV-0110(KC) (Retained) (Defense)

November 2011: Carol Plummer, et. al., v. William Lake, et. al., Commonwealth of Kentucky 13th Judicial District Garrard Circuit Court, Civil Action No. 09-CI-00450 (Retained) (Defense)

November 2011: Larry Smith as Trustee for the Heirs and Next of Kin of David Cornelius Smith v. Timothy Gorman and Timothy Callahan and the City of Minneapolis, U.S. District Court District Of Minnesota, Civil No. 11-CV-03071 (SRN/JJK) (Retained) (Plaintiff)

November 2011: Evie Oquendo, et al., v. Las Vegas Metropolitan Police Department, et al, U.S. District Court District of Nevada, Case No. 2:11-cv-00698-RCJ-PAL (Retained) (Defense)

November 2011: Terry Stadler, et al. v. The City of Phoenix, et al. U.S. District Court for the District of Arizona, Case No. CV10-1072-PHX-SRB (Deposed) (Defense)

December 2011: David Maxson v. Zane Seipler, et al., U.S. District Court Northern District of Illinois, Case No.: 07-CV-05197 (Deposed) (Defense)

December 2011: Stephen Torres v. City of Albuquerque, et al., Second Judicial District County of Bernalillo State of New Mexico, No. CV 2011-06551 (Retained) (Defense)

January 2012: William Spiess et al., v. Pocono Mountain Regional Police Department et al., U.S. District Court Middle District of Pennsylvania, No. 3:CV-10-0287 (Retained) (Defense)

January 2012: Maryann Simonelli v. Mt. Snow LTD, et al., State of Vermont Windham County, SS Windham District Court, Docket No. 403-4-10 Wmcr (Retained) (Defense)

February 2012: Ginger Katenmoyer v. Camden Police Department, et al., U.S. District Court of the District of New Jersey, Civil Action No. 08-cv-01995-RBK-JS (Deposed) (Defense)

February 2012: Karin Woodruff v. Kathy O'Kelly, et al., U.S. District Court Western District of Arkansas, Case No. 11-05089-JLH (Retained) (Defense)

February 2012: Jerry Hartrim v. Las Vegas Metropolitan Police Department, et al., U.S. District Court State of Nevada, Case No: 2:11-cv-00003-RLH-PAL (Retained) (Defense)

March 2012: Curtis Lee Wimberly v. City of Henderson, et al., U.S. District Court District of Nevada, Case 2:10-cv-01414-LDG-LRL (Retained) (Defense)

April 2012: Bret Cornell v. City and County of San Francisco, et al., Superior Court of the State of California County of San Francisco Case No. CGC-11509240 (Testified) (Plaintiff)

April 2012: Michael Cristini v. City of Warren & Donald Ingles et al., U.S. District Court Eastern District of Michigan Southern Division, Case No.:2:07-cv-11141-DML-VMM (Retained) (Defense)

April 2012: Joshua James Jordahl v. City of Madison Police Department, et al., State of South Dakota County of Lake, CIV. 10-288 (Retained) (Defense)

April 2012: Amy Leichtenberg v. City of LeRoy, et al., U.S. District Court of the Central District of Illinois Peoria Division, 1:10-cv-01253-JAG (Deposed) (Defense)

April 2012: Anthony D. Graham, Jr., v. City of Tallahassee, et al., U.S District Court for the Northern District of Florida Tallahassee Division, Case No.:4:11-cv-213-RS-WCS (Deposed) (Plaintiff)

EX. G

April 2012: Terence Arthur R. Whiteman, M.D. v. Rosado, et. al., U.S. District Court For The Western District of Michigan Southern Division, Case No. 1:11-cv-00466-GJQ (Deposed) (Defense)

May 2012: Theresa Moriarty and Doug Garrabrant v. County of Sandoval, et al., U.S. District Court for the District of New Mexico, Case No. 1:11-cv-00722 JAP/KBM (Deposed) (Defense)

June 2012: Estate of Jess Lee Powell v. Pennington County, et al., State of South Dakota County of Pennington, Civil No. 11-2002 (Retained) (Defense)

July 2012: Tara O'Grady-Sullivan v. Nye County, et al., U.S. District Court for the District of Nevada, Case no: 2:11-cv-00839-RLH (CWH) (Retained) (Defense)

July 2012: Christopher Aparicio v. Luna County, et al., Federal District Court District of New Mexico, No. 11-CV-676 RB/GBW (Testimony) (Defense)

August 2012: Peter Labrada, et al., v. Essex County Prosecutors Office, et al. Superior Court of New Jersey Law Division Essex County, Docket No. ESX-L-7291-09 (Deposed) (Defense)

August 2012: Estate of Trevor Neil Hawkins-Varinecz, et al., v. Horry County Police Department, et al., U.S. District Court for South Carolina, Civil Action No. 4:11-CV02638-TLW-TER (Retained) (Defense)

August 2012: Eugene Carl DeBoise, Sr., et al., v. Taser International, Inc., et al., U.S. District Court Eastern District of Missouri Eastern Division, No. 4:10-CV-0818-TIA (Deposed) (Defense)

August 2012: Eduardo Lopez-Castro, et al., v. Nevada Highway Patrol, et al., U.S. District Court for the District of Nevada, Case No. 2-11-cv-01014 (Retained) (Defense)

August 2012: Brian Olsen v. City of Boulder City, et al., U.S. States District Court District of Nevada, Case No.: 2:12-cv-00543-JCM-PAL (Retained) (Defense)

August 2012: Lizette Vargas, et al., v. City of Philadelphia, et al., U.S. District Court for the Eastern District of Pennsylvania, No.: 11-2639 (Retained) (Defense)

August 2012: Henry Kaleta v. Samantha Johnson and Trevor Johnson, U.S. District Court District of Minnesota, Civil No. 12-CV-00170JNE/FLN (Retained) (Plaintiff)

