# In The Matter Of:
*Cheri Marie Hanson vs.*
*Daniel Best, et al.*

*Officer Daniel Best*
*June 20, 2016*



*Min-U-Script® with Word Index*

EX. O

Page 25

1  Q. Now, when you arrived at the Hy-Vee,
2 was your audio turned on, as well, or how --
3  A. It's -- because I'm not working today,
4 but there would be a microphone in here (indicating).
5  Q. Okay.
6  A. And you hit a red button to activate
7 it.
8  Q. And your microphone was activated. Is
9 that correct?
10  A. Yeah.
11  Q. Now, looking at you -- are you in the
12 same type of uniform that you would have been wearing
13 on January 1 or has it been changed?
14  A. It's -- January 1, I would have had
15 layers of clothing on, including a sweater.
16  Q. I understand.
17  A. Yeah.
18  Q. I'm mostly interested in on your right
19 shoulder, you have --
20  A. Yeah (indicating).
21  Q. What is that?
22  A. This setup would be the same.
23  Q. Okay.
24  A. And then on my sweater would be my
25 badge (indicating) and my name tag (indicating).

Page 26

1  Q. Okay. On your right shoulder, what is
2 that?
3  A. This is a lapel mic.
4  Q. It's a Motorola what?
5  A. It's a lapel mic.
6  Q. Okay. Is that for communicating with
7 the dispatcher --
8  A. Yep.
9  Q. -- or other squads?
10  A. Both.
11  Q. Okay. And, then, on your left
12 shoulder, which is empty, you have a leather container
13 attached to your epaulette.
14  A. Uh-huh.
15  Q. What does that contain normally if you
16 were on duty?
17  A. That's where the microphone goes.
18  Q. Okay.
19  A. It's roughly the same size as this
20 (indicating).
21  Q. Okay.
22  A. You just pull it up (indicating), put
23 the microphone in, and lock it into place.
24  Q. All right. And the microphone, then,
25 is that in sync with the video on your dash cam?

Page 27

1  A. Should be.
2  Q. Okay.
3  A. That's a software thing.
4  Q. Yeah. But it's intended to be?
5  A. Yes.
6  Q. It's supposed to be?
7  A. Right.
8  Q. If it's operating correctly, it would
9 be?
10  A. Right.
11  Q. On January 1, 2013, to your knowledge,
12 was your dash cam and your audio mic working properly?
13  A. To the best of my knowledge.
14  Q. Okay. To the best of your knowledge,
15 the audio recorder and the dash cam would have been
16 working together in sync?
17  A. Correct.
18  Q. Okay. Now, at about 4:44/4:45 a.m. on
19 January 1st, you entered the Hy-Vee entryway. Is that
20 correct?
21  A. Yes.
22  Q. And when you entered the Hy-Vee, people
23 were inside the front cart area of the store. Is that
24 correct?
25  A. I believe Christopher Ahl was. Memory

Page 28

1 serves there was people on the other side of the
2 window that were in the store, including some
3 employees.
4  Q. Okay. To the best of your
5 recollection, was Christopher Ahl the only person that
6 would have been in the actual cart area of the store
7 when you first came in?
8  A. I couldn't be positive. Because I
9 would have came in on and Andrew and then saw
10 Christopher, I think, like, 10 or 15 feet away.
11  Q. Now, the front cart area of the Hy-Vee
12 store is at the front entry area of the Hy-Vee,
13 correct?
14  A. Correct. On the south side of the
15 building.
16  Q. Okay. Now, before you arrived at the
17 Hy-Vee, did you have an understanding whether
18 Andrew Layton had entered the main area of the store?
19  A. No. I just went with what the
20 information was. It came in as a suspicious person
21 sleeping in the front entry, which is not untypical
22 for downtown Hy-Vee because of our homeless
23 population.
24  Q. Okay. Were you aware or did you have
25 any information to suggest that before you arrived at

