# In The Matter Of:
*Cheri Marie Hanson vs.*
*Daniel Best, et al.*

*Officer Audrey Kranz*
*June 21, 2016*



depo international
worldwide deposition services

*Min-U-Script® with Word Index*

EX. W

Page 61

1  Q. At any point in time, was the full
2  weight of his body weighing on the side of his
3  shoulder?
4  A. No.
5  Q. Okay. The full weight of his body was
6  falling somewhere between the front of his left
7  shoulder and the front of his right shoulder. Is that
8  right?
9  A. No.
10  Q. I'm just trying to understand what you
11  mean by "moving around."
12  At all points in time, there was some
13  part of his chest/his torso area that was still in
14  contact with the ground. Is that right?
15  A. As well as his hips and his thighs,
16  yes.
17  Q. Okay. And, so, he was prone?
18  A. Yes.
19  Q. And at the point in time that he's
20  hobble strapped, prone on the ground, is he still
21  making animalistic sounds?
22  A. Yes.
23  Q. I think in your report you even refer
24  to them as "bizarre."
25  A. Yes.

Page 62

1  Q. And when you say animalistic, is that
2  animal like; something you'd expect from an animal?
3  A. Yes.
4  Q. What did you think was going on? Did
5  you smell alcohol?
6  A. I don't remember.
7  Q. Did you have any idea what was
8  happening with Andrew Layton?
9  MR. FLYNN: Objection. Foundation.
10  THE WITNESS: I don't know.
11  BY MR. MILLER:
12  Q. I'm asking if you have an idea.
13  A. I had no clue what was going on with
14  him.
15  Q. Okay. Did any of the other officers
16  tell you what they thought was happening?
17  A. I heard somebody say something about
18  meth. I don't remember who said that.
19  Q. Okay. Would it have been Officer Best?
20  A. I don't know who said that.
21  Q. Do you think it was Officer Groby who
22  said it?
23  MR. FLYNN: Objection. Foundation.
24  THE WITNESS: I don't know who said it.
25  BY MR. MILLER:

Page 63

1  Q. Okay. Are there any officers on the
2  scene who you know didn't say it?
3  A. No. I don't know.
4  Q. And at the point in time that
5  Andrew Layton is being hobble strapped, is
6  Commander Frericks there?
7  A. He arrives at some point. I don't know
8  where he was at that time.
9  Q. Okay. And you don't know if he had
10  arrived or not at that time; you weren't aware of
11  where he was at?
12  A. I don't remember, no.
13  Q. And, so, he's hobble strapped, prone on
14  the ground.
15  What happens next?
16  A. We get the hobble straps. I back off.
17  Baker and Huettl, they remain by Andrew's side until
18  Gold Cross can arrive. Gold Cross is summoned.
19  Q. And, so, when Gold Cross arrives, he's
20  still prone on the ground, right?
21  A. He's still on the ground, yes.
22  Q. And do you assist in lifting him onto
23  the cot?
24  A. Yes.
25  Q. And he's essentially lifted from his

Page 64

1  position prone on the ground to a position prone on
2  the cot. Is that right?
3  A. Yes.
4  Q. And then he's placed on that bed and
5  then he's strapped down. Is that right?
6  A. Yes.
7  Q. And he's strapped down on his stomach?
8  A. Yes.
9  Q. And he was face down when he was
10  strapped down?
11  A. Yes.
12  Q. You said you heard one officer say
13  something about meth.
14  Do you know why that officer said
15  something about meth?
16  A. Do I know why they said that?
17  Q. Yes.
18  A. I would imagine that officer suspected
19  meth use.
20  MR. FLYNN: Object. I'm just going to
21  put on the record: Counsel, who's not even involved
22  in asking questions, sits there and makes faces and
23  grimaces at the witness. And I think it's
24  unprofessional and you need to stop it.
25  MR. BEHRENBRINKER: For the record,

Page 65

1  Joe, I think you're either mistaken or you're just
2  trying to be argumentative and bullying. I don't know
3  what your problem is, but I'm not making faces at the
4  witness. I'm listening to what she has to say.
5     MR. FLYNN: I stand by what I said.
6     MR. BEHRENBRINKER: That's fine. Stand
7  by it, but you know what? You're incorrect. You're
8  making a false statement, Joe.
9     MR. FLYNN: I am not.
10    MR. BEHRENBRINKER: Yes, you are.
11    MR. MILLER: Okay. Well, it's not
12 distracting to me, so I'm going to keep moving on.
13    Can you read back what my last question
14 was.
15    (Requested portion of the record was
16    read by the reporter.)
17 BY MR. MILLER:
18    Q.  And what I'm asking is: What would
19 make someone suspect meth use?
20    A.  **I can't speak for another officer's
21 suspicions.**
22    Q.  Okay. Did you suspect meth use?
23    A.  **Could have been.**
24    Q.  Why?
25    A.  **Because many of the things he was**

