UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Cherie Marie Hanson, as trustee for the
next of kin of Andrew Derek Layton,

     Plaintiff,

v.

                                 **MEMORANDUM OPINION**
                                       **AND ORDER**
                         Civ. No. 15-4578 (MJD/SER)

Daniel Best, Audrey Burgess,
Craig Frericks, Kyley Groby,
Matthew Huettl and Kenneth
Baker, individually and acting
in their official capacities as City
of Mankato Department of Public Safety
Police Officers; Gold Cross Ambulance,
Michael Jason Burt and Thomas John Drews,

     Defendants.

_____

     James Behrenbrinker and Bryce Miller, Collins, Buckley, Gauntry & Haugh, PLLP, Counsel for Plaintiff.

     Joseph E. Flynn, Pat J. Skoglund and Vicki A. Hruby, Jardine, Logan & O'Brien, P.L.L.P, Counsel for Defendants Best, Burgess, Frericks, Goby, Huettl and Baker.

_____

     This matter is before the Court on Defendant Mankato Police Officers'

motion for summary judgment.

## I.     Factual Background

At 4:40 a.m. on January 1, 2013, Mankato Police Officers Daniel Best and

Kenneth Baker were dispatched to Hy-Vee to check on a male, later identified as

Andrew Layton, who was sleeping in the unheated foyer.  (Hruby Aff., Ex. 1

(Best Dep. at 22-23); Miller Decl. Ex. O (Best Dep. at 28).)  Best arrived at the Hy-

Vee at 4:45 a.m., and observed Layton curled up in a fetal position.  (Miller Decl.

Ex. O (Best Dep. at 32).)  He was wearing a winter coat, a hoodie was pulled up

over his head and he was wearing white sneakers.  (Id.; Hruby Aff., Ex. 1 (Best

Dep. at 33).)  Best assumed Layton was intoxicated and asleep.  (Id. at 34.)

Best went over to Layton and tapped him with his left hand, after which he

started to stir and flex his limbs.  (Id. at 34.)  In his police report, Best wrote that

Layton then leaned into him and attempted to push him into the carts.  (Id., Ex.

31 (Best Report at 2).)  At his deposition, Best testified that Layton shoved him

into the carts.  (Id. Ex. 1 (Best Dep. at 36).)  In response to Layton's reaction, Best

used physical force to put Layton on the ground and on his stomach using a foot

sweep technique.  (Id. at 38.)  Best then got on top of Layton, with his chest to

Layton's back, in order to keep Layton down.  (Id. at 39.)  Layton began to moan,

growl and make other loud noises.  (Id. Ex. 7 (Best Squad Video).)  Best then

2

radioed for immediate assistance, airing "16. Fighting."  (Id. Ex. 1 (Best Dep. at 39).)

Best then repeatedly ordered Layton to put his hands behind his back, but Layton instead continued to growl, thrash around, swing his arms and twist away from Best.  (Id. at 39-40, 57.)  Prior to the arrival of additional officers, and seeing that Best was fatiguing due to Layton's resistance, Eric Klompenhower, the Hy-Vee manager, stepped in and held down Layton's right arm.  (Id. at 51; Ex. 31 (Best Report at 2); Ex. 6 (Klompenhower Dep. at 36).)  Layton continued to resist and began to violently thrash and kick, striking both Best and Klompenhower.  (Id. Ex. 7 (Best Squad Video); Ex. 8 (Banguara Cell Video); Ex. 6 (Klompenhower Dep. at 58, 63, 68-69).)  Best then told cab driver Christopher Ahl to sit on Layton's legs, which he did.  (Id. Ex. 7 (Best Squad Video at 4:46:42); Ex. 1 (Best Dep. at 52-53).)  Other Mankato officers arrived and took over for Klumpenhower and Ahl.  (Id. Ex. 31 (Best Report at 3).)

Officer Baker testified that when he arrived, Layton was prone on the floor lying face down struggling with Best.  (Id. Ex. 2 (Baker Dep. at 46); Ex. 16 (Baker Report ¶ 4).)  Baker grabbed Layton's right upper arm and delivered three to four knee strikes to Layton's right shoulder.  (Id. Ex. 16 (Baker Report ¶ 10).)  He then

knelt on Layton's back while Layton continued to squirm.  (Id. ¶ 12.)

Officer Huettl testified that after he arrived at the Hy-Vee, he immediately grabbed Layton's left arm.  (Id. Ex. 4 (Huettl Dep. at 42).)  Layton was trying to pull his arms under him, and to prevent Layton from using his arms to push himself up, Huettl grabbed his arm and pulled it out from under him.  (Id. at 46.) Baker then punched Layton five or six times in his right arm with a closed fist. (Id. Ex. 16 (Baker Report ¶ 13).)