August 2012: Randall Ray Bowman v. Boulder City Officer A. Johnson, et al., U.S. District Court District of Nevada, Case No. 2:11-cv-00609-RCJ (LRL) (Retained) (Defense)

September 2012: Wayne Burwell v. Hartford Police Officer Frederick Payton et al., U.S. District Court for the District of Vermont Case No.: 5:2012cv00166 (Deposed) (Defense)

September 2012: Janice Wells v City of Lumpkin et al., U.S. District Court Middle District of Georgia Columbus Division, Civil Action No. 4:12-cv-00093-cdl (Retained) (Defense)

September 2012: Estate of Christopher Capps v. Pennington County, et al., U.S. District Court District of South Dakota Western Division (Deposed) (Defense)

September 2012: Adrian Michael Marr v. Christopher Steward, et al., U.S. District Court District of Minnesota, Case No.: 11-cv-02160 SRN/LIB (Testimony) (Plaintiff)

September 2012: Stanley Jackson v. Washtenaw County, et al., U.S. District Court, Eastern District of Michigan, Southern Division, Case No. 12-cv-10963 (Deposed) (Defense)

October 2012: Henry Jones, Jr. v. Officer Vincent Thornton, et al. U.S. District Court Eastern District of Arkansas Western Division, Case No. 4:12-cv-00094-BRW (Testified) (Defense)

October 2012: Terrance Jones v. City of Lake City, et al., U.S. District Court Middle District of Florida Jacksonville Division, Case No. 3:11-cv-1210-J-34 JBT (Deposed) (Plaintiff)

October 2012: Carnell Williams-Carney v. Philadelphia, et al., Eastern District of Pennsylvania, C.A. 12-4029 (Testified) (Defense)

November 2012: Darren Brown v. Edward Bailey III, et al., U.S. District Court for the District of Maryland Northern Division, No. 1:11 cv-1901 (Retained) (Defense)

EX. G

November 2012: William Lloyd Jorgenson v. William Reinbold and Andrew Johnson, U.S. District Court District of Minnesota, Case No. 12-0387 (JRT/JJG) (Retained) Plaintiff)

December 2012: Daniel Harrigan v. Marion County, Oregon, et al., U.S. District Court, Oregon, Civil No. 6:11-CV-06174-SI (Testified) (Plaintiff)

December 2012: James Goton v. Sierra County, et al., U.S. District Court for the District of New Mexico, No. 2:12-CV-00194-GBW-CEG (Retained) (Defense)

December 2012: Samanda Dorger, et al., v. City of Napa, et al., U.S. District Court Northern District of California, Case No. 4:12-cv-00440-YGR (Retained) (Defense)

December 2012: Andres Cortez v. Jorge Gonzalez et al., Cause No. EP-12-CV-0050-PRM (Retained) (Defense)

January 2013: Daniel Melo v. City of South Burlington, Superior Court Chittenden Unit, State of Vermont, Docket No.: S1027-11 CnC (Deposed) (Defense)

January 2013: Johnathan Jones, et al v. Las Vegas Metropolitan Police Department, et al, U.S. District Court of Nevada (Deposed) (Defense)

February 2013: Wigley v. Bernalillo County Sheriff's Office, et al., State of New Mexico County of Bernalillo Second Judicial District, D202-CV-2012-03974 (Retained) (Defense)

February 2013: Ray Shatney, et al., v. Hardwick Police Department, et al., U.S. District Court for the District of Vermont, Civil Case No. 1:12cv-00023 (Deposed) (Defense)

February 2013: Tracey Pope v. Las Vegas Metropolitan Police Department, et al., U.S. District Court District of Nevada, Case No: 2:12 cv (Retained) (Defense)

March 2013: Troy Ellison v. Donna Lesher, U.S. District Court Eastern District of Arkansas Western Division, Civil Action No. 4:11-CV-00752 BSM (Deposed) (Defense)

March 2013: Albert Purnell v. City of Philadelphia et al, U.S. District Court for the Eastern District of Pennsylvania, 2:11-cv-06900-CDJ (Testified) (Defense)

April 2013: Ajaleh Waiters, et al. v. City of Union City, Georgia and Luther Lewis State Court of Fulton County, Georgia Civil Action File No. 2012-EV-015990-A (Retained) (Defense)

April 2013: Allan P. Zitta and Tracy Zitta v. Town of Richmond, et al. U.S. District Court for the District of Vermont, Civil Case NO. 1:12-cv-00160 (Retained) (Defense)

May 2013: Whitney Duenez, et al. v. City of Manteca, et al., U.S. District Court for the Eastern District of California, Case No. 2:11-cv-01820-LKK-KJN (Deposed) (Plaintiff)

May 2013: Ruth Tuite v. New Jersey et al., U.S. District Court for the District of New Jersey, Civil Action No. 10-CV-06772 SRC/MAS (Retained) (Defense)

May 2013: Frank Marchionne v. Las Vegas Metropolitan Police Department, et al., U.S. District Court Clark County, Nevada, Case No. A-12-664253-C (Retained) (Defense)

May 2013: Cristina Paulos v. Las Vegas Metropolitan Police Department, et al., U.S. District Court Clark County, Nevada, Case No. A-12-666754-C (Retained) (Defense)

May 2013: Estate of Michael Godawa v. Officer David Byrd, U.S. District Court Eastern District of Kentucky Northern Division at Covington, Case No. 12-00170-WOB-JGW (Deposed) (Defense)

June 2013: Cheryl Brigan v. Richard Benko and the City of Cloquet, U.S. District Court District of Minnesota Case No. 12-CV-712 DWF/LIB (Retained) (Plaintiff)