Page 29

1  the store, Andrew had made any type of a commotion at
2  the store?
3      A.   No.
4      Q.   In fact, he hadn't, based on your
5  investigation or whatever, he had not made any type of
6  a commotion at the store prior to you arriving.  Is
7  that a fair statement?
8          MR. FLYNN: Objection.  Foundation.
9          THE WITNESS: Him sleeping in the front
10 entry at 4:30 in the morning is a commotion for the
11 staff.
12 BY MR. BEHRENBRINKER:
13     Q.   Okay.  Well, the staff didn't call you,
14 did --
15     A.   No.
16     Q.   And the staff didn't --
17     A.   It was the cab driver.
18     Q.   It was such a commotion, the staff
19 wasn't even aware of it?
20         MR. FLYNN: Objection.  Argumentative.
21 BY MR. BEHRENBRINKER:
22     Q.   Is that true?
23         MR. FLYNN: Foundation.
24 BY MR. BEHRENBRINKER:
25     Q.   Is that correct, sir?

Page 30

1      A.   Say it again.  I'm sorry.
2      Q.   The staff wasn't even aware that Andrew
3  was sleeping in the cart area, correct?
4      A.   I'm assuming --
5          MR. FLYNN: Objection.  Foundation.
6  BY MR. BEHRENBRINKER:
7      Q.   Isn't that correct, sir?
8      A.   I don't know.
9      Q.   Okay.  Did anyone tell you that, before
10 you arrived, Andrew had created any type of a
11 disturbance inside the Hy-Vee store?
12     A.   No.
13     Q.   Okay.  Did anyone tell you or give you
14 any information to suggest that Andrew had exhibited
15 any type of rowdy behavior at the Hy-Vee store prior
16 to your arrival?
17     A.   No, sir.
18     Q.   Okay.  Had anyone suggested or told you
19 that Andrew had verbally threatened anyone at the
20 Hy-Vee store prior to your coming?
21     A.   No.  The knowledge that I had was a
22 suspicious person sleeping in the front lobby.  That
23 was the only information I had --
24     Q.   I understand that.  I'm just trying to
25 ask my questions.

Page 31

1      A.   No, I -- okay.
2      Q.   Had anyone told you or given you any
3  information to suggest that, prior to your arrival,
4  Andrew had been abusive in any way toward anyone else?
5      A.   At the store?
6      Q.   At the store.
7      A.   No.
8      Q.   Okay.  Had anyone suggested or told you
9  that, prior to your arriving, Andrew had disturbed the
10 peace --
11     A.   No.
12     Q.   -- of anyone at the store?
13     A.   No.
14     Q.   Okay.
15         MR. FLYNN: Make sure you let him
16 finish his question before you start to answer.
17         THE WITNESS: I will.
18 BY MR. BEHRENBRINKER:
19     Q.   When you entered the store, do you
20 remember people laughing at Andrew laying on the floor
21 sleeping?
22     A.   Only after I reviewed the video.
23     Q.   Okay.
24     A.   That's not from my immediate memory.
25     Q.   Okay.  So you have a recollection after

Page 32

1  you've reviewed -- would that have been the cell phone
2  video?
3      A.   Yes.
4      Q.   So you viewed the cell phone video and
5  based upon your viewing of that, it refreshes your
6  memory that when you came in the store, people were
7  laughing at Andrew sleeping in the cart area.  Is that
8  a fair statement?
9      A.   Yes.
10     Q.   Now, when you came into the store,
11 Andrew was curled up in a fetal position snoring -- or
12 sleeping and snoring, correct?
13         MR. FLYNN: Objection.  Foundation.
14 BY MR. BEHRENBRINKER:
15     Q.   Correct?
16     A.   Yes.
17     Q.   Okay.  And when you came into the
18 store, Andrew was wearing a winter coat or a winter
19 jacket.  Is that correct?
20     A.   It was kind of like a hoodie.  I don't
21 know if it was -- I would call it a jacket.
22     Q.   Okay.  But it was a winter coat?
23     A.   Yeah.  It was a hoodie.
24         MR. FLYNN: Objection.  Asked and
25 answered.