Page 66

1  **displaying I've seen displayed in people that I know
2  are high on meth.**
3     Q.  Did you suspect alcohol use?
4     A.  **I don't remember.**
5     Q.  Did you suspect any other kind of
6  intoxication?
7     A.  **I don't know.**
8     Q.  When you were there at the scene
9  working on Andrew Layton, you know, hobble strapping
10 him, helping hold him down, did you notice anything
11 about his body temperature?
12    A.  **No, I didn't notice anything.**
13    Q.  Did any other officer say anything
14 about his body temperature?
15    A.  **Somebody said something about him
16 sweating a lot.**
17    Q.  When?
18    A.  **I don't know.**
19    Q.  You say somebody said something about
20 him sweating a lot. Let's talk about that.
21    A.  **Okay.**
22    Q.  Do you remember who that was?
23    A.  **No.**
24    Q.  Would it have been one of the six
25 officers who were there, or five officers and

Page 67

1  Commander Frericks who was there?
2     A.  **You're including myself in that?**
3     Q.  Yes.
4     A.  **I didn't say it.**
5     Q.  You didn't say it. So it's one of the
6  four others?
7     A.  **I don't know. It would have been one
8  of them, yes.**
9     Q.  So this is something said at the scene.
10 Is that right?
11    A.  **Yes.**
12    Q.  Okay. Did you call the ambulance?
13    A.  **I did not, no.**
14    Q.  Do you know who did?
15    A.  **No, I don't.**
16    Q.  When the ambulance arrived, did you
17 have any communication with either of the paramedics
18 on the ambulance?
19    A.  **No.**
20    Q.  Were the paramedics there as you lifted
21 Andrew Layton onto the cot?
22    A.  **I think they were standing by the cot
23 or they assisted in lifting him. They were in the
24 lobby area, yes.**
25    Q.  So you were in proximity to the

Page 68

1  paramedics?
2     A.  **When we lifted him onto the cot, yes.**
3     Q.  Okay. And, so, you saw Andrew Layton
4  being strapped onto the cot and then you saw him being
5  wheeled on that cot and put in the back of the
6  ambulance. Is that right?
7     A.  **Once he was strapped on the cot, I
8  don't really remember anything after that.**
9     Q.  Okay.
10    A.  **I don't remember watching him get
11 wheeled away. I don't recall.**
12    Q.  Okay. Did you observe a paramedic
13 taking his vitals?
14    A.  **I don't remember.**
15    Q.  Blood pressure?
16    A.  **I don't remember any of that, no.**
17    Q.  Okay. And I think we talked about
18 earlier as part of your taser training, you reviewed
19 the taser policy that the Mankato Department of Public
20 Safety has. Is that right?
21    A.  **Yeah. We have -- we recertify once a
22 year.**
23    Q.  Okay. You started, though, in the
24 middle of 2012?
25    A.  **Correct.**

Page 69

1  Q. And, so, you would have been exposed to
2  that policy when you started. Is that right?
3  A. Yes.
4  Q. Okay. And then you were exposed to
5  that policy a year after that?
6  A. I don't know when the recertification
7  training would have been.
8  Q. Okay. So it might not be a year from
9  your start date? It might be periodic. You start,
10 you have the recertification, and then it's every year
11 from there. Is that right?
12 A. No. We don't recertify based on our
13 start date. There's set trainings that every member
14 of the department goes through.
15 Q. Okay.
16 A. So I don't know after I started when
17 that training would have been.
18 Q. That's exactly what I want to ask
19 about. I want to understand how this works.
20    So you said that you would have
21 reviewed the taser policy when you got initially
22 trained in June of 2012?
23 A. Correct.
24 Q. Okay. And you don't know when the
25 recertification training was. Is that right?

Page 70

1  A. No.
2  Q. Okay. If the recertification training
3  was sometime in, let's say, October, would you have
4  skipped that one and then waited for the next one or
5  would you have done the recertification only three
6  months or four months after you had been trained?
7  A. I believe we still would have done the
8  recertification.
9  Q. Okay. And, so, you're familiar with
10 the taser policy, correct?
11 A. Yes.
12 Q. And, so, you never witnessed medical
13 personnel actually provide an examination of
14 Andrew Layton. Is that right?
15 A. If I did witness it, I don't remember
16 it.
17    MR. STOERI: I'm sorry, I couldn't
18 hear.
19    MR. MILLER: Want to read that back.
20    (Requested portion of the record was
21     read by the reporter.)
22 BY MR. MILLER:
23 Q. And, so, as you've sat here and
24 testified here today, you described Andrew Layton as
25 being aggressive, having incoherent speech, grunting,