When Officer Groby, now Lindholm, arrived at the Hy-Vee, Layton was on his stomach and Best was on top of him, and a citizen, Christopher Ahl, was sitting on his legs.  (Id., Ex. 3 (Lindholm Dep. at 28-29); Ex. 18 (Groby Report).) Groby told Ahl to move so she could take over.  (Id. Ex. 18 (Groby Report).) Groby then put pressure on his lower back to assist the other officers in getting Layton's arms from underneath him.  (Id. Ex. 3 (Lindholm Dep. at 36); Ex. 18 (Groby Report).)  Layton continued to resist, so Groby applied weight to the middle of his back and held his head down an applied pressure behind his ear in an effort to get Layton to comply.  (Id. Ex. 3 (Lindholm Dep. at 40); Ex. 18 (Groby Report).)  Layton continued to resist.  (Id.)

When Officer Burgess, now Kranz, arrived, she saw four officers on the

4

floor struggling to handcuff Layton, so she took out her taser and got down with them on the floor.  (Id. Ex. 12 (Kranz Dep. at 27-28, 33).)  She decided to deploy the taser on her own in the drive-stun mode to the back of Layton's thigh. (Id. at 33; Ex. 1 (Best Dep. at 64); Ex. 7 (Best Dash cam at 04:47:43).)  Burgess had to stun him a second time before the officers were able to handcuff Layton's wrists behind his back.  (Id. Ex. 12 (Kranz Dep. 38-39); Ex. 1 (Best Dep. at 68-69); Ex. 32 (Best Report at 3).)  Two sets of cuffs were used to restrain Layton's hands behind his back due to the fact that Layton continued to resist.  (Id., Ex. 12 (Kranz Dep. at 44).)

After he was handcuffed, Layton was further restrained with a RIPP Hobble due to his continued struggles and kicking.  (Id., Ex. 1 (Best Dep. at 70); Ex. 12 (Kranz Dep. 44-45).)  In the process of placing Layton in the Hobble restraint, Best was kicked two to three times in the chest and Burgess' hand was smashed into one of the shopping carts. (Id. Ex. 1 (Best Dep. at 74); Ex. 12 (Kranz Dep. at 37-38, 56).)  After the Hobble restraint was applied, Layton continued to struggle, rolling from side to side, in a prone-like position.  (Id. Ex. 1 (Best Dep. at 90-91); Ex. 12 (Kranz Dep. at 60); Ex. 2 (Baker Dep. at 78-79).)  Best admitted that after the leg restraints were applied, he said to someone that "we're getting the

anger out of him first.  Then we're taking him to jail."  (Id. Ex. 1 (Best Dep. at 82).)

After the Hobble was applied, Best was able to locate Layton's wallet.  (Id. Ex. 2 (Baker Dep. at 94).)  When he heard Layton's name, Baker recognized it from previous contacts he had with Layton involving narcotics.  (Id. at 95.)  Best also had prior contacts with Layton, but did not recognize him that night.  (Id. Ex. 1 (Best Dep. at 84).)

Because Layton continued to resist and spit on the officers, a spit mask was put over his head.  (Id. Ex. 4 (Huettl Dep. at 63-64); Ex. 2 (Baker Dep. at 127); Ex. 3 (Lindholm Dep. at 71).)  At 4:54 a.m., Best is heard on the squad video stating that he believed Layton was "methed out."  (Id. Ex. 1 (Best Dep. at 80).)  Commander Frericks also admitted that he thought Layton was intoxicated on methamphetamine.  (Id. Ex. 13 (Frericks Dep. at 69).)  Frericks requested that Layton be transported to the jail by Gold Cross ambulance because he did not believe officers could safely transport Layton in a squad, which would require the removal of his restraints, which was not viewed as a viable option at that time.  (Id. Ex. 13 (Frericks Dep. at 38, 49, 69); Ex. 1 (Best Dep. at 84, 93-94, 106).)  Frericks further wanted to prevent positional asphyxia.  (Id. Ex. 19 (Frericks Report).)

6

While waiting for the ambulance, both Baker and Huettl remained on either side of Layton to ensure he would not harm himself.  (Id. Ex. 2 (Baker Dep. at 88, 184).)  Layton continued to fight the restraints and yell in an unintelligible manner, although his resistance would stop intermittently.  (Id. at 75, 94.)  In his report, Huettl wrote that "[w]hile waiting for Gold Cross to arrive, Layton displayed a fluxuation [sp] in moods by being calm at time but then immediately would display 'raging behavior' by tensing his muscle, yelling and groaning, pushing his body to the point of exhaustion, rocking his head back and forth, and violently flexing and shaking."  (Id. Ex. 17 (Huettl Report at 1).)  The officers believed that given Layton's continued resistance, it was best to keep him on his stomach, and Baker used his hands to press Layton's shoulders to the ground.  (Id. Ex. 2 (Baker Dep. at 84-86, 184).)  At the same time, Groby held Layton's thighs to the ground, as Layton was trying to rise to a kneeling position.  (Id. Ex. 3 (Lindholm Dep. at 72-73, 75).)