June 2013: Stephanee Thompson v. The State of New Jersey, et al., Superior Court of New Jersey Law Division Camden County Docket No. CAM-L3879-10 (Retained) (Defense)

June 2013: Ronald Whitcomb v. City of Panama City, et al., U.S. District Court Northern District of Florida Panama City Division (Retained) (Plaintiff)

July 2013: Robin Thompson v. James "Clint" Murray, et al., U.S. District Court Eastern District of Arkansas Western Division, Case No: 4:11-cv-OO804 BRW (Retained) (Defense)

July 2013: Dennis Kucera v. Town of Hartford, et al., U.S. District Court for the District of Vermont, Civil Case No. 5:12cv00264 (Retained) (Defense)

July 2013: Ladarris Tunstall v. William W. Brislin, Robert H. Duhaime, U.S. District Court for the Vermont, Civil Case No. 2:12-cv-31 (Retained) (Defense)

EX. G

July 2013: Anthony Boschele and Nancy Boschele v. Chesterfield Co Sheriff's Office, et al., U.S. District Court for the District of South Carolina Florence Division, Civil Action No.: 2013-CP-13-000185 (Deposed) (Defense)

July 2013: Wesley Bettis v. City of Montpelier, U.S. District Court for the District of Vermont, (Retained) (Defense)

August 2013: David Eaton v. City of Tallahassee Florida and Scott Cherry, U.S. District Court Northern District of Florida Tallahassee Division, Case No. 4:13-CV00002-WS-CAS, (Retained) (Plaintiff)

August 2013: Semaj Randolph, et al., v. City of Orangeburg, et al., U.S. District Court for the District of South Carolina Orangeburg Division, Civil Action No: 5:12-cv-3087-JMC (Retained) (Defense)

September 2013: Demian Boroff v. Nickolas Lynn, et al., U.S. District Court for the District of New Jersey Vicinage of New Ark, Civil Action No. 2:2011cv06849 (Retained) (Defense)

September 2013: Christina West v. City of Tallahassee, (Retained) (Defense)

September 2013: Tyson Powers v. Campbell et al., U.S. District Court for the District of Utah Central Division, Civil No. 2:12-cv-851 BCW (Retained) (Defense)

September 2013: Dontae Thomas v. Tyrone Barze, et al., U.S. District Court District of Minnesota, Case No. 12-2272Jrt/AJB (Defense) (Plaintiff)

October 2013: Samantha Compton v. City of Harrodsburg, KY, et al., U.S. District Court Eastern District of Kentucky Central Division at Lexington, Civil Action No. 5:12-cv-00302-JMH (Retained) (Defense)

October 2013: M.H., et al., v. County of Alameda, et al., U.S. District Court for the Northern District of California, Case No. C11-2868 JST (MEJ) (Deposed) (Plaintiff)

November 2013: Jesse Compodonico v. City of Miami, et al., U.S. District Court Southern District of Florida Miami Division, Case No. 12-24077 (Retained) (Defense)

November 2013: Veronica Vacaneri and Joel Smith, Jr. v. Arpaio, et al., U.S. District Court of Arizona District Court Phoenix Division, Case No. 2:2013cv02262 (Retained) (Defense)

November 2013: Celestine Gibson v. Las Vegas Metropolitan Police Department, et al., U.S. District Court for the District of Nevada, Case: 2:12-CV-00900-GMN-CWH (Retained) (Defense)

November 2013: Lori Colvey v. City of Norfolk, et al., U.S. District Court for the District of Nebraska, Case No. 8:13-cv01 (Retained) (Defense)

November 2013: Rickey Ward v. Las Vegas Metropolitan Police Department, et al., U.S. District Court District of Nevada, Case No. 2:13cv769-APG-GWF (Retained) (Defense)

December 2013: Melene James v. City of Boise, et al., District Court of the Fourth Judicial District of the State of Idaho, Case No. CV-PI-2012-16734 (Retained) (Defense)

December 2013: Daniel L. Fancher v. City of Minneapolis, et al., U.S. District Court for the District of Minnesota, Case No. 13-CV-00435 (DSD/JJK) (Testimony) (Plaintiff)

December 2013: Darrell Frederick v. City of Rogers, et al., Arkansas Western District Court, Case No. 5:2013cv5155 (Retained) (Defense)

December 2013: Maria Ortiz, et al., v. New Jersey State Police, et al., U.S. District Court for the District of New Jersey, Civil No. 11-2300 NLH AMD (Retained) (Defense)

December 2013: David Earl Sutherland v. The Laurens County Sheriff's Department, Civil Action No. 2011-CP-90-902 and Jennifer Marie Cobb v. The Laurens County Sheriff's Department, Civil Action No. 2011-CP 90-903, State of South Carolina County of Laurens, (Deposed) (Defense)

December 2013: Christopher Montgomery, et al., v. City of Philadelphia, et al, U.S. District Court for the Eastern District of Pennsylvania, Civil Action No. 13-256 (Retained) (Defense)

January 2014: Jerame C. Reid v. Cumberland County, et al., U.S. District Court for the District of New Jersey, Civil Action No. 1:11-cv-05841-NLH-AMD (Retained) (Defense)

January 2014: Jenny Rebecka Royal v. City of Blythe, Superior Court of Richmond County, Georgia, Civil Action File No: 2012RCCV735 (Retained) (Defense)

15

EX. G

January 2014: Derek Guindon v. City of Sioux Falls (Retained) (Defense)

January 2014: Janneth Valero v. Trooper J. Smith, et al., U.S. District Court District of New Jersey, Civ. Act. No.: 11-5710 (JLL-MAH) (Retained) (Defense)

February 2014: Estate of Darrin E. Hanna v. City of North Chicago, et al., U.S. District Court Northern District of Illinois Eastern Division, Case No. 11 CV 8836 (Retained) (Defense)