Page 71

1  making animal-like sounds, exhibiting incredible
2  strength, being impervious to pain, profuse sweating.
3     Does that make you think that he had
4  any kind of medical condition?
5     MR. FLYNN: Objection.
6  Mischaracterizes her testimony.
7     MR. STOERI: Join.
8     MR. MILLER: I absolutely did not
9  mischaracterize any of the testimony, but.
10    MR. FLYNN: I don't believe she said
11 "impervious to pain."
12    MR. MILLER: I read it off the sheet
13 and she said "yes." I remember it.
14    MR. FLYNN: I don't remember that. If
15 I'm mistaken, I stand corrected; but I don't remember
16 that. I remember a different response.
17 BY MR. MILLER:
18 Q. Are you aware of any condition that has
19 these symptoms?
20 A. Those are symptoms related to excited
21 delirium.
22 Q. And is that a medical condition, as you
23 understand it?
24 A. It can be, yes.
25 Q. What do you mean "can be"?

Page 72

1  A. I mean that it can be a medical
2  condition, but it's also, at the time, officers first
3  on scene, an individual that needs to be controlled
4  due to their violent and aggressive behavior.
5  Q. So whether or not it's a medical
6  condition depends on whether or not officers need to
7  control them. Is that what your testimony is?
8     MR. FLYNN: Objection.
9  Mischaracterizing her testimony.
10    THE WITNESS: It could be a medical
11 condition, but it doesn't really change the response
12 of the officers first on scene.
13 BY MR. MILLER:
14 Q. I'm not asking you about the response.
15 I'm asking you whether or not it's a medical condition
16 in your understanding.
17 A. That is my understanding.
18 Q. What do you understand the words
19 "medical condition" to mean?
20 A. Something that may require a medical
21 evaluation, which was provided to Layton by Gold
22 Cross.
23 Q. We just talked about whether or not you
24 actually observed the paramedics providing a medical
25 evaluation and you said you do not remember seeing it.

Officer Audrey Kranz - June 21, 2016
Cheri Marie Hanson vs. Daniel Best, et al.

Page 73

1  A. I don't remember seeing it, no.
2  Q. Okay. So, then, you just testified
3  that it was provided by Gold Cross.
4     How do you know that?
5  A. He was put in an ambulance. He's in
6  their care.
7  Q. And where was he taken in that
8  ambulance?
9  A. The jail.
10 Q. Is there a doctor at the jail?
11 A. Not that I know of.
12 Q. Do they provide medical treatment at
13 the jail?
14    MR. FLYNN: Objection. Foundation.
15    THE WITNESS: I don't know.
16 BY MR. MILLER:
17 Q. You're a Mankato police officer, right?
18 A. Yes.
19 Q. You've been to the jail?
20 A. Yes.
21 Q. Do you know what amenities are
22 available at the jail?
23 A. No.
24 Q. You don't know what's available at the
25 jail?

Page 74

1  A. I don't work for the jail. I work for
2  Mankato.
3  Q. Okay.
4  A. I do not know what amenities are
5  available at the jail.
6  Q. Do you know if there's a medical doctor
7  there?
8  A. I don't know.
9  Q. Okay. Do you believe there was one?
10 A. I don't know.
11    MR. FLYNN: Objection. Foundation.
12    MR. MILLER: I'm asking her what she
13 believes.
14    MR. FLYNN: She disqualified herself.
15 If you know, go ahead.
16    THE WITNESS: I don't know.
17 BY MR. MILLER:
18 Q. I described a set of conditions that
19 you observed in Andrew Layton and you said that you
20 understood that those symptoms could indicate excited
21 delirium. Is that right?
22 A. That's right.
23    MR. STOERI: I'm going to object to
24 that as a misstatement of her testimony. You did not
25 describe what she observed, including, for example,

Page 75

1  sweating. She never said she observed that. So
2  you're misstating the testimony.
3     MR. FLYNN: Join.
4  BY MR. MILLER:
5  Q. You did not directly observe sweating,
6  right? You heard that from somebody else?
7  A. Correct.
8  Q. But at the point in time that
9  Mr. Layton was put into the back of the ambulance, you
10 had gained that knowledge. Is that right?
11 A. I had heard somebody said it, yes.
12 Q. Okay. Had you heard that at the time
13 that he was put onto the cot?
14 A. I think so.
15 Q. Okay. I described a set of conditions
16 that you became aware of at some point, through your
17 own experience or other officers', and you said that
18 those conditions could indicate a condition called
19 excited delirium. Is that right?
20 A. Yes.
21 Q. And you're not a medical doctor?
22 A. No.
23 Q. So you wouldn't have the skills or
24 training to determine whether or not those sets of
25 conditions were this condition called excited delirium