Gold Cross arrived at the scene at 5:05 a.m.  (Id. Ex. 24 (Gold Cross Report).)  Paramedics Michael Burt and Thomas Drews were advised by Baker that Layton was a known meth abuser and an alcoholic.  (Id. Ex. 23 (Drews Dep. at 73, 103).)  Thereafter the paramedics assessed Layton's medical needs and

7

concluded his behavior did not present a medical emergency, that he did not

need emergency treatment and could be transported safely to jail.  (<u>Id.</u> Ex. 24

(Gold Cross Report); Ex. 22 (Burt Dep. at 95-96, 134-36, 138); Ex. 23 (Drews Dep.

at 125-27).)  "He had an adequate rate, he was breathing, a patent airway,

circulation, no gross major bleeds, no life-threatening signs."  (<u>Id.</u> Ex. 22 (Burt

Dep. at 135-36).)  The paramedics also took into consideration information

provided by the officers that Layton's reaction was consistent with his behavior

in prior police contacts.  (<u>Id.</u> at 136.)

Officers Baker, Huettl, Groby and Frericks lifted Layton onto a cot, and his

leg restraints were unhooked from the handcuffs.  (<u>Id.</u> Ex. 2 (Baker Dep. at 81);

Ex. 4 (Huettl Dep. at 83); Ex. 3 (Lindholm Dep. at 91-92); Ex. 13 (Frericks Dep. at

46); Ex. 25.)  The paramedics then tried to position Layton on his side, but Layton

kept rolling to the prone position.  (<u>Id.</u> Ex. 24 (Gold Cross Report at 2); Ex. 23

(Drews Dep. at 163); Ex. 2 (Baker Dep. at 154-55).)  They also placed a pillow

under his shoulder, with his head turned to the left, so he wasn't lying flat on his

stomach in the ambulance.  (<u>Id.</u> Ex. 22 (Burt Dep. at 114-15).)  Baker knelt on

Layton's left shoulder to allow application of a velcro wrist restraint.  (<u>Id.</u> Ex. 2

(Baker Dep. at 117-19).)  After the wrist restraint was applied, Baker got off the

cot and the paramedics positioned cot straps over Layton.  (Id. at 119; Ex. 22 (Burt Dep. at 118-19).)  One witness testified that once on the gurney, she observed Layton become "a little less active" but that he continued to move his body. (Plaintiff Ex. Y (Devens Dep. at 55-56).)

Best and Baker rode in the ambulance with Layton, given that he continued to resist his restraints.  (Hruby Aff. Ex. 1 (Best Dep. at 118-19); Ex. 2 (Baker Dep. at 113) Ex. 24 (Gold Cross Report at 2); Ex. 22 (Burt Dep. at 127); Ex. 28 (Drews BCA Statement at 7).)  During transport, Layton continued to struggle on the cot so Baker guided his shoulder back to the cot so he would not fall off or get wrapped up on the loose cot straps.  (Id. Ex. 2 (Baker Dep. at 122-27).)  At the same time, Burt kept one hand on Layton's wrist to feel his pulse and the other on his back to make sure he was breathing.  (Id. Ex. 24 (Gold Cross Report); Ex. 27 (Burt BCA Statement at 6).)  He kept fighting until shortly before entering the jail Sally Port, when he stopped moving, but he was still breathing and had a pulse.  (Id. Ex. 24 (Gold Cross Report at 2); Ex. 27 (Burt BCA Statement at 6.).) Burt checked his pulse and reported that he had a radial pulse.  (Id. Ex. 24 (Gold Cross Report at 2); Ex. 2 (Baker Dep. at 133, 135-36); Ex. 27 (Burt BCA Statement at 6-7).)

Once at the jail, Layton was rolled into the booking area, where it was discovered that he was in cardiac arrest.  (Id. Ex. 23 (Drews Dep. at 122); Ex. 2 (Baker Dep. at 137).)  Officers removed his handcuffs and CPR was initiated and after two applications of the AED, a cardiac rhythm was restored.  (Id. Ex. 29 (Gold Cross Report at 6); Ex. 32 (Jail Video).)  Layton was then transported to the hospital.  (Id. Ex. 29 (Gold Cross Report at 6).)

Layton did not regain consciousness and died on January 5, 2013.  (Id. Ex. 30 (Autopsy).)  The autopsy report states that Layton suffered from acute pneumonia due to probable excited delirium; atherosclerotic heart disease, multiple abrasions and contusions, focal subgaleal hematoma (bleeding between the skull and scalp), focal acute soft tissue neck hemorrhage, and microvesicular hepatic steatosis (liver disease commonly caused by tetracycline, Reyes syndrome and hepatitis C).  (Id.)  The autopsy further noted that the hospital drug screen was positive for amphetamine and that he had an ethanol level of 0.143 g/dL. (Id.)