February 2014: Lawrence Gordon v. Las Vegas Metropolitan Police Department, et al., U.S. District Court District of Nevada, Case No.: 2:12-cv-019095-GMN-GWF (Retained) (Defense)

February 2014: Jane Doe v. City of Harvey, et al., U.S. District Court for the Northern District of Illinois Eastern Division, Case No.:1:12-CV-2069 (Deposed) (Defense)

February 2014: Michael V. Roberts v. City of Reading, et al., U.S. District Court for the Eastern District of Pennsylvania, Case No.: 5:13-cv-01990-LS (Retained) (Defense)

February 2014: Cheri Lane, et al.,  v. City of Camden, et al., U.S. District Court for the District of New Jersey, Civil Action No. 1:11-cv-5584 (RBK/JS) (Retained) (Defense)

February 2014: Irving J. Marquez v. Eddy County, et al., U.S. District Court for the District of New Mexico, Case 1:11-cv-00838-DJS-WDS (Deposed) (Defense)

March 2014: Leo Hardy v. City of Milwaukee, et al., U.S. District Court Eastern District of Wisconsin, No. 2:13-cv-00769 (Deposed) (Plaintiff)

March 2014: Warren Robinson v. Town of Denmark, State of South Carolina County of Orangeburg, Civil Action No. 13-CP-38-00270 (Retained) (Defense)

March 2014: Michael Alan Ewing v. Cumberland County, et al., U.S. District Court for the District of New Jersey, Civil Acton No. 1:09-cv-05432 (Retained) (Defense)

March 2014: Bernalillo County Sheriff's Department, et al., U.S. District Court for the District of New  Mexico, No. 13-CV-00733 PJK/KBM (Retained) (Defense)

March 2014: Ezell, et al., v. City of Milwaukee, et al., U.S. District Court Eastern District of Wisconsin, Case No. 2:2013cv00771 (Retained) (Plaintiff)

April 2014: Irving J. Marquez v. Eddy County, et al., U.S. District of New Mexico, 11-CV-838 JAP/WDS (Retained) (Defense)

April 2014: Carolyn Hall, et al., v. Officer Eric Fries, et al., U.S. District Court for the Middle District of Georgia Valdosta Division, Civil Action No. 7:13-cv-105(HL) (Deposed) ( Defense)

April 2014: Fabian Prive v. Richard Wells, U.S. District Court for the District of Vermont, Civil Action No. 5:13-cv-320-cr (Retained) (Defense)

May 2014: Barbara Diane Latham, et al., v. Lincoln County Sheriff's Department, et al., U.S. District Court for the District of New Mexico, Case No. 2:13-cv-00822 (Retained) (Defense)

May 2014: Christopher M. Harvey v. Darryl Carr, U.S. District Court, Western District of Kentucky, Paducah Division, Case No. 5:13CV-116-R (Retained) (Defense)

May 2014: Randall Ehlers v. City of Rapid City, et al., U.S. District Court District of South Dakota Western Division, Case No. 5:12-cv-05093-JLV (Retained) (Defense)

May 2014: Tyler Galipeau v. Joshua Stemp, et al., U.S. District Court for the District of Vermont, Case No. 2:14-cv-55 (Retained) (Defense)

May 2014: Ella Baker v. City of Camden, et al., U.S. District Court for the District of New Jersey, Civil Action No. 1:12-cv-494 (Retained) (Defense)

May 2014: James H. Coitrone v. Bobby D. Murray, et al., U.S. District Court Western District of Kentucky Paducah Division, Civil Action No. 5:12-CV-00195-R (Retained) (Defense)

June 2014: Estate of Jeremy Shawn Rucinski v. Oakland County, et al., U.S. District Court Eastern District of Michigan, 2:13-cv-14667-MFL-PJK

June 2014: Marlon Whitmore v. Timothy Wilhelm, et al., U.S. District of Northern District of California, No. C 13-1408 PJH (Retained) (Plaintiff)

June 2014: Michael Kent v. Oakland County, et al., U.S. District Court Eastern District of Michigan Southern Division, Case No. 2:13-cv-15003-BAF-RSW (Retained) (Defense)

June 2014: James A. Lewis, et al., v. City of Philadelphia, et al., U.S. District Court for the Eastern District of Pennsylvania, Civil Action No. 13-2547 (Testimony) (Defense)

16

June 2014: Ernestine Wingate v. City of Darlington, et al., U.S. District Court for the District of South Carolina, Case No. 4:13-CV03343-RBH-KDW (Retained) (Defense)

June 2014: Edwards v. Town of West Seneca, et al., New York Supreme Court (Retained) (Defense)

July 2014: Yolanda L. Ruiz, et al, v. City of Hidalgo, et al., 370th District Court of Hidalgo County, Texas, Cause No. C-1629-13-G (Retained) (Defense)

July 2014: Fraternal Order of Police v. City of Camden, et al., U.S. District Court for the District of New Jersey, Civil Action No.:1:10-cv-01502 (Retained) (Defense)

August 2014: Diane Williams, et al., v. City o Philadelphia, et al, U.S. District Court for the Eastern District of Pennsylvania, Docket No. CV-12-2387 (Retained) (Defense)

August 2014: Joseph Occhipinti, et al, v. Detective Lisa Bauer, et al, U.S. District Court for the Middle District of Pennsylvania, Civil Action No. 3:13-CV-01875 (Retained) (Defense)

August 2014: Estate of Gregory Harrison v. City of Bowling Green, et al, U.S. District Court Western District of Kentucky at Bowling Green, Case No. 1:13CV-124M (Retained) (Defense)

August 2014: Johnathan Rose et al, v. County of Sacramento, et al, U.S. District Court Eastern District of California, Case No. 2:13-cv-01339-TLN-EFB (Retained) (Plaintiff)