Page 76

1  or something else?
2  A. Correct.
3  Q. Okay. Do you understand excited
4  delirium to be a medical emergency?
5     MR. FLYNN: Objection. Foundation.
6     THE WITNESS: I don't know.
7     MR. STOERI: Objection. Lack of
8  foundation.
9     THE WITNESS: I don't know.
10 BY MR. MILLER:
11 Q. Have you been trained as a Mankato
12 police officer in what to do with people who are
13 exhibiting the signs of excited delirium?
14 A. To summon Gold Cross as soon as
15 practicable.
16 Q. And why would you summon Gold Cross?
17 A. Because they can evaluate him.
18 Q. Okay. And, so, you'd summon Gold Cross
19 to make sure that an evaluation happens. Is that
20 right?
21 A. Can you say that again.
22 Q. So you would summon Gold Cross to be
23 sure that a medical evaluation happens. Is that
24 right?
25 A. Yes.

Min-U-Script® Depo International, Inc.
(763) 591-0535 or (800) 591-9722 | www.depointernational.com
(19) Pages 73 - 76
EX. W

Page 77

1 Q. And, so, wouldn't you agree that
2 excited delirium is a medical condition requiring
3 immediate evaluation?
4     MR. FLYNN: Objection. Foundation.
5     MR. STOERI: Join.
6     THE WITNESS: I don't know.
7 BY MR. MILLER:
8 Q. Wouldn't you agree that your training
9 has indicated that excited delirium is a medical
10 condition requiring immediate evaluation?
11 A. **No, not immediate, but an evaluation as**
12 **soon as they're able.**
13 Q. And do you know why there would be an
14 evaluation as soon as able?
15     MR. FLYNN: Objection. Foundation.
16     MR. STOERI: Join.
17     THE WITNESS: No, I don't know.
18 BY MR. MILLER:
19 Q. In the training that you received from
20 the Mankato Police Department, is part of that
21 training a belief that those conditions could lead to
22 sudden death?
23 A. **I believe so, yes.**
24 Q. And, so, when you're being trained that
25 it could lead to sudden death, wouldn't you agree that

Page 78

1 as soon as practical means with some urgency?
2 A. **Yes.**
3 Q. Okay.
4     MR. FLYNN: Objection. Argumentative.
5     You need to wait and pause before you
6 answer.
7     THE WITNESS: Okay.
8 BY MR. MILLER:
9 Q. We talked a little bit earlier about
10 whether or not you had communicated with Gold Cross,
11 right?
12 A. **Right.**
13 Q. Were you aware of any other officer
14 that communicated with Gold Cross regarding these
15 symptoms that you had knowledge of?
16 A. **No.**
17 Q. You don't know if anyone did?
18 A. **I don't know what they talked with Gold**
19 **Cross about.**
20 Q. Okay. Is it your understanding that
21 when you're the officer that uses the taser, it's your
22 obligation to make sure, from that point on, that the
23 taser policy is followed?
24 A. **I don't really understand that**
25 **question.**

Page 79

1 Q. Okay. Let me try it a different way.
2     The taser policy provides instruction
3 on what you should do before you use it. Is that
4 right?
5 A. **Yes.**
6 Q. Like it provided that you're supposed
7 to give a verbal warning, or if you don't give a
8 verbal warning, you're supposed to document that
9 afterwards, right?
10 A. **I guess so.**
11 Q. Okay. And, then, the taser policy also
12 talked about how you should use your taser. Is that
13 right?
14 A. **Yes.**
15 Q. The duration of how long you would tase
16 someone, things like that are described in the policy.
17 Is that right?
18 A. **I don't believe so.**
19 Q. The policy might describe circumstances
20 when you should use the drive stun versus the dart
21 mode, right?
22 A. **I don't know if it describes**
23 **circumstances, but it talks about both uses, yes.**
24 Q. Okay. And in the policy, one of the
25 sections is called Application of the Taser Device.

Page 80

1     Is that something that you remember
2 reviewing?
3 A. **I don't really remember reviewing it;**
4 **but I know I've gone over the policy, yes.**
5 Q. Okay. And, so, there's some
6 instruction about things that you should do around the
7 time that you're actually deploying it?
8 A. **Yes.**
9 Q. Okay. And then there's some
10 instruction about things that should be done with the
11 person who's been tased after you've used it, right;
12 whether or not you should seek medical treatment for
13 them, things of that nature. Is that right?
14 A. **I believe so but in relation to the**
15 **probes being deployed, is mostly what it's about. And**
16 **they weren't done in this situation.**
17 Q. And there's policies about how you
18 should report the use of it, things like that, right?
19 A. **I don't know if there's policies, no.**
20 **I think guidelines, I guess.**
21 Q. Okay. There's a section in it that
22 says, "Report of Use: All taser device charges shall
23 be documented in their related arrest crime report."
24 A. **In my report?**
25 Q. Yeah.