The autopsy photos show no marks or bruising on Layton's arm, but his face was bruised and marked with several contusions.  (Plaintiff Ex. B.)  The right side of Layton's forehead sustained a significant pressure abrasion, and the front

area of Layton's right shoulder sustained a significant pressure abrasion.  (Id.)

Layton also suffered significant neck trauma and a fracture to the hyoid bone.

(Plaintiff Ex. A (Baden Report at 5).)  The autopsy report states that "[t]he hyoid

bone and thyroid cartilage are intact." (Hruby Aff. Ex. 30 (Autopsy at 7).)

Plaintiff, Layton's mother, has brought a number of claims against the

defendant officers: Count I asserts a Fourth Amendment claim under 42 U.S.C. §

1983; Count II asserts a Deliberate Indifference to Serious Medical Needs claim

under 42 U.S.C. § 1983; Count III, Punitive Damages under Federal Law; and

Count VII, asserts a Wrongful Death claim in violation of Minn. Stat. § 573.02.

## II.    Standard for Summary Judgment

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  Amini v. City of

Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).  The party opposing summary

judgment may not rest upon mere allegations or denials, but must set forth

specific facts showing that there is a genuine issue for trial.  Krenik v. County of

Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**III.    Defendants Mankato Police Officers' Motion for Summary Judgment**

    **A.    Qualified Immunity**

When bringing a Section 1983 claim a plaintiff must establish (1) a

deprivation of a right secured by the Constitution or laws of the United States

and (2) that the deprivation was committed under color of state law.  Lugar v.

Edmondson Oil Co., 457 U.S. 922, 931 (1982).  A government official that is sued

under Section 1983 in his/her individual capacity may raise the defense of

qualified immunity.  Sisney v. Reisch, 674 F.3d 839, 844 (8th Cir. 2012).

"Qualified immunity protects government officials from liability for civil

damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." Id.

(citations omitted).

To determine whether the defendant officers are entitled to qualified

immunity, the Court must conduct the following inquiry: "(1) whether the facts

that a plaintiff has alleged ... make out a violation of a constitutional right and (2)

whether the constitutional right violated was clearly established at the time of

defendant's alleged misconduct."  Id.

### 1.    Constitutional Violation

In Count I, Plaintiff claims that Layton's right to be free from unreasonable

searches and seizures and the use of excessive force in violation of the Fourth

Amendment was violated when he was restrained in a prone position at a time

when he no longer posed a threat, and as a result, he was unable to breathe and

later died.  The defendant officers move for summary judgment on this claim on

the basis that Layton was not subjected to excessive force, and that under the

totality of the circumstances, the defendant officers are entitled to qualified

immunity.

A claim that law enforcement officers used excessive force is analyzed

under the Fourth Amendment and its reasonableness standard.  Foster v.

Metropolitan Airports Comm'n, 914 F.2d 1076, 1081 (8th Cir. 1990) (quoting

Graham v. Connor, 490 U.S. 386 (1989)).  The actions of law enforcement are to be

judged from the perspective of a reasonable officer at the scene of the arrest, and

whether the totality of the circumstances justified the level of the force used.  Id.

> Circumstances such as the severity of the crime, whether the suspect posed a threat to the safety of the officers or others, and whether the suspect was resisting arrest are all relevant to the reasonableness of the officer's conduct. "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment."

Id. at 1081-82 (citations omitted).

Other factors relevant to assessing the objective reasonableness of force used by officers include the extent of the plaintiff's injury or any effort made by the officer to temper or to limit the amount of force used and the severity of the security problem at issue.  Ryan v. Armstrong, 850 F.3d 419, 427 (8th Cir. 2017) (quoting Kingsley v. Hendrickson, __ U.S. __, 135 S. Ct. 2466, 2473 (2015)).

To ensure the safety of the public and individuals, "police officers are not only permitted, but expected, to exercise what the Supreme Court has termed 'community caretaking functions.'"  Winters v. Adams, 254 F.3d 758, 763 (8th Cir. 2001) (quoting United States v. King, 990 F.2d 1552, 1560 (10th Cir. 1993)); Meehan v. Thompson, 763 F.3d 936, 941 (8th Cir. 2014).  When exercising this function, an officer may seize a person if there is reason to believe the person is impaired, presents a danger to themselves or others.  Meehan, 763 F.3d at 941. "Police officers are often constitutionally obligated to care for [intoxicated]

14

individuals, and because alcohol can have disparate effects on different people, police officers must be given some latitude in evaluating whether an intoxicated individual can properly care for herself." Id. at 944.