August 2014: Paul L. Daniel, v. Brian Begnoche (City of St. Albans) et al, U.S. District Court for the District of Vermont, Civil Action No. 2:13-cv (Retained) (Defense)

August 2014: Robert Noble v. City of Camden, et al., U.S. District Court for the District of New Jersey Camden Vicinage, Case No. 1:13-cv-04391-JBS-AMD (Retained) (Defense)

September 2014: Kevin Hawkins, et al., v. City of Tallahassee, et al., U.S. District Court for the Northern District of Florida Tallahassee Division, Case No. 4:13-cv-539-/CAS (Retained) (Defense)

September 2014: Dennis Stallins v. City of Princeton, et al., U.S. District Court Western District of Kentucky Paducah Division, Case No. 5:13-CV-157-R (Retained) (Defense)

September 2014: Marilyn Monroe Howard v. City of Pine Bluff, et al., Case No.: 5:14-CV-0330 (Retained) (Defense)

September 2014: Arlean Brown, As PR of Estate of Melvin Lawhorn v. Elliott, et al., U.S. District Court for District of South Carolina, Columbia Division, Case No.:3:14-cv-01188-JMC-PJG (Deposed) (Defense)

September 2014: James Simmons v Sheriff Mark Gober, et al., U.S. District Court Eastern District of Arkansas Pine Bluff Division, Case No.:5:13-cv-100 DPM

October 2014: Annie Harmon, et al., v. County of Sacramento, et al, U.S. District Court in and for the Eastern District of California, Case No.:2:12-cv-02758 TLN AC (Deposed) (Plaintiff)

October 2014: Mary Bisom and Daniel Bisom, as co-guardians on behalf of their adult son, Thomas Bisom, v. United States of America, U.S. District Court for the District of Montana Helena Division, Cause No. 13-CV-42-DLC-RKS (Testimony) (Defense)

November 2014: Shanika A. Graves v. City of Miami, U.S. District Court Southern District of Florida Miami Division, Case No. 13-22501-CIV-KMM (Deposed) (Defense)

November 2014: Antoine Hodges, and Annette Hodges v. Las Vegas Metropolitan Police Department, et al., U.S. District Court District of Nevada, Case No.: 2:13-cv-02014-JCM-NJK (Retained) (Defense)

November 2014: Trena Rice, et al., v. Chuck Wright, et al., U.S. District Court for the District of South Carolina, Case No. 7:14-cv-02839-BHH (Retained) (Defense)

December 2014: Shirley W. Wingler v. Brad White Sheriff of Lamar County, Georgia, and John Cary Bittick, Sheriff of Monroe County, Georgia, In the Superior Court of Lamar County, Civil Action File No. 14B-2116-F (Retained) (Defense)

January 2015: Jerry Glover, et al., v. Deputy Adam Pailet, et al., U.S. District Court for the Eastern District of Louisiana, Civil Action No. 13-2948 (Retained) (Defense)

January 2015: Alanda Forrest v. City of Camden, et al., U.S. District Court for the District of New Jersey Camden Vicinage, Civil Action No. 1:09-cv-01555-RBK-JS (Testimony) (Defense)

17

EX. G

January 2015: D.G., v. The City of Las Cruces, et al., U.S. District Court for the District of New Mexico, No. 14-CV-000368 (Retained) (Defense)

January 2015: Ed White and Donna Joyce White v. Brian Mark Gillis and City of Helena, Superior Court of Telfair County State of Georgia, Civil Action No. 09-CV-070 (Retained) ( Defense)

January 2015: Henry Jeffery Davis, Jr. v. The City of Warner Robins, et al., Superior Court of Peach County State of Georgia, Civil Action No.07-V-711 (Retained) (Defense)

January 2015: Philip Sieff as Trustee for the next-of-kin of Dawn M. Pfister v. Brady Juell, et al. File No. 3010-19717 (Retained) (Plaintiff)

January 2015: Geraldine Johnson, et al., v. City of Philadelphia, et al., U.S. District Court for the Eastern District of Pennsylvania, Civil Action No. 14-2331 (Retained) (Defense)

January 2015: John Gonzales and Terresa Gonzales v. Las Vegas Metropolitan Police Department, et al., U.S. District Court of Nevada, Case No. 2:14-CV-01827-APG (GWF) (Retained) (Defense)

February 2015: Tim McLemore v. City of Columbia, et al., U.S. District of South Carolina Columbia Division, Civil Action No. 3:13-cv-01952-JFA (Retained) (Defense)

February 2015: Cathlyn Ann Pozdol, et al., v. City of Miami, et al., U.S. District Court Southern District of Florida Miami Division, Case No. 13-cv-22167-JLK (Retained) (Defense)

March 2015: Crystal Snider v. City of Philadelphia, et al., U.S. District Court for the Eastern District of Pennsylvania, Case 2:14-cv-02598-WB (Retained) (Defense)

March 2015: Angel Landeros and Amelia Villalba v. Las Vegas Metropolitan Police Department, et al., U.S. District Court District of Nevada, Case No. 2:14-cv-01525-JCM-CWH, (Retained) (Defense)

March 2015: Victor Patino v. Las Vegas Metropolitan Police Department, et al., U.S. District Court District of Nevada, Case 2:15-cv-00009-RFB-PAL (Retained) (Defense)

March 2015: Albert Jones v. City of Philadelphia, et al., Court of Common Pleas Philadelphia County, No. 764 (Retained) (Defense)

March 2015: Nicholas Kincade v. Thomas Davidson, et al., U.S. District Court Northern District of Indiana Hammond Division, Cause No. 2:14-cv00234-PPS-JEM (Retained) (Defense)

March 2015: Linda Williams, et al., v. City of Harvey, et al., Circuit Court of Cook County, Illinois County Department , Law Division, No. 2011L 6566 (Retained) (Defense)