Plaintiff asserts she is not challenging the force used on Layton prior to him being handcuffed and hobbled. Rather, Plaintiff challenges whether the defendant officers' conduct after Layton was restrained was objectively reasonable, because once Layton was restrained, the record demonstrates that he was subdued and controlled, and that he no longer posed a threat to defendant officers or anyone else. As such, it was objectively unreasonable for the defendant officers to keep him hobbled and on his stomach, or tied down to the stretcher with force or weight on his back for over thirty minutes, instead of moving him into a recovery position or on his back and transporting him to the hospital. See Morrison v. Bd. of Trustees of Green T.P., 583 F.3d 394, 404-05 (6th Cir. 2009); Henderson v. Munn, 439 F.3d 497, 502-03 (8th Cir. 2006) (when viewing facts in light most favorable to plaintiff, after plaintiff was handcuffed and lying face down, a reasonable jury could decide plaintiff no longer posed a threat based on the record as a whole). Plaintiff further argues that Layton's squirming or attempts to lean to his left or lean to his right while pressed down

15

on his stomach should be viewed as attempts to breathe rather than resisting arrest.

In support of her claim that keeping Layton in a prone position after he was placed in a four point restraint constitutes excessive force, Plaintiff has submitted an expert report from John Ryan.  Ryan was a police officer for twenty years, and thereafter became a consultant regarding law enforcement practices. (Plaintiff Ex. G (Ryan Rpt at 1).)  He has a Bachelor's Degree in the Administration of Justice from Roger Williams University, a Master of Science Degree in the Administration of Justice from Salve Regina University and a Juris Doctor from Suffolk University Law School.  (Id. at 1-2.)  He has served as an adjunct professor in the graduate Administration of Justice program at Salve Regina University and has written several manuals on police practices.  (Id. at 2.) Based on his specialized background, education, experience and training, Ryan has provided an opinion that once Layton was restrained, keeping him in a prone position for a prolonged period of time "was contrary to all generally accepted policies, practices, training and legal mandates."  (Id. at 46.)  Ryan noted that after Layton was handcuffed and hobbled:

Officer Huettl and Officer Baker remained with Layton while awaiting the

16

ambulance.  It is also clear based on testimony and the various recordings that other officers left the immediate area.  Officer Huettl testified that he stood up at points leaving just Baker down by Layton's side.  Clearly any arguable danger with respect to moving Mr. Layton to his side, rather than leaving him on his stomach had passed.

(Id. at 47.)

Ryan further noted that the record shows that Layton was taken to the floor and positioned on his stomach from 4:45 a.m to approximately 5:25 a.m. (Id. at 49.)  He opined that officers are well-trained to recognize the need to move Layton to a position that facilitated breathing and to monitor his well being while in maximum restraint, and failure to do so "was contrary to all generally accepted policies, practices, training and legal mandates."  (Id. at 51.)

The defendant officers argue that the record is undisputed that after Layton was handcuffed and hobbled, he continued to actively fight against his restraints at intervals.  (Hruby Aff., Ex. 3 (Lindholm Dep. at 57 "he would continue to put his legs towards his butt and then try to kick them back the other way (indicating).  He continued to move, again, from side to side, he'd rub his head side to side on the carpet.  He continued to tense his muscles, try to pull away from the handcuffs."); Ex. 2 (Baker Dep. at 125); Ex. 22 (Burt Dep. at 149, one of the paramedics, testifying that when they tried to talk to Layton to obtain a

17

medical history, he would become agitated and fight against the restraints); Ex.

23 (Drews Dep. at 47-48 "When he walked in and first saw him he was laying

down handcuffed and fighting against resist – or restraints. So, that tells me he's

a threat to others."); Ex. 25 (Gorby Squad Video).)

Although there is no video depicting exactly what Layton was doing at

that time, the squad car videos include audio in which Layton can heard

groaning and yelling unintelligibly after the time he was restrained. (Id. Ex. 8

(Best Squad Car Video); Ex. 25 (Gorby Squad Car Video).)

The defendant officers further argue the record supports their position that

Layton posed a threat to himself and was kept on his stomach while still in the

Hy-Vee in order to ensure he did not strike his head on the adjacent wall or the

shopping carts. (Id. Ex. 3 (Lindholm Dep. at 65, testifying that it wasn't safe to

move Layton on his side because of the lack of space in the foyer, and the

placement of the carts, the officers were afraid he would hit his face); Ex. 13

(Frericks Dep. at 33, testifying that it was "too dangerous" to place Layton on his

side); Ex. 2 (Baker Dep. at 84, "I mean, he would, again, try to fight against the

restraints and try to roll. And I was concerned that if he was acting like that and

he was – he would roll maybe onto his – the way he was positioned, onto his

wrists.  I mean, he could cause injury to himself.  So I mean, the best position to keep control over him and make sure that nothing else escalated was to his him in the position he was in").)

The record further shows that the officers continued to monitor Layton while awaiting the paramedics.  The Gorby squad car video shows that three officers remained by Layton during this time.  (Id. Ex. 25 (Gorby Squad Video).) The officers can be heard pleading with Layton to relax or calm down, and in response, Layton continued his verbal outbursts which consisted of unintelligible yelling, moaning or groaning.  (Id.)  When the paramedics arrived, the officers claim they deferred to them regarding whether Layton required immediate medical treatment.  (Id. Ex. 2 (Baker Dep. at 184); Ex. 22 (Burt Dep. at 128-49).)