March 2015: Samuel Jones v. Nye County, et al., U.S. District Court for the District of Nevada, Case 2:14-cv-01354-JCM-PAL (Retained) (Defense)

March 2015: Ben F. Clark v. Gary Campbell, et al., U.S. District Court District of Nevada, Case No. 3:14-CV -00333-LRH-WGC (Retained) (Defense)

March 2015: Michael Bear v. Delaware County, Ohio, et al., U.S. States District Court Southern District of Ohio Western Division, Case No. 2:14-cv-0043 (Retained) (Defense)

April 2015: Ingram v. Camden County, et al., U.S. District Court, District of New Jersey, Docket No. 14-cv-5519 (Retained) (Defense)

April 2015: Willard McFarland v. State of Ohio, Ohio State Highway Patrol, Court of Claims Civil Judicial Division State of Ohio, Case Number 2014-00709 (Retained) (Defense)

April 2015: Santos Lopez Paniagua v. City of Phoenix, et al., Superior court of Arizona Maricopa County, Case No. CV 2014-009112 (Retained) (Defense)

April 2015: Joshua Taylor, et al., v. City of Philadelphia, et al., U.S. District Court for the Eastern District of Pennsylvania, Civil Action No. 13-2241 (Retained) (Defense)

April 2015: Hung Lam v. City of San Jose, et al., U.S. District Court for the Northern District of California, Case No. 14-cv-00877 PSG (Testimony) (Plaintiff)

April 2015: Madel C. Rivero, Personal Representative of the Estate of Lilia Lorena Blandin v. Sheriff Steve Loftis, et al., In The Court Of Common Pleas, C.A. No. : 2013-CP-23-06522 (Testimony) (Defense)

18

EX. G

May 2015: Ruben Martinez, et al., v. Valencia County, et al., State of New Mexico County of Valencia Thirteenth Judicial District, Civil No. D-1314-CV-2014-00466 (Retained) (Defense)

May 2015: William Robert Cossens v. Jordan Davis, U.S. District Court for the District of Minnesota, Case No. 14-cv-01787-RHK-JJK (Retained) (Plaintiff)

May 2015: Markin Summers v. Commissioner Charles Ramsey, et al., U.S. District Court for the Eastern District of Pennsylvania, Civil Action No. 2:13-cv-06644-JHS (Retained) (Defense)

May 2015: Nicole McDaniels, et al., v. PO Jermias Olivo, et al., Court of Common Pleas First Judicial District of Pennsylvania Civil Trial Division., No. 01030 (Retained) (Defense)

May 2015: Gary v. City of Hazleton, et al. U.S. District Court Middle District of Pennsylvania, (Retained) (Defense)

June 2015: Nathan Felts v. Valencia County, et al. , U.S. District Court for the District of New Mexico, No: 1:13-cv-1094 MCA/RHS , (Deposed) (Defense)

June 2015: David Stevenson Boyd, II, v. David William Weiner, et al., Civil Action No.: 6:12 -cv-01039-TMC (Retained) (Defense)

June 2015: McCleave v. City of Rock Hill, et al.,  State of South Carolina County of York, Civil Action No.: 14-CP-46-3661 (Retained) (Defense)

June 2015: Nancy Smith v. City of Huntsville, et al., U.S. District Court for the Northern District of Alabama Northeastern Division , Civil Action Number 5:14-cv-555AKK (Deposed) (Defense)

June 2015: Jerry Rose, et al., v. Wabash Police Department, et al., Wabash Circuit Court, Cause No. 85C01-1506-CT-373, (Retained) (Defense)

June: 2015: Estate of Cesar Munive v. Town of Cicero, et al., U.S. District Court Northern District of Illinois, Case No. 12 CV 5481 (Retained) (Defense)

June 2015: Ayounna McClinton as PR of Duane Strong v. City of Tallahassee, Clayton Fallis and Derek Hawthorne, U.S. District Court Northern District of Florida Tallahassee Division, (Defense) (Retained)

June 2015: James Ashford, et al., v. City of Milwaukee, et al., U.S. District Court Eastern District of Wisconsin, Case No. 13-CV-00771 (Retained) (Plaintiff)

June 2015: Daniel Zavatson v. City of Warren, et al., U.S. District Court Eastern District of Michigan Southern Division, Case No: 14-10623, (Retained) (Defense)

July 2015: Ariana Mason v. Las Vegas Metropolitan Police Department, et al., U. S. District Court of Nevada, Case No. 2:15-cv-00738, (Retained) (Defense)

July 2015: Clifton Ray Oliver v. International Hotel Group, et al., U.S. District Court for the District of Montana Missoula Division, CV 14-84-M-DLC-JCL (Retained) (Defense)

July 2015: Michael J.D. Hawkes v. County of Bernalillo, U.S. District Court for the District of New Mexico, (Retained) (Defense)

August 2015: Samir Coyett v. City of Philadelphia, et al., U.S. District Court for the Eastern District of Pennsylvania, Civil Action No. 2:15-cv-00869-SD (Retained) (Defense)

August 2015: Richard L. Crouse v. New Jersey State Police Department, et al., U.S. District Court for the District of New Jersey Vicinage of Trenton, Civil Action No. 13-7494 (MAS-DEA) (Retained) (Defense)

August 2015: Melissa Hardan v. Nye County Sheriff's Office, et al., U.S. District Court District of Nevada, Case No. 2:15-cv-00470-GMN-PAL, (Retained) (Defense)

August 2015: Brian Ballentine, et al., v. Las Vegas Metropolitan Police Department, et al., U.S. District Court District of Nevada, Case No. 2:14-cv-01584 (Deposed) (Defense)