The Court recognizes that the use of prone restraints is not, in and of itself, a constitutional deprivation.  For example, in Ryan v. Armstrong, the court found the officers' use of prone restraints - including the shackling of the inmate's ankles with his legs crossed and bent back at the knees and applying body weight to his back, coupled with two Taser drive-stuns - to be objectively reasonable, given the inmate exhibited physical and aggressive resistance to the officers' attempts to restrain him.  850 F.3d at 427.

In this case, however, the record demonstrates that once Layton was restrained by handcuffs and the hobble, he only sporadically resisted the restraints yet he was forced to remain on his stomach. Both witness testimony and the squad car videos demonstrate that at times, Layton was quiet and not resisting the restraints. At other times, he would have outbursts and resist his restraints. Viewing the facts in the light most favorable to Plaintiff, and recognizing that the defendant officers do not dispute that when a suspect is restrained, it is best to keep him on his side or in a recovery (sitting up) position, a jury could reasonably find that Layton could be safely moved off his stomach while awaiting the ambulance. Accordingly, the Court finds there is a genuine issue of material fact as to whether the officers used excessive force by keeping Layton in a prone position for an extended period of time after he was placed in restraints.

In addition, a police officer may be liable for an unreasonable seizure under the Fourth Amendment if he/she fails to intervene to prevent the unconstitutional use of excessive force by another officer. Krout v. Goemmer, 583 F.3d 557, 565-66 (8th Cir. 2009). Taking the facts in the light most favorable to Plaintiff, a jury could reasonably find the defendant officers failed to intervene

when they had a duty and opportunity to do so.

### 2.     Clearly Established Constitutional Right

"To determine whether a right is clearly established we ask whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." White v. McKinley, 519 F.3d 806, 813 (8th Cir. 2008) (quoting Clemmons v. Armontrout, 477 F.3d 962, 965 (8th Cir. 2007)). "This inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" Wilson v. Layne, 526 U.S. 603, 614 (1999).  It is not necessary that the Court identify "a case directly on point for a right to be clearly established." White v. Pauly, 137 S. Ct. 548, 552 (2017).  Nonetheless, "existing precedent must have placed the statutory or constitutional question beyond debate.  In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." Id.

With respect to the claim of excessive force, Plaintiff frames the question to the Court as follows: "Is it clearly established that it was objectively unreasonable for defendant officers, working as a team, to keep Layton in maximum four-point restraint on his stomach for 30 minutes and misuse those restraints by applying

downward force or pressure with their hands, knees, or other body parts to

Layton's head area, neck, shoulders, back, hips and upper leg areas, after

Layton's wrists were handcuffed behind his back, his ankles were hobble-tied

together, and he was subdued and under control."  (Plaintiff's Brief at 29.)

The law is clear that to overcome qualified immunity, Plaintiff must show

a robust consensus of cases to demonstrate that the particular conduct at issue

violated clearly established law.  De La Rosa v. White, 852 F.3d 740, 747 (8th Cir.

2017).  As applied here, Plaintiff is required to produce case law which would

have given the defendant officers notice that after they handcuff and hobble a

resisting suspect, failure to move that suspect into a recovery position when it

was possible to do so without subjecting him to further harm violated clearly

established law.

In support of her claim that the defendant offices are not entitled to

qualified immunity, Plaintiff has cited multiple published opinions which

provided the defendant officers fair warning that subjecting Layton to prolonged

prone restraint when he no longer posed a danger constitutes excessive force

under the Fourth Amendment.  See e.g. McCue v. City of Bangor, 838 F.3d 55 (1st

Cir. 2016) (finding that it was clearly established as of September 2012 that

exerting significant, continued force on a person's back while the person is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force); Weigel v. Broad, 544 F.3d 1143, 1154 (10th Cir. 2008) (finding it clearly established law that to a person who is fully restrained and posed no danger, it is excessive force to continue to use pressure on that person' upper torso while he is lying on his stomach); Cruz v. City of Laramie, Wyo., 239 F.3d 1183, 1189 (10th Cir. 2001) (finding that where it is obvious that a person is acting under diminished capacity, use of hog-tie restraint may constitute excessive force); Gutierrez v. City of San Antonio, 139 F.3d 441 (5th Cir. 1998) (same).

Plaintiff has also cited to numerous decisions which hold that a police officer may be liable for a Fourth Amendment violation if the officer fails to intervene to prevent the unconstitutional use of excessive force.  See Krout, 583 F.3d at 565-66; Putman v. Gerloff, 639 F.2d 415 (8th Cir. 1981); see also Torres-Rivera v. O'Neill-Cancel, 406 F.3d 43, 51-52 (1st Cir. 2005); Priester v. City of Riviera Beach, 208 F.3d 919, 924-25 (11th Cir. 2000).