September 2015: Antionette Bean v. City of Camden, et al., Superior Court of New Jersey Law Division -  Camden County, Civil Action No. L-4549-12 (Testified) (Defense)

August 2015: State of Maryland v. Caesar Goodson, et al., Baltimore City Circuit Court, (Testimony)(Defense)

EX. G

September 2015: Emil Jutrowski v. Township of Riverdale, et al., U.S. District Court District of New Jersey Newark Vicinage, Civil Action No. 12-3318 (CCC-JAD) (Retained) (Defense)

September 2015: James Steven Scott, et al., v. Officer Kyle Palmer, et al., U.S. District Court for the Northern District of Alabama Northwestern Division, Case No.: 3:14-cv-01034-WHH (Retained) (Defense)

September 2015: Rodell Sanders v. City of Chicago Heights, et al., U.S. District Court for the Northern District of Illinois Eastern Division, 13-CV-221 (Deposed) (Defense)

October 2015: Montes v. City of Las Cruces, et al., U.S. District Court for the District of New Mexico, No. 2:13-CV-0031 JCH/GBW (Retained) (Defense)

October 2015: Amanda Geraci v. City of Philadelphia, et al., U.S. District Court for the Eastern District of Pennsylvania, Civil Action No. 2-14-cv-05264-MAK (Retained) (Defense)

October 2015: Joel D. Naselroad v. Dennis Mabry, et al., U.S. District Court for the Eastern District of Kentucky Central Division at Lexington, Case No. 5:14-cv-00389-DCR (Retained) (Defense)

October 2015: John "Jack" Raines III as guardian of the Estate of John Raines IV v. James Burroughs, Steven Culliford, Conway Police Officers. USDC-Eastern Division. (Retained)(Defense)(Deposed 6/22/16)

November 2015: Paul Rogers v. Torrance County, et al., State of New Mexico County of Torrance Seventh Judicial District Court, D-722-CV- 2014-00005 (Deposed) (Defense)

November 2015: Judith Gray v. Town of Athol, et al., U.S. District Court for the District of Massachusetts, Civil Action No. 4:15-CV-10276-TSH (Retained) (Defense)

November 2015: Estate of Zachary Hammond v. City of Seneca, et al., U.S. District Court for the District of South Carolina Anderson Division, 8:15-cv-04031-TMC (Retained) (Defense)

Adam Brooks v. City of Henderson, et al., U.S. District Court District of Nevada, Case No: 2:14-cv-374-GMN-GWF (Retained) (Defense)

December 2015: Harvester Harris v. Las Vegas Metropolitan Police Department, et al., U.S. District Court District of Nevada, Case No. 2:15-cv-00337-GMN-PAL (Retained) (Defense)

December 2015: Ana Biocini, et al., v. City of Oakland, et al., U.S. District Court Northern District of California, Case No. 3:14-cv-03315-THE (Retained) (Plaintiff)

December: Peter J.R. Martin v. Michael Malinowski, U.S. District Court for the District of Vermont, Case No. 1:15-cv-171 (Retained) (Defense)

December 2015: Estate of Dillon McGee v. Madison County, Tennessee, et al., U.S. District, U.S. District Court for the Western District of Tennessee Eastern Division, No.: 1:15-1069, (Retained) (Defense)

December 2015: Emanuel Solis and Jose Izaguirre v. The Village of Summit and Maureen Godsel, Circuit Court of Cook County, Illinois County Department, Case No. 2013 L 001406, (Retained) (Defense) (Deposed 5/9/16)

December 2015: Todd Hatchett, et al, v. Jack Kermes, U.S. District Court for the Northern District of Texas Dallas Division, Civil Action No. 3:15-cv-2309

December 2015: Niquel Reid v City of Boston, Commonwealth Massachusetts Superior Court Suffolk, Civil Action No. 13-2001A (Deposed) (Defense)

January 2016: Catherine Daniels, et al., v. City of Miami Gardens, et al., U.S. District Court Southern District Florida (Retained) (Defense)

January 2016: Estate of Keith Chipepo v. New Jersey State Police, et al., Docket No. L-7853-14, and Estate of Martha Conley v. New Jersey State Police, et al., Docket No. L-8217-14, Superior Court of New Jersey Law Division, (Retained) (Defense)

January 2016: Puente Arizona, et al., v. Joseph Arpaio, et al., U.S. District Court for the District of Arizona, No. 2:14-cv-01356-DGC (Retained) (Defense)

January 2016: Stephen Stubbs, et al., v. Las Vegas Metropolitan Police Department, et al., U.S. District Court of Nevada, Case No. 2:15-cv-02152 (Retained) (Defense)

January 2016: Paul Weddle v. City of Boulder City, et al., U.S. States District Court District of Nevada, Case No. 2:15-cv-02041 (Retained) (Defense)

EX. G

January 2016: Courtney Rogalski, et al., v. Las Vegas Metropolitan Police Department, et al., U.S. District Court District of Nevada, Case No. 2:15-cv-01821-JCM-VCF (Retained) (Defense)

January 2016: Clark v. Village of Grayslake, et al., Circuit Court of Lake County, (Retained) (Defense)

January 2016: Arthur Donn v. City of Springfield, et al., U.S. District Court, Northern District of Florida, Panama City Division, Case No. 5:15-cv-00238-RH-GRJ (Retained) (Defense)

February 2016: Barbara Crowley v. Town of Enfield, et al., U.S. District Court District of Connecticut, Civil Action No. 3:14-CV-01903 (MPS) (Retained) (Defense)

February 2016: Estate of Samantha Ramsey, et al., v. Tyler Brockman, et al., U.S. District Court, Eastern District of Kentucky at Covington, Case No. 2:15-cv-00052-DLB-JGW (Retained) (Defense)