If it is determined that it was not objectively reasonable to leave Layton in a prone position after he was maximally restrained, and that defendant officers could have intervened to prevent such use of excessive force, the Court finds that

23

it is clearly established that such conduct would constitute a violation of Layton's

constitutional rights.  Accordingly, the defendant officers are not entitled to

summary judgment based on qualified immunity.

### C.        Deliberate Indifference

"[A] pretrial detainee has a constitutional right to adequate medical care

while in custody" and such right may be violated if "officials 'intentionally

deny[] or delay[] access to medical care or intentionally interfere[] with the

treatment once prescribed.'"  Dadd v. Anoka County, 827 F.3d 749, 756 (8th Cir.

2016) (quoting Estelle v. Gamble, 429 U.S. 97, 104-05 (1976)).  Such claims are

subject to "the deliberate-indifference standard that governs claims brought by

convicted inmates under the Eighth Amendment."  Jackson v. Buckman, 756 F.3d

1060, 1065 (8th Cir. 2014).

Deliberate indifference to medical needs "requires both an objective and a

subjective analysis."  Id.

> Under the objective prong, [plaintiff] must establish that he suffered from
> an objectively serious medical need.  To be objectively serious, a medical
> need must have been "diagnosed by a physician as requiring treatment" or
> must be "so obvious that even a layperson would easily recognize the
> necessity for a doctor's attention." Under the subjective prong, [plaintiff]
> must show that an official "actually knew of but deliberately disregarded
> his serious medical need."  This showing requires a mental state "akin to

24

criminal recklessness."  Consequently, [plaintiff] must show "more than negligence, more even than gross negligence" to evince deliberate indifference.

Id. (internal citations omitted).

Plaintiff asserts that Layton was clearly suffering from Excited Delirium Syndrome on the day of his death, and that the officers were aware of this condition and understood that arrestees displaying signs or symptoms of this syndrom have a serious medical problem that presents an increased risk of sudden death.  She further asserts it is undisputed that once confronted by Officer Best and others, Layton began to forcefully resist all attempts to restrain him and at times exhibited great strength.  He was also loudly moaning and growling and making other unintelligible sounds.  These are all symptoms of one experiencing Excited Delirium Syndrome.

Further, Plaintiff asserts the autopsy report indicates that Layton's death was related to Excited Delirium Syndrome.  (Hruby Aff., Ex. 301 at 1.)   In addition, Plaintiff's medical expert, Dr. Michael Baden, concluded that had Layton been immediately brought to the hospital, he would not have died. (Plaintiff Ex. A (Baden Report at 6).)

The Court finds there are fact questions as to whether Layton was suffering

from an obvious medical emergency that required immediate medical attention.

While the autopsy report indicates that Layton suffered from acute pneumonia

due to probable excited delirium (Hruby Aff., Ex. 30), Plaintiff's medical expert

has opined that Layton was not experiencing Excited Delirium Syndrome given

the fact that he "was found sleeping quietly on the store floor after drinking

alcohol New Year's evening into early morning; no drugs were present in his

blood other than alcohol; and his temperature was normal at Mankato Hospital."

(Plaintiff Ex. A (Baden Report at 5).)

In addition, Frericks reported that he called for paramedics to transport

Layton, because he did not believe the officers could do so safely.  (Hruby Aff.,

Ex. 19 (Frericks Report).)  He also reported that before the ambulance left the

scene, he asked Best to ask the paramedics if they thought Layton should go to

the hospital.  (Id.)  Frericks testified that Best reported that the paramedics could

not evaluate Layton in the state he was in.  (Id.)  However, both Drews and Burt

deny or do not recall that Best asked whether they thought Layton should go to

the hospital first.  (Id. Ex. 22 (Burt Dep. 157); Ex. 23 (Drews Dep. at 167-68).)

The Court further notes that while it is clear that the decision was made to

transport Layton directly to the jail, it is not clear how that decision was made.

26

The officers argue that the paramedics conducted a medical assessment and determined he was not in need of immediate medical attention.  However, at his deposition, Drews testified that when he and his partner arrived at the scene, they were told their job was to assist the officers in transporting Layton to the jail. (Plaintiff Aff., Ex. T (Drews Dep. at 69-71).)  Drews further stated that one of the officers told him that they had dealt with Layton many times, and that Layton typically acted as he did on the night in question, so Drews assumed the officers knew what they were doing.  (Id. 72.)  One of the officers also told Drews that Layton was either on alcohol or meth.  (Hruby Aff., Ex. 23 (Drews Dep. at 73).) Based on what the officers told him, Drew decided to take him to the jail as requested by the police.  (Id. at 75.)  Burt also testified that they went to the Hy-Vee to assist police in safely transporting "somebody to their facility."  (Id. Ex. 22 (Burt Dep. at 132).)