February 2016: Christopher Demski v. Town of Enfield, et al., U.S. District Court District of Connecticut, Civil Action No. 3:14-CV-01568 (JAM) (Retained) (Defense)

February 2016: Landon L. Michael v. Joshua Trevena and Ryan Chaffee in their individual capacities as officers of the Watford City Police Department, U.S. District Court District of North Dakota, Case 4:15-cv-00074-CSM (Retained) (Defense)

March 2016: Nikita Hawkins v James Christ, et al., U.S. District Court for the Eastern District of Arkansas Western Division, Case No. 4:12CV00694 BSM (Retained) (Defense)

March 2016: Estate of Phillip Keith Johnson v. City of Rockford, et al., U.S. States District Court for the Northern District of Illinois Eastern Division, Case No. 13CV6887 (Retained) (Defense)

March 2016: John D. Elliott, et al v. City of Anderson, et al., U.S. District Court for the District of South Carolina Anderson Division, Case No. 8:15-cv-03448-TMC-KFM (Retained) (Defense)

March 2016: Todd Hatchett, et al., v. Jack Kermes, U.S. District Court for Northern District of Texas Dallas Division, Civil Action No. 3:15-CV-2309 (Retained) (Defense)

March 2016: Ronald Harding v. Lindahl, et al., U.S. District Court of Maine, Case 2:15-CV-00396-NT (Retained) (Defense)

March 2016: Gregory McDaniel v. State Law Enforcement Division, et al., U.S. District Court District of South Carolina, 0:14-cv-04717-JMC-PJG (Retained) (Defense)

April 2016: Quinton Brown v. Sumter County Sheriff Anthony Dennis, et al., U.S. District Court State of South Carolina Columbia Division, Civil Action No. 3:15-3334-JMC-PJG (Retained) (Defense)

April 2016: Gladis Callwood, as Administratix of Estate of Khari Illidge v. Phenix City, AL, et al., U.S. District Court for the Middle District of Alabama (Retained) (Defense)

May 2016: Sheila Brawley, Mother and Next Friend of Rhaykeem D. Samuels, a minor, v. City of Madison, et al., Circuit Court Third Judicial Circuit Madison County, Illinois, Case No.:15-L-1505 (Retained) (Defense)

May 2016: Adam Rasmussen v. Sergeant Matthew Steffens, et al., Fourth Judicial District Court, County of Hennepin, Minnesota, Case No.: 15-CV-02859-JRT-SER (Retained) (Plaintiff)

May 2016: Sanchez, et al., v. Valencia County (NM) Board of County Commissioners, 13th Judicial District Court, Valencia County, New Mexico, Case No.: D-1314-CV-2015-00981 (Retained) (Defense)

May 2016: Martin W. McMillan v. Town of Macedon, et al., New York State Supreme Court of Wayne County, New York (Retained) (Defense)

May 2016: Robert Bryant v. Camden County Police Department, Jose Gonzalez, and Officer Jacob Levy, Superior Court of New Jersey, Law Division (Retained) (Defense)

May 2016: Ellinor Mary Rinko, Individually and as Personal Representative of the Estate of Ingrid L. Mayer v. Lancaster County Sheriff's Office, State Court, Lancaster County. Case # 14-CP-29-01687 (Retained) (Defense)

June 2016: Robert A. Bayard v. City of Camden, et al., U.S. District Court, District of New Jersey. (Retained)(Defense)

EX. G

June 2016: Juanita Norman, Individually and in Her Capacity As Administratrix Ad Prosequendum of The Estate of Sherron J. Norman, Deceased v. Hadden Township, et al., United States District Court, District of New Jersey, Camden Vicinage, Docket No. 1:14-cv-6034 NLH-JS. (Retained) (Defense)

June 2016: Joy and Kenneth Clarke v. New Mexico State Police, United States District Court, District of New Mexico. (Retained) (Defense)

June 2016: Estate of Aaron Lamar McDaniels v. City of Philadelphia, Federal District Court for Eastern District of Pennsylvania, 15 CV 2803.(Retained)(Defense)

July 2016: Estate of Todd W. Shultz, Wayne L. Shultz, Jr., As the Administrator of the Estate of Todd W. Shultz v. York County, Pennsylvania, et al., United States District Court for the Middle District of Pennsylvania, No.: 1:14-CV-02402-JEJ. (Retained)(Defense)

July 2016: Capasso, Bethany, et al. v. City of Avon, et al, Lorain County Common Pleas. (Retained)(Defense)

July 2016: Ian Tuuamalemalo v. LVMPD, et al., United States District Court, District of Nevada, No.: 2:16-cv-619-JAD-VCF. (Retained)(Defense)

July 2016: Fetters v. Hummelstown, et al., USDC for Middle District of Pennsylvania (Retained)(Defense)

July 2016: Tad Woods v. Geraldine Martinez, Twelfth Judicial District Court, State of New Mexico, No.: D-1215-CV-2013-00689. (Retained)(Defense)

July 2016: Cierra Brooks v. Baltimore Police Department, et al., Baltimore City Circuit Court. No.: 15 647 CCN 121H10119. (Retained)(Defense)

August 2016: Clint Gulledge v. Chesterfield County Sheriff's Office, et al., Lancaster County Court of Common Pleas (Retained)(Defense)

August 2016: Elijah Pontoon and Lakeya Hicks v. City of Aiken, et al., U.S. District Court for District of South Carolina, No.: 1:15-cv-04697-JMC-PJG. (Retained)(Defense)

August 2016: Philipe Holland v. City of Philadelphia, Mitchell Farrell, and Kevin Hanvey. USDC Ed of PA, No. 16-1900. (Retained)(Defense)

August 2016: Larry Barber v. Officer Steve Williams, U.S. District Court, District of Nevada, No.: 2:13-CV-00538-GMN-CWH. (Retained)(Defense)

EX. G