And despite the paramedics' claims they were only transporting Layton to the jail, there is evidence in the record to support the defendant officers' claims that the paramedics did conduct some type of medical assessment of Layton prior to transport, and that they continued to monitor Layton's medical needs during transport.  (Id. Ex. 24 (Patient Care Report, Run No. 69).)  Accordingly, the

Court finds there are fact questions as to whether Layton was suffering from an obvious medical condition that required immediate medical attention.

The defendant officers argue that they are nonetheless entitled to summary judgment on this claim because they relied upon the paramedics' medical judgment regarding 1) whether Layton required medical treatment and 2) the appropriate positioning of Layton during transport. See Carpenter v. Gage, 686 F.3d 644, 651 (8th Cir. 2012) ("Where the medical professionals either acquiesced in Carpenter's refusal of medical treatment, or, under Carpenter's own version, never even suggested that treatment was warranted, there is insufficient evidence that a need for medical treatment was so obvious that the sheriff's deputies exhibited deliberate indifference by taking Carpenter to jail."); Christian v. Wagner, 623 F.3d 608, 614 (8th Cir. 2010) ("If trained health care officials could not find a serious medical need in these circumstances, then we decline to hold that a reasonable layperson should have done so."). Based on the assessment of the paramedics, the defendant officers argue that Plaintiff cannot establish that Layton's condition was so obvious to a layperson or that the officers disregarded a known risk to his health.

As noted above, however, there are fact questions as to who made the

28

decision to transport Layton to the jail, and whether such decision was
reasonable under the circumstances.  Viewing the facts in the light favorable to
Plaintiff - that Layton was struggling to breathe and showed he was in great
discomfort or distress - the officers are not entitled to summary judgment based
on the claim that they could rely on the paramedics' medical judgment.  See
Gordon ex rel. Gordon v. Frank, 454 F.3d 858, 862 (8th Cir. 2006) (affirming
district court decision to deny officers' motion for summary judgment on
deliberate indifference claim).

### D.    Punitive Damages - Section 1983

To be entitled to punitive damages in an action brought under § 1983, a
plaintiff must demonstrate that the defendant was "motivated by evil motive or
intent, or acted with reckless or callous indifference to the federally protected
rights of others."  Smith v. Wade, 461 U.S. 30, 56 (1983).  The terms reckless and
callous focus on the actor's state of mind and whether the defendant knew he
was acting in violation of federal law.  Quigley v. Winter, 598 F.3d 938, 953 (8th
Cir. 2010).  "Punitive damages are awarded to 'punish the defendant for his [or
her] willful or malicious conduct and to deter others from similar behavior."
Coleman Rahija, 114 F.3d 778, 787 (8th Cir. 1997) (quoting Memphis Cmty Sch.

<u>Dist. v. Stachura</u>, 477 U.S. 299, 306, n. 9 (1986)).  Whether or not punitive damages should be imposed is a matter left to the discretion of the trier of fact.  <u>Wade v. Haynes</u>, 663 F.2d 778, 785 (8th Cir. 1981).

The defendant officers argue they are entitled to summary judgment on Plaintiff's claim for punitive damages, as the record demonstrates that they did not intentionally harm Layton and called Gold Cross to transport Layton safely.

The Court finds that based on the record thus far, a jury could find that the defendant officers acted with reckless or callous indifference to Layton's constitutional rights.  Accordingly, summary judgment on this claim must be denied.

### E.      Wrongful Death - Minn. Stat. § 573.02

In Count VII, Plaintiff alleges that the defendant officers, as well as the paramedics, have committed wrongful acts and omissions for purposes of Minn. Stat. § 573.02, and that such wrongful acts and omissions directly and proximately caused Layton's death.  (Comp. ¶¶ 154-155.)  As a result, Plaintiff alleges she is entitled to an amount that includes, but is not limited to, medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection and support. (<u>Id.</u> ¶ 156.)

30

In response to the defendant officers' motion for summary judgment on this claim, Plaintiff asserts that she has not asserted a stand alone state law claim. Instead, she asserts that Minn. Stat. § 573.02 was referenced in Count VII since there is no federal wrongful death statute, and the reference to state law was to put defendants on notice of the remedies sought through federal claims.

However, Count VII is captioned as "WRONGFUL DEATH - MINN. STAT. § 573.01." (Comp. at p. 36.)  Under Minnesota law, a wrongful death claim is a separate and distinct cause of action.  Minn. Stat. § 573.02; Smith v. City of Minneapolis, 754 F.3d 541, 549 (8th Cir. 2014).  As Plaintiff has conceded she is not asserting a stand alone claim under Minnesota's wrongful death statute, such claim will be dismissed.

IT IS HEREBY ORDERED that Defendant Mankato Police Officers' Motion for Summary Judgment [Doc. No. 66] is GRANTED in part and DENIED in part as follows: the motion is GRANTED as to Count VII and Count VII is dismissed with prejudice; the remainder of the motion is DENIED.

Date:   November 28, 2017

s/ Michael J. Davis
Michael J. Davis
United States District Court

31